## UNITED STATES DISTRICT COURT
## DISTRICT OF DELAWARE

| | |
|---|---|
| DRYWALL ACOUSTIC LATHING AND INSULATION LOCAL 675 PENSION FUND, Individually And On Behalf of All Others Similarly Situated, <br><br> Plaintiff, <br><br> vs. <br><br> MOLSON COORS BREWING COMPANY, PETER H. COORS, W. LEO KIELY III, CHARLES M. HERINGTON, FRANKLIN W. HOBBS, RANDALL OLIPHANT, PAMELA PATSLEY, WAYNE SANDERS, ALBERT C. YATES, TIMOTHY V. WOLF, PETER SWINBURN, DAVID G. BARNES and PETER M.R. KENDALL, <br><br> Defendants. | CIVIL ACTION NO. _____ <br><br> **CLASS ACTION COMPLAINT FOR VIOLATIONS OF FEDERAL SECURITIES LAWS** <br><br> **JURY TRIAL DEMANDED** |

# PART 2 OF 2

In reaching their conclusion and making their recommendation, the members of the Molson independent committee relied on their personal knowledge of Molson and the industry in which it is involved and on the advice of its legal and financial advisors. The Molson independent committee also reviewed the information provided by Molson and its advisors. *The Molson independent committee considered numerous factors to be in favor of the merger, including among other things, the following:*

* * *

- *the current economic, industry and market trends affecting each of Molson and Coors in their respective markets*, including those which favor the concentration of business in the hands of a small number of large companies;

* * *

- *the significant opportunities for the combined company to realize the estimated annual cost savings resulting from the merger* of approximately U.S.$50 million and $90 million, respectively, in the first two years following the merger and U.S.$175 million in annual cost savings thereafter;

- the ability of the shareholders of Molson to continue to participate in future earnings and growth of the combined company after completion of the merger transaction through their ownership of shares of the combined company's stock or exchangeable shares of Molson Coors Exchangeco; [Emphasis added].

54.    **Preliminary Proxy-Prospectus.** On or about September 17, 2004, when

defendants first filed the Preliminary Proxy Statement with the SEC, Coors issued a release

which highlighted the purported benefits of the Merger, Molson's reasons for the Merger, and

again quoted defendants, in part, as follows:

> *The combination is expected to unlock significant value for shareholders*. From the outset, value creation will come from both the ability to focus marketing investments on core brands to grow revenues and the ability to capture an expected US$175 million in annualized synergies, half of which are expected to be realized within the first 18 months following completion of the merger. Secondly, *a stronger overall financial platform will lead to deeper support of core brands and key markets to drive revenue, share and volume growth. Finally, the merger will create the scale and balance sheet strength to allow Molson Coors Brewing Company*

22

*to compete more effectively in the increasingly global and highly dynamic brewing industry long-term.*

Leo Kiely, chief executive officer of Coors, stated, "Today's filing of the preliminary proxy is an important step in the merger process. *We look forward to continuing to demonstrate to our shareholders the compelling nature of this transaction, notably its ability to create shareholder value on a sustained basis. I'm confident in our ability to achieve our goals for the new organization*, and I am excited to work with a strong management team that represents a balanced combination of talent from both organizations."

Daniel J. O'Neill, chief executive officer of Molson, stated, "Through the capture of US$175 million in synergies, all of which will be taken to the bottom line in the first three years, this transaction will result in a 24 percent increase in pro forma profitability above current base-line trends. Given the combined company's significant cash flow and strong balance sheet with relatively low debt levels, we will also have the financial resources to make the investments necessary to ensure the ongoing strength of our brands." [Emphasis added].

55. **Final Prospectus : The Merger Transaction**. The foregoing statements were also reproduced and/or incorporated by reference into the Company's Proxy/Prospectus, which described the final terms of the Merger, in part, as follows:

**The Merger Transaction**

The merger transaction featured the following steps:

- Adolph Coors Company changed its name to "Molson Coors Brewing Company" and amended its certificate of incorporation and bylaws to implement the merger transaction.

- Molson paid a special dividend in the amount of Cdn.$5.44 per share, or a total of approximately Cdn.$652 million (U.S.$519 million, based on exchange rates as of February 7, 2005) in connection with the plan of arrangement to Molson Class A non-voting and Class B common shareholders of record at the close of business on the last trading day immediately prior to the date of closing the merger transaction, excluding Pentland Securities (1981) Inc. and its subsidiaries (referred to collectively in this prospectus as "Pentland"). In the interest of demonstrating its support for the merger transaction, Pentland waived any participation in the special dividend.

- All of Molson's shares (other than shares of dissenting holders) were exchanged, through a series of exchanges, for shares of Molson Coors common stock and/or exchangeable shares of Molson Coors Exchangeco.

- The stockholders of Coors retained their shares, which remained outstanding as shares of Molson Coors.

The combination was carried out in accordance with a combination agreement, dated as of July 21, 2004, as amended, by and among Molson, Coors and Molson Coors Exchangeco, and the documents referred to in that agreement. Upon completion of the merger transaction:

- Each holder of Molson Class A non-voting shares who was a Canadian resident for Canadian income tax purposes received, for each of those shares, either (i) 0.360 of a Class B exchangeable share of Molson Coors Exchangeco (and certain ancillary rights), (ii) through a series of exchanges, 0.360 of a share of Class B common stock of Molson Coors, or (iii) an equivalent combination of Class B exchangeable shares (and certain ancillary rights) and, through a series of exchanges, Class B common stock of Molson Coors.

- Each holder of Molson Class A non-voting shares who was not a Canadian resident received, through a series of exchanges, for each of those shares, 0.360 of a share of Class B common stock of Molson Coors.

- Each holder of Molson Class B common shares who was a Canadian resident for Canadian income tax purposes received, for each of those shares, either (i) 0.126 of a Class A exchangeable share and 0.234 of a Class B exchangeable share of Molson Coors Exchangeco (and certain ancillary rights), (ii) through a series of exchanges, 0.126 of a share of Class A common stock and 0.234 of a share of Class B common stock of Molson Coors, or (iii) an equivalent combination of exchangeable shares (and ancillary rights) and, through a series of exchanges, shares of Molson Coors common stock.

- Each holder of Molson Class B common shares who was not a Canadian resident received, through a series of exchanges, for each share, 0.126 of a share of Class A common stock and 0.234 of a share of Class B common stock of Molson Coors.

56. **Documents Incorporated by Reference**. The Proxy/Prospectus incorporated by reference additional SEC filings as set forth below:

The SEC allows us to "incorporate by reference" the information we file with them, which means that we can disclose important information to you by referring you to those documents. The information incorporated by reference is considered to be part of

this prospectus. If information contained directly in this prospectus is inconsistent with information contained in a document filed with the SEC prior to the date of this prospectus, the information contained directly in this prospectus will apply and will supersede such previously filed information. Information that we later file with the SEC will automatically update and supersede the information contained directly or incorporated by reference in this prospectus. Accordingly, we incorporate by reference the documents listed below and any future filings we make with the SEC under Sections 13(a), 13(c), 14 or 15(d) of the Securities Exchange Act of 1934 prior to the termination of this offering:

| **Coors Filing** | **Periods:** |
|---|---|
| Annual Report on Form 10-K | Year ended December 28, 2003. |
| Quarterly Reports on Form 10-Q | Quarters ended March 28, 2004, June 27, 2004 and September 26, 2004. |
| Current Reports on Form 8-K | Filed February 5, 2004, April 9, 2004, April 22, 2004, May 21, 2004, June 9, 2004, July 20, 2004, July 22, 2004 (two filings), August 3, 2004 (two filings), August 4, 2004, August 10, 2004, October 1, 2004, October 28, 2004, November 5, 2004, November 15, 2004, November 17, 2004, January 7, 2005, January 14, 2005, February 7, 2005 and February 9, 2005. |

We also incorporate by reference (i) the Joint Proxy Statement/Management Information Circular that we filed with the SEC on Schedule 14A on December 10, 2004, including the consolidated balance sheet of Molson Inc. as at March 31, 2004 and March 31, 2003 and the consolidated statements of earnings, retained earnings and cash flows of Molson Inc. for the years then ended and March 31, 2002, the unaudited consolidated balance sheet of Molson Inc. as at September 30, 2004, the unaudited consolidated statements of earnings, retained earnings and cash flows of Molson Inc. for the six months ended September 30, 2004, and (ii) the Supplement to Joint Proxy Statement/Management Information Circular that we filed with the SEC on Schedule 14A on January 19, 2005, including the Unaudited Pro Forma Condensed Combined Balance Sheet of Molson Coors Brewing Company as of September 26, 2004 and

the Unaudited Pro Forma Condensed Combined Income
Statements of Molson Coors.

57.    **Molson Shareholders Approve the Merger**.  Based on defendants materially

false and misleading representations about the nature and effect of the Merger and the financial

condition performance of Coors, in late-January 2005, shareholders of Molson cast their proxies

and voted overwhelmingly in favor of the Merger.  Thereafter, on February 9, 2005, the Merger

was consummated and, immediately thereafter, the combined Company issued a release which

stated, in part, the following:

Molson and Coors Complete Merger to Form Molson Coors Brewing Company

> MONTREAL, Canada and GOLDEN, Colorado, Feb. 9 / - Molson
> Inc. (TSX: MOL.A) and Adolph Coors Company (NYSE: RKY)
> today announced that they have completed the transaction
> announced on July 22, 2004 to combine Molson and Coors in a
> merger of equals. Molson Coors Brewing Company is a new
> global brewing company with the operating scale and balance
> sheet strength to be a major player in the continuing consolidation
> of the brewing industry.
>
> Molson and Coors shareholders approved the combination at their
> special shareholder meetings held on January 28 and February 1,
> 2005, respectively, and the Quebec Superior Court approved the
> transaction as required by Canadian law on February 2, 2005.
>
> *W. Leo Kiely III, chief executive officer of Molson Coors
> Brewing Company said, "By combining Molson and Coors, we
> have created a company with the market and financial strength
> necessary to drive organic growth and compete more effectively
> in today's increasingly challenging global market,* while
> preserving the rich heritages of two of the world's most prominent
> brewing companies. We look forward to drawing on this brewing
> heritage and the combined strengths of a world-class management
> team to deliver greater value to our customers, partners, employees
> and shareholders."
>
> "This transaction marks a new and important chapter in the history
> of both companies," said Eric H. Molson, chairman of Molson
> Coors Brewing Company. "*It leverages successful business
> relationships and builds on the strategic and cultural fit between
> our two companies. With an impressive track record in brewing
> excellence, the new Molson Coors Brewing Company will be a
> dynamic and competitive organization that will create long-term*

*value for our shareholders and the communities in which we operate."*

\* \* \*

**Synergies and Cost Savings**

***The company has established an Office of Synergies and Integration to facilitate the development and implementation of plans to achieve the expected benefits of the transaction. Through this Office, chaired by Daniel J. O'Neill, the company expects to achieve annualized synergies of approximately US$175 million over three years.*** The principal sources of these synergies include the optimization of brewery networks, increased procurement efficiencies, streamlined organizational design and consolidated administrative functions. [Emphasis added.]

58.     **Molson Results for 3Q:F04.** The same day, February 9, 2005, defendants issued a release that announced financial and operational results for Molson in its last quarter as a non-combined company. These results, announcing "virtually flat" net sales revenues, came as no surprise to investors. Accordingly, that day, while shares of the Company traded down slightly on the first day of trading, to $73.50 from about $75.75, this 3% price decline was expected. The Company's CFO, defendant Wolf, was quoted by the *Associated Press* as stating that Molson's results were "overall, as anticipated."

59.     **Coors Results for 4Q and FY:2004.** On February 9, 2005, defendants also issued a release that purported to announce financial and operational results for Coors 4Q and fiscal year 2004 as a non-combined company. Coors's release, which purported to announce higher consolidated net sales, net income and earnings per share for 4Q and FY:2004 stated, in part, the following:

**Molson Coors Reports Adolph Coors Company 2004 Fourth Quarter and Full-Year Results**

GOLDEN, Colo., Feb. 9 -- Molson Coors Brewing Company (NYSE, TSX: TAP) today announced the most recent financial results for Adolph Coors Company, ***reporting higher consolidated***

27

*net sales, net income and earnings per share for the fourth quarter and full-year 2004.*

For the 13-week fourth quarter ended Dec. 26, 2004, the company reported net sales of $1.1 billion, *up 10.2 percent from the fourth quarter of 2003. Fourth quarter 2004 sales volume increased 4.7 percent from the fourth quarter 2003. Fourth quarter operating income of $90.9 million and net income of $55.7 million increased 37.5 percent and 54.4 percent, respectively, from a year ago. Fourth quarter earnings per share were $1.45, up 48.0 percent from a year earlier.* Earnings for fourth quarter 2004 benefited from solid beer pricing and volume growth in the company's Americas and Europe segments, along with one-time gains on asset sales totaling $19.2 million pretax, a lower effective tax rate, and favorable foreign currency exchange rates. These results do not include Molson Inc. financial results for the quarter ended December 2004, which were released separately.

*For the 52-week fiscal year ended Dec. 26, 2004, Adolph Coors Company achieved consolidated net sales of $4.3 billion, a 7.6 percent increase from 2003.* Reported sales volume totaled 32,703,000 U.S. barrels, or 38,376,000 hectoliters, in 2004, a 0.1 percent decrease from 2003. *Net income for the full year was $196.7 million, a 12.6 percent increase compared to full year 2003, and earnings per share were $5.19, up 8.8 percent from the prior year.*

Leo Kiely, chief executive officer, said, *"Overall, Adolph Coors Company finished 2004 with good financial results in a very competitive industry environment.* In the U.S., despite very soft industry demand, our sales to retail increased in the fourth quarter, partially driven by the comparison to lower sales in the fourth quarter of 2003, when we faced U.S. supply-chain challenges. Our volume trends also benefited from the introduction of Aspen Edge earlier this year and strong growth from our Blue Moon and Zima XXX brands in the fourth quarter. In addition*, continued progress on productivity initiatives in our U.S. operations enabled us to manage cost pressures*, which were particularly challenging in the areas of energy and packaging materials. *In Canada, our Coors Light business continued to deliver strong profit growth.*

* * *

"Looking ahead, we will be simultaneously focused on improving the fundamentals of our U.S. and U.K. businesses and on working with our new colleagues from Molson to maximize the value opportunities presented by the Molson Coors merger, which closed earlier today." [Emphasis added.]

60.     Defendants' representations, particularized above, were materially false and misleading when made because they failed to disclose the following facts:

a.     When the Merger closed on or about February 9, 2005 - - almost a third of the way into the first fiscal quarter of 2005 - - it was not true that Coors was operating according to plan, nor was it true that no material adverse change in Coors's business had occurred;

b.     Defendants violated the terms of the Merger Agreement and the Proxy\Prospectus by failing to disclose that, by that time, Coors's business was being, and would continue to be, adversely impacted by conditions which were then already causing Coors to perform well below plan, and well below consensus estimates;

c.     At the time of the Merger, it was foreseeable that O'Neill would not participate in any meaningful way in the integration of the two companies, and would not fulfill the duties and responsibilities of the Office of Synergies and Integration; and

d.     At the time of the Merger, defendants were motivated to conceal the adverse conditions which were then impacting Coors and did conceal these adverse conditions because it allowed defendants to arrange the Merger transaction such that the relatives and heirs of the Coors and Molson families could dominate the combined Company - - by collectively being able to nominate at least 10 members of the 15 member Board.

## THE TRUTH BEGINS TO BE REVEALED

61.     It was only weeks after the close of the Merger that investors learned that Coors was operating well below plan. On April 28, 2005, before the open of trading, defendants published a release announcing disappointing results for the Company's first quarter of 2005. In the release, defendants revealed, in part, the following:

Molson Coors Reports 2005 First Quarter Results

29

DENVER, April 28 /PRNewswire-FirstCall/ -- Molson Coors Brewing Company (NYSE: TAP; Toronto) today announced higher consolidated net sales and sales volume for the first quarter of 2005 compared to the first quarter of 2004, but *reported a net loss in the 2005 first quarter. The net loss was primarily attributable to lower sales volume in key markets versus a year earlier and special charges related to the recent Molson Coors merger totaling $40.7 million in the first quarter of 2005.*

The company's 2005 first quarter results include the business of Molson Inc. following the completion of the merger on Feb. 9, 2005, compared to the first quarter of 2004, which includes only the results of the former Adolph Coors Company. The company's reported consolidated sales volume and net sales increased in the 2005 first quarter compared to the first quarter 2004 due to the combination of the Molson and Coors businesses.

For the 13-week first quarter ended March 27, 2005, the merged company reported net sales of $1.1 billion and sales volume of 8,094,000 barrels, or 9,497,985 hectoliters (HLs). The company reported a net loss of $46.5 million, or $0.74 per share, during the 2005 first quarter. *Excluding special items, the company reported an after-tax loss of $5.1 million during the 2005 first quarter.* (See the company's website, www.molsoncoors.com for reconciliation to the nearest U.S. GAAP measure.)

\* \* \*

On a pro forma basis, the company reported a consolidated net loss of $79 million, or $0.91 per share, based on 86.2 million pro forma diluted shares outstanding during the 2005 first quarter.

Leo Kiely, Molson Coors president and chief executive officer, said*, "The common underlying cause for difficult first quarter results was the lack of volume growth in each of our major markets.* While disappointing, this performance reinforces the importance of integrating the operations and organization of the combined company, so we can capitalize on our new strengths and build an even more competitive and profitable global enterprise. [Emphasis added.]

62.     Immediately following publication of this release, shares of the Company fell

precipitously, almost $14.50 per share, to $63.00 per share, a decline of almost 20% - - a

testament to investors surprise and disappointment in the results.  The *Denver Post*, reported, in

part, the following:

Molson Coors shares fell $14.30 to $63. The 19 percent decline was the fifth-largest loss Thursday among companies listed on the New York Stock Exchange.

*The quarterly loss of 74 cents a share was unexpected by Wall Street analysts, who in consensus forecasts had predicted a 36-cent-a-share profit.*

*"These results are well below our performance goals and the potential we see for the company,"* chief executive Leo Kiely said in a conference call. "We obviously had a very tough first quarter in each of our markets."

*Beer sales fell 2 percent in Canada and the United States and 17 percent in the United Kingdom, Molson Coors said.* [Emphasis added.]

63.    Following publication of these shockingly disappointing results, defendants

hosted a conference call, a transcript of which was available publicly from various sources, for

analysts and investors during which defendants also revealed, in part, the following:

- *Pro forma volume of only 10.7 billion barrels represented a 5.6% decline yr/yr due to lower volumes in all of the Company's major markets*;

- *Net sales were also down 6% pro-forma yr/yr to $1.2 billion*;

- *Pro-forma net loss was $79.0 million* versus a pro-forma net gain of $36 million reported in 1Q:04 - - *excluding charges, pro-forma net loss was $4.0 million or $0.04 per share*

- *Excluding Molson brands, pro forma US volume year over year declined 3.6% due to soft sales to retail* and because distributors ended the first quarter last year with inventories about 100,000 barrels higher than normal due to rollout of Aspen Edge and re-launch of Zima;

- *"These results are well below our performance goals and the potential we see for our Company."* (Defendant Kiely). [Emphasis added].

64.    **O'Neill Resigns, Pockets $4.8MM Severance Payment.** The same day, April

28, 2005, O'Neill announced that he would abandon the Chair of Office of Synergies and

Integration, leave the Company and take with him millions of dollars in severance related

payments - - which payments were not change of control payments and which payments he could

not have obtained had he not waited for the Merger to close.  According to the *Rocky Mountain*

*News* (Denver, CO), O'Neill would receive, in part, the following:

> **HEADLINE: BREWERY EXEC'S EXIT LUCRATIVE; MOLSON COORS VICE CHAIRMAN GETS $4.8 MILLION SEVERANCE**
>
> Molson Coors Vice Chairman Dan O'Neill will resign *with a multimillion-dollar severance package,* joining the ranks of departing executives who exit the brewer with buckets of cash.
>
> *O'Neill will get about $66,709 per month for the next three years - a total of $2.4 million - plus a special bonus of $2.4 million for delivering the "synergies and integration plan" to the Molson Coors board at next month's meeting.*
>
> *In addition, all the restrictions on his stock options lapse.* Most of his options, given to him when he was CEO of Molson, required the stock to gain significantly before the options could be used. The company now has waived those rules.
>
> *O'Neill cashed out the remainder of a 1999 Molson options grant earlier this year, giving him roughly $33 million in pretax profits.*
>
> He is not the only executive to have benefited from the merger. *Previously, 12 former Adolph Coors Co. executives used change-of-control provisions in their employment contracts to resign and collect two years' worth of salary and bonus. The payments cost Molson Coors $29 million this quarter,* the company said Thursday.
>
> *       *       *
>
> The specifics of *the announcement came as a surprise to some, however. Coors and Molson heavily sold their merger on $175 million in annual synergies and told investors that O'Neill would be in charge of the cost-cutting plan.*
>
> But the company had to back off a special $3 million payment O'Neill was to get after the merger closed. Instead, the companies said O'Neill would get the payment only if he left the company.
>
> *The new $4.8 million deal, disclosed Thursday, is even more lucrative than the one that irked shareholders last summer.*
>
> *"It's ludicrous,"* said Michael Palmer of Toronto's Veritas Research, a longtime harsh critic of Molson. "The company lost 5 market-share points (in Canada). . . . I always like to think in a capitalist system, people are rewarded for success, not for (messing up)."[Emphasis added.]

32

65. At all relevant times, the material misrepresentations and omissions particularized in this Complaint directly or proximately caused or were a substantial contributing cause of the damages sustained by plaintiff and other members of the Class. As described herein, defendants made or caused to be made a series of materially false or misleading statements, and omitted to disclose material adverse facts about the Coors and/or the Company, its business, prospects and operations. These material misstatements and omissions had the cause and effect of creating in the market an unrealistically positive assessment of Coors and/or the Company and its business, prospects and operations, thus causing the Company's securities to be overvalued and artificially inflated at all relevant times. Defendants' materially false and misleading statements and omissions contained in the Merger Agreement and joint Merger Proxy/Prospectus resulted in plaintiff and other members of the Class exchanging their shares for shares of the Company at artificially inflated prices, thus causing the damages complained of herein.

**Applicability Of Presumption Of Reliance:
Fraud-On-The-Market Doctrine**

66. At all relevant times, the markets for Coors, and the Company's securities were efficient markets for the following reasons, among others:

a. The stock of Coors and the Company shares met the requirements for listing on major national and international securities markets, and were listed and actively traded in the United States, on the New York Stock Exchange, and in Canada, on the Toronto Stock Exchange, both of which were highly efficient and automated markets;

b. As a regulated issuer, Coors and the Company filed periodic public reports with the SEC and each of the individual exchanges upon which their shares traded;

c. Defendants and the respective companies regularly communicated with public investors *via* established market communication mechanisms, including through regular

disseminations of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and

        d.     Coors and the Company were followed by securities analysts employed by major brokerage firms who wrote reports which were distributed to the sales force and certain customers of their respective brokerage firms. Each of these reports was publicly available and entered the public marketplace.

     67.    As a result of the foregoing, the market for Coors and the combined Company's securities promptly digested current information regarding the respective companies from all publicly available sources and reflected such information in Coors and the combined Company's share price. Under these circumstances, all former shareholders of Molson who surrendered their Molson shares in the February 2005 Merger, and all open market purchasers of Coors and the Company's securities during the Class Period, suffered similar injuries and a presumption of reliance applies.

## NO SAFE HARBOR

     68.    The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this complaint. Many of the specific statements pleaded herein were not identified as "forward-looking statements" when made. To the extent there were any forward-looking statements, there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements. Alternatively, to the extent that the statutory safe harbor does apply to any forward-looking statements pleaded herein, defendants are liable for those false forward-looking statements because at the time each

of those forward-looking statements was made, the particular speaker knew that the particular forward-looking statement was false, and/or the forward-looking statement was authorized and/or approved by an executive officer of the Company, who knew that those statements were false when made.

## COUNT I.

**(Against All Defendants)**
**For Violation of Section 14(a)**
**of the Exchange Act and SEC Rule 14a-9**

69.    Plaintiff incorporates by reference each and every allegation contained above, as if set forth herein only to the extent, however, that such allegations do ***not*** allege fraud, scienter or the intent of the defendants to defraud plaintiff or members of the Class.  This count is predicated upon defendants strict liability for making false and materially misleading statements in the Registration Statement and/or Proxy-Prospectus.  This Count is asserted by plaintiff against all defendants by and on behalf of persons who acquired shares of the Company pursuant to the false Registration Statement and Proxy Statement issued in connection with the February 2005 Merger.

70.    As a result of the foregoing, the defendants named herein violated  §14(a) of the Exchange Act and obtained the approval of the Merger by the Molson shareholders by way of a false and misleading Prospectus.

71.    These defendants prepared, disseminated and/or approved the false Joint Proxy/ Prospectus specified above, which contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

72.    Defendants have violated §14(a) of the Exchange Act and SEC Rule 14a-9 in that they issued the Prospectus to solicit and obtain the votes of Molson shareholders, to approve the Merger of Molson by and into the Company by making statements which defendants should have known were untrue and/or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

73.    As a consequence of the foregoing course of conduct, and the resulting decline in the price of the Company's stock, plaintiff and the members of the Class have been damaged.

## COUNT II.

### (Violations Of § 10(b) Of The Exchange Act And Rule 10b-5 Promulgated Thereunder Against All Defendants)

74.    Plaintiff incorporates by reference and realleges all preceding paragraphs as though fully set forth herein, except the allegations in Count I.

75.    During the Class Period, Defendants engaged in a plan, scheme and course of business which operated as a fraud upon Plaintiffs and other Class Members, and made various untrue statements of material fact and omitted to state material facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading to Plaintiffs and other Class Members as set forth above. The purpose and effect of this scheme was to induce Plaintiffs and the other members of the Class to purchase the Company's securities during the Class Period at artificially inflated prices.

76.    By reason of the foregoing, Defendants knowingly or recklessly violated § 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder in that they themselves or a person whom they controlled: (a) employed devices, schemes and artifices to defraud; (b) made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or

(c) engaged in acts, practices and a course of business that operated as a fraud or deceit upon Plaintiffs and other members of the Class in connection with their purchases of the Company's common stock during the Class Period.

77.     As a result of the foregoing, the market price of the Company's securities was artificially inflated during the Class Period. In ignorance of the false and misleading nature of the representations described above, Plaintiffs and other members of the Class relied, to their detriment, directly on the misstatements or the integrity of the market both as to price and as to whether to purchase these securities. Plaintiffs and the other members of the Class would not have purchased Coors and/or Molson Coors securities at the prices they paid, or at all, if they had been aware that the market prices had been artificially and falsely inflated by Defendants' false and misleading statements and omissions. At the time of the purchase of Coors and/or Molson Coors securities by Plaintiffs and the other members of the Class, the fair market value of said securities was substantially less than the prices paid. Plaintiffs and the other members of the Class have suffered substantial damages as a result.

78.     Each misrepresentation and/or omission of material fact alleged herein was made with reckless disregard for, or knowledge of its false and misleading nature.  At all relevant times, each defendant knew the material facts. Thus, the misrepresentations and omissions complained of herein were made with the Defendants' knowledge of their falsity, or, at the very least, with recklessness with respect to their truth or falsity.

79.     The Individual Defendants had the opportunity to commit and participate in the fraud described herein. The Individual Defendants were high ranking officers and/or directors of Coors and/or the Company and thus controlled the Company's press releases, corporate reports, SEC filings and communications with analysts.

80.    Defendants had the motive to commit and participate in the fraud.

81.    As set forth above, Defendants were on notice at all times during the Class Period about the true state of Coors's business. Thus, defendants knew or recklessly disregarded the negative facts alleged herein at all relevant times. Nevertheless, defendants acted to suppress and conceal the truth about from investors, and actively misrepresented the benefits of the merger.

### COUNT III.
**(Violations of § 20(a) Of The Exchange Act**
**Against The Individual Defendants)**

82.    Plaintiff incorporates by reference and realleges all preceding paragraphs as though fully set forth herein, except the allegations in Count I.

83.    The Individual Defendants acted as controlling persons of Coors and/or Molson Coors within the meaning of Section 20(a) of the Exchange Act as alleged herein.  By virtue of their high-level positions, and their ownership and contractual rights, participation in and/or awareness of the Company's operations and/or intimate knowledge of the false financial statements filed by the Company with the SEC and disseminated to the investing public, the Individual Defendants had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements which Plaintiffs contend are false and misleading.  The Individual Defendants were provided with or had unlimited access to copies of the Company's reports, press releases, public filings and other statements alleged by Plaintiffs to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

84.    In particular, each of these Defendants had direct and supervisory involvement in the day-to-day operations of the Company and, therefore, is presumed to have had the power to

38

control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.

85.    As set forth above, Coors and/or Molson Coors and the Individual Defendants each violated Section 10(b) and Rule 10b-5 by their acts and omissions as alleged in this Complaint. By virtue of their positions as controlling persons, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act. As a direct and proximate result of Defendants' wrongful conduct, Plaintiffs and other members of the Class suffered damages in connection with their purchases of the Company's common stock during the Class Period.

**WHEREFORE**, plaintiff prays for relief and judgment, as follows:

a.    Determining that this action is a proper class action, designating plaintiff as Lead Plaintiff and certifying plaintiff as a class representative under Rule 23 of the Federal Rules of Civil Procedure and plaintiff's counsel as Lead Counsel;

b.    Awarding compensatory damages in favor of plaintiff and the other Class members against all defendants, jointly and severally, for all damages sustained as a result of defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

c.    Awarding plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees;

d.    Awarding extraordinary, equitable and/or injunctive relief as permitted by law, equity and the federal statutory provisions sued hereunder, pursuant to Rules 64 and 65 and any appropriate state law remedies to assure that the Class has an effective remedy; and

e.    Such other and further relief as the Court may deem just and proper.

## JURY TRIAL DEMANDED

Plaintiff hereby demands a trial by jury.

Respectfully submitted,

**MILBERG WEISS BERSHAD
& SCHULMAN LLP**

By: _____

Seth D. Rigrodsky (DSBA No. 3147)
Ralph N. Sianni (DSBA No. 4151)
Brian D. Long (DSBA No. 4347)
919 North Market Street, Suite 411
Wilmington, DE 19801
(302) 984-0597
(302) 984-0870 (fax)

- and –

Steven G. Schulman
Peter E. Seidman
Andrei V. Rado
One Pennsylvania Plaza
New York, NY 10119-0165
(212) 594-5300
(212) 868-1229

**MURRAY, FRANK & SAILER LLP**

Eric J. Belfi
275 Madison Avenue, 8th Floor
New York, NY 10016
Telephone: (212) 682-1818
Facsimile: (212) 682-1892

***Attorneys for Plaintiff***

**LAW OFFICES OF MICHAEL A. SWICK**
One William Street, Suite 900
New York, NY  10004
Telephone:  (212) 584-0770
Facsimile:  (212) 584-0799

*Of Counsel*

## CERTIFICATION

I, Ingrid Ochodek, Plan Administrator for Drywall Acoustic Lathing and Insulation Local 675 Pension Fund ("DALI"):

1. I have reviewed the complaint and authorized its filing.

2. DALI purchased or otherwise acquired securities of Molson Coors Brewing Company, which are the subject of the complaint, *but not* at the direction of its counsel or in order to participate in any private action arising under the Securities Act of 1933 or Securities Exchange Act of 1934, as amended by the Private Securities Litigation Reform Act of 1995.

3. DALI is willing to serve as a representative party on behalf of a class, including providing testimony at deposition and trial, if necessary.

4. In the three years prior to this certification, DALI has applied to serve or served as a representative party on behalf of a class in an action brought under the federal securities laws in the following actions: *DALI v. Molex* (N.D. Ill. 2005).

5. During the Class Period, DALI engaged in the following transactions:

### TRANSACTION INFORMATION

| BUY OR SELL | TRADE DATE | NO. OF SHARES | PRICE PER SHARE |
|---|---|---|---|
| | | See attached. | |

6. DALI will not accept any payment for serving as a representative party on behalf of the Class beyond its *pro rata* share of any recovery, except such reasonable costs and expenses (including lost wages) directly relating to the representation of the Class and its activities in the lawsuit, as ordered or approved by the Court.

7. Nothing herein shall be construed to be or constitute a waiver of its attorney-client privilege.

8. I certify under penalty of perjury that the foregoing is true and correct.

Executed on 05/13/2005.          Signature _____

Ingrid Ochodek
Plan Administrator for DALI

**Schedule A**
## DRYWALL ACOUSTIC LATHING AND INSULATION LOCAL 675 PENSION FUND
### Molson Coors Brewing Company (NYSE and TSX: TAP)

**Exchange:**

On 2/9/05, 125,700 Molson shares were exchanged for 45,252 Molson Coors shares in connection with the merger of Molson and Coors.