# Exhibit A

LEXSEE 2004 U.S. DIST. LEXIS 10200

IN RE AMERICAN BUSINESS FINANCIAL SERVICES, INC. SECURITIES
LITIGATION

CIVIL ACTION NO. 04-0265

UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF
PENNSYLVANIA

*2004 U.S. Dist. LEXIS 10200*

**June 3, 2004, Decided**
**June 3, 2004, Filed; June 3, 2004, Entered**

**SUBSEQUENT HISTORY:** Complaint dismissed at, in part *In re Am. Bus. Fin. Servs., 2005 U.S. Dist. LEXIS 10853 (E.D. Pa., June 2, 2005)*

**DISPOSITION:** Engler Group's motion for appointment as lead plaintiff and for approval of lead plaintiff's selection of lead counsel granted. Engler Group's selection of Schiffrin & Barroway, LLP and Geller Rudman PLLC as lead counsel approved. Motion of plaintiffs Operative Plasterers' and Cement Masons' International Employees' Trust Fund and Operative Plasterers' and Cement Masons' Local Union Officers' and Employees' Pension Fund for appointment as lead plaintiff and for approval of lead plaintiff's selection of lead counsel denied.

**LexisNexis(R) Headnotes**

**COUNSEL:** [*1] For RICHARD WEISINGER, INDIVIDUALLY AND ON BEHALF OF ALL OTHERS SIMILARLY SITUATED, Plaintiff: RICHARD A. MANISKAS, SCHIFFRIN & BARROWAY, LLP, BALA CYNWYD, PA.

For AMERICAN BUSINESS FINANCIAL SERVICES, INC., ANTHONY J. SANTILLI, RICHARD KAUFMAN, ALBERT W. MANDIA, Defendants: JILL BAISINGER, KAREN PIESLAK POHLMANN, MARC J. SONNENFELD, MORGAN, LEWIS & BOCKIUS LLP, PHILADELPHIA, PA.

For EDWARD ENGLER, JANDRE LA FATE, AMERICA BUSINESS FINANCIAL SERVICES, INC.

INVESTORS, Movants: DARREN J. CHECK, SCHIFFRIN & BARROWAY, LLP, BALA CYNWYD, PA.

For THE OPERATIVE PLASTERERS' AND CEMENT MASONS' INTERNATIONAL EMPLOYEES' TRUST FUND, THE OPERATIVE PLASTERERS' AND THE CEMENT MASONS' LOCAL UNION OFFICERS' AND EMPLOYEES PENSION FUND, Movants: MARC S. HENZEL, LAW OFFICES OF MARC S. HENZEL, BALA CYNWYD, PA. RAMZI ABADOU, THOMAS E. GLYNN, WILLIAM S. LERACH, LERACH COUGHLIN STOIA & ROBBINS LLP, SAN DIEGO, CA.

**JUDGES:** THOMAS N. O'NEILL, JR., J.

**OPINIONBY:** THOMAS N. O'NEILL, JR.

**OPINION:**

 **MEMORANDUM**

 O'Neill, J.

 June 3, 2004

 These consolidated actions brought against defendants American Business Financial Services, Inc. (ABFS), Anthony J. Santilli, Richard Kaufman and Albert W. Mandia have been filed on [*2] behalf of all persons who purchased or otherwise acquired ABFS' publicly traded securities during the Class Period.

Case 1:05-cv-00294-GMS   Document 33-2   Filed 08/02/2005   Page 3 of 26

Page 2
2004 U.S. Dist. LEXIS 10200, *

Plaintiffs allege that defendants made false and misleading statements concerning ABFS' earnings and seek to recover damages for violation of *Sections 10(b) and 20(a) of the Securities Exchange Act of 1934* (Exchange Act) and *Rule 10b-5* promulgated thereunder.

Now before me are two competing motions for appointment of lead plaintiffs and approval of their selection of lead counsel pursuant to *Section 21D(a)(3)(B) of the Exchange Act*, as amended by the *Private Securities Litigation Reform Act of 1995* (the PSLRA). The Engler Group, comprised of individual investors Edward Engler and Jandre LaFate, alleges it suffered approximately $ 69,660 in financial losses during the class period and proposes the appointment of Schiffrin & Barroway, LLP and Geller Rudman PLLC as lead counsel for the class. The Pension Funds, comprised of the Operative Plasterers' and Cement Masons' International Employees' Trust Fund and the Operative Plasterers' and Cement Masons' Local Union Officers' and Employees' Pension fund, allege they suffered losses of approximately $ 28,000 during the class [*3] period based on their purchase of approximately 5,000 shares of ABFS stock at a cost of over $ 61,000. The Pension Funds propose the appointment of Darren J. Robbins and Laura M. Andracchio of Lerach Coughlin Stoia & Robbins LLP as lead counsel and the Law Offices of Marc S. Henzel as liason counsel to the class. For the reasons stated below, I will grant the motion of the Engler Group for appointment as lead plaintiff and approval of their selection of Schiffrin & Barroway, LLP and Geller Rudman PLLC as lead counsel.

Under the PSLRA, courts "shall appoint as lead plaintiff the member or members of the purported plaintiff class that the court determines to be most capable of adequately representing the interests of class members." *15 U.S.C. § 78u-4(a)(3)(B)(i)*. "The purpose behind the PSLRA is to 'empower investors so that they, not their lawyers, control private securities litigation' by allowing the Court to ensure the transfer of 'primary control of private securities litigation from lawyers to investors.'" *In re: Party City Securities Litigation, 189 F.R.D. 91, 103 (D.N.J. 1999)*, quoting *Chill v. Green Tree Fin. Corp., 181 F.R.D. 398, 407 (D. Minn. 1998)* [*4] (further citations omitted).

The court shall adopt a presumption that the most adequate plaintiff in any private action arising under this chapter is the person or group of persons that . . . in the determination of the court, has the largest financial interest in the relief sought by the class and . . . otherwise satisfies the requirements of *Rule 23 of the Federal Rules of Civil Procedure*."

*15 U.S.C. § 78u-4(a)(3)(B)(iii)(I)*. The Engler Group is the presumptive lead plaintiff in this case. It has filed a motion to be appointed lead plaintiff, has the largest financial interest of all those bringing actions, and has made a prima facie showing that it can satisfy the typicality and adequacy requirements of *Rule 23*. *In re Cendant Corp. Litig., 264 F.3d 201, 263 (3d Cir. 2001)*, cert denied *535 U.S. 929, 152 L. Ed. 2d 212, 122 S. Ct. 1300 (2002)* ("The initial inquiry . . . should be confined to determining whether the movant has made a *prima facie* showing of typicality and adequacy.").

The *Rule 23* typicality requirement requires that the injuries of the movant with the largest financial losses should not [*5] be markedly different from those of the other moving parties and that the movant's claims be based on the same legal issues as the claims of other class members. See *In re Cendant, 264 F.3d at 265*. The Engler Group alleges injuries and makes claims which are typical of other plaintiffs in the class. Like all other class members, they claim they were injured by purchasing or otherwise acquiring ABFS securities during the class period at prices allegedly inflated by defendant's allegedly materially false and misleading statements and/or omissions.

In assessing whether the movant satisfies *Rule 23*'s adequacy requirement, courts should consider whether it "has the ability and incentive to represent the claims of the class vigorously, [whether it] has obtained adequate counsel, and [whether] there is [a] conflict between [the movant's] claims and those asserted on behalf of the class."

*Id.*, quoting *Hassine v. Jeffes, 846 F.2d 169, 179 (3d Cir. 1988)*. With the largest financial interest in the outcome of the litigation, the Engler Group clearly has an incentive to represent the claims of the class with vigor. The Engler Group [*6] has also selected and retained competent and experienced counsel to represent themselves and the class and there is no apparent conflict between their claims and the claims asserted on behalf of the class.

The Pension Funds have not rebutted the presumption that the Engler Group is the most adequate plaintiff.

Once the presumptively most adequate plaintiff is established, a member of the purported plaintiff class may rebut the presumption only upon proof that such plaintiff will not fairly and adequately protect the interests of the class or is subject to unique defenses that render such plaintiff incapable of adequately representing the class.

*In Re Cell Pathways, Inc. Sec. Litig., 203 F.R.D. 189, 190 (E.D. Pa. 2001), citing 15 U.S.C. § 78u-4(a)(3)(B)(iii)(II).* The Pension Funds argue that although the Engler Group's claimed losses appear to be greater than their own the Engler Group cannot adequately represent the interests of the class as a sole lead plaintiff.

The Pension Funds argue that Congress' intention in enacting the PSLRA was to encourage courts to appoint as lead plaintiffs persons or entities "whose sophistication [*7] and interest in the litigation are sufficient to permit that person or entity to function as an active agent for the class . . . ." *In re Cendant Corp. Litig., 264 F.3d 201, 266 (3d Cir. 2001).* They further argue that as institutional investors they are in the best position to prosecute securities fraud claims and to negotiate with and supervise counsel. However, while the aim of the PSLRA may have been "to encourage institutional investors to seek out a more active role in securities action lawsuits" in order to improve the quality of representation, thus benefitting shareholders and assisting courts," *In re Lucent Techs. Sec. Litig., 194 F.R.D. 137, 151 (D.N.J. 2000),* the language of the Act does not require that institutional investors take precedence over individual plaintiffs who are otherwise qualified to serve in a lead capacity. See, e.g., *Reiger v. Altris Software, Inc., 1998 U.S. Dist. LEXIS 14705, at *14 (S.D. Cal. Sept. 11, 1998)* ("If Congress had intended to restrict the application of the rebuttable presumption to institutional investors, it could have stated such in the statute.").

It may well be that the members [*8] of Congress hoped that, with the help of the PSLRA, institutional investors would come to so dominate securities fraud class actions that they eventually would monopolize the lead plaintiff role. Regardless of the wisdom of such policy, however, that policy is not expressly stated in the PSLRA. Indeed, the PSLRA never mentions the term "institutional investor." . . .

The institutional investor is not presumptively the most adequate plaintiff solely by virtue of its status as an institutional investor, however. If that were the case, Congress would have simply provided that institutional investors are presumptively the most adequate plaintiffs regardless of the size of financial loss and saved the Court from the need to engage in the very analysis it undertakes here. Instead, Congress chose to use the size of financial loss as the initial proxy for determining whether a particular plaintiff would be the "most adequate plaintiff."

*In re Telxon Corp. Secs. Litig., 67 F. Supp. 2d 803, 820-22 (N.D. Ohio 1999)*(citations omitted). Accordingly, where an individual investor or group of individual investors has suffered a larger financial loss than an institutional [*9] investor and has made a *prima facie* showing of typicality and adequacy, it is up to the institutional investor to rebut the presumption that the individual investor or group of individuals is the most adequate plaintiff.

Although the Pension Funds have established that they would be well equipped to serve as lead counsel, the question at this stage "*is not* whether another movant might do a better job of protecting the interests of the class than the presumptive lead plaintiff; instead, the question is whether anyone can prove that the presumptive lead plaintiff will not do a 'fair[] and adequate[]' job." *In re Cendant, 264 F.3d at 268* (emphasis and omissions in original). The Pension Funds have not established that the Engler Group will not do a fair and adequate job of representing the interests of the class.

The Pension Funds argue that the Engler Group was unable to calculate accurately its financial interest in the case and improperly inflated the size of their loss by neglecting to account for stock dividends executed during the class period, and that this faulty calculation is evidence that the Engler Group is not sufficiently sophisticated to [*10] adequately represent the plaintiff class. They argue that the proceeds the Engler Group received from the additional shares they received as the result of two ten percent stock dividends executed by ABFS during the class period reduces their aggregated loss to $ 65,652 (still a larger loss than that of the Pension Funds). The Engler Group disputes the Pension

Funds' allegation that its calculation was incorrect, arguing that the receipt of dividends should not be deducted from damages as dividends are treated as income under the federal tax regulations and payment of dividends is not related to whether stock shares were purchased or sold at artificially inflated prices. Neither the Engler Group nor the Pension Funds provide citations to case law or other support for their arguments as to whether dividends should be included or excluded in calculating losses or damages resulting from securities fraud. Beyond this one allegedly inaccurate calculation, the Pension Funds have presented no further evidence to rebut the presumption that the Engler Group will be able to adequately represent the class.

The Pension Funds allege that the Engler Group was created by counsel, although they have [*11] produced no evidence to support this allegation other than the absence of an explanation from the Engler Group of why it has moved as a group. If

> a court were to determine that the movant "group" with the largest losses had been created by the efforts of lawyers hoping to ensure their eventual appointment as lead counsel, it could well conclude, based on this history, that the members of that "group" could not be counted on to monitor counsel in a sufficient manner.

*In re Cendant*, 264 F.3d at 267, citing *In re Razorfish, Inc. Sec. Litig.*, 143 F. Supp. 2d 304, 307-08 (S.D.N.Y. 2001). See also *Smith v. Suprema Specialties, Inc.*, 206 F. Supp. 2d 627, 637 (D.N.J. 2002) (holding a group of individual investors "amalgamated together for the sole purpose of obtaining lead plaintiff status" did not meet the requirements of the PSLRA). Both Engler and LaFete have sufficiently large individual financial losses to qualify individually as the plaintiff with the largest financial interest, so it appears that the Engler Group was not "cobbled together by cooperating counsel for the obvious purpose of creating a large enough grouping [*12] of investors to qualify as 'lead plaintiff,' which can then select the equally artificial grouping of counsel as 'lead counsel.'" *In re Razorfish, Inc. Sec. Litig.*, 143 F. Supp. 2d at 307-08. Although I may consider the history and extent of the relationship between the members of the Engler Group in my determination, the statute does not mandate "that the members of a proper group be 'related in some manner; it requires only that any such group 'fairly and adequately protect the interests of the class.'" *In re Cendant*, 264 F.3d at 266-67.

Although institutional investors may be better able to monitor the conduct of class counsel "because of their greater resources and higher levels of awareness gained from prior involvement in similar actions," *In re Lucent*, 194 F.R.D. at 152, the Pension Funds have not produced sufficient evidence to demonstrate that the individuals in the Engler Group, the proposed lead plaintiff with the largest financial loss, lack sufficient resources or experience to monitor the conduct of class counsel. "To sustain a group of proposed lead plaintiffs, courts have established protocols to ensure that the group [*13] will be effective . . . including requiring declarations or affidavits to demonstrate that the proposed lead plaintiffs can work effectively as a group." *Smith*, 206 F. Supp. 2d at 635. Engler and Lafete have submitted a declaration that they "agree to . . . exercise joint decision-making and work together in this case to 'fairly and adequately protect the interests of the class." (Engler/LaFete Decl. P 4). Without additional evidence to show why Engler and Lafete could not work together to exercise jointdecisionmaking, the Pension Funds have not rebutted the presumption that the Engler Group is the most adequate plaintiff and I will appoint the Engler Group as lead plaintiff in this action.

Under the PSLRA, "the most adequate lead plaintiff shall, subject to the approval of the court, select and retain counsel to represent the class." *15 U.S.C. § 78u-4(a)(3)(B)(v)*. Both the Conference Committee Report and the Senate Report establish "that the court should not interfere with lead plaintiff's choice of counsel, unless such intervention is necessary to 'protect the interest of the plaintiff class.'" *Janovici v. DVI, Inc., Fed. Sec. L. Rep. (CCH) P92636, 2003 U.S. Dist. LEXIS 22315 at *42 (E.D. Pa. Nov. 25, 2003) [*14]*, quoting *Smith v. Suprema Specialties, Inc.*, 206 F. Supp. 2d 627, 641 (D.N.J. 2002), quoting H.R. Conf. Rep. No. 104-369, at 35 (1995), reprinted in 1995 U.S.C.C.A.N. 730, 734; S.Rep. No. 104-98 at 11-12 (1995) reprinted in 1995 U.S.C.C.A.N. 679, 690). I do not find such intervention would be necessary here. n1

> n1 Indeed, both Schiffrin & Barroway, one proposed lead counsel of the Engler Group, and Milberg Weiss Bershad Hynes & Lerach LLP, the former firm of the proposed lead counsel of the Pension Funds, have been praised by the courts for their conduct in class action lawsuits. See, e.g., *Henry v. Sears, Roebuck & Co.*, No. 98-4110, 1999 U.S. Dist. LEXIS 13831, at *5-6 (N.D. Ill. Aug. 27, 1999) (stating that class counsel, which included the firm of Schiffrin, Craig & Barroway, exhibited professional skill and standing in abundance); *In re Rite Aid Corp. Sec. Litig.*, 269 F. Supp. 2d 603, 611 (E.D. Pa.

2004 U.S. Dist. LEXIS 10200, *

*2003)* (finding that it "would be hard to equal the skill [Milberg Weis] demonstrated" in representing the interests of the class). Lerach Coughlin Stoia & Robbins LLP was founded in May, 2004 and includes includes 51 partners formerly with the west coast operations of Milberg Weiss Bershad Hynes & Lerach LLP.

[*15]

The Pension Funds object to the Engler Group's proposal to appoint two lead counsel to represent the plaintiff class. "Where more than one lead counsel is appointed, there is the potential they may ultimately seize control of the litigation, an occurrence the PSLRA intended to foreclose." *In re Party City Secs. Litig., 189 F.R.D. 91, 115.* The PSLRA does not, however, explicitly restrict the role of lead counsel to one law firm. See, e.g., *In re USEC Secs. Litig., 168 F. Supp. 2d 560, 568 (D. Md. 2001),* citing *In re MicroStrategy, Inc. Secs. Litig., 110 F. Supp. 2d 427, 440 (E.D. Va. 2000).* The crucial inquiry in determining whether co-lead counsel are appropriate is whether they "will enhance, rather than reduce, the efficiency of the litigation." *In re MicroStrategy, 110 F. Supp. 2d. at 440.* Inasmuch as the PSLRA places restrictions on the payment of attorneys' fees and expenses, no increase in litigation costs will result from the appointment of two lead counsel. See *15 U.S.C. § 77z-1(a)(6).* Because I am satisfied that the law firms of Schiffrin & Barroway, LLP and Geller Rudman PLLC [*16] can work together efficiently and without unnecessary duplication of services, I will approve them to serve as lead counsel in this matter.

**ORDER**

AND NOW, this 3rd day of June 2004, after considering the motion of plaintiffs Edward Engler and Jandre Lafate to be appointed lead plaintiffs and for approval of lead plaintiff's selection of lead counsel and the motion of plaintiffs Operative Plasterers' and Cement Masons' International Employees' Trust Fund and Operative Plasterers' and Cement Masons' Local Union Officers' and Employees' Pension Fund for appointment as lead plaintiff and for approval of lead plaintiff's selection of lead counsel and all responses thereto, it is hereby ORDERED as follows:

1. The motion of plaintiffs Edward Engler and Jandre Lafate (the Engler Group) for appointment as lead plaintiff, and for approval of lead plaintiff's selection of lead counsel is GRANTED.

2. The Engler Group's selection of Schiffrin & Barroway, LLP and Geller Rudman PLLC as lead counsel is approved.

3. The motion of plaintiffs Operative Plasterers' and Cement Masons' International Employees' Trust Fund and Operative Plasterers' and Cement Masons' Local [*17] Union Officers' and Employees' Pension Fund for appointment as lead plaintiff and for approval of lead plaintiff's selection of lead counsel is DENIED.

THOMAS N. O'NEILL, JR., J.

# Exhibit B

LEXSEE 2003 U.S. DIST. LEXIS 19606

**MARIE CASDEN, individually and on behalf of all others similarly situated, Plaintiff, v HPL TECHNOLOGIES, INC, Y DAVID LEPEJIAN, and ITA GEVA, Defendants.**

No C-02-3510 VRW

**UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF CALIFORNIA**

*2003 U.S. Dist. LEXIS 19606*

**September 29, 2003, Decided**

**SUBSEQUENT HISTORY:** Costs and fees proceeding at, Motion granted by *In re HPL Techs., Inc., 2005 U.S. Dist. LEXIS 7244 (N.D. Cal., Apr. 22, 2005)*

**DISPOSITION:** [*1] Plaintiffs' motions to consolidate was granted. Fuller & Thaler's motions to appoint lead plaintiff and to approve lead counsel was granted. Leff and Kelly's motions to appoint lead plaintiff and to approve lead counsel was denied. Local 705's motions to appoint lead plaintiff and to approve lead counsel was denied. Local 705's request for status conference was granted.

**LexisNexis(R) Headnotes**

**COUNSEL:** For Marie Casden, Plaintiff: Darren J. Robbins, Milberg Weiss Bershad Hynes & Lerach LLP, San Diego, CA. Ilona Kohn, Abbey Gardy LLP, New York, NY. Robert S. Green, Green & Jigarjian LLP, San Francisco, CA. Robert A. Jigarjian, Green & Jigarjian LLP, San Francisco, CA.

For Local 705 Pension Fund, Movant: Patrick J. Coughlin, Milberg Weiss Bershad Hynes & Lerach LLP, San Francisco, CA. Willow E. Radcliffe, Milberg Weiss Bershad Hynes & Lerach, San Francisco, CA.

For Fuller & Thaler Asset Management, Inc., Movant: Joseph M. Barton, Gold Bennett Cera & Sidener LLP, San Francisco, CA. Steven O. Sidener, Gold Bennett Cera & Sidener LLP, San Francisco, CA.

For HPL Technologies Inc., Defendant: Laurence Andrew Weiss, Heller, Ehrman, [*2] White & McAuliffe LLP, San Francisco, CA. Louis Pugh, Morrison & Foerster LLP, San Francisco, CA. Margaret L. Wu, Morrison & Foerster, San Francisco, CA.

For David Lepejian, Defendant: Michael F. Tubach, O'Melveny & Myers LLP, San Francisco, CA.

For UBS Paine Webber, Inc., 3rd Party Defendant: Rohit K. Singla, Munger Tolles & Olson, San Francisco, CA.

For Ivelocity, Interested Party: Andrew L. Barroway, Schiffrin & Barroway, LLP, Bala Cynwyd, PA. Darren J. Check, Esq., Schiffrin & Barroway, LLP, Bala Cynwyd, PA. Evan J. Smith, Brodsky & Smith LLC, Bala Cynwyd, PA. Jeffrey R. Krinsk, Findelstein & Krinsk, San Diego, CA. Stuart L. Berman, Schiffrin & Barroway, Bala Cynwyd, PA.

**JUDGES:** VAUGHN R WALKER, United States District Judge.

**OPINIONBY:** VAUGHN R WALKER

**OPINION:**

**ORDER**

As noted in its December 23, 2002, order, the court currently has before it eleven cases alleging that defendants committed open market securities fraud: C-02-3510 VRW, C-02-3520 VRW, C-02-3553 VRW, C-02-3562 VRW, C-02-3604 VRW, C-02-3665 VRW, C-02-3816 VRW, C-02-3821 VRW, C-02-3861 VRW, C-

02-3946 VRW and C-02-4449 VRW. These cases, along with a companion criminal case, CR-02-266 VRW, have been related and assigned [*3] to the undersigned. Since its last order, the court has related several more such cases: C-02-4145 VRW, C-02-4157 VRW, C-02-4240 VRW, and C-03-1749 VRW (see Docs ## 69, 73). At the time of the court's last order, the court had not yet had time to examine whether these cases were indeed related; thus, the court withheld judgment on several of the parties' motions until relation could be addressed. Since then the court has subsequently related the cases and is now able to address the pending motions.

In the cases now before the court, two parties have filed motions to consolidate these actions. Three prospective lead plaintiffs have filed motions for appointment as lead plaintiff to prosecute a putative class action against defendants for alleged securities fraud relating to the initial public offering of stock in defendant HPL Technologies, Inc (HPL), as well as to approve their choices of lead counsel. These prospective plaintiffs are: Robert Leff and Daniel Kelly (Leff and Kelly), the International Brotherhood of Teamsters, Local 705 Pension Fund (Local 705) and Fuller & Thaler Asset Management, Inc (Fuller & Thaler). See Docs ## 10, 12, 13, 20, 29, 35, 38, 39, 40. Defendants endorse [*4] consolidation but express no view regarding the choice of lead plaintiff. See Doc # 51. Additionally, Local 705 has requested that the court hold a status conference to discuss the propriety of lifting the current discovery stay. Doc # 75.

For the following reasons, the court GRANTS the motions for consolidation. The court DENIES Leff and Kelly's motions to be appointed lead plaintiffs and to approve lead counsel. The court DENIES Local 705's motions to be appointed lead plaintiff and to approve lead counsel. The court GRANTS Fuller & Thaler's motions to be appointed lead plaintiff and to approve lead counsel. Finally, the court GRANTS Local 705's request to hold a status conference. The court addresses each of these issues in turn.

I

Both Leff and Kelly and Local 705 have moved this court to consolidate this group of related cases. Docs ## 10, 13, 39, 40. Defendants HPL and its directors do not oppose such consolidation. See Doc # 51.

These actions are appropriate for consolidation. Consolidation is proper when the cases involve common questions of law or fact. *FRCP 42(a)*; see also *Southwest Marine, Inc v Triple A Machine Shop, Inc, 720 F. Supp. 805, 806 (ND Cal 1989)*. [*5] Once the court establishes that such common questions exist, it must weigh the interests of judicial economy against the potential for delay, confusion, and prejudice. *Southwest Marine, 720*

*F. Supp. at 806*. The interests of judicial economy are particularly strong in securities class action cases. See *Takeda v Turbodyne Technologies, Inc, 67 F. Supp. 2d 1129, 1130 (CD Cal 1999)* (finding that such cases should be consolidated "in the interests of judicial economy and to relieve the parties and absent class members of the burdens associated with participating in duplicative litigation"). Indeed, the Private Securities Litigation Reform Act of 1995 (PSLRA) provides that consolidation should occur when the various securities class actions assert substantially the same claim. See *15 USCS § 78u-4(a)(3)(B)(ii); Osher v Guess?, Inc., 2001 U.S. Dist LEXIS 6057, *7 (CD Cal)*.

With respect to the cases currently before the court, there are many common questions of law and fact. Each case involves similar claims of violations of federal securities laws. Each case involves a similar group of defendants. Consolidation would "expedite[] [*6] pretrial proceedings, reduce[] case duplication, avoid[] the need to contact parties and witnesses for multiple proceedings and minimize[] the expenditure of time and money for all parties involved." Local 705 Mot Consol 4:12-14; see also *In re Equity Funding Corp of America Secur Litig, 416 F. Supp. 161, 176 (CD Cal 1976)*. Finally, no party has alleged that prejudice, delay, or confusion would result from consolidation, and no such negative consequence is apparent to the court. Thus, the court concludes that consolidation under *FRCP 42(a)* is appropriate and GRANTS the motions to consolidate.

In accordance with this order, therefore, the court consolidates the following actions for all purposes including, but not limited to, discovery, pretrial proceedings and trial proceedings:

. C-02-3510 VRW
. C-02-3520 VRW
. C-02-3553 VRW
. C-02-3562 VRW
. C-02-3604 VRW
. C-02-3665 VRW
. C-02-3816 VRW
. C-02-3821 VRW
. C-02-3861 VRW
. C-02-3946 VRW
. C-02-4449 VRW
. CR-02-266 VRW
. C-02-4145 VRW
. C-02-4157 VRW
. C-02-4240 VRW
. C-03-1749 VRW

The consolidated cases shall be identified as: In re HPL Technologies [*7] Securities Litigation, Case No C-02-3510-VRW, and the files of this action shall be maintained in one file under Master File No C-02-3510-

VRW. Any other action now pending or hereafter filed in this district that arises out of the same facts and claims alleged in these related actions shall be consolidated for all purposes as the court is apprised of them. The parties shall notify the court of any other action that is pending or filed in or outside this district that may be related to the subject matter of these consolidated actions, if and when they become aware of such actions.

Every pleading filed in these consolidated actions, or in any separate action included herein, shall bear the following caption:

UNITED STATES DISTRICT COURT NORTHERN DISTRICT OF CALIFORNIA

In re HPL TECHNOLOGIES, INC SECURITIES LITIGATION

No C-02-3510 VRW

CLASS ACTION

When a pleading is intended to be applicable to all actions to which this order is applicable, the words "All Actions" shall appear immediately after the words "This Document Relates To:" in the above caption. When a pleading is intended to be applicable only to some, but not all, of such actions, the court's docket number for each [*8] individual action to which the document is intended to be applicable and the last name of the first-named plaintiff in said action shall appear immediately after the words "This Document Relates To:" in the caption described above, e g, "This Document Relates To: Casden, Case No C-00-3510-VRW."

From the date of entry of this order, the parties shall comply with *15 USC § 78u-4(b)(3)(C)(i)*, without regard to whether a stay under *15 USC § 78u-4(b)(3)(B)* is in effect, and shall comply with *15 USC § 78u-4(b)(3)(C)(i)*'s provisions concerning documents relevant to allegations contained in any and all of the pleadings in these actions, including any consolidated complaint.

Unless otherwise agreed among the parties, the lead plaintiff (designated in this order below) shall file a consolidated class action complaint no later than 60 days from the date of this order. The consolidated class action complaint shall be treated as if it were the original complaint, and all defendants shall have 45 days after the filing and service of the consolidated class action complaint to answer or otherwise respond. Notwithstanding [*9] the filing of the consolidated class action complaint pursuant to *FRCP 15(a)*, in the event that defendants file any motions directed at the consolidated class action complaint, counsel are to meet and confer and report to the court with regard to an acceptable briefing and hearing schedule for such motions. The briefing schedule, however, shall be

governed by the local rules unless the court orders otherwise.

II

Leff and Kelly, Local 705, and Fuller & Thaler all move the court for appointment as lead plaintiff in this action. Docs ## 10, 12, 20, 29, 35, 38, 40. As part of its last order regarding this matter, the court had begun to conduct the inquiry to select a lead plaintiff mandated by the PSLRA amendments to the *Securities Act of 1933* and the *Securities Exchange Act of 1934 (15 USC § § 77z-1, 78u-4)* and further elucidated by the Ninth Circuit in *In re Cavanaugh, 306 F.3d 726 (9th Cir 2002)*. The court now finishes that inquiry and finds that Fuller & Thaler is the most appropriate lead plaintiff. Additionally, the court finds that Fuller & Thaler's proposed lead counsel is satisfactory.

A

The selection [*10] of a lead plaintiff or plaintiffs in class action litigation brought under federal securities law is governed by the PSLRA amendments to the Securities Act of 1933 and the Securities Exchange Act of 1934. See *15 USC § § 77z-1, 78u-4*. In relevant part, the amendments provide:

> the court shall consider any motion made by a purported class member in response to [the required notice of the filing of a class action suit], including any motion by a class member who is not individually named as a plaintiff in the complaint or complaints, and shall appoint as lead plaintiff the member or members of the purported class that the court determines to be the most capable of adequately representing the interests of class members
> * * *.

*15 USC § 78u-4(a)(3)(B)(i)*.

In *In re Cavanaugh, 306 F.3d 726 (9th Cir 2002)*, the Ninth Circuit laid out a three-step process for identifying the lead plaintiff pursuant to the statutory criteria. Step one is verification of the proper posting of a "notice 'in a widely circulated national business-oriented publication or wire service.'" *Cavanaugh, 306 F.2d at 729* (quoting [*11] *15 USC § 78u-4(a)(3)(A)(i)*). Step two is the court's consideration of "the losses allegedly suffered by the various plaintiffs before selecting as the 'presumptively most adequate plaintiff' - and hence the presumptive lead plaintiff - the one who 'has the largest financial interest in the relief sought by the class' * * *. In other words, the district court must compare the financial stakes of the various plaintiffs and determine

which one has the most to gain from the lawsuit." *ID. at 729-30.* Step three is the opportunity for plaintiffs not found to be the presumptive lead plaintiff to rebut the presumptive lead plaintiff's showing in satisfaction of the adequacy and typicality requirements for lead plaintiff designation. *ID. at 730.*

1

All parties agree that the first step, verification of proper notice, has been completed. See *Cavanaugh, 306 F.3d at 729* (quoting *15 USC § 78u-4(a)(3)(A)(I)*). Thus, as the court previously recognized in its past two orders, it may proceed to step two.

2

The second step of Cavanaugh itself seems to comprise two decisions: (a) comparison of the financial [*12] stakes of the various plaintiffs to identify the one with the largest financial interest in the litigation; and (b) determination of the typicality and adequacy of that plaintiff identified as the one with the largest financial interest in the litigation. *ID. at 729-30.*

a

As to the first part of the inquiry, the court must consider four factors relevant to identifying the prospective plaintiff with the largest financial interest: (1) the number of shares purchased during the class period; (2) the number of net shares purchased during the class period; (3) the total net funds expended during the class period; and (4) the approximate losses suffered. See *In re Enron Corp Securities Litigation, 206 F.R.D. 427, 440 (SD Tex 2002); In re Nice Systems Securities Litigation, 188 F.R.D. 206, 217 (DNJ 1999); In re Olsten Corp Securities Litigation, 3 F. Supp. 2d 286, 295 (EDNY 1998); Lax v. First Merchs. Acceptance Corp., 1997 U.S. Dist LEXIS 12432 at *18 (ND Ill 1997).*

The court's December 11, 2002, order was aimed at obtaining information necessary to make the step 2(a) determination. As directed, each prospective lead [*13] plaintiff filed with the court a spreadsheet and accompanying declaration providing information regarding the class period each proposed, the number of shares each purchased or held prior to the class period and the cost of any such shares, the date, number and price per share of any purchase or sale of HPL stock during the proposed class period and the estimated actual (or "true") value of those shares at the time of each purchase or sale. See Docs ## 60, 61, 62.

Based on the information provided, the court reported the following results in its December 23, 2002, order:

. Because the proposed class periods of each prospective plaintiff begin on the date of the initial public offering of HPL stock, no prospective lead plaintiff held shares prior to the class period.

. Because each prospective lead plaintiff asserts that virtually the entire value of the stock during the class period was due to defendants' alleged fraudulent conduct, each identified the true value of the stock as essentially zero.

. Leff and Kelly:

- Combining their purchases, Leff and Kelly purchased 16,000 shares during the class period;

- Because neither sold shares during the [*14] class period, the number of net shares purchased was also 16,000;

- Together, they expended a total of $ 192,391;

- Because neither sold shares during the class period, their net expenditure was also $ 192,391;

- Based on their calculation of the "true" value of the stock ($ 0.22/share), their estimated losses were $ 188,871. See Doc # 60.

. Local 705:

- Local 705 purchased 26,200 shares during the class period;

- The number of net shares purchased was 24,600;

- Total funds expended were $ 365,503;

- Net funds expended were $ 344,383;

- Based on its calculation of the "true" value of the stock ($ 0.0163/share), Local 705's estimated losses were $ 344,008. See Doc # 62.

. Fuller & Thaler:

- Fuller & Thaler purchased 226,700 shares during the class period;

- The number of net shares purchased was 199,700;

- Total funds expended were $ 2,444,965;

- Net funds expended were $ 2,065,225;

- Based on its calculation of the "true" value of the stock ($ 0/share), Fuller & Thaler's estimated losses were $ 2,065,225. See Doc # 61.

By each of the four measures, Fuller & Thaler's financial interest [*15] is by far the largest.

As Fuller & Thaler clearly emerges as having the greatest financial stake by any of these measures, the court, following the dictates of Cavanaugh, turns to that proposed plaintiff to determine whether it meets the typicality and adequacy requirements of *FRCP 23(a)*.

b

"The district court has latitude as to what information it will consider in determining typicality and adequacy." *Cavanaugh, 306 F.3d at 732*. And "lead plaintiff's choice of counsel and fee arrangements may be relevant," but relevant "only to determine whether the presumptive lead plaintiff's choice of counsel is so irrational, or so tainted by self-dealing or conflict of interest, as to cast genuine and serious doubt on that plaintiff's willingness or ability to perform the functions of lead plaintiff." *ID. at 732-33* (quoting *In re Cendant Corp Litig, 264 F.3d 201, 266 (3d Cir 2001))*. This initial inquiry whether the plaintiff with the greatest financial interest also satisfies the requirements of *FRCP 23(a)* is one for the court to conduct, generally "not considering [*16] at this stage any arguments by other members of the putative class." *Cendant, 264 F.3d at 264*.

The Cendant court identified several factors for the court to consider. In assessing typicality, the court should look to any marked differences in the circumstances of the presumptive lead plaintiff or legal theories on which it, as opposed to the other class members, will rely. *Id.* In assessing adequacy, the court should examine the potential lead plaintiff's ability and incentive to represent the class vigorously. *ID. at 265.* As an element of this inquiry, the Cendant court included an analysis of the potential lead plaintiff's "willingness and ability to select competent class counsel and to negotiate a reasonable retainer agreement with that counsel." *Id* (citing *In re Quintus Secur Litig, 201 F.R.D. 475, 485 (ND Cal 2001))*.

Because Fuller & Thaler provided little information in its certification on which the court might base its determination, the court conducted an inquiry of Fuller & Thaler's counsel (no representative of Fuller & Thaler being present), regarding the nature of its business generally and its holdings in HPL specifically. [*17] In the interest of economizing the court's and the parties' time, the court conducted a similar inquiry of Local 705's representative and counsel for Leff and Kelly.

Because some of the representations of Fuller & Thaler's counsel regarding his client were incomplete or tentative, the court requested that Fuller & Thaler file a supplemental declaration on or before January 3, 2003, with additional information for the court to consider in determining whether Fuller & Thaler meets the adequacy and typicality requirements of *FRCP 23(a)*. See Doc # 64. Fuller & Thaler filed such declaration on January 2, 2003. Doc # 65.

The results of the inquiries and declaration are as follows: Fuller & Thaler is a money management firm located in San Mateo, California. It has been in business for roughly ten to fifteen years and manages mutual funds as well as private accounts for institutional investors and wealthy individuals. Fuller & Thaler purchased HPL shares on behalf of five separate account-holders, which were the accounts of pension funds and other institutional investors. Fuller & Thaler's counsel was not aware of the breakdown of the shares purchased [*18] among the five accounts, but believed that the shares purchased and any returns on shares sold were distributed among the accounts in the same proportion each time. Record title of the shares is held by Fuller & Thaler, the account-holders holding the beneficial interest. Fuller & Thaler purchased the shares for investment. Fred Stanske, Fuller & Thaler's small capitalization securities portfolio manager, was responsible for the decisions to purchase and sell HPL shares. Stanske was also identified as the person at Fuller & Thaler responsible for managing this litigation, if Fuller & Thaler is selected as lead plaintiff. See Jan Decl

Frederick W Stanske (Stanske Decl II) 2:1-2, 2:10-14. Additionally, should Fuller & Thaler be appointed as lead plaintiff, they would select the firm of Gold, Bennet, Cera & Sidener LLP to represent the class. Fuller & Thaler Lead Pl Mot 6:28-7:4. This law firm, Fuller & Thaler, asserts, is quite experienced in securities litigation and was recently appointed lead counsel in a major securities fraud class action in the Western District of Pennsylvania. ID. at 7:13-21; see also Decl Joseph M Barton (Barton Decl), Exh C (Doc # 22).

Local 705 was represented [*19] at the hearing by John Naughton, a member of the board of trustees of the pension plan and chair of the board's investment subcommittee, who appeared specifically to address any questions the court might have about the local and its investments in HPL. Naughton informed the court that Local 705 has approximately 23,500 members in the greater Chicago area, mostly freight workers and employees of United Parcel Service. During the time of the class period, the fund held roughly $ 1.2 billion. The distribution of those holdings was roughly 45% in equities, 45% in bonds and 10% in real estate. Jack Witt is managing director of the fund and heads the board of trustees. Local 705 purchased HPL shares on the advice of one of its money managers, a San Diego firm called Capital Works. The stock was purchased for investment and Local 705 holds record title and the beneficial interest. If named lead plaintiff, Witt would supervise the litigation, perhaps assisted by James Daley, Local 705's in-house counsel.

Finally, Leff and Kelly were represented by their counsel, who informed the court that both are individual investors interested in jointly supervising the litigation. Leff is a resident of [*20] Cambridge, Massachusetts, and Kelly a resident of New York state. If selected, they intend to represent the class jointly, but have not reached an agreement on how they would proceed if appointed as lead counsel.

Based on the information provided to the court, it can reasonably conclude that Fuller & Thaler satisfy the requirements of typicality and adequacy. With respect to the typicality requirement, the lead plaintiff must present "claims or defenses * * * typical of the claims or defenses of the class * * *." FRCP 23(a). Additionally, as noted above, the court must examine any marked differences in the circumstances of the presumptive lead plaintiff or legal theories on which it, as opposed to the other class members, will rely. Cendant, 264 F.3d at 264.

Here, Fuller & Thaler assert that it meets the requirement of typicality because it "has suffered the same or similar injuries as absent class members due to a common course of conduct by defendants." See Fuller & Thaler Lead Pl Mot 5:19-21. Specifically, it contends that, like other members of the class, it: (1) acquired HPL common stock during the class period; (2) it [*21] acquired the stock at artificially inflated prices, due to defendants' alleged false and misleading statements and failure to disclose material information; and (3) it thus suffered damages. ID. at 6:5-10.

The court agrees that Fuller & Thaler has suffered similar injuries as the rest of the members of the class. This, however, does not end the inquiry. Despite such similar injury, the court must also consider whether the plaintiff's circumstances "are markedly different" from those of other class members. Cendant, 264 F.3d at 265.

Fuller & Thaler, in some respects, does have significantly different circumstances from some of the other members of the class. As noted above, the investment firm does not hold the beneficial interest of the HPL shares it purchased. Rather, it purchased those shares on behalf of several of its account-holders. While it retains the record title to the shares, the beneficial interest in the shares is actually held by the account-holders. Thus, although Fuller & Thaler made the initial decision to purchase the shares, it no longer has an ownership interest in the shares beyond record title. Arguably, this difference might affect Fuller & Thaler's [*22] incentives to prosecute the case effectively. In other words, the fact that it only holds record title to the shares might give it less reason to prosecute the case vigorously than a plaintiff who actually held the beneficial interests in such shares. Thus, its interests in the case might not be typical.

Despite this difference, it should be noted that of the three prospective lead plaintiffs in this case, only one both made the initial investment decision and has retained the beneficial ownership of the shares. Local 705, while holding both record title and beneficial ownership of the shares, did not make the decision to invest. Instead, the decision to purchase the shares was made by Capital Works, the San Diego firm that functioned as one of Local 705's money managers. Leff and Kelly, who hold the lowest number of HPL shares, are the only plaintiffs who both made the purchase choice and retained beneficial interest. See ID. at 7:25-8:1. Given the variation amongst these plaintiffs' circumstances, therefore, there does not seem to be a clear norm as far as ownership status.

Thus, despite lacking beneficial ownership, the court concludes that Fuller & Thaler's circumstances here [*23] are not so markedly different from the other class members as to make it atypical. Accordingly, the court finds that Fuller & Thaler meet FRCP 23(a)'s typicality requirement.

2003 U.S. Dist. LEXIS 19606, *

Turning to the second *FRCP 23(a)* requirement, the court now must evaluate whether Fuller & Thaler will likely be able to represent the class fairly and adequately. The lead plaintiff's primary responsibilities in this regard are (1) monitoring the conduct of class counsel, and (2) deciding whether and when the case should be settled or taken to trial. *Quintus, 201 F.R.D. at 481.* In conducting this inquiry, the court must ask whether the prospective plaintiff has incentive to represent the class vigorously. *Cendant, 264 F.3d at 265.*

One component of this inquiry is to "consider the manner in which [the potential plaintiff] has retained counsel and negotiated an attorney's fee for the class." *Quintus, 201 F.R.D. at 482.* A prospective lead plaintiff might not meet the adequacy requirement "if it lacked legal experience or sophistication, intended to select as lead counsel a firm that was [*24] plainly incapable of undertaking the representation, or had negotiated a clearly unreasonable fee agreement with its chosen counsel." *Cendant, 264 F.3d at 265-66.* Of course, the "choice of counsel has traditionally been left to the parties," *Cavanaugh, 306 F.3d at 734,* and the court should not "improperly interfere[] with the lead plaintiff's authority and responsibility to select counsel whom he believes will best serve his own interests and the interests of the class." *Id.* Thus, the court merely reviews Fuller & Thaler's relationship with counsel to ensure that it is reasonable.

Fuller & Thaler appear to meet this requirement. First, it cannot seriously be doubted that Fuller & Thaler has the experience and sophistication necessary to handle the responsibilities of being a lead plaintiff. Fuller & Thaler is a nationally known investment firm with over $ 1.4 billion under management. Nov Decl Frederick W Stanske (Stanske Decl I) 1:23-25. One of the named principals, Russell J Fuller, has nearly thirty years of experience in academic research, financial analysis, and investment management; he is also the author of an investment textbook. ID. at 1: [*25] 26-28. The other named principal, Richard H Thaler, is a professor of behavioral science and economics at the University of Chicago business school. ID. at 2:2-4. Fred Stanske, who would be the person at Fuller & Thaler responsible for overseeing the litigation, has extensive fund management responsibility and holds an MBA from the University of Chicago. See ID. at 2:5-7. Additionally, Fuller & Thaler has served as the lead plaintiff in four separate securities class actions. ID. at 2:13-24. Thus, it is apparent that Fuller & Thaler has both professional experience and sophistication in the realms of securities and securities litigation.

Second, Fuller & Thaler's choice of counsel for this case seems reasonable. It has chosen the firm Gold, Bennett, Cera & Sidener as prospective lead counsel.

The firm lists securities litigation as one of its specialties. See Barton Decl, Exh C, 1. Many of its attorneys have extensive experience in securities litigation cases, see ID. at 4-8, and one of its named partners, Paul F Bennet, has authored several articles and commentaries on the subject. ID. at 4. The firm lists upwards of fifty securities litigation cases in which it has participated. See id [*26] at 9-12. Based on this information, it seems unlikely that "the presumptive lead plaintiff's choice of counsel is so irrational, or so tainted by self-dealing or conflict of interest, as to cast genuine and serious doubt on that plaintiff's willingness or ability to perform the functions of lead plaintiff." *Cavanaugh at 732-33* (quoting *Cendant, 264 F.3d at 266*).

Having determined that Fuller & Thaler satisfy the requirement of adequate ability to choose counsel, the court must also consider whether the putative plaintiff has adequate incentive to represent the class vigorously. See *Cendant, 264 F.3d at 265.* As noted earlier with respect to typicality, Fuller & Thaler has not retained the beneficial ownership of the HPL shares that it purchased, and this presents the possibility that its incentive to pursue the class action vigorously may be lacking.

The investment firm's incentives, however, also include the incentive that arises from the enormous amount of HPL shares it purchased. Fuller & Thaler, as noted above, purchased and holds record title to an overwhelming number of HPL shares. Specifically, it purchased over a quarter of a million shares; [*27] in contrast, Leff and Kelly and Local 705 only purchased 16,000 shares and 26,000 shares, respectively. Further, Fuller & Thaler's estimated losses totaled more than two million dollars, which again stands in sharp contrast with the several hundred thousand dollars lost by each of the other prospective plaintiffs.

Additionally, despite its lack of beneficial ownership, Fuller & Thaler retains a great deal of control over the securities it purchased. It has "full and complete investment discretion and decision-making authority with respect to the securities it purchases for its clients' accounts." Stanske Decl I, 2:25-26. It alone made the decision to purchase the HPL stock, and it retains sole voting authority over those shares. See id 3:4-10. Given the size of the loss and the degree of control, the court finds that Fuller & Thaler possesses adequate incentive to maintain vigorously the securities class action against HPL. Accordingly, Fuller & Thaler meets the adequacy requirement of *FRCP 23(a)* and *Cavanaugh.*

Having determined that Fuller & Thaler satisfies the requirements of the second step of *Cavanaugh,* the court turns to the third [*28] and final step of the inquiry.

3

The third step of Cavanaugh presents the other potential lead plaintiffs with the opportunity to raise arguments why Fuller & Thaler does not satisfy the requirements of typicality and adequacy. *Cavanaugh, 306 F.3d at 730.* The other two potential lead plaintiffs - Leff and Kelly, and Local 705 - each present arguments in their moving papers why Fuller & Thaler is not an appropriate choice under the requirements of *FRCP 23(a).*

First, Leff and Kelly challenge Fuller & Thaler's appointment on the grounds that the court does not have adequate information about the investment firm to choose it as lead plaintiff. Specifically, Leff and Kelly allege that Fuller & Thaler fail to provide information about its qualifications, who will be responsible for the litigation, or whether it retains beneficial ownership of the stock. See Leff and Kelly Opp 5:24-6:6 (Doc # 47).

This objection, at least subsequent to the additional information the court has obtained about Fuller & Thaler, is without merit. As noted earlier, Fuller & Thaler was founded by individuals with considerable experience in the securities [*29] field. Additionally, the firm has provided that Fred Stanske will be in charge of supervising the litigation. Further, the court has been made aware of the fact that Fuller & Thaler does not retain beneficial ownership over the HPL securities; but as discussed above, the court has determined that this information does not prevent it from finding Fuller & Thaler to be either typical or adequate.

Leff and Kelly's second apparent objection to Fuller & Thaler's appointment as lead plaintiff is that, as an investment advisor, it may not have the authority to serve in such capacity. See Leff and Kelly Opp 6:3-4. This is not the case.

As Fuller & Thaler point out, *FRCP 17(a)* requires that all actions be prosecuted by the "real party in interest," which is determined by the substantive law that governs the cause of action. *Lemanik v McKinley Allsopp, Inc, 125 F.R.D. 602, 607 (SDNY 1989).* Since the claims in this case concern causes of action under the Exchange Act, the Exchange Act thus governs who can be a real party in interest.

*Section 10(b) of the Exchange Act* and *Rule 10b-5* concern fraud "in connection with the purchase or sale [*30] of any security." The Supreme Court has found that private civil remedies under the Exchange Act are limited to those individuals who have actually purchased or sold such securities, rather than individuals who may have acquired the securities in some other fashion. *Blue Chip Stamps et al v Manor Drug Stores, 421 U.S. 723, 736, 44 L. Ed. 2d 539, 95 S. Ct. 1917 (1975).* Investment advisors who make the decisions to purchase the securities qualify as purchasers within the meaning of

10b-5, regardless of whether they purchased securities for their own accounts or for the accounts of their customers. *Lemanik, 125 F.R.D. at 607; see also Monetary Management Group of St Louis, Inc v Kidder Peabody & Co, 604 F. Supp. 764, 766-67 (ED Mo 1985)* (finding that *§ 12(2) of the Exchange Act* required that plaintiff be a purchaser rather than owner, and thus holding that an advisor who purchased on behalf on its clients was a real party in interest); *Odette v Shearson, Hammill & Co, 394 F. Supp. 946, 959 (SDNY 1975)* (noting that a "broker who purchases or sells as agent for his customer satisfies the purchaser-seller requirement"). Indeed, [*31] such advisors' status as the parties who make investment decisions is an important qualification for being a real party in interest. *Medline Industries, Inc. v. Blunt, Ellis & Loewi, Inc., 1993 U.S. Dist LEXIS 581, at *6 (ND Ill 1993)* (citing *Congregation of the Passion, Holy Cross Province v Kidder Peabody & Co, et al, 800 F.2d 177 (8th Cir 1986)).*

Fuller & Thaler meets these qualifications to be a real party in interest for this action. As an investment advisor, it actually consummated the purchases of the HPL securities for its clients, thus bringing it within the definition of "purchaser." Additionally, according to the declaration of Mr Stanske, it had complete discretion over its clients' accounts and thus made the actual decision to purchase the HPL shares. Therefore, Fuller & Thaler is a real party in interest within the meaning of both *Rule 10b-5* and *FRCP 17(a)* and thus has standing to serve as lead plaintiff in this action.

Local 705 also opposes the appointment of Fuller & Thaler as lead plaintiff, but on different grounds from Leff and Kelly. It argues that Fuller & Thaler is presumptively barred [*32] from serving as lead plaintiff because it has previously been appointed as lead plaintiff in five other securities litigation actions. Local 705 Opp 2:1-16 (Doc # 49). Such appointments, Local 705 contends, trigger the PSLRA's bar against serving as lead plaintiff in more than five securities actions in a three-year time period. See ID. at 2:14-20; see also *15 USC § 78u-4(a)(3)(B)(vi).*

Local 705's argument fails for several reasons. First, Fuller & Thaler has only been appointed as lead plaintiff in four actions within the relevant three-year period. On January 10, 2001, it was appointed as lead plaintiff in In re Westell Technologies Secur Litig, C-00-6735 (ND Ill). Stanske Decl I, 2:16-18. On September 20, 2002, it was appointed as lead plaintiff in In re Uniroyal Tech, C-02-1141 (MD Fla). ID. at 2:18-19. On October 21, 2002, it was appointed lead plaintiff in In re SeeBeyond Tech Corp, C-02-5330 (CD Cal). ID. at 2:19-20. It was also appointed lead plaintiff in two more cases, Wireless Facilities IPO Litig, C-01-4779 (SDNY), and ON Semiconductor IPO Litig, C-01-6114 (SDNY), in

summer of 2001; however, those two cases have been consolidated [*33] into In re IPO Securities Litigation, C-01-92 (SDNY). See ID. at 2:20-24. Thus, as a result of the consolidation, Fuller & Thaler has been appointed as lead plaintiff in only four securities class action suits, which does not trigger the PSLRA's presumptive bar.

Second, many courts in this circuit have recognized that the presumptive bar can be lifted in the cases of qualified institutional plaintiffs. As Fuller & Thaler suggests, the PSLRA ensures that "large institutional plaintiffs with expertise in the securities market would control the litigation, rather than lawyers." *Naiditch v Applied Micro Circuits Corp, 2001 U.S. Dist LEXIS 21374, *6 (SD Cal)*. Keeping this purpose in mind, the court notes that the PSLRA also provides the court with discretion to appoint a lead plaintiff who has already served in that capacity in five other suits within the time period. *In re Critical Path, Inc, Secur Litig, 156 F. Supp. 2d 1102, 1108 (ND Cal 2001); In re Network Associates, Inc, Secur Litig, 76 F. Supp. 2d 1017, 1030 (ND Cal 1999); see also 15 USC § 78u-4(a)(3)(B)(vi)*.

Further, the statute itself does not seem to [*34] restrict institutional plaintiffs to only five appointments within three years. For one thing, the language of *§ 78u-4(a)(3)(B)(vi)* applies the restriction only to "person[s]." The conference report describes such persons as "individuals" rather than entities. HR Conf Rep No 104-369. For another, the conference report explicitly states that "institutional investors seeking to serve as lead plaintiff may need to exceed this limitation and do not represent the type of professional that this legislation seeks to restrict." Id. Rather, Congress was much more concerned about preventing "individuals who are motivated by the payment of a bounty or bonus" from becoming repeat lead plaintiffs. Id. "As a result, the Conference Committee grants courts discretion to avoid the unintended consequence of disqualifying institutional investors from serving more than five times in three years." Id. Evidently, the presumptive bar was not intended to apply to institutional plaintiffs or to thwart the purpose of the PSLRA.

A number of courts in this circuit have exercised their discretion under *§ 78u-4(a)(3)(B)(vi)* to lift the presumptive bar with respect to institutional plaintiffs. In Naiditch [*35] , for example, the court found that lifting the bar was appropriate in light of Congress' purpose in enacting the PSLRA: "Appointing [the institutional plaintiff] FSBA would be entirely consistent with the purposes of this section. FSBA is an experienced institutional investor * * *." *Naiditch, 2001 U.S. Dist 21374 at *6-*7*. This was especially true in light of the fact that the other prospective lead plaintiffs suffered much smaller losses than did the institutional plaintiff and had less experience in securities litigation than did

the institutional plaintiff. *2001 U.S. Dist. LEXIS 21374 at *8; see also Critical Path, 156 F. Supp. 2d at 1112* (approving the appointment of an institutional investor who exceeded presumptive limitation, since it was the only acceptable institutional investor and large shareholder); *Network Associates, 76 F. Supp. 2d at 1030-31* (finding institutional investor to be presumptive lead plaintiff despite exceeding presumptive limitation).

As Local 705 points out in its papers, not all courts in this circuit, indeed in this district, have allowed institutional investors to overcome the presumptive bar. In *Aronson v McKesson HBOC, Inc, 79 F. Supp. 2d 1146 (ND Cal 1999)*, Judge Whyte refused to lift the presumptive bar against an institutional investor, saying that the statute's text "contains no flat exemption for institutional investors" and that the prospective plaintiff "had not demonstrated why it should be excepted from the ban against frequent litigants." *ID. at 1156-57*. Aronson, however, did not hold that institutional investors could never be exempt from the presumptive bar. Rather, Judge Whyte was unconvinced that he should exercise his discretion to exempt the particular plaintiff in question. See id.

In the case at bar, the court finds that Fuller & Thaler should be exempted from PSLRA's presumptive bar, even if the bar applies. As noted above, the investment firm is only serving in four class actions, due to consolidation; this should not trigger the bar in the first place. Even if it did, the court would exercise its discretion under *§ 78u-4(a)(3)(B)(vi)* to exempt Fuller & Thaler. In keeping with the purposes of the PSLRA to promote the appointment of experienced institutional investors, Fuller & Thaler are the kind of qualified institution that should be exempted from the bar. Their professional and legal experience [*37] in the securities realm makes them an appropriate candidate for lead plaintiff. Additionally, their participation in securities class actions, while extensive, is not excessive: At most, they have been appointed as lead plaintiff in five other lawsuits. Finally, the magnitude of their investment and loss is so much greater than the other prospective plaintiffs that exemption would be appropriate.

Accordingly, because Leff and Kelly and Local 705 have failed to rebut the presumption that Fuller & Thaler should be appointed lead plaintiff in this class action, the court GRANTS Fuller & Thaler's motion to be appointed lead plaintiff. The court also DENIES both Leff and Kelly's motion and Local 705's motion to be appointed as lead plaintiff.

B

Fuller & Thaler also move the court to grant its motion to approve Gold, Bennett, Cera & Sidener as lead counsel in this action. The PSLRA gives the lead

2003 U.S. Dist. LEXIS 19606, *

plaintiff the authority, subject to the approval of the court, to appoint lead counsel. *15 USC § 78u-4(a)(3)(B)(v)*. "The choice of counsel has traditionally been left to the parties * * * Selecting a lawyer in whom a litigant has confidence is an * * * important client [*38] prerogative." *Cavanaugh, 306 F.3d at 734.* As the court has already discussed at some length, Fuller & Thaler's choice of counsel seems reasonable. Accordingly, the court approves Fuller & Thaler's choice of counsel and GRANTS its motion to appoint Gold, Bennett, Cera & Sidenar as class counsel. The court also, therefore, DENIES Leff and Kelly's motion and Local 705's motion to approve their choices for lead counsel.

### III

On August 27, 2003, the court received a letter from Local 705 requesting a status conference, based on its concerns that the class would be prejudiced if steps were not taken to preserve certain evidence. As such, Local 705 requested that one of the topics of discussion at the status conference be the possibility of lifting the discovery stay for the purpose of obtaining certain evidence. See Local 705 Letter (Doc # 75). HPL did not oppose the scheduling of a status conference, but did oppose the lifting of the discovery stay. See HPL Letter (Doc # 76).

Given the fact that the court has just ruled on the motions for appointment of lead plaintiff and counsel, and given that no motion to dismiss is currently pending before the court, no discovery stay [*39] is currently in effect. See *15 USC § 78u-4(b)(3)(B)*. Because the court herein rules on the various motions to appoint lead plaintiff and counsel, however, holding a status conference to discuss the upcoming schedule seems appropriate. Accordingly, the court GRANTS Local 705's request for a status conference. Counsel for the parties are ORDERED to appear at a status conference in this matter on Wednesday, November 12, 2003, at 9:00 am.

### IV

For the foregoing reasons, plaintiffs' motions to consolidate (Docs ## 10, 13, 39, 40) are GRANTED. Fuller & Thaler's motions to be appointed lead plaintiff and to approve lead counsel (Docs ## 20, 29, 35) are GRANTED. Leff and Kelly's motions to be appointed lead plaintiff and to approve lead counsel are DENIED (Docs ## 10, 40). Local 705's motions to be appointed lead plaintiff and to approve lead counsel (Docs ## 12, 38) are DENIED. Local 705's request for a status conference (Doc # 75) is GRANTED.

IT IS SO ORDERED.

9/29/2003

VAUGHN R WALKER

United States District Judge

# Exhibit C

LEXSEE 2003 U.S. DIST. LEXIS 21534

In re DJ ORTHOPEDICS, INC., SECURITIES LITIGATION; This Order Relates to: ALL ACTIONS.

CASE NO. 01-CV-2238-K (RBB)

UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF CALIFORNIA

*2003 U.S. Dist. LEXIS 21534*

November 16, 2003, Decided
November 17, 2003, Filed

**SUBSEQUENT HISTORY:** Settled by, Dismissed by, Motion granted by, Costs and fees proceeding at *In re dj Orthopedics, Inc. Secs. Litig., 2004 U.S. Dist. LEXIS 11457 (S.D. Cal., June 21, 2004)*

**DISPOSITION:** Motion for class certification granted.

**LexisNexis(R) Headnotes**

**COUNSEL:** [*1] For STEVEN LARKY, plaintiff: Darren Jay Robbins, Milberg Weiss Bershad Hynes and Lerach, San Diego, CA.

For ORACLE PARTNERS, plaintiff: Valerie Louise McLaughlin, Milberg Weiss Bershad Hynes and Lerach, San Diego, CA.

For LOUISIANA SCHOOL EMPLOYEES' RETIREMENT SYSTEM, plaintiff: Blair A Nicholas, Bernstein Litowitz Berger and Grossman, San Diego, CA.

For DJ ORTHOPEDICS, INC., LESLIE H CROSS, CYRIL TALBOTT, III, CHARLES T ORSATTI, MITCHELL J BLUTT, DAMION E M.D., KIRBY L CRAMER, defendants: William F Sullivan, Paul Hastings Janofsky and Walker, San Diego, CA.

For GOLDMAN, SACHS & CO., J.P. MORGAN SECURITIES, INC., UBS WARBURG LLC, U.S. BANCORP., PIPER JAFFRAY INC, defendants: Stephen D Alexander, Fried Frank Harris Shriver and Jacobson, Los Angeles, CA.

For FIRST UNION SECURITIES, INC., defendant: Alan K Brubaker, Wingert Grebing Brubaker and Ryan LLP, San Diego, CA. Steven M Malina, Kevin P Shea, Ungaretti and Harris, Chicago, IL.

**JUDGES:** Judith N. Keep, United States District Court Judge.

**OPINIONBY:** Judith N. Keep

**OPINION:**

ORDER GRANTING MOTION FOR CLASS CERTIFICATION

On September 29, 2003, lead plaintiff, Louisiana School Employees' Retirement System ("LSERS"), filed the [*2] instant motion for class certification pursuant to *Federal Rule of Civil Procedure ("Fed. R. Civ. P.") 23*. Defendants' opposition to the motion was filed on November 10, 2003. Plaintiffs' reply was also filed on November 10, 2003. All parties proceed through counsel. This court has jurisdiction because this action was brought pursuant to the Securities Exchange Act of 1933 (the "SEA"), *15 U.S.C. § 77 et seq.*

The court notes Defendants' Request for Judicial Notice in Support of its Memorandum of Points and Authorities. The court takes judicial notice that the documents were produced, but does not take judicial notice of the truth of the information contained therein. The court also notes receipt of a letter from defendants, dated November 4, 2003, in which defendants request an oral appearance regarding the pending motion addressed in this order. In it defendants raise three arguments. The

first and second are contained in defendants' papers and are addressed by this order accordingly. The third is addressed in this order to the extent it was raised in defendants' papers. Finally, the court notes receipt of a letter from plaintiffs objecting to defendants' [*3] letter. The objection is duly noted.

## I. Background

The following is based on the parties' pleadings and papers and should not be construed as findings of fact by the court.

Defendant dj Orthopedics, Inc. ("DJO") is an orthopedic sports medicine company headquartered in Vista, California. Defendants' Points & Authorities at 3. Defendants Leslie H. Cross, Cyril Talbot, III, and Charles T. Orsatti are officers of DJO and/or high-ranking board members. See Complaint PP9-11. Defendants Mitchell J. Blutt, M.D., Damion E. Wicker, M.D., and Kirby L. Cramer, M.D. are also associated with DJO, although it is unclear from the record what their positions or associations with DJO are. Investment banks, Goldman Sachs & Co., J.P. Morgan Securities, Inc., UBS Warburg LLC, U.S. Bancorp, First Union Securities, Inc. and Piper Jaffray Inc. (the "underwriter defendants") underwrote the initial public offering ("IPO") at issue in this case and are also defendants to this action. See Plaintiff's Points & Authorities at 2. The above-mentioned defendants will be referred to collectively as "defendants."

DJO planned an IPO of nine million shares of common stock to be sold for $ 17 each, [*4] for total proceeds of $ 153 million. Plaintiffs' Points & Authorities at 1-2. The IPO was scheduled for November 15, 2001, and DJO issued a Registration Statement/Prospectus (the "Prospectus") beforehand. Id. Just before the IPO, defendants learned that sales for the current period had declined. Id. On November 14, 2001, the day before the scheduled IPO, the "underwriter sales teams" contacted some of the investors and told them of new (decreased) estimates for the quarter's earnings and 2001 revenues. Defendants' Points & Authorities at 6. The IPO went forward as planned on November 15, 2001. Id. Plaintiffs allege that by going forward with the IPO, defendants violated federal securities laws because their Registration Statement/Prospectus was materially false. Id. at 3. The Prospectus was false, they contend, because it omitted material and adverse information about the then-current quarter's decline in sales. Id. In their complaint, plaintiffs allege the following four causes of action: (1) violation of the *SEA § 11* by defendant DJO, see *15 U.S.C. § 77k*; (2) violation of the *SEA § 11* by underwriter defendants, see *15 U.S.C. § 77k*; [*5] (3) violation of the *SEA § 12(a)(2)* by all defendants, see *15 U.S.C. § 77l(a)(2)*; and (4) violation

of *§ 15 of the SEA* by individual defendants, Cross, Talbot, and Orsatti, see *15 U.S.C. § 77o*. See Complaint at PP35-66.

Presently, named plaintiffs, Larky and LSERS, ask the court to certify a class of plaintiffs, containing two subclasses therein, pursuant to *Fed. R. Civ. P. 23*. See Plaintiffs' Points & Authorities at 1. They also ask the court to appoint Larky and LSERS as class representatives. Plaintiffs' Motion at 1.

## II. Legal Standard

All class actions in federal court must meet the prerequisites set forth in *Fed. R. Civ. P 23(a)*. Rule 23(a) states:

> One or more members of a class may sue . . . as representative parties on behalf of all only if (1) the class is so numerous that joinder of all members is impracticable, (2) there are questions of law or fact common to the class, (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class, and (4) the representative parties [*6] will fairly and adequately protect the interests of the class.

*Fed. R. Civ. P. 23(a)*. Moreover, in order to certify a plaintiff class based on common questions of law or fact under *Federal Rule of Civil Procedure 23(b)(3)*, plaintiffs must demonstrate "that the questions of law or fact common to the class predominate over any questions affecting only individual members, and that a class action is superior to other available methods for the fair and efficient adjudication of the controversy." *Fed. R. Civ. P. 23(b)(3)*. In other words, a class action can be maintained if there is numerosity, commonality, typicality, adequacy, predominance, and superiority. See *Hanlon v. Chrysler Corp., 150 F.3d 1011, 1022 (9th Cir. 1998)*.

Under *Federal Rule of Civil Procedure 23*, the trial court has broad discretion in determining whether a class should be certified. See *Armstrong v. Davis, 275 F.3d 849, 872, n.28 (9th Cir. 2001)*. However, plaintiff has the burden of establishing the prerequisites [*7] for class certification set forth in *Rule 23*. See *Hanon v. Dataproducts Corp., 976 F.2d 497, 508 (9th Cir. 1992)* (citing *Mantolete v. Bolger, 767 F.2d 1416, 1424 (9th Cir. 1985)*).

## III. Discussion

Plaintiffs propose a class, represented by Larky and LSERS, consisting of "all persons and entities who purchased the common stock of DJO in or traceable to its

IPO." Plaintiffs' Points & Authorities at 1. Within that class, plaintiffs propose a division into two subclasses. The first subclass consists of "all purchasers of DJO common stock in or traceable to the IPO who defendants did not contact on November 14, 2001 regarding information omitted from the Registration Statement/Prospectus and thus are not subject to the affirmative defense of knowledge (the 'No Knowledge Subclass')." Plaintiffs' Points & Authorities at 2. The second proposed subclass consists of "all purchasers of DJO common stock in or traceable to the IPO who defendants did contact on November 14, 2001 regarding information omitted from the Registration Statement/Prospectus and thus are potentially subject to defendants' affirmative defense of knowledge (the 'Putative-Knowledge [*8] Subclass')." Plaintiffs' Points & Authorities at 2.

## A. Numerosity

*Rule 23(a)* requires that the class for certification be so numerous that joinder of all members individually is impracticable. *Fed. R. Civ. P. 23(a)(1).* In order to satisfy this requirement, plaintiffs need not show that joinder of all members is impossible. Rather, impracticability is enough. See *Harris v. Palm Springs Alpine Estates, Inc., 329 F.2d 909, 913-14 (9th Cir. 1964).* Moreover, plaintiffs argue, the exact size of the class need not be known if general knowledge and common sense indicate that the class is large. Plaintiffs' Points & Authorities at 6 (citing *Schwartz v. Harp, 108 F.R.D. 279 (C.D. Cal. 1985).*

Plaintiffs allege that the class numbers in the tens of thousands. Defendants do not dispute that plaintiffs have established the requisite numerosity. Given the size of the proposed class and subclasses, the court agrees that plaintiffs have established the numerosity prerequisite.

## B. Commonality

To establish the commonality prerequisite in accordance with *Rule 23(a)(2),* there must be "questions of [*9] law or fact common to the class," *Fed. R. Civ. P. 23(a)(2).* Plaintiffs assert that they satisfy the commonality prerequisite because there are common questions to all plaintiffs in the class with respect to their *sections 11, 12, and 15* causes of action. See Plaintiffs' Points & Authorities at 8, 13 n.11.

### i. *Section 11*

With respect to their cause of action brought pursuant to *section 11 of the SEA,* plaintiffs contend that there are several questions of law and fact common to all plaintiffs in the class, including, among others, whether the Prospectus contained an untrue statement or omitted a fact that made the Prospectus misleading, and whether

that fact was material. See Plaintiffs' Points & Authorities at 8.

### a. *Putative-Knowledge Subclass*

Defendants do not dispute that the above-mentioned common questions exist. Instead, they argue that members of the Putative-Knowledge Subclass have no claim because defendants contacted them before the IPO regarding the information omitted from the Prospectus. Defendants' Points & Authorities at 14. Therefore, they reason, members of this subclass are subject to the affirmative [*10] defense of knowledge. Id. at 14-15. The Supreme Court, in Eisen v. Carlisle & Jacquelin, quoting the 5th circuit, states: "In determining the propriety of a class action, the question is not whether the plaintiff or plaintiffs have stated a cause of action or will prevail on the merits, but rather whether the requirements of *Rule 23* are met.'" *Eisen v. Carlisle & Jacquelin, 417 U.S. 156, 178, 40 L. Ed. 2d 732, 94 S. Ct. 2140 (1974)* (quoting *Miller v. Mackey Int'l, 452 F.2d 424, 427 (5th Cir. 1971)).* As applied to the instant facts before the court, defendants' claimed defense does not diminish plaintiffs' establishment of the common questions set forth above in accordance with the requirements of *Rule 23(a).* The court, therefore, finds that the Putative-Knowledge Subclass satisfies the commonality requirement.

### b. *No-Knowledge Subclass*

With respect to the No-Knowledge Subclass, defendants attempt to dispute the fact that the members of this class lacked the relevant information when they purchased their stock in the IPO. See Defendants' Points & Authorities at 21. Again, this argument, like that discussed with respect to the Putative-Knowledge [*11] Subclass, goes to the likely success of plaintiffs' claims on the merits. More precisely, the argument goes to the merits of defendants' defense. Because the merits should not be considered at the class certification stage, see *Eisen, 417 U.S. at 178,* the court finds plaintiffs' statement of common questions sufficient to satisfy the commonality requirement for the No-Knowledge Subclass.

### ii. *Section 12*

To establish liability under *section 12 of the SEA,* plaintiffs must establish that (1) defendants offered or sold securities through the use of interstate commerce; (2) defendants misrepresented or omitted material facts; and (3) plaintiffs had no knowledge of the untruth or omission. See *15 U.S.C. § 77l.* Plaintiffs argue that the first two elements present common questions to all members of the class. Plaintiffs' Points & Authorities at 13 n.11.

### a. *Putative-Knowledge Subclass*

With respect to the Putative-knowledge subclass, defendants argue only that because plaintiffs bear the burden of proving absence of knowledge to succeed on the merits of a *section 12* claim, individualized questions of knowledge predominate. Defendants' [*12] Points & Authorities at 14. Arguments regarding the predominance of common issues are misplaced in determining the issue of commonality. The court will address the issue of predominance below. See infra at Part III(E). At this juncture, the appropriate inquiry is merely whether plaintiffs have stated common questions of law and fact sufficient to establish commonality. Several circuits have held that even a single common issue is sufficient. See, e.g., *In re American Medical Systems, Inc., 75 F.3d 1069, 1080 (6th Cir. 1996)*. Although it is unusual that plaintiffs make their entire argument in a footnote, they do state that two of the three elements of their *section 12* claim present common questions of law or fact. See Plaintiffs' Points & Authorities at 13 n.11. *Rule 23* requires no more of them, and the court, therefore, finds that this subclass satisfies the commonality requirement for a *section 12* cause of action.

b. No-Knowledge Subclass

Defendants make the same argument with respect to the No-Knowledge Subclass as they made for this subclass's *section 11* claim. See Defendants' Points & Authorities at 21 (disputing the subclass members' lack [*13] of knowledge). This court applies the same analysis as it did above. See supra at Part III(B)(i)(b). The court, therefore, concludes that this subclass satisfies the commonality requirement for its *section 12* cause of action.

iii. *Section 15*

In addition to those elements required to establish a *section 11* claim, *section 15 of the SEA* requires that plaintiffs prove that defendants are control persons within the meaning of section 15. See *15 U.S.C. § 77o*. Thus, plaintiffs argue that all of the *section 11* common questions they set forth are also common with respect to their *section 15* claim. Moreover, they argue that this additional element (whether defendants are control persons) is also a common question. See Plaintiffs' Points & Authorities at 8. Defendants make no new arguments with respect to plaintiffs' *section 15* argument. The court finds that plaintiffs have satisfied their burden of establishing common questions of law and fact sufficient to establish commonality for the class.

C. Typicality

The "claims . . . of the class representative must be typical of the claims . . . of the class." *Fed. R. Civ. P. 23(a)(3)* [*14] . The test for typicality is (1) whether

other members have the same or similar injury as the representative; (2) whether the action is based on conduct not unique to the representative; and (3) whether other class members have been injured by the same course of conduct. *Hanon v. Dataproducts Corp., 976 F.2d 497, 508 (9th Cir. 1992)*.

i. Putative-Knowledge Subclass

According to plaintiffs, the claims of proposed representative for the Putative-Knowledge Subclass, LSERS, are typical of the claims of the class because the information disclosed to LSERS via its investment advisor was the same information disclosed to all subclass members. Plaintiffs' Reply at 6. Such a uniform disclosure, they conclude, makes the issue identical for every member of the subclass, thereby making LSERS's claim typical of the claims of the subclass. Id. Defendants make two arguments in response. First, defendants contend that if defendants made a disclosure to all members of the subclass, then none of the members has a claim. Defendants' Points & Authorities at 16. Second they contend that LSERS's claim is atypical of the subclass because LSERS purchased its DJO stock [*15] after the price fell. As a result, they argue, unique defenses apply to LSERS that do not apply to other subclass members. Id.

Defendants' first argument lacks merit because, as discussed above, a determination of plaintiffs' claims on the merits is inappropriate at the class certification stage. *Eisen, 417 U.S. at 178*. Moreover, this issue is not predetermined. Plaintiffs dispute that the disclosure made to members of the subclass was adequate to immunize defendants from liability. See Plaintiffs' Points & Authorities at 12. Determination of this issue is appropriate at a later stage of litigation, but cannot be dispensed with at this point.

Defendants' second argument equally fails. While defendant correctly states that defenses unique to the representative may defeat typicality, see *Hanon, 976 F.2d at 508*, defendants do not articulate what "unique" defenses might apply to plaintiff LSERS that would not apply to other subclass members. See Defendants' Points & Authorities at 16. Based on the information before the court, there is nothing to indicate that LSERS's purchase of stock after the price fell distinguishes it from other Putative-Knowledge [*16] Subclass members who, by definition, also had information about DJO's decline in sales before making their purchases. The court concludes that the Putative-Knowledge Subclass satisfies the typicality requirement.

ii. No-Knowledge Subclass

With respect to the No-Knowledge Subclass, plaintiffs contend that the claims of proposed

representative Larky are typical of the claims of the subclass because Larky was unaware of the information omitted from the Prospectus before he acquired stock and was exposed to the same rumors afterward. Plaintiffs' Reply at 9. Defendants, however, claim that Larky is atypical because he is subject to the unique defense of knowledge because, despite his purchase of DJO stock on November 14, 2001, he could have cancelled his purchase transaction up until November 20, 2001, at which point rumors of the sales decline had publicly swirled. Defendants' Points & Authorities at 22-23. It is not clear to the court that the other members of the subclass did not have the same opportunity that Larky had to cancel their transactions until the transaction finally "settled" a few days after initially acquiring the stock. Further, such time period for finalization [*17] of the transaction appears irrelevant. The SEA focuses on the adequacy of the Prospectus at the time of acquisition. 15 U.S.C. § 77k. The Prospectus did not change between November 14 and November 20. Therefore, Larky and all members of the subclass were exposed to the same information (or lack thereof) in the Prospectus and the same rumors whether they acquired their stock on November 14 or November 20. Thus, Larky is not subject to a different or unique defense that the other members of the subclass are not, and the court does not find defendants' argument persuasive.

Defendants also argue that Larky is atypical because he still holds his stock, which he purchased for $ 17 per share and which, as of October 17, was worth $ 17 per share. Id. at 23. Thus, they contend, he has no damages and is unsuitable as a representative. Id. The Ninth Circuit states that a determination of damages "is invariably an individual question and does not defeat class action treatment." Blackie v. Barrack, 524 F.2d 891, 905 (9th Cir. 1975). Accordingly, the court rejects this argument.

Although plaintiffs' argument is thin on its application of the facts [*18] to the law, the court is satisfied that it has sufficiently stated the requisite typicality. First, proposed representative Larky's claim arises from the same or similar injury as other members of the subclass in that he did not know of the information falsified in or omitted from the Prospectus when he acquired his DJO stock. See Plaintiffs' Points & Authorities at 14. Second, the conduct on which the action is based, the falsification or omission of information from the Prospectus, is not unique to Larky. Id. Third, all members of the subclass allegedly were injured by the same falsification or omission. Id. The court finds that the No-Knowledge Subclass satisfies the typicality requirement.

**D. Adequacy of Representation**

Rule 23(a)(4) requires that class representatives "fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a)(4). This prerequisite is satisfied if the named representatives (1) appear able to prosecute the action vigorously through qualified counsel, and (2) have no antagonistic or conflicting interests with the unnamed members of the class. Lerwill v. Inflight Motion Pictures, Inc., 582 F.2d 507, 512 (9th Cir. 1978). [*19] Plaintiffs contend that both LSERS and Larky are represented by qualified counsel because their counsel are members of a reputable firm with significant expertise in the field of securities litigation. See Plaintiffs' Points & Authorities at 16. Moreover, LSERS and Larky, "like the members of their proposed subclasses seek to prove statutory violations of the [SEA] giving rise to damages," and, as such, do not have conflicting interests with their respective subclass members. Id.

i. Putative-Knowledge Subclass

Defendants dispute that LSERS is an adequate representative for this subclass because LSERS is a "professional plaintiff" within the meaning of 15 U.S.C. § 77z-1(a)(3)(B)(vi), and because LSERS is not adequately interested in the action. See Defendants' Points & Authorities at 17, 19. The "professional plaintiff" provision precludes persons (or institutions) from serving as a lead plaintiff in more than five securities class actions in a three year period. 15 U.S.C. § 77z-1(a)(3)(B)(vi). This provision, however, applies only to lead plaintiffs, not to class representatives. See id. Moreover, defendants [*20] point to only five actions in which LSERS is or has been the lead plaintiff (including this action) in the last three years. Defendants' Points & Authorities at 17. Thus, the professional plaintiff provision does not render LSERS an inadequate class representative.

As to defendants second argument, that LSERS is not adequately interested in this action, the court finds it unpersuasive. In support of their argument, defendants rely only on Berger v. v. Compaq Computer Corp., a Fifth Circuit case that interprets the Private Securities Litigation Reform Act ("PSLRA") as implementing a heightened standard for judging the adequacy of a class representative. 279 F.3d 313 (5th Cir. 2002). Even the Fifth Circuit, however, qualified its heightened standard, stating, "we have not . . . created an additional requirement under rule 23(a)(4)." Berger, 279 F.3d at 313. Further, plaintiffs properly point out that the Ninth Circuit has explicitly rejected any interpretation of the PSLRA requiring more than the explicit requirements set forth in Rule 23(a)(4) to establish adequacy. Plaintiffs' Reply at 7; In re Cavanaugh, 306 F.3d 726, 737 (9th Cir. 2002) [*21] ("We do not believe . . . [the PSLRA], in the words of the Fifth Circuit, "raises the standard

adequacy threshold."). The PSLRA was intended to encourage plaintiff participation and discourage lawyer-driven lawsuits, but it does not mandate that plaintiffs have at-the-ready the details of each case in which they are involved. See *In re Cavanaugh* 306 F.3d at 737 ("The Reform Act was intended to 'protect[] investors who join class actions against lawyer-driven lawsuits by . . . increasing the likelihood that parties . . . whose interests are more strongly aligned with the class . . . will participate in the litigation and exercise control over the selection and actions of plaintiff's counsel.'") (quoting H.R. Conf. Rep. No. 104-369 (1995)). Plaintiffs hired counsel to be responsible for the details of this litigation, and the reliance on such counsel only demonstrates that plaintiffs satisfy the first prong of hiring "qualified counsel."

Finally, plaintiffs have adequately demonstrated that LSERS has no interests that conflict with other members of the subclass. Accordingly, the court finds that this subclass has satisfied the requirement of adequacy.

ii. [*22] No-Knowledge Subclass

Defendants dispute Larky's adequacy as representative of the No-Knowledge Subclass based on his lack of resources to finance the actual or potential costs of this litigation. Defendants' Points & Authorities at 23. Thus, defendants apparently dispute that Larky satisfies the first prong of adequacy, his ability to "vigorously pursue" the litigation. The authority defendants cite, however, does not support their position. Although In re THO Inc. Sec. Litig. does cite to cases in which courts are concerned with plaintiffs financial resources, the court goes on to point out that no such concern exists in the instant case because plaintiff's lawyers have agreed to advance costs. See *In re THQ, Inc. Secs. Litig., 2002 U.S. Dist. LEXIS 7753, *27-28.* In fact, this is exactly the argument plaintiffs rely on. See Plaintiffs' Reply at 10 ("Counsel has appropriately agreed to bear any costs assessed if this lawsuit is unsuccessful."). The concern regarding financial resources is that a representative might be forced to settle on terms unfavorable to the class due to a lack of resources. See *McGowan v. Faulkner Concrete Pipe Co., 659 F.2d 554, 559-60 (5th Cir. 1981).* [*23] Because plaintiffs have quieted any doubts this court might have regarding the financial resources to fund this litigation, the court finds that Larky is not likely to be forced into a position antagonistic to the other subclass members. Therefore, the court finds him an adequate representative of the No-Knowledge Subclass.

**E. Predominance**

*Rule 23(b)(3)* requires that "questions of law or fact common to the members of the class predominate over

any questions affecting only individual members." *Fed. R. Civ. P. 23(b)(3).* As discussed above in Part III(B), plaintiffs have satisfied the court that common questions of law or fact exist with respect to the *section 11, 12, and 15* causes of action of each subclass. Thus, the remaining issue is whether those common questions predominate over individual questions.

Defendants' contention is that knowledge of the information falsified or omitted from the Prospectus, either as a defense to plaintiffs' *section 11* claim or as an element of the *section 12* claim, will predominate over the common issues in the case. Defendants' Points & Authorities at 14. Plaintiffs dispute this contention, [*24] arguing that individualized determinations of knowledge will not predominate over common questions of law or fact. Plaintiffs' Points & Authorities at 8-9.

i. Putative-Knowledge Subclass

Defendant relies on Zimmerman v. Bell, a Fourth Circuit opinion, for the proposition that individualized determinations regarding knowledge will predominate over common questions. See Defendants' Points & Authorities at 14; *Zimmerman v. Bell, 800 F.2d 386, 390.* In Zimmerman, the court reasoned that "because the extent of knowledge of the omitted facts . . . will vary from shareholder to shareholder," individual issues predominate. *Id.* The same reasoning, however, does not apply to certification of the Putative-Knowledge Subclass because, by definition and admission, this subclass received a uniform disclosure of information. See Plaintiffs' Points & Authorities at 2, 9. Based on plaintiffs' admitted uniform exposure to this information, no individualized knowledge determinations are necessary. Any inquiry into knowledge will be common to the subclass. Therefore, plaintiffs have demonstrated that common questions will predominate over individualized issues, [*25] and the court finds that the Putative-Knowledge Subclass satisfies the predominance requirement.

ii. No-Knowledge Subclass

Here, defendants' argument that individual determinations of knowledge will be required is likely accurate. With respect to plaintiffs' *section 11* cause of action, defendants propose to prove that each member of the subclass did in fact have knowledge of the information falsified or omitted from the Prospectus before purchasing their shares. Defendants' Points & Authorities at 13. Similarly, with respect to plaintiffs' *section 12* cause of action, plaintiffs will bear the burden of proving that each sub-class member lacked the relevant information. Because there was no uniform disclosure of information to this subclass, an inquiry into knowledge will necessarily be individualized. Moreover, because defendants proposed knowledge as a defense to

*section 11* liability and because plaintiffs must prove lack of knowledge as an element of their *section 12* claim, knowledge is likely to be a significant issue. The question that remains, however, is whether the individualized determinations of knowledge will predominate over the common questions set forth by plaintiffs. [*26] See Plaintiffs' Points & Authorities at 8.

There is no binding Ninth Circuit authority addressing this discrete issue. Instead, defendants again rely on Zimmerman, a Fourth Circuit case. The case is now relevant with respect to the No-Knowledge Subclass, because, like in *Zimmerman*, No-Knowledge Subclass members could potentially have varying degrees of knowledge. For this reason the Fourth Circuit refused to certify the class. See *Zimmerman, 800 F.2d at 390*. However, plaintiffs rely on directly contradictory authority in which the court found that despite the potential need for individualized knowledge determinations in plaintiffs *section 11 and 12* claims, common questions still predominate. See *In re First Republic Bank Sec. Litig., 1989 U.S. Dist. LEXIS 11139*, at *22 (N.D. Tex. 1991).

This court finds the authority relied upon by plaintiffs more persuasive than that of defendants. First, in *Zimmerman*, a significant problem with the class to be certified was that the class was overly broad. See *800 F.2d at 388-89*. Plaintiffs have remedied this problem by dividing the class into two subclasses, thereby reducing the [*27] need for individualized determinations on the issue of knowledge. Second, the weight of Zimmerman is counterbalanced by the directly contradictory case, In re First Republic Bank Sec. Litig., in which the court reached the directly opposite conclusion. See *1989 U.S. District LEXIS 11139* at *22-*23. Third, plaintiffs have set forth six common questions of fact or law and defendants indicate only one question that is individualized. See Plaintiffs' Points & Authorities at 8; Defendants' Points & Authorities at 13. Fourth, the proof regarding the individualized issue would rely as much on information common to all subclass members (e.g. how widespread was the public dissemination of the information) as it would on individual information (e.g. to what sources of information was each subclass member exposed). Fifth, the trial court has broad discretion in determining whether a class should be certified. See *Armstrong, 275 F.3d at 872 n.28*. Finally, the Ninth Circuit states that the issue underlying class certification is "whether a defendant's course of conduct is in its broad outlines actionable, [not whether there are] slight differences [*28] in class members' positions." *Blackie, 524 F.2d at 892*. The court, therefore, finds that the slight differences among the subclass members does not defeat certification in this case, and the No-

Knowledge Subclass has established that common questions of law or fact predominate over the individual issue of knowledge.

### F. Superiority

Plaintiffs must satisfy a final requirement set forth in *Rule 23(b)*. "Class resolution must be 'superior to other available methods for the fair and efficient adjudication of the controversy.'" *Hanlon v. Chrysler Corp., 150 F.3d 1011, 1023 (9th Cir. 1998)* (quoting *Fed. R. Civ. P 23(b)(3)*). The inquiry for this prerequisite is whether "the objectives of the particular class action procedure will be achieved in the particular case . . . . [and] involves a comparative evaluation of alternative mechanisms of dispute resolution. *Id.* In Hanlon, the court first considered what alternatives existed. Id. Next it weighed the potential burden the alternative would impose on the judiciary and on potential plaintiffs. Id.

Applying this analysis to the instant case, [*29] like in *Hanlon*, individual actions would be the alternative mechanism available to plaintiffs. Next, even if efficacious, tens of thousands of individual claims would certainly unnecessarily burden the judiciary. See Plaintiffs Points & Authorities at 6 (estimating the size of the class). Third, litigation costs might dwarf potential recovery for many class members, thereby placing a significant burden on plaintiffs. For these reasons, a class action is clearly the preferred mechanism for adjudicating these cases. The court finds that plaintiffs satisfy the superiority requirement.

### IV. Conclusion

For the foregoing reasons the court certifies the class as follows:

. The class consists of all persons and entities who purchased the common stock of DJO in or traceable to its IPO.

. Within that class there are two subclasses:

o The first subclass, the No-Knowledge Subclass, consists of all purchasers of DJO common stock in or traceable to the IPO who defendants did not contact on November 14, 2001 regarding information omitted from the Prospectus.

o The second subclass, the Putative-Knowledge Subclass, consists of all purchasers of DJO common stock [*30] in or traceable to the IPO who defendants did contact on November 14, 2001

regarding information omitted from the Prospectus.

Further, the court appoints LSERS representative of the Putative-Knowledge Subclass and Larky representative of the No-Knowledge Subclass.

**IT IS SO ORDERED.**

11/16/03
Date

**Judge Judith N. Keep**

**United States District Court**

**Southern District of California**