IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

)
IN RE MOLSON COORS BREWING       )    Civil Action No. 05-294-KAJ
COMPANY SECURITIES LITIGATION,   )    (Consolidated)
                                 )

## MEMORANDUM ORDER

I.    Introduction

These consolidated actions are before me upon competing motions for

appointment as lead plaintiff and approval of selection of lead counsel. (Docket Items

["D.I."] 19 and 16; the "Metzler Motion" and the "Plumbers Motion," respectively.)[1]  All

three complaints purport to make class action claims for various violations of federal

securities laws, those violations allegedly being related to the February 9, 2005 merger

(the "Merger") of Molson, Inc. ("Molson") and Adolph Coors Company ("Coors") to

create the Molson Coors Brewing Company ("Molson Coors"). (D.I. 1 in each of C.A.

Nos. 05-294-KAJ, 05-317-KAJ, and 05-324-KAJ.)  For the reasons set forth herein, I

am granting the Metzler Motion and denying the Plumbers Motion.

II.   Background

Before the Merger, Molson was the largest brewer in Canada and one of the

largest in the world, with gross sales of $3.5 billion (Canadian) in the fiscal year ending

---

[1]Both motions also sought the consolidation of civil actions 05-294-KAJ, 05-317-
KAJ, and 05-324-KAJ.  That request was not opposed by the defendants and was
granted in a separate order.  (D.I. 53.)  The prerequisite for the present motions, *see* 15
U.S.C. § 78u-4(a)(3)(B)(ii) ("the court shall not make the determination [selecting a lead
plaintiff] ... until after the decision on the motion to consolidate is rendered"), has thus
been satisfied.

March 31, 2004. (D.I. 1 at ¶ 41.)[2]  Coors was the third-largest brewer in the United

States and one of the largest in the world, with $5.4 billion (U.S.) of sales in the fiscal

year ending December 28, 2003. (*Id.* at ¶ 42.)  On July 21, 2004, Coors and Molson

entered into a definitive merger agreement (the "Agreement"). (*Id.* at ¶ 50.)  In their

July 22 announcement of the deal (*id.* at ¶¶ 48; D.I. 21 at 3), the two companies noted

their expectation that the combined business entity would deliver "US$175 million in

pre-identified synergies and cost savings, annually, by 2007 – half of which would be

achieved within 18 months of the Merger."  (D.I. 1 at ¶ 48.)[3]  Those cost savings would

be realized in part, it was said, because Molson's Chief Executive Officer, Daniel J.

O'Neill, would head a specially created "Office of Synergies." (*Id.* at ¶ 49.)  In

describing his new role, Mr. O'Neill stated that his responsibility would be "to deliver the

identified synergies, unlock additional opportunities and lead the teams that have the

most past experience in making this happen." (*Id.*)

The Agreement contained certain customary representations and warranties,

including that "the business of Coors ... has been conducted in the ordinary course

consistent with past practices" and that nothing had occurred that could "reasonably be

expected to have a Material Adverse Effect on Coors ... ." (*Id.* at ¶ 50.)  In a December

10, 2004 proxy statement filed with the SEC, the merger parties reaffirmed that "each

party's obligation to complete the merger transaction is subject to ... the material truth of

representations and warranties and material compliance with covenants by the other

[2]Citations are to docket items in C.A. No. 05-294-KAJ.

[3]The quotation is from the Complaint, not the merger announcement.

2

party." (Id. at ¶ 52.) That proxy statement also described specific factors that were considered by a special committee of Molson's board of directors, including, "the current economic, industry and market trends affecting each of Molson and Coors in their respective markets[,]" and "the significant opportunities for the combined company to realize the estimated ... cost savings resulting from the merger ... ." (Id. at ¶ 53.) In the Proxy/Prospectus provided to shareholders, numerous filings Coors had made with the SEC were incorporated by reference, including a 10-K, 10-Qs, and 8-Ks. (See id. at ¶ 56.)

According to the plaintiffs, the representations made about the nature and effect of the Merger and the financial performance of Coors led the Molson shareholders to agree to the Merger in a January 2005 vote, which was followed on February 9, 2005 by the consummation of the Merger. (Id. at ¶ 57.) On that same date, the new company announced the financial results of Coors' last quarter, "reporting higher consolidated net sales, net income and earnings per share for the fourth quarter and full-year 2004." (Id. at ¶ 59.)

Soon thereafter, however, bad news began to emerge. On April 28, 2005, Molson Coors announced disappointing results for the first quarter of 2005. (Id. at ¶ 61.) O'Neill also announced that he was leaving the company and, of course, his position as Chair of the Office of Synergies and Integration. (Id. at ¶ 64.) His severance package amounted to $4.8 million (U.S.); in addition, restrictions on his stock options were removed, and he stood to make $33 million in pretax profits by cashing in those options. (Id.) The market's response to the news from Molson Coors was not

3

kind. Shares of the company immediately fell by nearly 20%, the fifth-largest loss that day among New York Stock Exchange listed companies. (*Id.* at ¶ 62.)

Price shifts of the magnitude experienced by Molson Coors stock on April 28 do not go unnoticed by securities litigators. In short order, suit was filed because, as the plaintiffs tell it, the precipitous decline in the company's stock price resulted from a series of materially false or misleading statements and failures to disclose material facts, for which the defendants are at fault. (*Id.* at ¶ 65.) In essence, the plaintiffs claim that investors were misled first about the performance of Coors in the months leading up to the Merger and thereafter about that of Molson Coors until April 28, 2005. (*See id.* at ¶¶ 4-5.) They claim that the defendants have violated Sections 10(b) and 14(a) of the Exchange Act and SEC Rules 10b-5 and 14a-9. (*Id.* at ¶¶ 69-81.) They also claim that the individual defendants have violated Section 20(a) of the Exchange Act. (*Id.* at ¶¶ 82-85.)

At this juncture, however, the merits of the plaintiffs' claims are not at issue. We are now at the stage where, as the pertinent statute puts it, "the court shall consider any motion made by a purported class member ... and shall appoint as lead plaintiff the member or members of the purported class that the court deems most capable of adequately representing the interests of the class members ... ." 15 U.S.C. § 78u-4(a)(3)(B)(i). More pointedly, it is time to decide which of the plaintiffs' law firms will win the money race.[4]

---

[4]By this observation, I mean no disrespect to these firms or others engaged in the representation of plaintiffs in securities litigation. I mean simply to be honest about what appears to be at stake. It is the lead counsel who stands to gain, not the lead plaintiff, as both the tone of the arguments and the logic of the incentives suggest here.

4

The two sets of plaintiffs competing for lead plaintiff status are, first, Metzler

Investment GmbH ("Metzler") and Drywall Acoustic Lathing and Insulation Local 675

Pension Fund ("Local 675") (collectively, Metzler and Local 675 are referred to herein

as the "Metzler Group"), and, second, Plumbers & Pipefitters National Pension Fund

("Plumbers").[5]  (D.I. 17 at 1; D.I. 21 at 1.)  The Metzler Group claims to have suffered

losses of $2,753,798.15 because of the defendants' wrongful acts, and it therefore

claims to be the movant with the "largest financial interest in the relief sought by the

_____

The "pick me" urgency seems far more likely to come from the lawyers than the parties because, in the real world, people are not so eager to undertake work that someone else will do for them.  If another plaintiff is willing to shoulder the burden of supervising the litigation, one would think other class members would be pleased to step back. That, at least, is what one would could conclude is rational when, as is the case here, there is no persuasive suggestion that one group of plaintiffs will be any more competent at or dedicated to the job than the other.  The incentives giving rise to the classic "free rider" phenomenon, i.e., the inclination of people to take advantage of a benefit without bearing a commensurate portion of the associated burden, do not evaporate simply because securities are involved.  They get overridden because securities lawyers are involved, lawyers who are vying for the chance to take the laboring oar in litigation and the monetary rewards that go with it.

After going over the parties' submissions and counter-submissions, which, including appendices, run to hundreds of pages in length, it strikes me that this exercise is simply a business investment for the lawyers.  They invest their time and consume judicial resources in the hope of scoring a significant financial return.  That is perfectly rational from an economic perspective, but, from a public policy perspective, one might question whether the right incentives are yet in place.  It is for others to determine the degree to which the Congressional goal of making class action securities cases more client-driven and less lawyer-driven has been realized. *Cf.* 7 Newberg on Class Actions § 22:2 at 15 & n.6 (West 2002) ("The [PSLRA's] lead plaintiff provisions arose out of Congress' concern ... that some class action securities litigation had become 'lawyer-driven' ... .").  At this stage of this case, however, it appears that the lawyers are still very much in the driver's seat.

[5]Metzler is a German investment advisor/manager and asserts that it is acting as attorney in fact for investors in two specific funds, its MI-FONDS 208 fund and its MI-FONDS 705 fund.  (D.I. 21 at 1; trans. of 10/27/05 oral arg. ["Tr."] at 20.)  Local 675 and Plumbers are, as their names indicate, union pension funds.

class." (D.I. 21 at 8, quoting 15 U.S.C. § 78u-4(a)(3)(B)(iii)(I).) Plumbers claims to have

suffered losses of $1,000,818 for essentially the same reasons and, interestingly, to

have the largest financial interest of any competing lead plaintiff movant. (D.I. 17 at 7.)

The Metzler Group is represented by the law firm Milberg Weiss Bershad & Schulman

LLP ("Milberg Weiss"), while Plumbers is represented by the firm of Lerach Coughlin

Stoia Geller Rudman & Robbins LLP ("Lerach Coughlin").[6]

III.    Legal Standards

        The selection of a lead plaintiff is committed to the court's discretion. *See*

*Gariety v. Grant Thornton, LLP*, 368 F.3d 356, 370 (4th Cir. 2004) (noting that district

court did not abuse its discretion in determining suitability of lead plaintiff). So too is the

approval of a lead plaintiff's choice of lead counsel. *See In re Milestone Scientific*

*Securities Litigation*, 187 F.R.D. 165, 175 (D.N.J. 1999) ("The decision to approve

counsel selected by the lead plaintiff is a matter within the discretion of the district

court.").

        Under the Private Securities Litigation Reform Act (the "PSLRA"), there are

"detailed procedures for courts to follow" in the selection process. *In re Cendant Corp.*

*Litig.*, 264 F.3d 201, 222 (3d Cir. 2001). Those procedures direct me to "appoint 'the

most adequate plaintiff' as the lead plaintiff, and ... to 'adopt a presumption' that the

most adequate plaintiff is the movant that 'has the largest financial interest in the relief

_____

[6]These firms have a familial relationship. Milberg Weiss used to be known as
Milberg Weiss Bershad Hynes & Lerach, the name change apparently reflecting Mr.
Lerach's decision to launch the competing law firm that bears his name and is the rival
to Milberg Weiss for lead counsel in this action. (*See* D.I. 18, Ex. D at 13 ("Lerach
Coughlin attorneys, working under the former Milberg Weiss mantel ...").)

6

sought by the class' and 'otherwise satisfies the requirements of Rule 23 of the Federal Rules of Civil Procedure.'" *Id.* (quoting 15 U.S.C. § 78u-4(a)(3)(B)(i) & (iii)(I).)[7] That presumption "may be rebutted only upon proof by a member of the purported plaintiff class that the presumptively most adequate plaintiff will not fairly and adequately protect the interests of the class or is subject to unique defenses that render such plaintiff incapable of adequately representing the class." 15 U.S.C. § 78u-4(a)(3)(B)(iii)(II).

Thus, beyond the size of the financial stake held by a lead plaintiff candidate, the court must consider whether the candidate may serve as a class representative in light of the Rule 23 requirement that a litigant can represent a class "only if (1) the class is so numerous that joinder of all members is impracticable, (2) there are questions of law or fact common to the class, (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class, and (4) the representative parties will fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a). In the context of selecting the lead plaintiff, "the focus is only on the typicality (Rule 23(a)(3)) and adequacy (Rule 23(a)(4)) requirements." *Fields v. Biomatrix, Inc.*, 198 F.R.D. 451, 456 (D.N.J. 2000). "A full examination of the remaining Rule 23 factors should be left for consideration on a motion for class certification." *Id.* (internal quotation marks and citation omitted).

"[T]he court must keep firmly in mind that the inquiry is not into the adequacy or fitness of counsel but into the adequacy of plaintiff, and the choice of counsel is only an

---

[7]In addition to the assessment of the financial interest of the movant and the factors set forth in Rule 23, I must determine whether the movant has "either filed the complaint or made a motion in response to a notice" of the suit. 15 U.S.C. § 78u-4(a)(3)(B)(iii)(I)(aa). Both movants satisfy that requirement.

7

indicator--and a relatively weak one at that--of plaintiff's fitness." *In re Cavanaugh*, 306 F.3d 726, 733 (9th Cir. 2002).  When all is said and done, "only one 'entity' is entitled to speak for the class: *the* lead plaintiff." *Cendant*, 264 F.3d at 223 n.3 (original emphasis).

Once the lead plaintiff is chosen, that party is primarily responsible for selecting lead counsel.   15 U.S.C. § 78u-4(a)(3)(B)(v) ("The most adequate plaintiff shall, subject to the approval of the court, select and retain counsel to represent the class."). However, "[t]he judgment of a lead plaintiff or proposed lead counsel is not dispositive in the appointment of lead counsel.  Approval of lead counsel necessarily requires an independent evaluation of, among other considerations, the effectiveness of proposed class counsel to ensure the protection of the class." *In re Milestone Scientific Sec. Litig.*, 187 F.R.D. 165, 176 (D.N.J. 1999).

IV.    Discussion

A.    *Appointment of Lead Plaintiff*

Plumbers concedes that the Metzler Group claims "a facially larger financial interest" in the outcome of this litigation, but it nevertheless argues that the Metzler Group "should not be appointed lead plaintiff because they cannot adequately represent the class."  (D.I. 27 at 1.)  More specifically, Plumbers argues that: (1) Metzler failed to "timely establish that it has any financial interest in the relief sought ..., or that it was authorized ... under applicable German law to seek lead plaintiff status[;]" (2) Metzler "failed to comply with the certification requirements set forth by the PSLRA, as it does not certify that it has *all* of the transactions it made ... during the class period [in

8

the securities at issue;]" and (3) "Metzler does not meet the requirements of Rule 23 because as a foreign investment advisor it is subject to unique defenses that will be exploited by defendants to the detriment of the entire class should Metzler be appointed as lead plaintiff." (D.I. 27 at 1-2; original emphasis.)[8]  Plumbers does not make any other argument of significance in favor of its own candidacy. Its approach is, essentially, to say that the Metzler Group is unqualified and that it, Plumbers, is really the only alternative.

The Metzler Group responds first by saying that Metzler has been "appointed lead plaintiff or co-lead plaintiff in four securities class actions, and has never been rejected on adequacy grounds." (D.I. 32 at 1.) Indeed, says the Metzler Group, the same arguments that counsel for Plumbers makes against Metzler now were also advanced without success, by the same counsel, in two of those four cases, *In re Corinthian Colls. Inc. S'holder Litig.*, No. 04-CV-5025 (C.D. Cal. 2004), and *South Ferry LP #2 v. Killinger*, No. 2:04-CV-01599 (W.D. Wa. 2004). (D.I. 56 at 2.)

Turning to the specific arguments, the Metzler Group contends that it has made a prima facie showing that it has sustained the largest losses and therefore has the greatest financial stake in the outcome of this action. (D.I. 32 at 4-5.) Thus, it argues, the burden is on Plumbers to come forward with some proof that the Metzler Group is not qualified to serve but that, instead, Plumbers has done nothing but advance

---

[8]Plumbers also mentions an argument that the Metzler Group "is nothing more than a random assemblage of plaintiffs cobbled together by their lawyers." (D.I. 27 at 3.) Since Metzler alone, without the presence of Local 675 in the Metzler Group, claims a loss in excess of Plumbers' (*see* D.I. 32 at 4), it is not surprising that Plumbers does not dwell on this point.

9

speculation about whether Metzler is authorized to assert the financial interests of its investors. (*Id.*) Metzler asserts that it has provided affidavits demonstrating that it has the necessary authorization to serve as attorney in fact and that it has chosen to exercise that authority by pursuing this action. (*Id.* at 6-7.) With respect to whether it documented its transactions in the securities at issue, the Metzler Group contends that it has made all the necessary certifications about its transactions. (*Id.* at 6.) And, finally, in response to Plumbers' argument that Metzler will be subject to unique and problematic defenses because it is a German company, the Metzler Group asserts that "[f]oreign investors are routinely appointed as lead plaintiffs and/or class representatives[,]" and, "[a]s already noted, Metzler itself has been appointed a lead plaintiff in four securities class actions." (*Id.* at 8.)

I believe that the Metzler Group has the better of these arguments. It is correct in its assertion that many courts, including this one, have approved foreign investors as lead plaintiffs in cases such as this. *See, e.g., Blechner v. Daimler-Benz AG*, No. 04-CV-331, at 1-2 (D. Del. Sept. 16, 2004) (attached as Ex. F to D.I. 32; appointing two Austrian institutions as lead plaintiff); *In re Nortel Networks Corp. Sec. Litig.*, No. 01 Civ. 1855, at *13 (S.D.N.Y. Sept. 5, 2003) (attached as Ex. F to D.I. 33; appointing Canadian institution to serve as lead plaintiff); *In re Goodyear Tire & Rubber Co. Sec. Litig.*, No. 5:03CV2166, 2004 WL 3314943 at *1, 8 (N.D. Ohio, May 12, 2004) (attached as Ex. D to D.I. 33; appointing Austrian investment advisor/asset manager as lead plaintiff). In doing so, the notion that a "non-domestic ... investment firm" is "an

10

uncommitted and uncontrollable candidate for lead plaintiff" has been expressly

rejected as "insupportable." *Goodyear,* 2004 WL 3314943, at *5.

Significantly, Plumbers' counsel has already made much the same arguments

being made against Metzler here and those arguments have been rejected in other

courts. *See supra* at 9. The Metzler Group consists of sophisticated institutions with

experience in class action securities litigation. The group appears to have followed the

requirements set forth in the PSLRA, and it plainly has the largest financial stake in the

outcome of the suit. When pressed on that last point at oral argument, the most that

counsel for Plumbers could say, repeatedly, was that Metzler really did not have any

financial interest because it was an investment advisor. (*See, e.g.,* Tr. at 49-52.) I

reject that assertion. The Metzler Group has come forward with affidavit evidence

adequate to support the conclusion that Metzler is serving as attorney in fact for the

investors in the identified funds, has authority to make decisions and act on their behalf,

and is able to recover moneys for them. Plumbers has come forward with nothing more

than unsupported and unpersuasive arguments about the sufficiency of that showing.

Consequently, as required by 15 U.S.C. § 78u-4(a)(3)(B)(iii)(I)(bb), the Metzler Group

has shown "the largest financial interest in the relief sought by the class." *Cf. In re*

*eSpeed, Inc. Sec. Litig.*, No. 05-CV-2091, 2005 WL 1653933, at *1 (S.D.N.Y. July 13,

2005) (to have standing, an investment advisor "must be the attorney in fact for his

clients, and he must be granted both unrestricted decision-making authority and the

specific right to recover on behalf of his clients").

I also conclude, in light of the record as it now stands, that the Metzler Group

satisfies the typicality and adequacy grounds of Rule 23.[9]  Plumbers does not

specifically target its argument against the Metzler Group at either typicality or

adequacy. Instead it relies primarily on the general argument that Metzler is subject to

unique defenses because of its status as a foreign investment advisor. [10] (D.I. 27 at 2,

8-10.) However, for the reasons already noted, that argument does not overcome the

showing the Metzler Group has made on typicality and adequacy.

"The typicality requirement is designed to align the interests of the class and the

class representatives so that the latter will work to benefit the entire class through the

pursuit of their own goals. However, typicality ... does not require that all putative class

members share identical claims." *In re Warfarin Sodium Antitrust Litig.*, 391 F.3d 516,

531-32 (3d Cir. 2004) (internal quotation marks and citations omitted). "Factual

differences will not render a claim atypical if the claim arises from the same event or

---

[9]All of the requisites of Rule 23(a) will be carefully examined at the time a motion to certify the class is under consideration.

[10]Plumbers makes two additional arguments in passing. As to Metzler, it makes a logistical argument: Europe is too far away, so Metzler will be "prevented from making necessary appearances in this Action." (D.I. 27 at 10.) In an action such as this, with a well-heeled institutional party like Metzler, which claims to have losses of over $2 million, that argument deserves no more attention than Plumbers gave it. It is wholly unpersuasive. Metzler appears to have both the resources and the incentive to serve in the lead counsel role with the same degree of attention that Plumbers itself could be expected to give. As to Local 675, Plumbers makes the one sentence assertion that "Local 675 is subject to unique defenses ... because *it did not purchase any of its Molson shares on the open market*, but instead received all of its shares ... in the merger ... ." (*Id.* at 3; original emphasis.) The Metzler Group rightly points out that this is an odd argument because the complaint defines the class as including shareholders who received shares in the merger (D.I. 1 at ¶ 1) and because "[a] fraud on the market that inflates the price of the offerors stock is no less injurious to those who receive such stock in a share-exchange than those who purchase the stock ... on the open market." (D.I. 32 at 17 n.11.)

12

practice or course of conduct that gives rise to the claims of the class members, and if it
is based on the same legal theory." *Grasty v. Amalgamated Clothing & Textile Workers
Union,* 828 F.2d 123, 130 (3d Cir. 1987) (quoting 1 *Newberg on Class Actions* § 3.15,
at 168 (2d ed. 1985)), *cert. denied,* 484 U.S. 1042 (1988). "Indeed, even relatively
pronounced factual differences will generally not preclude a finding of typicality where
there is a strong similarity of legal theories." *Baby Neal v. Casey*, 43 F.3d 48, 58 (3d
Cir. 1994). I am satisfied that, as other courts evidently have found, Metzler's status as
a foreign entity and an investment manager/advisor does not outweigh the fundamental
factual similarity that the claims of the Metzler Group have with those of the putative
class.

More particularly, Plumbers' conjecture that a judgment against Metzler would
not preclude later suits by Metzler investors in Germany seems to be just that,
conjecture. In any event, the Metzler Group correctly calls this res judicata argument a
red herring. The preclusive effect in Germany of a judgment here is not a question
unique to the investors in Metzler, whom, it should be remembered, Metzler claims are
bound by the decisions it makes as their attorney in fact. To the extent there is any
such res judicata question, it would apply to any and all members of the putative class.

Similarly, as to the adequacy prong of Rule 23(a), Plumbers has not pointed to
anything showing that the interests of absent class members would be inadequately
pursued by the Metzler Group. "[T]he adequacy inquiry under Rule 23 has two
components designed to ensure that absentees' interests are fully pursued. First, the
adequacy inquiry tests the qualifications of the counsel to represent the class. Second,
it seeks to uncover conflicts of interest between named parties and the class they seek

13

to represent." *Warfarin*, 391 F.3d at 532 (internal quotation marks and citations omitted).  Plumbers does not contend that Milberg Weiss is unqualified to represent the class.[11]  Nor does Plumbers point to any issue, other than those already dealt with, to indicate that the members of the Metzler Group may have a conflict with other members of the putative class.

In sum, the Metzler Group has shown that it meets the three criteria set forth in 15 U.S.C. § 78u-4(a)(3)(B)(iii)(I): (1) it has "filed the complaint or made a motion in response to a notice;" (2) it has "the largest financial interest in the relief sought by the class;" and (3) it has "otherwise satisfie[d] the requirements of Rule 23 of the Federal Rules of Civil Procedure," insofar as that analysis can be undertaken at this point.  The Metzler Group is therefore the beneficiary of the PSLRA's presumption that it is the most adequate lead plaintiff.  Plumbers has failed to present proof sufficient to rebut that presumption, as is its burden under 15 U.S.C. § 78u-4(a)(3)(B)(iii)(II).

B.   *Approval of Lead Counsel*

As already noted, *supra* note 11, no one contends that Milberg Weiss is less than fully qualified to handle the responsibilities of lead counsel in this matter.  I have reviewed the materials provided regarding the firm (D.I. 22 at Ex. E) and am independently satisfied that the firm has the resources and experience to effectively represent the interests of the putative class.  The Metzler Group's selection of Milberg Weiss is therefore approved.

---

[11]There is no question that Milberg Weiss is qualified to serve as lead counsel.  It has a long history of successfully pursuing complex securities claims on behalf of class plaintiffs.  (*See* D.I. 22 at Ex. E; firm resume setting forth prominent cases from the firm's forty year history.)  Neither Plumbers nor any one else has asserted the contrary.

14

V.    Conclusion

Accordingly, it is hereby ORDERED that the Metzler Motion (D.I. 19) for

appointment as lead plaintiff and approval of its selection of lead counsel is GRANTED,

so that Metzler Investment GmbH and Drywall Acoustic Lathing and Insulation Local

675 Pension Fund are collectively appointed to serve as lead plaintiff in this action, and

Milberg Weiss Bershad & Schulman LLP is approved as lead counsel; it is further

ORDERED that the Plumbers Motion (D.I. 16) is DENIED in all respects.

UNITED STATES DISTRICT JUDGE

Wilmington, Delaware
December 2, 2005

15