# Consolidated Amended Class Action Complaint (Part 1 of 2)

## UNITED STATES DISTRICT COURT
### DISTRICT OF DELAWARE

| | | |
|---|---|---|
| IN RE MOLSON COORS BREWING COMPANY SECURITIES LITIGATION | ) ) ) ) | CIVIL ACTION NO. 05-294-KAJ CONSOLIDATED |

## CONSOLIDATED AMENDED CLASS ACTION COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS

Plaintiffs, by their counsel, make the following allegations upon information and belief based upon all of the facts set forth below, which were obtained through an extensive investigation made by and through their attorneys.  Lead Counsel's investigation has included, among other things, a review of: (i) the public filings of Molson Coors Brewing Company ("Molson Coors" or the "Company"), the Adolph Coors Company ("Coors"), and Molson, Inc. ("Molson") with the United States Securities and Exchange Commission (the "SEC"); (ii) press releases and other public statements issued by defendants; (iii) published reports and news articles regarding Molson Coors, Coors and Molson; and (iv) confidential communications with former Coors employees and independent consultants.  Plaintiffs believe that substantial evidentiary support will exist for the allegations set forth below after a reasonable opportunity for discovery.

### NATURE OF THE COMPLAINT

1.      This is a securities class action on behalf of all persons, other than defendants and certain other related parties, who are (i) former shareholders of Molson who received shares of Molson Coors (NYSE: TAP) as a result of the February 9, 2005 merger of Molson by and into Coors (the "Merger") ; (ii) open market purchasers of the common stock of Coors from July 22, 2004 through February 9, 2005, inclusive; and (iii) open market purchasers of the common stock of Molson Coors, from the completion of the Merger through April 27, 2005, inclusive, who

purchased securities of Coors and/or Molson Coors at artificially inflated prices and were damaged when the revelation of the true facts regarding Coors and Molson Coors caused a decline in Molson Coors' stock price. Plaintiffs seek remedies under Sections 14(a), 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), and the regulations promulgated thereunder by the SEC, including Rule 10b-5. The term "Class Period" refers to the period from July 22, 2004 through April 27, 2005.

2.      Plaintiffs allege, inter alia, that during the Class Period, defendants issued materially false and misleading statements of fact to the market in press releases and SEC filings, which caused the price of Coors and therefore Molson Coors stock to be artificially inflated, and caused economic loss to Class members when revelations of the true facts caused a decline in the value of their investments. Defendants also knowingly or recklessly manipulated their 2005 financial statements in violation of Generally Accepted Accounting Procedures ("GAAP") by failing to properly account for loss contingencies regarding executive severance payments and the significant losses form Molson Coors' Brazilian operations.

## INTRODUCTION

3.      On or about February 9, 2005, Coors and Molson consummated the Merger to form Molson Coors, a corporation registered and organized under the laws of the state of Delaware. The Merger was structured as a stock-for-stock "merger-of-equals" requiring approval by both Coors and Molson shareholders.

4.      Prior to the Merger, Molson had repeatedly disclosed and consistently reported that it was operating below plan and would not be able to achieve the growth in earnings previously anticipated. To obtain shareholder approval, defendants consistently stated that Coors was performing well, and that Molson's below-plan performance was expected and would not have an adverse impact on Molson Coors. Thus, investors were led to believe that the purported

financial and operational strength of Coors would enable Molson Coors to reach its projected

goals, despite Molson's pre-Merger performance.  Defendants, however, knew or recklessly

disregarded that Coors could not compensate for Molson's weak financial performance, because

Coors was experiencing a significant reduction in sales and increase in costs that were causing

Coors to also operate below plan.

5.      In addition, defendants consistently represented that the Merger would create

specific cost saving synergies, and would result in a substantially stronger company with greater

profitability and increased earnings.  Defendants valued these expected synergies at $50 million

in the first year, $90 million in the second year and $175 million in the third year, with even

greater increases beyond.  Defendants, however, knew or recklessly disregarded that it would be

virtually impossible for Molson Coors to achieve these synergies because, among other reasons,

Coors' rapidly increasing distribution costs would adversely effect the potential for cost saving

synergies, Molson and Coors were already distributing each other's products thereby reducing

the potential for cost saving synergies, the Merger would result in significant post-Merger

expenses due to the expected exodus of Coors senior executives who would be paid millions in

benefits, and Molson Coors would inherit Molson's Brazilian operations, which were an

unmitigated failure that eventually necessitated a $500 million post-Merger charge and a sale of

Molson's Brazilian interests at a fraction of their cost.

6.      Defendants also made false and misleading statements regarding the extent of

Molson's problems in Brazil and thus the potential effect on Molson Coors.  Prior to the Merger,

Molson was experiencing losses stemming from its 2002 acquisition of an 80% interest in

Cervejarias Kaiser Brazil, S.A. ("Kaiser"), the second largest brewer in Brazil.  Molson had paid

approximately $765 million for a 100% interest in Kaiser and transferred 20% of this interest to

Heineken N.V. ("Heineken") for $218.3 million about one month later. This Brazilian venture was such an unmitigated failure, that Heineken eventually took an impairment charge for its entire interest, and, on January 16, 2005, Molson Coors agreed to sell all but 15% of its interest for only $68 million. During the Class Period, defendants made false and misleading statements regarding the Brazilian operations that Molson Coors would inherit, including that Molson's 2004 losses were merely "a function of the current period costs." Defendants also failed to disclose that Molson Coors would inherit from Molson, as a result of the Kaiser acquisition, $500 million in Brazilian tax liabilities.

7.    The severity of defendants' illegal conduct is clearly demonstrated by the reaction of the market and by the reaction of analysts and investors during the perpetration of defendants' fraud. Initial reactions to the proposed Merger were largely negative. Several analysts suggested, inter alia, that the Merger was a "marriage of convenience" designed to benefit the Molson and Coors families and prevent a hostile takeover of either company, that both Coors and Molson were struggling in their home markets, and that few, if any, additional synergies would be generated because Coors and Molson already operated joint ventures in the U.S. and Canada. Several large institutional investors also publicly expressed concerns regarding the Merger.

8.    In response to this early opposition, defendants agreed, inter alia, to pay Molson shareholders a special dividend of C$5.44 per share for each share of Molson stock exchanged in the Merger. The effect of this special dividend was to increase Molson Coors' debt by approximately 20%.

9.    As a result of the special dividend to incentivize Molson shareholders to support the Merger, the false and/or misleading statements regarding Coors' profitability, the projected synergies between the two companies, and Molson's Brazilian operations, analysts that were

previously soured on the Merger began to take a more optimistic view, often projecting a stock value for Molson Coors approaching $98 per share. Molson and Coors shareholders voted to approve the Merger on January 28, 2005 and February 1, 2005, respectively.

10.     On April 28, 2005, defendants released Molson Coors' first quarterly results, and investors learned the truth about the impaired financial and operational condition of Coors and the subsequent problems facing Molson Coors. Specifically, Molson Coors reported a net loss caused by a lack of volume growth in all four of Molson Coors' major markets. In addition, as evidence that Coors was not the white knight it had made itself out to be, pro forma U.S. volume year-over-year had declined significantly for Coors products standing alone. On the day the results were announced, Daniel O'Neil, former Molson CEO who had accepted a position as Chair of the Office of Synergies and Integration at Molson Coors, announced his resignation with a $4.8 million severance package.

11.     After the true financial condition of Molson Coors was revealed on April 28, 2005, the value of Molson Coors dropped precipitously, from a closing price of $77.30 on April 28, 2005, to a closing price of $63.00 on April 29, 2005.

12.     As a result of the fraudulent scheme alleged herein, the price of Coors and Molson Coors' securities were artificially inflated during the Class Period and members of the Class were damaged when the true facts were revealed causing a decline in the value of their investments. The true purpose and effect of the Merger, and of defendants' fraudulent conduct, was to protect two struggling companies against potential hostile takeover action, and in the process allow members of the Coors and Molson families to retain control of Molson Coors. Following the Merger, former Coors Chairman Peter H. Coors and former Molson Chairman

Eric H. Molson together retained control of over 67% of the voting stock of Molson Coors, and were able to nominate 10 of Molson Coors' 15 board members.

13.     Defendants knowingly or recklessly participated directly in the fraudulent acts and misconduct for which damages are sought against them.  Defendants knew or recklessly disregarded that their public statements, inter alia, materially overstated the financial condition of Coors, materially overstated the projected synergies between Coors and Molson, and materially understated the problems with Molson Coors' Brazilian operations.  Defendants also knowingly or recklessly manipulated their 2005 financial statements in violation of GAAP by failing to properly account for loss contingencies regarding executive severance payments and the significant losses form Molson Coors' Brazilian operations.  All defendants culpably participated in the commission of the wrongs alleged herein.

## JURISDICTION AND VENUE

14.     Jurisdiction is conferred by § 27 of the Exchange Act (15 U.S.C. § 78aa) and 28 U.S.C. § 1331.  The claims asserted herein arise under and pursuant to Section 14(a) of the Exchange Act and Rule 14a-9 promulgated thereunder by the SEC (17 C.F.R. § 240.10b-5), and Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. § 240.10b-5).

15.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1331 and 1337, and Section 27 of the Exchange Act (15 U.S.C. § 78aa).  This Court also has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1331 and 1337, and Section 27 of the Exchange Act (15 U.S.C. § 78aa).

16.     Venue is proper in this District pursuant to § 27 of the Exchange Act (15 U.S.C. § 78aa) and 28 U.S.C. § 1391(b), § 1337.  In addition, venue is also proper in this District because

certain of the acts and practices complained of herein also occurred in substantial part in this District.

17.     In connection with the acts alleged in this Complaint, defendants also, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications and interstate transportation facilities.

**PARTIES**

18.     Meltzer Investment GmbH and Drywall Acoustic Lathing and Insulation Local 675 Pension Fund, collectively appointed to serve as Lead Plaintiff, as set forth in the certification accompanying the motion for appointment as Lead Plaintiff in this action, which is incorporated herein by reference, received shares of Molson Coors in or traceable to the Merger, and have been damaged by the artificial inflation and subsequent decline in the value of Molson Coors' stock following defendants' disclosures as set forth herein.

19.     Defendant Molson Coors is a corporation organized under the laws of the state of Delaware, with its principal place of business located in the United States at 1225 Seventeenth Street, Denver, Colorado (formerly 311 Tenth Street, Golden, Colorado), and with its Canadian executive offices located at 1555 Notre Dame Street East, Montreal, Quebec, Canada.  Molson Coors, formerly Coors, is a holding company engaged in the manufacturing, marketing and selling of malt beverage products through its principal subsidiaries, Coors Brewing Company, operating in the United States, and Coors Brewers Limited, operating in the United Kingdom. On February 9, 2005, as a result of the Merger, Coors became the parent of the merged Company, and changed the name of the merged company to Molson Coors Brewing Company.  Prior to the Merger, Molson sold its beer in Canada, Brazil and the United States.  At the time of the Merger, Molson had five breweries in Canada and eight breweries in Brazil, and distributed over 75 owned or licensed brands of beer and alcohol products.  Following the Merger, Molson Coors'

7

brands are now sold primarily in the Americas, and include Coors Light, Coors, Coors Non-Alcoholic, Extra Gold, Zima XXX, Aspen Edge, George Killian's Irish Red Lager, Keystone, Keystone Light, Keystone Ice, Blue Moon Belgian White Ale, Mexicali, Molson Canadian, Molson Export, Molson Dry, Kaiser and Bravaria.

20.     Defendant Peter H. Coors ("P. Coors") was, at the time of the Merger, Chairman of the board of directors of Coors. Accordingly, P. Coors was instrumental in negotiating the Merger, and/or in the preparation, publication, ratification and/or filing of the public statements and SEC filings regarding Coors and the Merger at all relevant times. Following the Merger, P. Coors remained as a member of the board of directors of Molson Coors. P. Coors is also Trustee of the Coors Trust, which prior to the Merger held 1.26 million shares of Coors Class A Voting stock, representing 100% of Coors' Class A voting stock, and also held 10.86 million shares of Coors' Class B common stock, representing approximately 30.9%. Following the Merger, the Coors Trust held 33.49% of Molson Coors' voting power and 3.27% of Molson Coors' economic ownership. In connection with the Merger, P. Coors and the Coors Trust entered into a voting agreement with Pentland Securities ("Pentland"), an entity controlled by Eric Molson and his brother Stephen Molson, whereby this group of shareholders collectively came to control, in the aggregate, over 67% of the voting shares of Molson Coors.

21.     Defendant W. Leo Kiely III ("Kiely") was, at the time of the Merger, President, Chief Executive Officer and a member of the board of directors of Coors. Accordingly, Kiely was instrumental in negotiating the Merger and/or in the preparation, publication, ratification and/or filing of the public statements and/or SEC filings regarding Coors and the Merger at all relevant times. Following the Merger, Kiely remained as Chief Executive Officer and a member of the board of directors of Molson Coors.

8

22.     Defendant Charles M. Herington ("Herington") was, at the time of the Merger, a member of the board of directors of Coors. Accordingly, Herington was instrumental in negotiating the Merger and/or in the preparation, publication, ratification and/or filing of the public statements and SEC filings regarding Coors and the Merger at all relevant times. Following the Merger, Herington remained as a member of the board of directors of Molson Coors.

23.     Defendant Franklin W. Hobbs ("Hobbs") was, at the time of the Merger, a member of the board of directors of Coors. Accordingly, Hobbs was instrumental in negotiating the Merger of Molson and/or in the preparation, publication, ratification and/or filing of the public statements and SEC filings regarding Coors and the Merger at all relevant times. Following the Merger, Hobbs remained as a member of the board of directors of Molson Coors.

24.     Defendant Randall Oliphant ("Oliphant") was, at the time of the Merger, a member of the board of directors of Coors. Accordingly, Oliphant was instrumental in negotiating the Merger, and/or in the preparation, publication, ratification and/or filing of the public statements and SEC filings regarding Coors and the Merger at all relevant times.

25.     Defendant Pamela Patsley ("Patsley") was, at the time of the Merger, a member of the board of directors of Coors. Accordingly, Patsley was instrumental in negotiating the Merger, and/or in the preparation, publication, ratification and/or filing of the public statements and SEC filings regarding Coors and the Merger at all relevant times. Following the Merger, Patsley remained as a member of the board of directors of Molson Coors.

26.     Defendant Wayne Sanders ("Sanders") was, at the time of the Merger, a member of the board of directors of Coors. Accordingly, Sanders was instrumental in negotiating the

Merger, and/or in the preparation, publication, ratification and/or filing of the public statements and SEC filings regarding Coors and the Merger at all relevant times.

27.    Defendant Albert C. Yates ("Yates") was, at the time of the Merger, a member of the board of directors of Coors. Accordingly, Yates was instrumental in negotiating the Merger, and/or in the preparation, publication, ratification and/or filing of the public statements and SEC filings regarding Coors and the Merger at all relevant times. Following the Merger, Yates remained as a member of the board of directors of Molson Coors.

28.    Defendant Timothy V. Wolf ("Wolf") was, at the time of the Merger, Vice President and Chief Financial Officer of Coors, Global. Accordingly, Wolf was instrumental in negotiating the Merger, and/or in the preparation, publication, ratification and/or filing of the public statements and SEC filings regarding Coors and the Merger at all relevant times. Following the Merger, Wolf remained as Chief Financial Officer of Molson Coors.

29.    Defendant Peter Swinburn ("Swinburn") was, at the time of the Merger, President of Coors Brewing Worldwide. Accordingly, Swinburn was instrumental in negotiating the Merger, and/or in the preparation, publication, ratification and/or filing of the public statements and SEC filings regarding Coors and the Merger at all relevant times.

30.    Defendant David G. Barnes ("Barnes") was, at the time of the Merger, Vice President, Finance and Chief Financial Officer, Coors U.S Brewing Company. Accordingly, Barnes was instrumental in negotiating the Merger, and/or in the preparation, publication, ratification and/or filing of the public statements and SEC filings regarding Coors and the Merger at all relevant times.

31.    Defendant Peter M.R. Kendall ("Kendall") was, at the time of the Merger, Chief Executive Officer, Coors Brewers Limited. Accordingly, Kendall was instrumental in

negotiating the Merger, and/or in the preparation, publication, ratification and/or filing of the public statements and SEC filings regarding Coors and the Merger at all relevant times.

32.     Defendant Daniel J. O'Neill ("O'Neill") was, at the time of the Merger, Chief Executive Officer, Molson, Inc.  Accordingly, O'Neill was instrumental in negotiating the Merger, and/or in the preparation, publication, ratification and/or filing of the public statements and SEC filings regarding Molson and the Merger at all relevant times.  Following, the merger, O'Neill remained as Chair of the newly formed "Office of Synergies and Integration" at Molson Coors.

33.     The defendants identified above in paragraphs 20 through 32 are referred to collectively herein as the "Individual Defendants."

34.     The Individual Defendants, because of their positions within Coors, had access to the adverse undisclosed information about the true operational and financial condition of Coors in the period immediately prior to the close of the Merger.  The Individual Defendants, inter alia, had access to Coors' internal corporate documents (including Coors' operating plans, budgets and forecasts, and reports of actual operations compared thereto), had conversations and connections with other corporate officers and employees, attended meetings among management and/or Coors' board of directors and/or committees thereof, and were provided with reports and other information regarding Coors and/or the Merger.

35.     It is appropriate to treat the Individual Defendants as a group for pleading purposes and to presume that the false, misleading and incomplete information conveyed in Coors' public filings, press releases and other publications as alleged herein are the collective actions of the narrowly defined group of defendants identified above.  Each of the above officers and/or directors of Coors, by virtue of their high-level positions within Coors, directly

11

participated in the management of Coors and/or Molson Coors, was directly involved in the day-to-day operations of Coors and/or Molson Coors at the highest levels, and was privy to confidential proprietary information concerning Coors and/or Molson Coors and those companies' business, operations, products, growth, financial statements, and financial condition, as alleged herein. The Individual Defendants were involved in drafting, producing, reviewing and/or disseminating the false and misleading statements and information alleged herein, was aware, or recklessly disregarded, that the false and misleading statements were being issued regarding Coors and/or Molson Coors, and approved or ratified these statements, in violation of the federal securities laws.

36.     As officers and controlling persons of a publicly-held company whose common stock was, and is, registered with the SEC pursuant to the Exchange Act, and governed by the provisions of the federal securities laws, the Individual Defendants each had a duty to disseminate promptly, accurate and truthful information with respect to Coors and/or Molson Coors' financial condition and performance, growth, operations, financial statements, business, products, markets, management, earnings, and present and future business prospects, and to correct any previously-issued statements that had become materially misleading or untrue, so that the market price of Coors and Molson Coors' publicly-traded securities would be based upon truthful and accurate information. The Individual Defendants' misrepresentations and omissions during the relevant period violated these specific requirements and obligations.

37.     The Individual Defendants participated in the drafting, preparation, and/or approval of the various public, shareholder and investor reports, and other communications complained of herein, and were aware of, or recklessly disregarded, the misstatements contained therein and omissions therefrom, and were aware of their materially false and misleading nature.

Because of their board membership and/or executive and managerial positions with Coors and/or Molson Coors, each of the Individual Defendants had access to the adverse undisclosed information about Coors' true operational and financial condition immediately prior to the Merger. Further, they also knew of the impact the true operating and financial condition of Coors would foreseeably have on Molson Coors following the Merger, as particularized herein, and knew or recklessly disregarded that these adverse facts rendered the positive representations made by or about Coors, Molson Coors, and their business issued or adopted by Coors and/or Molson Coors, materially false and misleading.

38.    The Individual Defendants, because of their positions of control and authority as officers and/or directors of Coors and/or Molson Coors, were able to and did control the content of the various SEC filings, press releases and other public statements pertaining to Coors and/or Molson Coors during the relevant period. Each Individual Defendant was provided with copies of the documents alleged herein to be misleading prior to or shortly after their issuance and/or had the ability and/or opportunity to prevent their issuance or cause them to be corrected. Accordingly, each of the Individual Defendants is responsible for the accuracy of the public reports and releases detailed herein and are therefore primarily liable for the representations contained therein.

39.    Each of the defendants is liable as a participant in a course of conduct that operated as a deceit on those who acquired shares of Coors and/or Molson Coors by disseminating materially false and misleading statements and/or concealing material adverse facts about Coors and/or Molson Coors prior to the Merger. Defendants' illegal and improper actions: (i) deceived the investing public regarding Coors and/or Molson Coors' business, operations, management and the intrinsic value of Coors and/or Molson Coors' common stock;

(ii) caused former shareholders of Molson to surrender their shares in a purported "merger-of-equals," when, in fact, defendants had withheld material information and omitted to disclose material adverse facts about Coors prior to the consummation of the Merger; and (iii) caused members of the Class to surrender their Molson shares in exchange for shares of Molson Coors, and/or to purchase shares of Coors and/or Molson Coors at artificially inflated prices and/or without full and adequate consideration.

## PLAINTIFFS' CLASS ACTION ALLEGATIONS

40.     Plaintiffs bring this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all those former shareholders of Molson who surrendered their Molson shares in exchange for shares of Molson Coors in connection with the Merger on or about February 9, 2005, and/or purchased shares of Coors and/or Molson Coors at artificially inflated prices and who were damaged thereby.  Excluded from the Class are defendants, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which defendants have or had a controlling interest.

41.     The members of the Class are so numerous that joinder of all members is impracticable.  While the exact number of Class members is unknown to plaintiffs at this time and can only be ascertained through appropriate discovery, plaintiffs believe that there are thousands of members in the proposed Class.  Record owners and other members of the Class may be identified from records maintained by Molson Coors or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

14

42.    Plaintiffs' claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by defendants' wrongful conduct in violation of federal law that is complained of herein.

43.    Plaintiffs will fairly and adequately protect the interests of the members of the Class and have retained counsel competent and experienced in class and securities litigation.

44.    Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

(a)    Whether the federal securities laws were violated by defendants' acts as alleged herein;

(b)    whether statements made by defendants to the investing public during the relevant period misrepresented material facts about the business, operations and management of Coors and/or Molson Coors and whether defendants breached any duty to convey material facts or to correct material facts previously disseminated;

(c)    Whether defendants participated in and pursued the fraudulent scheme or course of business complained of;

(d)    Whether defendants acted willfully, with knowledge or recklessly in omitting and/or misrepresenting material facts;

(e)    whether the market prices of Coors and/or Molson Coors were artificially inflated due to the material nondisclosures and/or misrepresentations complained of herein; and

(f)    Whether members of the Class have sustained damages when revelations of the true facts caused a decline in the value of their investments and, if so, what is the proper measure of damages.

45.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

## SUBSTANTIVE ALLEGATIONS AND
## DEFENDANTS WRONGFUL CONDUCT

**Prior To The Merger, It Was Publicly Known That Molson Was Performing Below Plan**

46.     Prior to the Merger, Molson was Canada's largest brewer and one of the world's leading brewers of quality beer, with operations located in Canada, Brazil and the United States. Founded in 1786, Molson was North America's oldest beer company, and one of its largest, with C$3.5 billion in gross sales for the fiscal year ended March 31, 2004.  Molson products included a portfolio of beers including Molson Canadian, Molson Export, Molson Dry, Rickard's, A Marca Bavaria, Kaiser and Bavaria.  Prior to the Merger, Molson was also a licensed authorized brewer and distributor of Coors brands in Canada under agreements between Molson and Coors. Pursuant to this license agreement, one of Molson's most profitable products was the Coors Light brand, which it manufactured and marketed throughout Canada prior to the Merger.

47.     On July 22, 2004, the same day that Molson and Coors announced that they had entered into a definitive merger agreement (the "Merger Agreement"), Molson revealed that it was operating well-below plan.  Specifically, Molson published its results for the three months ended June 30, 2004, which informed investors of the following:

- Excluding certain one-time rationalization costs, Molson's consolidated earnings before interest and taxes ("EBIT") decreased by 4.5%;

- Excluding certain one-time rationalization costs, Molson's net earnings decreased

by 19.3%;

- Excluding certain one-time rationalization costs, Molson's net earnings per share decreased by 19.4% – to $0.54 per share, while consensus estimates for Molson were $0.70 per share;

- Total Molson beer volume decreased by 3.4%, and volume in Canada decreased by 2.8%;

- Management in Canada and Brazil was replaced as part of Molson's "regaining the momentum" strategy, as outlined in Molson's annual report; and

- Molson's long-term goal of 10% EBIT growth remained, however Molson CFO Brian Burden acknowledged that "lower Q1 performance will make this challenging in the current fiscal year."

48.    On September 30, 2004, Molson published a press release further acknowledging its troubled condition.  Molson stated that, among other things, Molson's earnings would be below analysts' estimates, Molson was experiencing lower profitability in Brazil and lower volumes in Canada, Molson expected EBIT to decrease for both Brazil and Canada, Molson could face a write-down of C$200 million due to impairment of its Brazilian assets, and Molson would be unable to achieve its 10% EBIT growth target.  This release reads, in part, as follows:

### Molson Forecasts Lower Than Expected Second Quarter Earnings

Molson Inc. announced today that, on the basis of preliminary results compiled for the second quarter ending September 30, 2004, earnings before non-recurring items, such as the charges related to the proposed merger with Coors, will be below the current range of estimates published by financial analysts. Molson is making an early announcement as part of its reporting obligation to inform shareholders of this earnings shortfall.

This unfavourable variance was driven by lower profitability in Brazil and lower volumes in Canada. In Brazil, estimated volume was approximately 10% lower than a year ago and compounded by the high cost structure associated with the sales centers put in place over the last nine months. In Canada, a much cooler summer season in most regions across the country and the continued strength of the value segment in certain regional markets led to industry and market share declines.

"From an EBIT standpoint, we expect results in Brazil to be slightly below Q1 levels, while the volume shortfall in Canada points to a mid single-digit percentage decrease in domestic EBIT", indicated Brian Burden, Chief Financial Officer of Molson Inc.

In light of the continuing challenge presented by the Brazilian beer market, Molson is performing an impairment test of assets in the region. Though the impairment test is not completed, preliminary findings could justify a write-down of approximately CA$200 million. In addition, Molson is re-evaluating the business model in an effort to drive sustainable profitability in Brazil and specific cost reduction initiatives are being implemented.

Last July, Molson indicated that the lower first quarter performance would make the attainment of the annual 10% EBIT growth target a challenge.  Current quarter performance has confirmed that this will not be achieved in Fiscal 2005. Molson will provide more detail when it issues second quarter results which have been rescheduled for Thursday, October 28th, 2004. [Emphasis added].

49.     Also on September 30, 2004, Canadian Press Newswire reported that Molson's

situation in Brazil had become "a quagmire" because Molson had paid over C$1 billion in 2002

to acquire Kaiser, the second largest brewer in Brazil, and Kaiser's market share was dropping

significantly.  Furthermore, Molson's Brazilian operations were valued at only C$700 million

and Molson was forced to "re-evaluate[ing] [its] business model."  The report reads, in part, as

follows:

**Molson issues earnings warning: slow sales in Canada, weak profit in Brazil**

MONTREAL (CP) - Molson Inc. has served up a warning of disappointing summer-quarter earnings, saying sales have been slow in Canada and profitability continues to be squeezed in Brazil.

The brewer also disclosed Thursday evening that it is considering a $200-million writedown on its Brazilian assets.

> <u>The operations in Brazil are currently valued on the company's</u>
> <u>books at about $700 million. Molson paid more than $1 billion in</u>
> <u>2002 to acquire Kaiser, the second-largest brewer in the South</u>
> <u>American country, but the Brazilian adventure has become a</u>
> <u>quagmire:</u> Kaiser's market share was estimated at 10.7 per cent in
> August, down from 13.1 per cent a year earlier.
>
> In addition to the "preliminary" finding that a $200-million
> writedown might be warranted, Molson said it is "re-evaluating the
> business model in an effort to drive sustainable profitability in
> Brazil, and specific cost-reduction initiatives are being
> implemented."
>
> Molson said July-September earnings in Canada are significantly
> below the previous quarter, and it confirmed that it will not meet
> its target of a 10 per cent increase in annual operating profit.
> [Emphasis added].

50.    The report further states that Coors was not surprised by Molson's financial

situation and did not expect Molson's troubles to adversely affect the Merger, but that analysts

had noted that Molson experienced two consecutive disappointing periods:

> A Coors spokeswoman, Laura Sankey, said Thursday's news does
> not affect the U.S. brewery's position on the combination.
>
> "We continue to believe that the merger of Coors and Molson is a
> great transaction that will create a stronger global competitor,"
> Sankey said, adding that <u>Coors was not surprised by Molson's</u>
> <u>tepid results.</u>
>
> \*        \*        \*
>
> For analysts surveyed by Thomson One Analytics, this is the
> second consecutive unpleasant quarterly surprise from Molson.
> Their consensus estimate was for July-September earnings of 70
> cents per share, the same as they had predicted for the previous
> quarter, when Molson came in at 53 cents.
>
> In that quarterly report issued July 22 - the same day the Coors
> merger plan was announced - Molson said earnings excluding
> restructuring charges and other one-time items fell 19 per cent
> from a year earlier to $68.3 million, as beer volumes were down
> 2.8 per cent in Canada and 4.2 per cent in Brazil.  [Emphasis
> added].

51.     Following the publication of Molson's second quarter results, analysts reacted by lowering their estimates and price targets for Molson. On October 1, 2004, for example, CIBC World Markets issued a report which stated:

> MOL issued a profit warning last night citing that Q2/F05 EPS would be below the range of consensus estimates. We were the street-low at $0.59 per share. Recall that we had suggested Q2 would be ugly, and we lowered our numbers on Sep. 23 – <u>it looks like it's even uglier than we had thought</u>. [Emphasis added].

## Analysts And Institutional Investors Initially Oppose The Merger

52.     During the period just prior to, and immediately after, the announcement of the Merger, several analysts questioned whether the Merger would be profitable, noting for example that both Coors and Molson appeared to be struggling in their respective home markets, that few synergies could be expected because Molson and Coors already distributed each other's brands in their respective home countries, and that Coors would not be able to ameliorate Molson's problems in Brazil. Furthermore, at least one analyst, namely Prudential Equity Group, openly questioned whether the Merger was merely a "marriage of convenience" designed to allow the Molson and Coors families to deter potential acquirers and achieve control of Molson Coors. Specific analysts reported as follows:

> **Citigroup/Smith Barney**: "Given that Coors and Molson are already a combined entity since they operate two joint ventures, one in Canada and one in the US, we question 'where is the value and/or cost savings/synergies?'" (July 19, 2004);
>
> **CIBC World Markets:** "[W]e see little long-term strategic benefit to a Molson/Coors merger – both companies are struggling in their home market; the companies already work closely together to distribute each others brands in the other's home country; and Coors can't do much for Molson in Brazil." (July 19, 2004);
>
> **National Bank Financial: "**Bigger Is Not Always Better. Proposed merger increases scale but doesn't solve the strategic issues. Molson and Coors already share the profits in Coors Canada and Molson USA. We do not see significant changes to

any of the major markets for each of the companies." (July 19, 2004[1]);

**Bear Stearns:** We do not think that a merger of these two companies resolves any of the problems they face or provide them a better platform for surviving in the current landscape of the industry. Consider the following: Molson does not provide Coors any incremental volumes, scale, brand expertise or synergies in the United States... Molson does not bring any new brands to the table that would help Coors out of its 'one-brand' problem in the US; [and] Molson adds nothing to the UK base of Coors. A merger seems to take two medium sized problems and creates one new major complication." (July 19, 2004) "We're Unconvinced About Molson Coors. We're unconvinced that the proposed merger resolves the competitive threats afflicting Molson and Coors. Near-term, the deal gives Molson cheap cost efficiencies to tap for 3 years and lightens the relative weight of a wrecked Brazilian business. But if neither firm can stabilize its core market, both may look back on today and regret the transaction." (July 22, 2004);

**Prudential Equity Group.** "Coors and Molson confirm that they are in merger talks. A Coors/Molson merger seems like a 'Marriage of Convenience' to prevent a takeover of either company and keep the families in control, which doesn't sound too shareholder friendly near-term." (July 19, 2004) "Coors becomes bigger in troubled markets and smaller in good markets... Near term, Coors will likely get bigger, not better...Believing there are few top-line 'synergies' available given the combination of these 'troubled markets' we don't think that putting [Coors] and Molson together would create a better company in the near term, just a bigger company." (Italics omitted) (July 21, 2004);

**J.P. Morgan Securities:** "While this merger does allow Coors to become a bigger global player with better geographic diversity and deeper resources, we don't think it provides substantial benefit to either companies existing operations." (July 20, 2004); and

---

[1]    Later, on July 21, 2004, National Bank Financial issued a follow-up report which stated that, "A closer look at the possible 'merger of equals' indicates a mildly accretive transaction. While the specific nature of the proposed transaction remains unclear, further analysis indicates the outcome of a merger between Molson and Coors could be slightly accretive (3%) after including procurement savings of $60 million.... Merger Co. f2005 performa NAV of $39.00 offers shareholders modest upside.

> **RBC Capital Markets:** "[T]ransaction fails to resolve either
> company's underlying performance issues…" (July 23, 2004).

53.     In addition to the analysts' initial skepticism, beginning in the fall of 2004, large institutional Molson investors began to announce their opposition to the Merger. Given that Molson officers and directors accounted for 66 2/3% of all outstanding Molson options, investors specifically opposed Molson option holders being permitted to vote on the Merger. Institutional investors also riled against the reported multi-million dollar Merger bonus to O'Neill. Ultimately, the approval procedure was revised to allow option holders to vote only to exchange their options, and O'Neill agreed to accept the change of control payment he was entitled to in lieu of a severance payment, if he left Molson Coors within two years after the Merger. Ironically, O'Neill's actual payment, detailed more fully below, amounted to a greater sum than the earlier reported bonus. Despite these changes, institutional investors continued to publicly oppose the Merger.

54.     The Merger also faced early opposition from Ian Molson, the former Deputy Chairman of Molson who had retired from the Molson board of directors less than one month prior to the announcement of the Merger. According to media reports, Ian Molson had resigned from the Molson board because of a disagreement with Eric Molson regarding who would succeed Eric Molson as Chairman. Eric Molson had served as Chairman of Molson for the prior fifteen years, and as a member of the board for the prior 30 years, and controlled, at the time of his resignation, approximately 45% of Molson's voting shares. On July 23, 2004, the day after the Merger Agreement was signed, Ian Molson advised the Molson board of his intention to mount a takeover bid with a group of partners, later identified as Heineken. While Ian Molson ultimately could not secure financing for his attempted acquisition, which sought to provide

Molson shareholders with a value of C$40.00 per share, Ian Molson's opposition to the Merger continued. On January 11, 2005, Bloomberg reported that Ian Molson issued a statement that he continued to oppose the proposed Merger because it was "in effect a Coors takeover of Molson, with no premium being paid to Molson shareholders."

**In Response To The Initial Opposition Coors Offers A "Special Dividend" To Molson Shareholders**

55.     On November 5, 2004, in response to this opposition, Coors announced that in connection with the Merger it would pay to Molson shareholders a special dividend of C$3.26 per share, for a total of approximately C$381 million ($316 million). This special dividend would be paid to both Molson Class A non-voting and Class B common shares, excluding those shares held by Pentland.

56.     According to a release issued by Coors at that time, Eric Molson stated "Pentland's agreement to forego participation in the special dividend demonstrates a firm conviction that the Molson Coors merger is in the best interests of Molson and will bring significant value to its shareholders." Ian Molson, who continued to oppose the Merger, did not agree to any similar waiver or forbearance.

**Opposition To The Merger Continues Until The Special Dividend Is Significantly Increased**

57.     Despite the announcement of the special dividend, by early January 2005, media reports indicated that the Merger remained threatened by investor opposition. On January 4, 2005, for example, Bloomberg reported that Burgundy Asset Management Ltd., which then owned about 600,000 shares of Molson, had advised its clients that it would vote against the Merger because the deal did not value Molson fairly.

58.     Similarly, on January 6, 2005, Bloomberg reported that TAL Global Asset Management, a unit of Canadian Imperial Bank of Commerce holding approximately 1.2 million

Class A Molson shares, also opposed the Merger. The following day, <u>Bloomberg</u> reported that Highfields Capital Management LP, which owned approximately 8 million Molson shares, had announced its intention to vote against the Merger because of its belief that Molson was being undervalued.

59.     On January 8, 2005, <u>Bloomberg</u> reported that <u>The National Post</u> had conducted extensive interviews with people in the fund management industry, and was estimating that 28 million Class A share votes would be cast against the Merger. <u>The National Post</u> concluded that, based on historic voting indicators and its resulting calculations, the Merger would fail.

60.     In response to this opposition, on January 13, 2005, less than one month prior to the Merger vote, Coors increased the special dividend from C$3.26 per share to C$5.44 per share ($4.53). The effect of this increased dividend was that after the Merger, Molson Coors' debt rose by approximately 20% to a total debt of $2.5 billion.

61.     The increased dividend was a significant factor in encouraging Molson shareholders to support the Merger, but was characterized by at least one institutional shareholder as a "bribe." On January 14, 2005 a <u>Bloomberg</u> article quoted Stephen Jarislowsky, Chairman of Montreal-based Jarislowsky Fraiser, which owned 4.5 million shares of Molson prior to the Merger, as stating that, "This transaction doesn't make any sense long-term, but if they give us enough money we'll just get out of the way… <u>What they are saying is we will bribe you out of the deal so we can do it</u>… [I]f it's the best we can get [we will] vote with our feet." [Emphasis added]. Molson's then-largest institutional shareholder, Amvescap Plc's AIM Trimark Investments, which held approximately 16 million, or 15%, of Molson's Class A shares, also acknowledged that it intended to vote its shares in favor of the Merger because of the increased special dividend.

62.    Molson shareholders and other investors, however, were unaware that this special dividend of approximately $4.53 per Molson share would pale in comparison with the losses Class members would experience shortly after consummation of the Merger.

**Coors' Strategy - To "Bribe" Molson Shareholders With The Special Dividend And Simultaneously Issue False And Misleading Statements Regarding Coors' Financial Condition And The Expected Benefits Of The Merger**

63.    Coors engaged in a two-pronged strategy to garner support for its ill-fated merger with Molson: First, to "bribe" Molson shareholders with the increased special dividend as explained above, and second, to propound false and misleading statements that Coors was experiencing growth and profitability, and that the Merger would produce pre-identified synergies and benefits.

**Prior To The Merger Coors Falsely Trumpeted Itself As A Company Experiencing Growth And Profitability Above Expectations**

64.    Prior to the Merger, Coors was the third-largest brewer in the U.S. and the second-largest brewer in the United Kingdom. Founded in 1873, Coors produced and marketed a portfolio of beer brands designed to reach several tastes, styles and price points. At fiscal year-end December 28, 2003, Coors had U.S. $5.4 billion in sales. In the United States, Coors owned and/or licensed such brands as: Coors Light, Coors Original, Coors Edge, Coors Non-Alcoholic, Aspen Edge, Extra Gold, Zima, George Killian's Irish Red Lager, Keystone, Keystone Light, Keystone Ice, Blue Moon Belgian White Ale and Mexicali. Pursuant to another joint venture agreement, Coors also sold the Molson family of brands in the United States. Outside of the United States, Coors sold Carling, Worthington, Caffrey's, Reef, Screamers, Stones and, through a United Kingdom joint venture, Grolsch.

**Coors' Second Quarter Fiscal 2004 Results**

65.     Contrary to the lackluster performance of Molson prior to the Merger, during the pre-Merger period, Coors portrayed itself as a company that was experiencing above-consensus growth and profitability, and was outperforming the market.  Like Molson, on the day the Merger was announced Coors also published an earnings release for the second quarter of fiscal year 2004, noting for example that:

- Consolidated net sales of $1.15 billion represented an increase of 4.6% over net sales reported in 2Q:03;

- Operating income of $125.6 million represented an increase of 6.9% over operating income reported in 2Q:03;

- "Overall, second quarter results for Coors Brewing Company showed improved trends in several key areas of the business..." (Leo Kiely, President and CEO);

- To the extent some sectors of business were negatively impacted, such adverse events were caused by "largely temporary, factors" and "unique local issues";

- While U.S. retail volume "declined slightly" "the challenges were focused in select markets - particularly in Pennsylvania and Texas - where we face unique local issues.";

- Aspen Edge has been gaining volume . . .; and

- The Zima XXX brand had returned to "double digit percentage sales-to-retail growth…" [Emphasis added].

66.     In early September 2004, Coors management met with analysts at Bear Stearns, and guided Bear Stearns to believe that Coors was performing according to plan and was continuing to generate strong cash flows from operations.  Thereafter, on September 2, 2004, Bear Stearns issued a report that stated, in part, the following:

> We recently met with Coors management.  While we sense that Coors is on track to close the merger with Molson by year-end, the deal is not a sure thing as two-thirds of Molson's non-voting owners still need to approve.

> <u>Coors seems to have contingency plans in place for generating incremental cash flow over current guidance</u>. [Emphasis added].

67.    On August 6, 2004, Coors filed its Form 10-Q for the fiscal second quarter ended June 27, 2004, reiterating the results discussed in the press release and conference call. The Form 10-Q was signed by defendants Kiely and Wolf.

68.    In addition to the foregoing, Coors' second quarter 2004 Form 10-Q also contained the following certifications signed by defendants Kiely and Wolf:

> 1. I have reviewed this quarterly report on Form 10-Q of Adolph Coors Company;
>
> 2. Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;
>
> 3. Based on my knowledge, the financial statements, and other financial information included in this quarterly report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;
>
> 4. The registrant's other certifying officer[s] and I are responsible for establishing and maintaining disclosure controls and procedures [as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)] for the registrant and have:
>
> > (a) Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;
> >
> > (b) Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures as of the end of the period covered by this report based on such evaluation; and
> >
> > (c) Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the

registrant's fiscal quarter [the registrant's most recent fiscal quarter in the case of a quarterly report] that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting.

5. The registrant's other certifying officer[s] and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors [or persons performing the equivalent functions]:

(a) All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

(b) Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

* * *

[Kiely and Wolf] of Adolph Coors Corporation respectively, each hereby certifies that to his knowledge on the date hereof: (a) the Quarterly Report on Form 10-Q for the quarterly period ended June 27, 2004 … fully complies with the requirements of Section 13(a) or 15(d) of the Securities Exchange Act of 1934; and (b) information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of [Adolph Coors Corporation].

69.    As set forth more fully below, the above-described statements regarding Coors' financial condition were materially false and misleading when made because Coors, and the relevant individuals who propounded these statements, knew or recklessly disregarded that Coors was in fact experiencing financial difficulties and was not operating according to plan. For example:

(a)    Prior to the Merger, Coors was not experiencing "improving trends" in key areas of its business. Defendants knew and discussed internally that prior to the Merger, Coors' overall business was weak because Coors was experiencing a general decrease in sales,

particularly in key markets such as Texas, and a significant increase in expenses, particularly in shipping and distribution costs.  Texas was one of Coors' largest markets, and 2004 was the worst year Coors had ever experienced in Texas.  Sales in Texas were down at least 5%.

       (b)     Additionally, the factors that impacted Coors' overall results were not merely "temporary" as evidenced by the fact that Coors had been forecasting difficulties for the Dallas/Ft. Worth market since as early as 2000.

       (c)     Furthermore, Aspen Edge was not gaining volume and, in fact, sales of Aspen Edge were so poor that, in the summer of 2004, Coors began a policy of buying back the product and reimbursing every wholesaler in the country for any Aspen Edge product that went out of date.  Significantly, any modest growth in sales of minor products such as Zima or XXX, to the extent any such growth actually occurred, would have been immaterial in comparison with the negative effects of Coors' decrease in sales, increase in costs and the failure of Aspen Edge.

       (d)     The defendants were aware or recklessly disregarded Coors' pre-merger financial and operational difficulties discussed in subparagraphs (a) through (c) above. According to a former Coors director of supply chain management, this information was discussed at senior management meetings attended by, among others, defendants Wolf and Barnes.  Moreover, Kiely was aware of or recklessly disregarded the above described information because senior management who directly reported to him, including Supply Officer and Senior Vice President Robert Caseria ("Caseria") also attended these meetings.

### Coors' Third Quarter Fiscal 2004 Results

     70.     On October 28, 2004, Coors published a press release announcing financial results for the fiscal third quarter of 2004, which was later incorporated by reference into the Proxy Statement Coors filed with the SEC on or around December 10, 2004 (the "Proxy Statement").  In addition to announcing higher net sales and net income, Coors also represented

that the Merger would provide Molson shareholders with significantly added strength and near-term profitability.  The press release reads, in pertinent part, as follows:

### Coors Reports 2004 Third Quarter Results

GOLDEN, Colo., Oct. 28 /PRNewswire-FirstCall/ -- Adolph Coors Company (NYSE:RKY) today announced higher consolidated net sales and net income on lower consolidated sales volume for the third quarter of 2004.

*     *     *

"In the Americas, sales to retail were down slightly, consistent with trends earlier in the year.  During the quarter, the entire beer category was challenged by generally unfavorable weather in much of the U.S.  Although Coors Light sales declined at a low-single-digit rate, the brand's trends improved in several key areas of the U.S. Americas cost of goods per barrel were higher, primarily due to increases in transportation costs, lower sales volume and a sales mix shift toward more expensive, higher-margin brands and packages, offset partially by continued improvements in operations productivity.

"For the balance of 2004, we are focused on achieving a strong finish to the year. In the U.S., we will be lapping significant volume declines and additional costs related to our supply-chain disruptions in the fourth quarter of last year. Our new systems are now running smoothly and have resulted in substantially improved service to our distributors. In the U.K., in addition to our expectations that positive on-trade pricing will continue, we believe volume trends will improve from a difficult summer. On the other hand, if foreign exchange rates remain at today's levels, we anticipate less currency benefit to our U.K. financial results in the fourth quarter.

"We also continue to work toward closing our merger of equals with Molson. The transaction has received U.S. and Canadian anti-trust clearance, and we have filed a preliminary proxy statement for SEC review. This transaction will build on the strengths of both companies, make us more competitive in the consolidating global beer market and increase profits, cash flow and shareholder value substantially in both the short and long term." [Emphasis added].

71.    In connection with the publication of Coors third quarter 2004 results, Coors

hosted a conference call for analysts and investors.  During this call, Kiely stated that Coors

expected to improve volume and financial performance and that the Merger would increase

profits, cash flow and shareholder value in both the short and long terms, and Wolf stated that

Coors was encouraged by the performance of certain Coors products, including Aspen Edge:

Kiely:    In the face of a challenging environment for many beer companies,
we believe that our plans are in place, and we'll improve our
volume and financial performance going forward... [The merger of
Coors and Molson] is a great transaction that's designed to build
on the strengths of both of our companies, makes us more
competitive in the global consolidating beer business, and increase
profits, cash flow, and shareholder value substantially, in both the
short and long term.

*        *        *

Wolf:    We have been encouraged so far with how some of our higher
margins, higher priced products, Blue Moon, Zima, Aspen Edge,
are running on us.  And we obviously look for more of the same
next year... [Emphasis added].

72.    On November 5, 2004, Coors filed its Form 10-Q for the fiscal third quarter ended

September 26, 2004, reiterating the results discussed in the press release and conference call.

The Form 10-Q was signed by defendants Kiely and Wolf.

1.  I have reviewed this quarterly report on Form 10-Q of Adolph Coors
Company;

2.  Based on my knowledge, this report does not contain any untrue
statement of a material fact or omit to state a material fact necessary to
make the statements made, in light of the circumstances under which such
statements were made, not misleading with respect to the period covered
by this report;

3.  Based on my knowledge, the financial statements, and other financial
information included in this quarterly report, fairly present in all material
respects the financial condition, results of operations and cash flows of the
registrant as of, and for, the periods presented in this report;

31

4.  The registrant's other certifying officer[s] and I are responsible for establishing and maintaining disclosure controls and procedures [as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)] for the registrant and have:

> (a)  Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

> (b)  Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures as of the end of the period covered by this report based on such evaluation; and

> (c)  Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's third quarter [the registrant's most recent fiscal quarter in the case of a quarterly report] that has materially  affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting.

5.  The registrant's other certifying officer[s] and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors [or persons performing the equivalent functions]:

> (a)  All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

> (b)  Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

*  *  *

[Kiely and Wolf] of Adolph Coors Corporation respectively, each hereby certifies that to his knowledge on the date hereof: (a) the Quarterly Report on Form 10-Q for the quarterly period ended September 26, 2004 ... fully complies with the requirements of Section 13(a) or 15(d) of the Securities Exchange Act of 1934; and (b) information contained in the Report fairly

presents, in all material respects, the financial condition and results of operations of [Adolph Coors Corporation].

73.     As set forth more fully below, the above-described statements regarding Coors' financial condition were materially false and misleading when made because Coors, and the relevant individuals who propounded these statements, knew or recklessly disregarded that Coors was in fact experiencing financial difficulties and was not operating according to plan. For example:

(a)     Prior to the Merger, Coors was not experiencing "improving trends" in key areas of its business. Defendants knew and discussed internally that prior to the Merger, Coors' overall business was weak because Coors was experiencing a general decrease in sales, particularly in key markets such as Texas, and a significant increase in expenses, particularly in shipping and distribution costs. Texas was one of Coors' largest markets, and 2004 was the worst year Coors had ever experienced in Texas. Sales in Texas were down at least 5%.

(b)     Additionally, the factors that impacted Coors' overall results were not merely "temporary" as evidenced by the fact that Coors had been forecasting difficulties for the Dallas/Ft. Worth market since as early as 2000.

(c)     Furthermore, Aspen Edge was not gaining volume and, in fact, sales of Aspen Edge were so poor that, in the summer of 2004, Coors began a policy of buying back the product and reimbursing every wholesaler in the country for any Aspen Edge product that went out of date. Significantly, any modest growth in sales of minor products such as Zima or XXX, to the extent any such growth actually occurred, would have been immaterial in comparison with the negative effects of Coors' decrease in sales, increase in costs and the failure of Aspen Edge.

(d)     The defendants were aware or recklessly disregarded Coors' pre-merger financial and operational difficulties discussed in subparagraphs (a) through (c) above.

33

According to a former Coors director of supply chain management, this information was

discussed at senior management meetings attended by, among others, defendants Wolf and

Barnes. Moreover, Kiely was aware or recklessly disregarded the above described information

because senior management who directly reported to him, including Caseria, also attended these

meetings.

**Defendants Falsely Represent That The Merger Will Generate**
**$175 Million In Annual Synergies**

74.    Defendants also falsely represented that it had identified pre-existing synergies

between Molson and Coors that would save Molson Coors $175 million in costs by 2007.

75.    On July 22, 2004, Coors published a press release announcing that the boards of

directors of both Coors and Molson had entered into a definitive Merger Agreement, and stating,

inter alia, that the combination of Coors and Molson was "expected to generate approximately

US$175 million in annualized synergies by 2007, with half of these benefits achieved within 18

months following the completion of the merger." Kiely reiterated this statement on an investor

conference call the following day.

76.    Coors further represented that a newly-created "Office of Synergies and

Integration" would be established at Molson Coors, and would be chaired by former Molson

CEO O'Neill, to ensure that these "pre-identified" synergies materialized. Coors' July 22, 2004

press release further stated as follows:

> **Synergies and Cost Savings**
>
> The companies intend to establish an Office of Synergies and
> Integration to facilitate the development and implementation of
> plans to achieve the expected benefits of the transaction. The
> Office will be responsible for the realization of cost savings and
> other synergies, including the alignment of related capital
> expenditures, by applying best practices and global benchmarking.
> The Office will be chaired by Daniel J. O'Neill and will also

include Eric Molson and Leo Kiely.

"In my new role, my responsibility will be to deliver the identified synergies, unlock additional opportunities and lead the teams that have the most past experience in making this happen. The merger represents a transaction that will be difficult to match given the large value of synergies and the ability to reinvest additional synergies above the US$175 million to drive top-line sales growth," said Daniel J. O'Neill, president and chief executive officer of Molson Inc. "In addition, a merger with Coors allows our Canadian unit to secure the rights to sell and distribute the Coors Light brand, which might not be the case in an alternative transaction."

The combined company expects to achieve annualized synergies of approximately US$175 million by 2007. The principal sources of these synergies include the optimization of brewery networks, increased procurement efficiencies, streamlined organizational design, consolidated administrative functions and greater tax efficiencies. The companies expect to identify additional synergy opportunities between now and closing. These synergies are in addition to cost saving initiatives already underway at both companies. [Emphasis added].

77.    As set forth more fully below, the above-described statements regarding pre-identified synergies between Coors and Molson were materially false and misleading when made because Coors, and the relevant individuals who propounded these statements, knew or recklessly disregarded that these synergies were unlikely to be attained because, inter alia, Coors' increasing distribution costs would adversely affect any possible synergies, Molson and Coors were already distributing each other's products, and the Merger would generate significant costs including compensation and benefits for senior Coors executives who were expected to resign after the Merger, and significant costs resulting from Molson's failed Brazilian operations. According to a former Coors director of supply chain management, this information was discussed among Coors senior management at meetings attended by Brian Erhardt ("Erhardt"), who in addition to being the Director of Supply Chain Planning, was also an integral part of the

35

Synergies and Integration Group. On information and belief this information was shared with other members of the Synergies and Integration Group, including, Kiely, among others.

**Coors And O'Neill Falsely Represent The Extent Of Molson's Problems In Brazil
And The Likely Effect On Molson Coors**

78.    Coors also misrepresented the extent of Molson's significant losses in Brazil and the clear threat this posed to Molson Coors' prospects for success. In a Form S-3 Coors filed with the SEC on November 24, 2004, for example, Coors disclosed that Molson had announced an impairment charge of C$210 million from its Brazilian operations but that "[t]hese losses were a function of the current period costs associated with plans to significantly grow volumes and regain market share associated with the sales centers put in place during the last nine months in Brazil." Molson's problems in Brazil, however, were clearly not the result of temporary "current period costs" as evidenced by Molson Coors' eventual post-Merger impairment charge of $500 million and eventual sale of 68% of its Brazilian interest for only $68 million, as discussed below. A former Coors director of supply chain management has acknowledged that Coors was aware early in 2004 that the business in Brazil was "failing" and was "draining" Molson.

79.    These misrepresentations were also echoed by O'Neill, who joined Molson Coors after the merger, and as former CEO of Molson should have been particularly knowledgeable regarding Molson's Brazilian operations, and who as proposed chair of the Office of Synergies and Integration should have been particularly knowledgeable as to how these problems would be addressed post-Merger.

80.    On October 28, 2004, Molson hosted a conference call for analysts and investors during which, in response to a question from UBS analyst Jason Bilodeau, O'Neill stated that a

"going forward model" for Molson's Brazilian operations would be presented at the first board meeting of Molson Coors.

> Bilodeau: "It sounds like you've got a multiyear plan for Brazil. Have we of have you reached the point or seen enough progress that you're saying now, yes Brazil is here for the long haul? Or are we still sort of subject to review early next year as we've talked about in the past?"

> O'Neill: "We have clearly stated that in January of each year we review our business in detail; and we will do that with all our business going forward. So at the end of January or the beginning of February, depending on when the first board meeting is, with the new group we have a commitment to present to the new board members the Brazilian status <u>and going forward model</u>." [Emphasis added].

81.   O'Neill further stated that Molson was making "great inroads" with regard to the "Brazilian situation."

> …I think in the Brazilian situation, there's – from my prospective and I kind of speak from the cautiousness around the table, <u>we are all seeing great inroads being made</u> and we are all reluctant to talk about them. Because we don't have the credibility to talk about Brazil getting better, getting better and we want to – we are all cheering that Brazil gets better and we all know the programs that have been put in place but we just want to wait and see it and then talk about it. [Emphasis added].

82.   As set forth more fully below, the above-described statements regarding Molson's operations in Brazil, were materially false and misleading when made because Coors and the relevant individuals who propounded these statements knew or recklessly disregarded that, <u>inter alia</u>:

(a)   These losses were not merely the result of "current period costs" but rather Molson had been experiencing significant losses from its Brazilian operations for some time;

(b)   The extent of Kaisers' deterioration in financial position was greater than the noted impairment charge taken in October 2004;

37

(c)     Defendants knew or recklessly disregarded that negative events had adversely impacted Kaiser, necessitating a material write-downs of the goodwill and long-lived assets associated with Kaiser;

(d)     Kaiser had experienced a material decline in demand for its products, as evidenced by its domestic market share declines (from 17% four years ago to 8.7% in December 2005);

(e)     Kaiser lacked a proper distribution network adversely impacting its volumes and sales; and

(f)     Kaiser suffered from the aggressive tactics of smaller brewers, resulting in losses of market share.

83.     According to a former Coors director of supply chain management, Coors was aware as early as the first quarter of 2004 that Molson's Brazilian operations were "failing" and had the effect of "draining the company" and this information was discussed among Coors senior management at meetings attended by Erhardt as a member of the Synergies and Integration Group.  On information and belief this information was shared with other members of the Synergies and Integration Group, including, Kiely, among others.

**After Defendants' Statements Regarding Coors' Profitability, Expected Merger Synergies, And The Plan For Brazil, Analysts And Investors Perceived Coors As A Company That Had "Turned The Corner" And Adjusted Coors' Price Targets Significantly Upward**

84.     As a result of the false and misleading statements described above, by late-October 2004, Coors was perceived by analysts and investors as a company that had already "turned the corner."

85.     After Coors' announced their third quarter 2004 results on October 28, 2004, Legg Mason upgrading its recommendation for Coors to "Buy," and placed a near-term price

target of $86.00 on Coors' stock. Significantly, Legg Mason acknowledged that it had "run and re-run the numbers" and was "inclined to dismiss" its optimistic outlook for various reasons, but that the upgrade was warranted given "Coors' substantially increased Americas profits per case" and belief that Coors was poised to benefit from a "favorable inflection in shipping trends." Legg Mason also stated its favorable view of the Merger, based on an expected diversification of earnings, cost synergies and strategic outlook for Canada. The November 15, 2004 Legg Mason report stated, in part, the following:

> LIFTING ESTIMATED EARNINGS. We are taking our 4Q EPS estimate to $1.15 from $1.07 and establishing a 2005 EPS estimate of $5.38, treating Coors on an "as-is" basis, i.e., before a possible Molson merger. Consensus estimates for each period are $1.05 and $5.27, respectively...
>
> VALUATION. Our $86 price target reflects various analyses...
>
> We believe Coors' two main business - Coors America (two-thirds EBIT) and Coors Europe (one-third of EBIT) – are <u>on the brink of earnings momentum</u>. We have run and re-run the numbers, inclined to dismiss our outlook for the usual reasons (distant number three, dependent upon one brand, lack of economies of scale, lack of distributor influence) plus a few more (weakened beer demand, increasing category competitiveness). But we think doing so is increasingly imprudent due to Coors' substantially increased Americas profits per case and our belief that the company is at the front of a favorable inflection in shipment trends...
>
> \*          \*          \*
>
> Since July's news that Molson and Coors were seeking to merge, <u>we have warmed up to the combination's merits</u>. And recent news of a special dividend for Molson shareholders increases the likelihood that Coors' shareholders see these merits, in our view.
>
> <u>We believe the proposed combination has three main long-term benefits, more than offsetting significant losses in Brazil and share erosion in Canada. They are earnings diversification, significant cost synergies and an upgrade to the strategic outlook for Canada, Newco's profit center.</u> [Emphasis added].

86.    On November 9, 2004, UBS Investment Research ("UBS") also upgraded its

rating for Coors from "Neutral-2" to "BUY-2," and raised its near-term price target for Coors to

$82.00 per share.  UBS concluded that Coors appeared poised for significant earnings growth

and expansion and concluded that "we believe the company is poised to improve its volume

trajectory in the US."

87.    On November 23, 2004, Legg Mason issued a subsequent report reiterating its

favorable outlook for Coors:

> Shares recently upgraded to Buy from Hold. Opportunity to buy a
> value name at the front of a period of expected earnings
> momentum, in our view…
>
> We recommend buying [Coors] shares at current levels, ahead of
> (i) expected upward revisions of EPS estimates and (ii) shareholder
> approval of the proposed Molson merger, a transaction that
> increases earnings stability, improves the company's cost position,
> and strengthens each party's competitive standing in Canada,
> Newco's (Molson Coors) largest profit center, all else being equal.
> Much of the expected earnings momentum is expected from Coors
> Americas, a business generating nearly 40% more profit per barrel
> than it was three years ago and expected to sustain positively
> inflecting shipment growth for reasons including declining
> consumer interest in low-carb dieting.
>
> *        *        *
>
> Revised Estimates.  We have taken our 4Q EPS estimate to $1.15
> from $1.07 and established a 2005 EPS estimate of $5.38, treating
> Coors on an "as-is" basis, i.e., before a possible Molson merger.
> Consensus estimates for each period are $1.06 and $5.28,
> respectively. We have a basis for increasing our estimates for
> greater impact from the noted inflection and expect the Molson
> combination to be slightly accretive to year-one cash flow and
> year-one earnings before $77 million in incremental depreciation
> & amortization, a non-cash expense, for treatment of the
> transaction on a purchase basis.
>
> *        *        *

Target. Our $86 target price reflects various analyses including our expectation that Newco's free cash flow yield goes to 6.6% from 6.8% presently. [Emphasis added].

88.    By January 2005, analysts appeared further convinced of Coors' financial condition and were projecting price targets for Molson Coors as high as <u>$98 per share</u>:

| | |
|---|---|
| **Deutsche Bank** | "Stronger than expected Q4 volumes. Coors' year-end update highlighted better than forecasted wholesale shipments for both the quarter… and the year… the Coors portfolio may be showing some signs of improvement in the marketplace. Maintain Hold rating and $75 price target." (January 9, 2005); |
| **Bernstein Research** | "Synergies + Operating Leverage = Significant Earnings Growth<br>Improving operating margins, particularly those from merger synergies with Molson, are the primary drivers of our Outperform rating on Coors… We rate [Coors] <u>Outperform with a $98 price target</u>." (January 19, 2005) [Emphasis added]; |
| **Legg Mason** | "Reiterate BUY. We reiterate our BUY rating and $86 12-month price target on shares of Adolph Coors and would view any Anheuser-Busch-related selling of [Coors] shares as an incremental buying opportunity." (January 6, 2005); |
| **Legg Mason** | "Reiterate Buy, $86 Target. We reiterate the attractive risk/reward in shares of Adolph Coors, following the company's positive preannouncement of 4Q Americas shipments on Friday after the close. <u>The move is atypical and, in our view, is intended to help "sell" the proposed Molson deal by disclosing that the U.S.'s number - three brewer is not losing share at a time when the U.S.'s largest brewer is losing share.</u> … Our 4Q EPS estimate is going from $1.15 to $1.20, $0.12 above consensus." (January 10, 2005) [Emphasis added]; and |
| **Bernstein Research** | "Initiating Coverage of Coors with an Outperform. Merger Provides Significant Upside for [Coors] and Molson Shareholders. Investors in Coors are likely to be rewarded with significant upside if the Molson merger is approved…<u>Our analysis suggests that the proposed merger… would result in a $92 intrinsic value per share [and a near-term price target of $98 per share]</u>." (January 14, 2005.) [Emphasis added]. |

89.    On January 19, 2005, Institutional Shareholder Services (ISS), convinced that

Molson Coors would be "better positioned to compete," circulated a report advising its clients to

vote in favor of the Merger.  This report reads, in part, as follows:

> Conclusion: Overall, the proposed transaction comes close to a
> merger of equals through a balanced split of control and
> ownership.  While the merger of equals structure does not yield a
> premium for Coors shareholders, other than the value of cost
> savings, when realized, we note that the Coors family's desire to
> retain control was a constraint for potential takeovers… While the
> combined company will be controlled by the Coors and Molson
> families through a voting agreement and will retain a dual class
> structure, the rights of Class B shareholders are slightly improved
> to include board representation and voting rights on major
> corporate events. The combined company will be better positioned
> to compete in the consolidating industry… [Emphasis added].

**The Merger Agreement And Proxy Statement Confirm Coors' Warranty Against And
Duty To Report Any Material Adverse Change In Coors' Business**

90.    Pursuant to the Merger Agreement, Coors represented that no event had occurred

since December 28, 2003 that would likely have a materially adverse effect on Coors.  Moreover,

the Merger was conditioned on no such event having occurred:

> **ARTICLE IV**
>
> **REPRESENTATIONS AND WARRANTIES OF COORS**
>
> 4.9  Absence of Certain Changes or Events.  Since December 28,
> 2003, the business of Coors and its Subsidiaries has been
> conducted in the ordinary course consistent with past practices and
> there has not been (i) any event, occurrence or development of a
> state of circumstances or facts which has had or would,
> individually or in the aggregate, reasonably be expected to have
> any Material Adverse Effect on Coors, (ii) any material revaluation
> by Coors of any of its assets, including, without limitation, writing
> down the value of capitalized inventory or writing off notes or
> accounts receivable or any material sale of assets of Coors other
> than in the ordinary course of business, (iii) any material damage,
> destruction or loss (whether or not covered by insurance) with
> respect to any material assets of Coors or its Subsidiaries, (iv) any
> material Contract cancelled, terminated, or materially adversely

42

modified or (v) any event or action that if taken after the date
hereof would be prohibited by Section 5.2 hereof.

*     *     *

## ARTICLE VII

## CONDITIONS

7.2  Additional Conditions to Obligations of Molson.  The
obligation of Molson to consummate and effect the Arrangement
shall be subject to the satisfaction at or prior to the Effective Time
of each of the following conditions, any of which may be waived,
in writing, exclusively by Molson:

(a)      Representations and Warranties.  The representations and
warranties of each of Coors and Exchangeco contained in this
Agreement (without giving effect to any materiality (including the
word "material") or "Material Adverse Effect" qualification) shall
be true and correct as of the Closing Date with the same effect as if
made at and as of the Closing Date (other than such representations
that are made as of a specified date, which shall be true and correct
as of such date), except as would not reasonably be expected to
have, individually or in the aggregate, a Material Adverse Effect
on Coors or Exchangeco, as applicable. Molson shall have
received a certificate with respect to the foregoing signed on behalf
of Coors and Exchangeco by an authorized officer of Coors and
Exchangeco.

(b)      Agreements and Covenants.  Coors shall have performed or
complied in all material respects with all agreements and
covenants required by this Agreement to be performed or complied
with by it on or prior to the Closing Date, and Molson shall have
received a certificate to such effect signed on behalf of Coors by an
authorized officer of Coors.

(c)      <u>No Material Adverse Change.  Since the date hereof, there
shall not have occurred any fact, event, change, development,
circumstance or effect which, individually or in the aggregate, has
had or would reasonably be expected to have a Material Adverse
Effect on Coors.</u>  [Emphasis added].

91.      The Proxy Statement reaffirmed that the Merger was conditioned on the absence

of any events or changes that would have a materially adverse effect on either party, and that the

43

representations and warranties of the parties included the absence of such events as well as the

accuracy of the parties' financial statements and the absence of any undisclosed liabilities:

> Each party's obligation to complete the merger transaction is subject to the satisfaction of the following additional conditions by the other party:

> - the material truth of representations and warranties and material compliance with covenants by the other party;

> - the absence of events or changes that have or would reasonably be expected to have a material adverse effect on the other party;

> *      *      *

> **Representations and Warranties**

> The combination agreement contains a number of customary representations and warranties of Molson and Coors relating to, among other things:

> *      *      *

> - the accuracy of reports required to be filed with Canadian securities regulatory authorities and the Toronto Stock Exchange, in the case of Molson, and with the SEC and the New York Stock Exchange, in the case of Coors, since January 1, 2002 and the accuracy of the financial statements included in those reports;

> - absence of undisclosed liabilities;

> - absence of any material adverse effect and certain other changes or events since the date of the last audited financial statements; [Emphasis added.]

**Molson Admittedly Relied On The Purported Financial Condition Of Coors And The Projected Synergies In Approving The Merger**

92.    The Proxy Statement demonstrates that the Molson Independent Committee

specifically relied on the financial condition of Coors and the projected synergies in approving

the Merger:

Factors Considered by the Molson Independent Committee

On July 21, 2004, Molson's independent committee, after an extensive review and thorough discussion of all facts and issues it considered relevant with respect to the proposed merger transaction, concluded unanimously that the proposed merger transaction is fair to, and in the best interests of, the shareholders of Molson, other than Pentland and Eric H. Molson, from a financial and non-financial point of view. The Molson independent committee subsequently proposed that Molson's full board of directors authorize Molson to enter into the proposed combination agreement and recommend to shareholders of Molson that they vote in favor of the Molson shareholders resolution. On November 10, 2004, the Molson independent committee reaffirmed the conclusions reached on July 21, 2004 as well as the recommendations to Molson's full board of directors regarding the proposed combination agreement, as amended, and the Molson shareholders special resolution.

In reaching their conclusion and making their recommendation, the members of the Molson independent committee relied on their personal knowledge of Molson and the industry in which it is involved and on the advice of its legal and financial advisors. The Molson independent committee also reviewed the information provided by Molson and its advisors. The Molson independent committee considered numerous factors to be in favor of the merger, including among other things, the following:

*    *    *

- the current economic, industry and market trends affecting each of Molson and Coors in their respective markets, including those which favor the concentration of business in the hands of a small number of large companies;

*    *    *

- the significant opportunities for the combined company to realize the estimated annual cost savings resulting from the merger of approximately U.S.$50 million and $90 million, respectively, in the first two years following the merger and U.S.$175 million in annual cost savings thereafter;

- the ability of the shareholders of Molson to continue to participate in future earnings and growth of the combined company after completion of the merger transaction through their ownership of shares of the combined company's stock or exchangeable shares of

45

Molson Coors Exchangeco; [Emphasis added].

**Molson Shareholders Approve the Merger**

93.     On February 9, 2005, Molson Coors issued a press release announcing that

Molson and Coors shareholders had approved the Merger, on January 28, 2005 and February 1,

2005, respectively.  Molson Coors further reiterated that it was poised for growth and fully

expected to realize the projected $175 million in cost saving synergies:

> **Molson and Coors Complete Merger to Form Molson Coors
> Brewing Company**
>
> MONTREAL, Canada and GOLDEN, Colorado, Feb. 9 / - Molson
> Inc. (TSX: MOL.A) and Adolph Coors Company (NYSE: RKY)
> today announced that they have completed the transaction
> announced on July 22, 2004 to combine Molson and Coors in a
> merger of equals. Molson Coors Brewing Company is a new
> global brewing company with the operating scale and balance
> sheet strength to be a major player in the continuing consolidation
> of the brewing industry.
>
> Molson and Coors shareholders approved the combination at their
> special shareholder meetings held on January 28 and February 1,
> 2005, respectively, and the Quebec Superior Court approved the
> transaction as required by Canadian law on February 2, 2005.
>
> W. Leo Kiely III, chief executive officer of Molson Coors Brewing
> Company said, "By combining Molson and Coors, we have created
> a company with the market and financial strength necessary to
> drive organic growth and compete more effectively in today's
> increasingly challenging global market, while preserving the rich
> heritages of two of the world's most prominent brewing
> companies. We look forward to drawing on this brewing heritage
> and the combined strengths of a world-class management team to
> deliver greater value to our customers, partners, employees and
> shareholders."
>
> "This transaction marks a new and important chapter in the history
> of both companies," said Eric H. Molson, chairman of Molson
> Coors Brewing Company. "It leverages successful business
> relationships and builds on the strategic and cultural fit between
> our two companies. With an impressive track record in brewing
> excellence, the new Molson Coors Brewing Company will be a
> dynamic and competitive organization that will create long-term

value for our shareholders and the communities in which we operate."

\*        \*        \*

Synergies and Cost Savings

The company has established an Office of Synergies and Integration to facilitate the development and implementation of plans to achieve the expected benefits of the transaction. Through this Office, chaired by Daniel J. O'Neill, the company expects to achieve annualized synergies of approximately US$175 million over three years. The principal sources of these synergies include the optimization of brewery networks, increased procurement efficiencies, streamlined organizational design and consolidated administrative functions. [Emphasis added].

**The Day The Merger Closes Molson Coors Announces That Molson's Final Quarter As An Independent Company Was Flat And Coors' Final Quarter Was Positive**

94.    Molson Coors issued two additional press releases on February 9, 2005, one reporting flat financial results for Molson's last quarter as an independent company, and the other reporting positive financial results for Coors' last quarter before being affiliated with Molson.

95.    Molson's failure to improve its sales revenues came as no surprise to investors, and defendant Wolf, Molson Coors' CFO, was quoted by the Associated Press as stating that Molson's results were "[o]verall, as anticipated…"

**Coors' Fourth Quarter Fiscal 2004 Results**

96.    In contrast to the lackluster report of Molson final quarter, and consistent with what Coors had been trumpeting all along, Molson Coors announced that Coors had achieved higher consolidated net sales, higher net income and higher earnings per share for the fourth quarter and full year 2004.  The press release regarding Coors' final year and quarter stated, in part, the following:

**Molson Coors Reports Adolph Coors Company 2004 Fourth Quarter and Full-Year Results**

GOLDEN, Colo., Feb. 9 -- Molson Coors Brewing Company (NYSE: TAP; TSX) today announced the most recent financial results for Adolph Coors Company, reporting higher consolidated net sales, net income and earnings per share for the fourth quarter and full-year 2004.

\*        \*        \*

Earnings for fourth quarter 2004 benefited from solid beer pricing and volume growth in the company's Americas and Europe segments . . . .

\*        \*        \*

Leo Kiely, chief executive officer, said, "Overall, Adolph Coors Company finished 2004 with good financial results in a very competitive industry environment. In the U.S., despite very soft industry demand, our sales to retail increased in the fourth quarter, partially driven by the comparison to lower sales in the fourth quarter of 2003, when we faced U.S. supply-chain challenges.  Our volume trends also benefited from the introduction of Aspen Edge earlier this year and strong growth from our Blue Moon and Zima XXX brands in the fourth quarter.  In addition, continued progress on productivity initiatives in our U.S. operations enabled us to manage cost pressures, which were particularly challenging in the areas of energy and packaging materials.  In Canada, our Coors Light business continued to deliver strong profit growth.

\*        \*        \*

"Looking ahead, we will be simultaneously focused on improving the fundamentals of our U.S. and U.K. businesses and on working with our new colleagues from Molson to maximize the value opportunities presented by the Molson Coors merger, which closed earlier today." [Emphasis added].

97.    In conjunction with these press releases, Molson Coors hosted a conference call on February 9, 2005 for analysts and investors during which it was represented that Molson Coors was "more confident than ever" that the Merger would result in $175 million in cost savings synergies and that Molson Coors would "continue the near and long term potential" for its Kaiser business in Brazil:

48

> [W]e are obviously very pleased to have closed our merger to
> create Molson Coors Brewing Company, the fifth-largest brewer in
> the world.  Our work has just begun and we are more confident
> than ever that this transaction will deliver substantial value to our
> shareholders including $175 million of cost synergies over and
> above underlying cost potentials of these two great businesses.
> Our first order of business is to focus on our core markets,
> investing for growth on our leading brands.  Near term, our goal is
> to rejuvenate growth in the U.S.  To provide profitable growth in
> Canada for export in tandem with Coors Light.  Number three, to
> keep the growth momentum and share gains building in the UK.
> Number four, to continue the near and long-term potential for our
> Kaiser business in Brazil. This is a great transaction that is
> designed on strength of both companies, making them more
> competitive in the consolidated beer market and increase
> shareholder value substantially in both the short and long term....
> [Emphasis added].

98.    On March 11, 2005, Coors filed its Form 10-K for the fiscal year ended December

26, 2004, reiterating the results discussed in the press release and conference call.  The Form 10-

K was signed by defendants Kiely and Wolf.

99.    In addition to the foregoing, the Coors 2004 Form 10-K also contained the

following certifications signed by defendants Kiely and Wolf:

> 1.  I have reviewed this annual report on Form 10-K of Molson Coors
> Brewing Company;
>
> 2.  Based on my knowledge, this report does not contain any untrue
> statement of a material fact or omit to state a material fact necessary to
> make the statements made, in light of the circumstances under which such
> statements were made, not misleading with respect to the period covered
> by this report;
>
> 3.  Based on my knowledge, the financial statements, and other financial
> information included in this annual report, fairly present in all material
> respects the financial condition, results of operations and cash flows of the
> registrant as of, and for, the periods presented in this report;
>
> 4. The registrant's other certifying officer[s] and I are responsible for
> establishing and maintaining disclosure controls and procedures as defined
> in Exchange Act Rules 13a-15(e) and 15d-15(e) and internal control over
> financial reporting as defined in Exchange Act Rules 13a-15(f) and 15d-
> 15(f) for the registrant and have:

(a)  Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

(b)  Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

(c)  Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

(d)  Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's fourth quarter [the registrant's most recent fiscal quarter in the case of an annual report] that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting.

5.  The registrant's other certifying officer[s] and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors [or persons performing the equivalent functions]:

(a)  All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

(b)  Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

*   *   *

> [Kiely and Wolf] of Molson Coors Brewing Company respectively, each
> hereby certifies that to his knowledge on the date hereof: (a) the Annual
> Report on Form 10-K for the year ended December 26, 2004 … fully
> complies with the requirements of Section 13(a) or 15(d) of the Securities
> Exchange Act of 1934; and (b) information contained in the Report fairly
> presents, in all material respects, the financial condition and results of
> operations of the Company.

100.    As set forth more fully below, the above-described statements regarding Coors'
financial condition were materially false and misleading when made because Coors, and the
relevant individuals who propounded these statements, knew or recklessly disregarded that Coors
was in fact experiencing financial and operational difficulties and was not operating according to
plan.  For example:

(a)      Prior to the Merger, Coors was not experiencing "improving trends" in
key areas of its business.  Defendants knew and discussed internally that prior to the Merger,
Coors' overall business was weak because Coors was experiencing a general decrease in sales,
particularly in key markets such as Texas, and a significant increase in expenses, particularly in
shipping and distribution costs.  Texas was one of Coors' largest markets, and 2004 was the
worst year Coors had ever experienced in Texas.  Sales in Texas were down at least 5%.

(b)      Additionally, the factors that impacted Coors' overall results were not
merely "temporary" as evidenced by the fact that Coors had been forecasting difficulties for the
Dallas/Ft. Worth market since as early as 2000.

(c)      Furthermore, Aspen Edge was not gaining volume and, in fact, sales of
Aspen Edge were so poor that, in the summer of 2004, Coors began a policy of buying back the
product and reimbursing every wholesaler in the country for any Aspen Edge product that went
out of date.  Significantly, any modest growth in sales of minor products such as Zima or XXX,

to the extent any such growth actually occurred, would have been immaterial in comparison with the negative effects of Coors' decrease in sales, increase in costs and the failure of Aspen Edge.

(d)     The defendants were aware or recklessly disregarded Coors' pre-merger financial and operational difficulties discussed in subparagraphs (a) through (c) above. According to a former Coors director of supply chain management, this information was discussed at senior management meetings attended by, among others, defendants Wolf and Barnes. Moreover, Kiely was aware of or recklessly disregarded the above described information because senior management who directly reported to him, including Caseria, also attended these meetings.

(e)     Defendants knew at least three months before the Merger, that the day after the Merger was approved Molson Coors would announce the departure of the senior executives and their significant severance packages.

**Molson Coors Files An Investors' Prospectus Which Describes The Merger
And Incorporates Coors' Prior Statements**

101.     On or about February 11, 2005, Molson Coors filed an investors' prospectus (the "Investors' Prospectus") with the SEC. The Investors' Prospectus was signed by, defendants Kiely, Wolf, P. Coors, Herington, Hobbs, Oliphant, Patsley and Sanders. The Investors' Prospectus incorporated by reference the following documents:

| Coors Filing: | Periods: |
|---|---|
| Annual Report on Form 10-K | Year ended December 28, 2003. |
| Quarterly Reports on Form 10-Q | Quarters ended March 28, 2004, June 27, 2004 and September 26, 2004. |
| Current Reports on Form 8-K | Filed February 5, 2004, April 9, 2004, April 22, 2004, May 21, 2004, June 9, 2004, July 20, 2004, July 22, 2004 (two filings), August 3, 2004 (two filings), August 4, 2004, August 10, 2004, October 1, 2004, October 28, 2004, November 5, 2004, November 15, 2004, November 17, 2004, January 7, 2005, January 14, 2005, February 7, 2005 and February 9, 2005. |

\* \* \*

We also incorporate by reference (i) the Joint Proxy Statement/Management Information Circular that we filed with the SEC on Schedule 14A on December 10, 2004, including the consolidated balance sheet of Molson Inc. as at March 31, 2004 and March 31, 2003 and the consolidated statements of earnings, retained earnings and cash flows of Molson Inc. for the years then ended and March 31, 2002, the unaudited consolidated balance sheet of Molson Inc. as at September 30, 2004, the unaudited consolidated statements of earnings, retained earnings and cash flows of Molson Inc. for the six months ended September 30, 2004, and (ii) the Supplement to Joint Proxy Statement/Management Information Circular that we filed with the SEC on Schedule 14A on January 19, 2005, including the Unaudited Pro Forma Condensed Combined Balance Sheet of Molson Coors Brewing Company as of September 26, 2004 and the Unaudited Pro Forma Condensed Combined Income Statements of Molson Coors.

**After The Merger Kiely Further Proclaims Molson Coors'**
**Synergies And Expected Growth**

102.    On March 2, 2005, defendant Kiely, CEO of Molson Coors, took part in a widely

circulated interview with <u>Bloomberg</u> analyst Mike McKee, during which Kiely stated that

Molson Coors was "very confident about the synergies" and expected growth in each of Molson

Coors' key markets:

> KIELY:  You know, I think we've got to tell our story and we get
> an opportunity to do that tomorrow with our investor
> representatives. You know, we look forward to that.
>
> <u>We've got to be really explicit about our synergy story, the growth</u>
> <u>stories in each of our key markets, and the opportunity to bring</u>
> <u>these two great companies together and build a vision and a culture</u>
> <u>for the future.</u> So, that's what we're going to do.
>
> MCKEE: Well, you got downgraded today by one analyst. You
> had your long-term notes downgraded by Standard & Poor's.  Is
> this a company that's in trouble, a merger that may not work?
>
> KIELY:  <u>Oh, no way. This is – we're just beginning. We're out of</u>
> <u>the box and it's very exciting. We're very confident about the</u>
> <u>synergies, and I think the financial community will be tomorrow</u>
> <u>after we show them our plans</u>. And we've got a - we've got to lay
> expectations for each of these big businesses.
>
> You know, <u>we operate in four of the most profitable beer markets</u>
> <u>in the world</u>, and we've got to be able to have the time to tell our
> story, talk about our strategies, and then show our results.
>
> *          *          *
>
> <u>Well, we just have to tell our story… this is a great brand with</u>
> <u>great legs.</u> [Emphasis added].

In addition, Kiely also revealed that Molson Coors would complete its review of the Brazilian

operations and make recommendations to its board by May 2005.