# Consolidated Amended Class Action Complaint (Part 2 of 2)

**After The Merger Analysts Report A $100 Near-Term Price Target For Molson Coors**

103.    After the Merger, analysts continued to view the Merger favorably, often

projecting a near term price target for Molson Coors at or approaching $100 per share.

104.    On March 3, 2005, for example, after meeting with Molson Coors management in

New York, Bernstein Research again issued an "Outperform" rating and issued a near-term price

target of $98.00 per share.  This report stated that Molson Coors management was "highly

confident" in Molson Coors' ability to achieve the projected $175 million in cost saving

synergies, and even identified additional synergies that would add "at least" another $25 million

in annual savings:

> Molson Coors held an analyst meeting in New York yesterday to
> discuss its outlook for the newly combined company.
>
> Management remains highly confident in its ability to achieve
> $175MM in annual cost savings by 2007.  In addition, it identified
> additional non-operating synergies (lower tax rate, reduced interest
> expense) that will add at least another $25MM in annual cost
> savings...
>
> \*        \*        \*
>
> We have revised our EPS estimates and now project FY05 EPS of
> $4.58 and FY06 EPS of $5.58 including merger related
> depreciation and amortization. Excluding these items would result
> in FY05 and FY06 EPS of $5.18 and $6.23, respectively.
>
> Investment Conclusion. The Molson Coors analyst meeting gave
> us additional confidence that the merger will produce substantial
> benefits over the next several years.  Despite our fairly
> conservative view on potential merger synergies, we see
> significant upside to the stock at these levels. Although the
> company will still have to contend with competitive issues in some
> key markets, we believe the stock is discounting an unlikely
> "disaster scenario." We rate [Molson Coors] Outperform with a
> $98 year-end price target. [Emphasis added].

105.    On March 28, 2005, Credit Suisse First Boston issued a report which rated shares

of Molson Coors as "Outperform" and provided a discounted cash flow valuation based on near-

term price target of $100 per share. This report also predicted cost saving synergies approaching $200 million by 2007, a figure in excess of even Coors' initial projections:

- The combined Molson Coors company has tapped into something new. TAP benefits from strong competitive position in two high-margin beer markets – Canada and the U.K. – and has <u>the potential to nearly double the profitability of its U.S. business through cost savings programs and synergies</u>.

- Our new thesis views <u>Molson Coors as a margin expansion story rather than a U.S. sales growth story</u>. If management can execute on several key initiatives, we believe the company can generate $1.36 billion in EBITDA by 2007, <u>which would support a current share price in excess of $100</u>:

1. Exceed company targets for $175 million in synergy savings by 2007, driven by brewery and logistical optimization... procurement, elimination of redundant corporate overhead, and IT integration and rationalization.

2. Realize or exceed $100 million in "organic" cost savings over the next four to five years, primarily related to a reduction in freight and production costs.

3. Stabilize profitability in Canada after 2005, when the company will increase advertising spending by over 15% behind Molson Canadian.

4. Maintain Coors Light's share of the premium light beer category in the United States.

- <u>Our new DCF-based price target of $100 imbeds 5% annual profit growth off of our 2007 EBITDA estimate of $1.36 billion.</u>

*      *      *

**Drilling Down on Synergies and Cost Savings**

<u>We believe that Molson Coors can drive close to $200 [million in] synergies from the merger by 2007, and generate close to $100 million in additional cost savings in the Americas division over the next five years.</u> [Emphasis added].

106.    Similarly, on April 6, 2005, Credit Suisse First Boston issued an "Outperform" rating on Molson Coors and stated that Molson Coors could potentially double its U.S. profit margin by 2007 through synergies alone:

> Our Outperform rating on TAP is not dependent on robust U.S. revenue growth. Cost savings and synergies should allow TAP meaningful margin enhancement opportunities even if the overall U.S. beer industry remains challenged.
>
> TAP has the potential to double its operating margin in the U.S. through synergies alone by 2007…

107.    Likewise, on April 26, 2005, Bernstein Research issued a report which also rated Molson Coors "Outperform," and stated a near-term price target of $98.00 per share.  At this time, shares of Molson Coors were also trading near an all time high of almost $80 per share.

## THE TRUE FACTS ABOUT COORS' FINANCIAL CONDITION AND MOLSON COORS' PROSPECTS ARE REVEALED

108.    Less than three months after the Merger, investors began to learn the disappointing truth, namely that Coors had been operating below plan and therefore could not counter-balance Molson's losses, that Molson Coors would be unable to achieve anything remotely near the projected synergies, and that Molson's Brazilian operations were worse than reported and would ultimately result in a sale of Molson Coors' majority stake in Kaiser at a loss of over a half billion dollars.

### Molson Coors' First Quarter Results Are Disastrous

109.    On April 28, 2005, Molson Coors issued a press release announcing a net loss purportedly due to lower sales volumes in key markets and costs related to the Merger:

### Molson Coors Reports 2005 First Quarter Results

DENVER, April 28 /PRNewswire-FirstCall/ -- Molson Coors Brewing Company (NYSE: TAP; TSX) today announced higher consolidated net sales and sales volume for the first quarter of

2005 compared to the first quarter of 2004, but <u>reported a net loss in the 2005 first quarter. The net loss was primarily attributable to lower sales volume in key markets versus a year earlier and special charges related to the recent Molson Coors merger totaling $40.7 million in the first quarter of 2005</u>.

The company's 2005 first quarter results include the business of Molson Inc. following the completion of the merger on Feb. 9, 2005, compared to the first quarter of 2004, which includes only the results of the former Adolph Coors Company. The company's reported consolidated sales volume and net sales increased in the 2005 first quarter compared to the first quarter 2004 due to the combination of the Molson and Coors businesses.

For the 13-week first quarter ended March 27, 2005, the merged company reported net sales of $1.1 billion and sales volume of 8,094,000 barrels, or 9,497,985 hectoliters (HLs). <u>The company reported a net loss of $46.5 million, or $0.74 per share, during the 2005 first quarter. Excluding special items, the company reported an after-tax loss of $5.1 million during the 2005 first quarter.</u> (See the company's website, www.molsoncoors.com for reconciliation to the nearest U.S. GAAP measure.)

*    *    *

On a pro forma basis, the company reported a consolidated net loss of $79 million, or $0.91 per share, based on 86.2 million pro forma diluted shares outstanding during the 2005 first quarter.

Leo Kiely, Molson Coors president and chief executive officer, said, "<u>The common underlying cause for difficult first quarter results was the lack of volume growth in each of our major markets</u>. While disappointing, this performance reinforces the importance of integrating the operations and organization of the combined company, so we can capitalize on our new strengths and build an even more competitive and profitable global enterprise. [Emphasis added].

110.    Following the publication of these disastrous results, Molson Coors hosted a conference call for analysts and investors during which Kiely acknowledged, <u>inter alia</u>, a 5.6% decline in pro forma volume due to lower volume sales in <u>all</u> of Molson Coors' major markets, a 6% decline in pro forma net sales, and a pro forma net loss of $79 million compared to a pro forma net gain of $36 million for the first quarter of 2004.  Significantly, Kiely also

acknowledged that pro forma U.S. volume year-over-year declined by 3.6% <u>for Coors' products</u> <u>only</u>. Thus, while Coors and Molson Coors had led investors to believe that Coors' financial stability would be more than sufficient to counteract Molson's expected losses, it was actually Coors that was responsible for the bulk of Molson Coors' decline in pro forma U.S. volume. Finally, Kiely was forced to acknowledge that Molson Coors' first quarter results were "well below our performance goals."

**The Value Of Molson Coors' Shares Falls Precipitously The Day**
**The Financial Results Are Released**

111.    When the market closed on the day Molson Coors' first quarter results were released, the value of Molson Coors' stock had dropped from a closing price of $77.30 the night before, to a closing price of $63. The <u>Denver Post</u> reported on April 29, 2005 that this 19% decrease represented "the biggest daily drop" for Coors in the past 12 years, and was the fifth largest loss that day among all companies listed on the New York Stock Exchange. The <u>Denver</u> <u>Post</u> further reported that " [t]he quarterly [earnings per share] loss of 74 cents a share was unexpected by Wall Street analysts, who in consensus forecasts had predicted a 36-cent-a-share profit."

**<u>O'Neill Resigns On The Day Molson Coors' First Quarter Results Are Released</u>**

112.    On April 28, 2005, the day Molson Coors' first quarter earnings were released, O'Neill suddenly announced that he would abandon the Chair of Office of Synergies and Integration and that he would leave Molson Coors with approximately $4.8 million in severance related payments. The <u>Rocky Mountain News</u> (Denver, CO), described O'Neil's departure as follows:

**BREWERY EXEC'S EXIT LUCRATIVE;**
**MOLSON COORS VICE CHAIRMAN GETS $4.8 MILLION**
**SEVERANCE**

Molson Coors Vice Chairman Dan O'Neill will resign with a multimillion-dollar severance package, joining the ranks of departing executives who exit the brewer with buckets of cash.

O'Neill will get about $66,709 per month for the next three years - a total of $2.4 million - plus a special bonus of $2.4 million for delivering the "synergies and integration plan" to the Molson Coors board at next month's meeting.

In addition, all the restrictions on his stock options lapse. Most of his options, given to him when he was CEO of Molson, required the stock to gain significantly before the options could be used. The company now has waived those rules.

O'Neill cashed out the remainder of a 1999 Molson options grant earlier this year, giving him roughly $33 million in pretax profits.

He is not the only executive to have benefited from the merger. Previously, 12 former Adolph Coors Co. executives used change-of-control provisions in their employment contracts to resign and collect two years' worth of salary and bonus. The payments cost Molson Coors $29 million this quarter, the company said Thursday.

        *     *     *

The specifics of the announcement came as a surprise to some, however. Coors and Molson heavily sold their merger on $175 million in annual synergies and told investors that O'Neill would be in charge of the cost-cutting plan.

But the company had to back off a special $3 million payment O'Neill was to get after the merger closed. Instead, the companies said O'Neill would get the payment only if he left the company.

The new $4.8 million deal, disclosed Thursday, is even more lucrative than the one that irked shareholders last summer.

"It's ludicrous," said Michael Palmer of Toronto's Veritas Research, a longtime harsh critic of Molson. "The company lost 5 market-share points (in Canada). . . I always like to think in a capitalist system, people are rewarded for success, not for (messing up)." [Emphasis added].

113.    As noted in the above article, prior to April 28, 2005, twelve other former Coors executives exercised change in control provisions in their employment contracts which cost Molson Coors $29 million in its first quarter of operations. According to the terms of the Merger Agreement, the executives had until March 15, 2005 to decide whether to accept severance payments equal to twice their annual salaries and bonuses plus two years of benefits and pension contributions, or accept an employee retention bonus that required a two year commitment to Molson Coors.

114.    Before the Merger was consummated, investors could not know how many Coors executives would refuse to join Molson Coors. However, a former Coors director of supply chain management stated that, at least three months before the Merger, it was known within Coors that the day after the Merger was approved Molson Coors would announce the departure of the senior executives and their significant severance packages. On March 18, 2005, after it was known that 11 Coors executives had made this decision, Legg Mason noted that "11 departures is a lot," that "the company's change in control provisions encourage people to resign rather than work," and that the risk to integration was "notable." However, it was only after the release of Molson Coors' first quarter results that investors realized that Molson Coors would be forced to report a "special charge" of almost $30 million, primarily due to change-in-control payments and benefits for the Coors executives who elected to leave Coors following the Merger.

**After Molson Coors' First Quarter Results Analysts Are Stunned And Report That Molson Coors Is A "Mystery" Not An Investment**

115.    Analysts were clearly shocked by Molson Coors' first quarter results. On April 28, 2005, Prudential Equity Group reported that given Molson Coors' first quarter "the potential for seeing $175 in synergies is quite low." On April 29, 2005, Morgan Stanley characterized

Molson Coors' results as a "major earnings miss" and reported that the underlying earnings-per-share was a loss of 7 cents, compared with their estimate of a 40 cent gain. Morgan Stanley stated that "[w]eak industry volumes, share losses, and/or pricing pressures contributed to profit shortfalls across all geographies," and concluded that "[w]e see these challenges continuing or escalating, particularly the US pricing environment as A-B & Miller become more promotional. We also believe execution risk is increasing due to management turnover." Morgan Stanley stated bluntly that there was much it did not like about Molson Coors prospects, including the management turnover, and very little cause for optimism:

### What We Did Not Like

* Weak results in all four markets show the depth of challenges the company continues to face. The company missed our profit forecast in all four major countries as it struggles with some combination of weak industry growth, share losses, and/or pricing pressures.

*       *       *

* Management turnover increases execution risk. With the large number of experienced executives leaving the company, the risk increases that the company will have difficulty turning around its marketplace performance while merging the companies and re-structuring its North American operations.

### What We Liked

* Hard to find much to like. Greater geographic diversification was a key rationale for the Molson-Coors merger but at least one market needs to do well for this to work. [Emphasis added].

116. On April 29, 2005, Prudential Equity Group issued a report stating that Molson Coors is "more of a 'mystery' than an investment right now" and confirming that any chance to recognize the projected first year synergies of $50 million were "basically gone." The report reads, in pertinent part, as follows:

<u>Does anybody know what the right earnings base of Molson Coors (TAP) is?  After reading TAP's 1Q05 press release and listening to its company-sponsored conference call, we are having a difficult time answering that question ourselves... TAP reminds us more of a "mystery" than an investment right now.</u> Granted, after April 28, 2005's declines, getting negative doesn't make sense to us. But getting positive doesn't make sense to us either, particularly when <u>we have no idea what we are investing in.</u>

        *      *      *

Regardless of the bottom line, we know that <u>top line trends were awful with consumption and volume declines in every market.</u>

        *      *      *

We know that <u>the targeted $50 million in year-one synergies are basically "gone," given the big earnings miss</u>... from an earnings perspective, given that our numbers are coming down by $0.52 per share due to the 1Q05 miss, they were more than offset. After all, $50 million in savings is about $0.44 per share after tax assuming a 25% tax rate and 86 million shares outstanding.

Making matters worse, Canada (48% of 2004's EBITDA and TAP's most important market) is in much worse shape than expected after years of neglect.  Indeed, the "revenue" synergies expected once Canada is turned around may never materialize.

        *      *      *

We will return later with our thoughts on the upcoming year. But one thing is for certain, visibility to our revised $4.35 per share estimate, whether it be greater or less, is low, low, low! [Emphasis added].

117.    On April 29, 2005, JP Morgan issued a similar report which noted the unexpected drop in earnings-per -share, and the "flood" of management departures, and opined that Molson Coors was now "ill-suited to compete" in the brewing industry:

- Molson Coors reported a big Q1 EPS disappointment of -$0.06, versus the $0.36 consensus... What is disconcerting is that each of these regions is seeing weak industry trends, on top of Coors share losses, which makes a near-term rebound unlikely.

- In addition, a flood of recent management departures is going to make it more difficult for Coors to turnaround its business.  Coors

announced yesterday that Dan O'Neill, Molson's former CEO, is leaving the Company. While we expected this to happen eventually, timing is sooner than we expected, raising risk.

\*       \*       \*

Weak US Results Could Get Worse Going Forward. …[W]e expect Coors STR trends to worsen going forward as pricing pressure from competitors heats up and new product contribution drops off for Aspen Edge and Zima XXX… To put it simply, the ante is going up in the US, and Coors is ill-suited to compete given its small scale (11% share).

**The Truth Is Revealed Regarding The Extent Of Molson's Problems In Brazil, Molson Coors' Failure To Address The Problem, And The $500 Million Tax Liability Molson Coors Would Inherit**

118.    On May 11, 2005, investors also began to learn that, despite Molson's known failures in Brazil, the problems had only been seriously addressed for a few weeks. Although O'Neill had previously stated that the Brazilian problems were being addressed and that "great inroads" were being made, Kiely now acknowledged that Molson Coors' "teams" had only been conducting due diligence regarding Brazil for a few weeks after the Merger. On May 11, 2005, Bloomberg quoted Kiely as follows:

> [Company CEO] Kiely on the outlook for the Brazilian unit:
>
> "We have had due diligence teams working in Brazil for the past several weeks, and we will be presenting our initial assessment to our board of directors tomorrow…. The four key issues to be addressed in Brazil are the level of cash requirement going forward; the capabilities of our partner's distribution system; the potential and timing of the brand turnaround; and the ability to further adjust our cost base."

119.    Moreover, investors also learned that Molson Coors would be responsible for $500 million in tax liabilities resulting from Molson's failed pre-Merger Brazilian operations that had not been previously quantified in SEC filings regarding the Merger. On May 16, 2005, Bear

Stearns reported on this issue, and questioned whether there was a "Serious Credibility Crisis" at

Molson Coors:

> <u>Management of Molson Coors is not off to a good start in the area of credibility.</u> A worse-than-expected earnings surprise on the heels of the controversial merger, disappointment in the two strongest business units – the U.K. and Canada – and a subsequent downward restatement of Q1 earnings prompted a sharp drop in the value of Molson Coors shares in recent days. <u>Then last week we had the disclosure of nearly half a billion dollars of possible tax liabilities in Brazil that were previously not quantified in SEC merger filings.</u>

*       *       *

> **<u>The Brazilian Tax Problem in More Detail</u>**
>
> This week after examining the recently released TAP 10-Q in more detail, we have recognized more detail on the scale of Brazilian tax liabilities attached to the Molson business:
>
> **<u>From the 1Q05 10-Q:</u>**
>
> "Kaiser is party to a number of claims from the Brazilian tax authorities involving federal excise (IPI), social contribution (PIS and COFINS) and value-added state (ICMS) taxes. <u>We have made a preliminary evaluation of these contingencies as part of our allocation of the purchase price following the merger, resulting in a recorded estimated liability of $176 million. An additional $65 million of claims has been specifically identified for further evaluation as to the probability of loss. Beyond these amounts, there are $273 million of claims whose probability of loss was considered remote.</u> We intend to evaluate in detail the legal issues involved in these preacquisition contingencies during the allocation period. It is possible that actual amounts payable resulting from assessments by tax authorities could be materially different from the liabilities recorded."
>
> Although the nearly $200 million of contingent tax liability is included in the 2004 Molson annual report, <u>from what we can see in the proxy statement published in December 2004, the full scale of the Brazilian liability is not discussed. We believe the scale of these claims is indeed material….</u>

**From the December proxy:**

"We are and will continue to be subject to various contingent taxes, environmental and other liabilities and cannot predict with certainty that our reserves for those liabilities will be sufficient. If actual costs for these contingent liabilities are higher than expected, we could be required to accrue for additional costs. In the course of our respective businesses, we are subject to various litigation claims and other contingent liabilities. These include, among others, (i) claims asserted against Molson's subsidiary, Cervejarias Kaiser Brasil S.A., by Brazilian tax authorities, including claims for income taxes, federal excise taxes, value-added tax, revenue taxes (PIS/federal unemployment insurance contribution) and federal social security tax, (ii) claims by the U.S. Environmental Protection Agency that Coors is a potentially responsible party at the Lowry Superfund Site and (iii) various other legal claims arising in the ordinary course of our businesses…." [Emphasis added].

In a follow up report, dated August 2, 2005, Bear Stearns further stated that the combination of tax liabilities and losses in the Kaiser unit would "offset any gains from merger synergies," unless the Brazilian unit was sold.

120.    On May 18, 2005, Molson Coors issued a press release that announced purported "Changes For Brazilian Operations to Diminish Financial Risk." Molson Coors announced that it would make no further investment in Brazil, and effectively would put its Brazilian operations on life-support, while Molson Coors began to "explore a full range of options." Specifically, Kiely was quoted as stating, "So, starting immediately, I have instructed our management team to do two things. The first is to operate the Kaiser business on at least a cash break-even pace, on an operating basis…. The second is to explore a full range of options for Brazil…"

121.    Following the publication of this press release, shares of Molson Coors traded down another $0.70 per share, to close trading on May 18, 2005, at $59.40 per share. Following this report, analysts at Bear Stearns further lowered their 2005 earnings per share estimate to $4.10 from $4.22.

**The SEC Begins To Investigate Molson Coors**

122.    The contradiction between the market's expectation prior to the Merger, and the

subsequent disclosures of Molson Coors' material problems and liabilities almost immediately

after the Merger closed, did not escape the attention of the SEC.  Accordingly, on or about June

9, 2005, Molson Coors announced that the SEC had requested documents regarding, <u>inter alia</u>,

the Merger, Molson Coors' first quarter earnings report, and its operations in Brazil.  According

to a <u>Bloomberg</u> report, dated the same day, Brian Lane, a partner at Gibson Dunn & Crutcher

LLP in Washington, and a former director of the SEC's corporation finance section, discussed

the seriousness of this type of investigation and stated that, "Typically, SEC enforcement actions

aren't something resolved in a matter of weeks or months, but could extend well over a year."

**Molson Coors Restates Its First Quarter Financials Downward**
**And Releases Equally Poor Second Quarter Results**

123.    On August 2, 2005, Molson Coors again shocked investors by announcing a

restatement of its financial results for the first quarter 2005, and announcing that for the second

quarter of 2005 Molson Coors' <u>profits declined by 46%,</u> in substantial part as a result of

recording costs from tax liabilities at its Brazilian unit and for massive costs associated with

executive severance payments.  According to Molson Coors, the announced restatement of first

quarter 2005 results was necessary because its prior financial reporting for U.S. deferred taxes

for an acquisition made in the U.K. during 2002, did not comply with generally accepted

accounting principles.  Reported earnings per share for the second quarter of 2005 were $1.22,

well below consensus estimates of between $1.45 and $1.77.

**Molson Coors Sells The Bulk Of Its Brazilian Operations For Only $68 Million**

124.    On January 16, 2006, Molson Coors agreed to sell 68% of its 83% interest in its

Brazilian unit to Fomento Economico Mexicano SA ("FEMSA"), Mexico's largest beverage

company, for $68 million.  As noted above, Molson had paid $735 million for a 100% interest in

2002.  As a result of this sale, FEMSA will hold a 68% interest in the Brazilian unit, Heineken

will retain its 17% interest, and Molson Coors will have only a 15% interest.  Moreover, FEMSA

has publicly stated that debts and other claims account for $60 of the $68 million it is paying

Molson Coors, so that, consequently, Molson Coors will receive only $8 million in cash from the

sale.  Molson Coors simultaneously reported that its fourth quarter profits for 2004, excluding

some items, will be lower than a year earlier.

## FALSE FINANCIAL REPORTING IN VIOLATION OF GAAP

125.    At all relevant times during the Class Period, defendants represented that Molson

Coors' financial statements when issued were prepared in conformity with GAAP, which are

recognized by the accounting profession and the SEC as the uniform rules, conventions and

procedures necessary to define accepted accounting practice at a particular time.

126.    As set forth in Financial Accounting Standards Board ("FASB") Statement of

Concepts ("Concepts Statement") No. 1, one of the fundamental objectives of financial reporting

is that it provides accurate and reliable information concerning an entity's financial performance

during the period being presented.  Concepts Statement No. 1, ¶ 42, states:

> Financial reporting should provide information about an
> enterprise's financial performance during a period.  Investors and
> creditors often use information about the past to help in assessing
> the prospects of an enterprise.  Thus, although investment and
> credit decisions reflect investors' and creditors' expectations about
> future enterprise performance, those expectations are commonly
> based at least partly on evaluations of past enterprise performance.

127.    Furthermore, SEC Rule 4-01(a) of SEC Regulation S-X states that financial

statements filed with the SEC which are not prepared in accordance with GAAP will be

presumed to be misleading or inaccurate.  [17 C.F.R. § 210.4-01(a) (1)].  Management is

responsible for preparing financial statements that conform with GAAP.  As noted by the AICPA professional standards:

> financial statements are management's responsibility . . . .
> [M]anagement is responsible for adopting sound accounting
> policies and for establishing and maintaining internal control that
> will, among other things, record, process, summarize, and report
> transactions (as well as events and conditions) consistent with
> management's assertions embodied in the financial statements.
> The entity's transactions and the related assets, liabilities and
> equity are within the direct knowledge and control of management
> . . . .  Thus, the fair presentation of financial statements in
> conformity with Generally Accepted Accounting Principles is an
> implicit and integral part of management's responsibility.

128.    However, in order to artificially inflate the price of Molson Coors' shares, defendants used improper accounting practices in violation of GAAP and SEC reporting requirements, to falsely inflate Molson Coors' assets, stockholders' equity, and reported income (and falsely deflate reported expenses) for the quarterly and yearly periods during and immediately prior to the Class Period.  As discussed below, defendants caused Molson Coors to violate GAAP in several ways, by:

(a)    Improperly failing to record required write-downs for impairment in the value of the goodwill associated with the Kaiser acquisitions;

(b)    Improperly failing to timely record required write-downs for impairment in the value of Kaiser's long-lived assets;

(c)    Improperly accounting for executive severance; and

(d)    Improperly failing to timely accrue for Brazilian tax liabilities.

**Molson Coors' Failure To Timely Write Down Goodwill And Long-Lived Assets**

129.    Molson Coors' reported financial results during the Class Period were materially overstated because they failed to recognize millions of dollars in impairment losses relating to

goodwill and long-lived assets that had been recorded primarily in conjunction with Molson Coors' acquisition of Kaiser.

130.    GAAP requires that the reported value of goodwill be assessed for impairment on an annual basis, and, whenever certain triggering events occur, including: (i) a significant decrease in the market value of the asset; (ii) a significant adverse change in legal factors or in the business climate that could affect the value of an asset or an adverse action or assessment by a regulator; and/or (iii) a current period operating or cash flow loss combined with a history of operating or cash flow losses or a projection or forecast that demonstrates continuing losses associated with an asset used for the purpose of producing revenue.  FASB Statement of Financial Accounting Standards ("SFAS") No. 142, Goodwill and Other Intangible Assets, ¶¶ 26, 28 (June 2001).

131.    Similarly, under SFAS No. 144 Accounting for the Impairment or Disposal of Long-Lived Assets, "[a] long-lived asset (asset group) shall be tested for recoverability whenever events or changes in circumstances indicate that its carrying amount may not be recoverable." SFAS No. 144, ¶ 8 (August 2001).

132.    GAAP also provides that financial statements recognize and report a charge to income when: (a) information existing at the date of the financial statements indicates that it is probable (e.g., that there is a likely chance) that an asset had been impaired; and (b) the amount of the impairment can be reasonably estimated.  SFAS No. 5, Accounting for Contingencies, ¶ 8 (March 1975).

133.    In addition, SFAS No. 142 provides that where an event or changes in circumstances indicate that the carrying value of the asset may not be recoverable, then: (a) the company must compare the fair value of a reporting unit with its carrying amount, including

goodwill. When the carrying amount of a reporting unit exceeds its fair value, the second step of the goodwill impairment test shall be performed to measure the amount of impairment loss; and (b) compare the implied fair value of reporting unit goodwill with the carrying amount of that goodwill. If the carrying amount of reporting unit goodwill exceeds the implied fair value of that goodwill, an impairment loss shall be recognized in an amount equal to that excess through a charge against earnings.

134.    Molson, in a January 16, 2006 press release, announced that it sold 68 percent equity interest in its Brazilian unit, Kaiser, to FEMSA for $68 million cash, including the assumption by FEMSA of certain Kaiser-related debt and contingencies - a loss of approximately $225 million. As shown below, however, Molson was required under GAAP to have recognized this loss for Kaiser well before its January 2006 sale, because the fair value of Kaiser had deteriorated below the carrying value of these assets on Molson's books.

135.    By the beginning of the Class Period, at the latest, defendants knew or recklessly disregarded that events had occurred which called for the write-downs of millions of dollars in goodwill and long-lived assets, including, among other things: (a) these losses were not merely the result of "current period costs" but rather Molson had been experiencing significant losses from its Brazilian operations for some time; (b) the extent of Kaisers' deterioration in financial position was greater than the noted impairment charge taken in October 2004; (c) defendants knew or recklessly disregarded that negative events had adversely impacted Kaiser, necessitating a material write-downs of the goodwill and long-lived assets associated with Kaiser; (d) Kaiser had experienced a material decline in demand for its products, as evidenced by its domestic market share declines (from 17% four years ago to 8.7% in December 2005); (e) Kaiser lacked a proper distribution network adversely impacting its volumes and sales; and (f) Kaiser suffered

from the aggressive tactics of smaller brewers, resulting in losses of market share. Each of the forgoing problems related to Kaiser materially impaired its ability to contribute to Molson Coors' consolidated revenues and earnings.

136.    On March 18, 2002, Molson agreed to acquire Brazil's second largest brewer, Kaiser for $765 million in stock, cash and debt in partnership with Heineken. Molson paid for its share of the acquisition with $190 million in cash, $150 million in Class A common shares of Molson Inc. at a price of C$30.59 each, and debt of about $205 million.

137.    From the beginning, Molson's investment in Kaiser was based largely on the assumption that Brazil would be a lucrative market. In a Reuters News article of March 18, 2002, Dan O'Neill, President and Chief Executive of Molson Inc. stated:

> "This transaction strengthens Molson's continuous commitment to delivering long-term shareholder value."

> "This transaction should be accretive to earnings in one year and positive in year two. We feel the opportunity is immense, as Kaiser offers many of the same efficiency opportunities that Molson had in Canada three years ago. In addition, the partnership with Heineken opens up new opportunities for value creation."

138.    However, as defendants knew but failed to disclose, by no later than the beginning of the Class Period, Molson had determined that implementation of Kaiser was more problematic, that expected market share increases were not to be achieved, and that efficiency opportunities were substantially less than had previously been thought, or were non existent.

139.    According to Dow Jones Newswire on December 6, 2002, and at Molson's fiscal second-quarter 2002 conference call in early November, Molson disclosed that

> [A]verage volumes in the first six months of the fiscal year for the Brazil operation were down 19%, with a market-share decline to 15% from 16.9%. Most of the loss was attributed to its Bavaria brand, which was moving to a new distribution system.

> Using figures provided by Companhia de Bebidas das Americas
> (ABV), or Ambev, Brazil's biggest brewer, Howlett calculated that
> Molson's market share in Brazil fell to 12.8% in the second
> quarter. That is well below the 17.8% market share Molson
> estimated it would reach after combining its existing Bavaria
> operations with Cervejarias Kaiser SA, which it purchased earlier
> this year for US$765 million.

140.    Molson Coors was never able to effectively improve Kaiser's overall distribution

and selling capabilities, and thus earnings, volumes, and market share were negatively impacted.

In this regard, on January 18, 2006 The Wall Street Journal commented that:

> Femsa has the proper distribution network in place, an area where
> Molson Coors struggled. Femsa distributes Heineken and Coke
> products in Brazil through bottler Panamco, which it purchased in
> 2003. Molson Coors had to depend on Panamco and other Coke
> bottlers to distribute Kaiser.

141.    Further commenting on Kaiser's distribution problems, the Dow Jones

Commodities Service on January 17, 2006 reported that:

> "Given that the relationship with Coke bottlers is alleged to be one
> of the main reasons for Kaiser's sluggish performance since it was
> acquired by Molson in early 2002, it would be reasonable to
> assume a potential improvement on this front," Sao Paulo-based
> investment bank Banco Pactual said in a report.

142.    Additionally, Kaiser suffered from the aggressive tactics of smaller Brazilian

brewers. According to a January 23, 2006 Financial Times article, "Schincariol [a smaller

brewer], displaced Kaiser as Brazil's second biggest brewer and now has about 12 per cent of the

market."

143.    Information concerning the deteriorating condition of Kaiser gradually began to

become public in the second half of 2004. For example, On October 28, 2004, Molson disclosed

that declining sales volumes and the loss of market share caused Molson to revise its long term forecast of net cash flow from operations. This resulted in the decline of the value of their investment in Kaiser which was reflected by a $210 million impairment charge reducing goodwill by $130 million and other intangible assets by $80 million (Molson, Quarterly Report (Form 10Q) (September 30, 2004)). This was no surprise to Daniel O'Neil, who stated in their press release that, "[t]he second quarter performance was disappointing but not unexpected."

144.   Heineken, however, which had acquired 20 percent of Kaiser for about $220 million on April 17, 2002, announced during a press release on November 3, 2004, an impairment charge of $190 million EURO reducing its carrying value of its investment in Kaiser to zero. Heineken believed that the value of its minority stake was severely impaired and although the business as a whole has value, it was unable to determine the realizable value of its 20 percent with any accuracy or reliability.

145.   On May 11, 2005 Molson Coors disclosed that the Brazil segment continued to struggle with poor volume and share performance. Beer volume declined 7.1 percent on a pro forma basis versus a year ago. Profitability in general remained a problem and management was considering various courses of action with regard to the Kaiser business. Although the outlook of Brazilian operations looked bleak, Timothy Wolf, CFO of Molson Coors, reacted to these results during the earnings call on April 28, 2005 by stating:

> "[W]e are encouraged by the improved trends for our lead brand, Kaiser, which accounts for more than 75% of our Brazil business sales, and declined at a low single-digit rate in the quarter. We're encouraged by our new ad campaign that we began showing in December, which scores high in the area of consumer awareness, and has improved sales trends."

146.    On May 18, 2005, Molson Coors announced changes in its Brazilian operations to

diminish its financial risk in a press release.  In pertinent part, defendants disclosed:

> Molson Coors continues to believe that Brazil is a valuable beer market with
> potential for long-term growth.  From a strategic standpoint, Molson Coors wants
> to participate in this market with the Kaiser brand and possibly with its flagship
> Coors Light brand.  "While we have a strong and energized Brazilian team in
> place that's eager to win, and making solid progress month to month, we are
> unwilling to make further cash investments in Kaiser without greater certainty
> that it is a viable, long-term platform to compete effectively in Brazil," explained
> Leo Kiely, President and CEO of Molson Coors.  "So, starting immediately, I
> have instructed our management team to do two things.  The first is to operate the
> Kaiser business on at least a cash break-even pace, on an operating basis.  With
> the recent improvements in the business, we think this is achievable.  The second
> is to explore a full range of options for Brazil.  We want to be in the Brazilian
> market, but only on a winning basis, and not at the current risk level."

> The company confirmed that despite losses and slightly lower volumes over the
> recent months, the Kaiser business achieved considerable progress, delivering
> improved financial results compared to the previous year.

147.    Throughout the second and third quarter of 2005 Molson Coors continued to

disclose that they were still trying to determine Molson Coors' long-term role in the Brazilian

beer market with the goal of maximum shareholder returns even though the defendants continued

to state that (1) continued sales declines; (2) operating losses; (3) cost and pricing trends; and (4)

volume declines continued to be significant challenges.

148.    As late as November 1, 2005, defendants attempted to portray Brazil in a positive

light.  For example, in Molson Coors Q3 2005 earnings conference call Tim Wolf, CFO, asserted

that:

> The Brazil team continues to achieve significant progress of
> reducing costs and operating losses, even during the slower winter
> selling season in Brazil.  The Brazil results were also affected by a
> 19% appreciation in the Brazilian real against the U.S. dollar.
> Nonetheless, foreign exchange had no significant effect on Brazil
> operating results due to a decline in U.S. dollar denominated input
> costs.

75

149.    Nonetheless, despite all of foregoing material problems, at no time prior to the announced sale on January 16, 2006 of Kaiser, did defendants cause Molson Coors to take sufficient write-offs against the value of the goodwill and long-lived assets that it had recorded in connection with the acquisition of its stake in Kaiser; to the contrary, by refusing to take such write-offs, defendants in effect falsely represented that no such write-offs were necessary or appropriate.

**Defendants' Improper Accounting For Executive Severance**

150.    In order to overstate Coors' financial results, and the expected performance of Molson Coors, defendants failed to reveal that the Merger would result in the departure of many senior executives, resulting in a $30 million charge to earnings for the first quarter of 2005. According to a former Coors director of supply chain management, it was known at least three months before the Merger that on the day after the Merger was approved Coors would announce the departure of the senior executives and their significant severance packages.

151.    Defendants' failure to properly account for the likelihood, or at least the possibility, of future losses resulting from the Merger is a violation of GAAP. GAAP requires that an estimated loss from a loss contingency shall be accrued by a charge to income if both of the following conditions are met:

> a.    Information available prior to issuance of the financial statements indicates that it is probable that an asset had been impaired or a liability had been incurred at the date of the financial statements. It is implicit in this condition that it must be probable that one or more future events will occur confirming the fact of the loss.

> b.    The amount of loss can be reasonably estimated.

SFAS No. 5, Accounting for Contingencies, ¶ 8 (March 1975).

152.    GAAP also requires that financial statements disclose contingencies when it is at least reasonably possible (i.e., a greater than slight chance) that a loss may have been incurred. SFAS No. 5, ¶ 10.  The disclosure must indicate the nature of the contingency and shall give an estimate of the possible loss, a range of loss, or state that such an estimate cannot be made.  Id.

153.    The SEC considers the disclosure of loss contingencies to be so important to an informed investment decision that it issued Article 10-01 of Regulation S-X [17 C.F.R. § 210.10-01], which provides that disclosures in interim period financial statements may be abbreviated and need not duplicate the disclosure contained in the most recent audited financial statements, except that "where material contingencies exist, disclosure of such matters shall be provided even though a significant change since year end may not have occurred."

154.    Defendants did not comply with the aforementioned GAAP policies because defendants knew or recklessly disregarded that proper accounting for executive severance would reveal, in part, the true financial condition of Coors and/or Molson Coors.

155.    Accordingly, defendants violated GAAP by failing to properly account for the estimated loss resulting from executive severance and failing to disclose the nature of this loss contingency.  The failure to timely and properly account for this loss contingency was material, as evidenced by the $30 million charge to earnings for the first quarter of 2005.

156.    Moreover, defendants' violation of GAAP regarding executive resignations and severance further evinces the false and misleading nature of the statements described herein regarding the financial conditions of Coors and/or Molson Coors and the prospects for synergies between Coors and Molson after the Merger.

**Defendants Improperly Failed to Timely Account For Brazilian Tax Liabilities**

157.    The financial results reported during the Class Period were materially false and misleading because they failed to properly accrue for Brazilian tax liabilities.

158.    The Proxy Statement falsely represented that:

**Tax and Other Contingent Liabilities—Brazil**

Kaiser is a party to a number of claims from the Brazilian tax authorities. <u>Molson has either paid, or alternatively made provisions for, the amounts it believes may be ultimately due pursuant to these claims.</u> These legal tax proceedings include claims for income taxes, Federal excise taxes (IPI), value-added tax ICMS), revenue taxes (PIS / Federal unemployment insurance contribution) and Federal social security tax (COFINS).

**Contingent Liabilities**

Molson is subject to certain legal claims arising in the normal course of business and as a result of the disposition of previously held and discontinued businesses for which Molson has made provisions for the amounts it believes may be ultimately paid.

159.    GAAP provides that an estimated loss from a loss contingency, such as tax liabilities, "shall be accrued by a charge to income" if: (i) information available prior to issuance of the financial statements indicates that it is probable that an asset had been impaired or a liability had been incurred at the date of the financial statements; and (ii) the amount of the loss can be reasonably estimated. SFAS No. 5, ¶ 8. SFAS No. 5 also requires that financial statements disclose contingencies when it is at least reasonably possible (*e.g.*, a greater than slight chance) that a loss may have been incurred. The disclosure shall indicate the nature of the contingency and shall give an estimate of the possible loss, a range of loss or state that such an estimate cannot be made.

160.    The SEC considers the disclosure of loss contingencies to be so important to an informed investment decision that it promulgated Regulation S-X, which provides that disclosures in interim period financial statements may be abbreviated and need not duplicate the

disclosure contained in the most recent audited financial statements, <u>except that</u>, "where material contingencies exist, disclosure of such matters shall be provided even though a significant change since year end may not have occurred." 17 C.F.R. § 210.10-01.

161.    In addition, GAAP requires that financial statements disclose significant risks and uncertainties associated with an entity's business. American Institute of Certified Public Accountant's Statement of Position No. 94-6, <u>Disclosure of Certain Significant Risks and Uncertainties</u> (December 30, 1994).

162.    In addition, "[a]n expense or loss is recognized if it becomes evident that previously recognized future economic benefits of an asset have been reduced or eliminated . . ." Concepts Statement No. 5, ¶ 87.

163.    Indeed, not until May 11, 2005 did Molson Coors disclose the extent of the Brazilian tax liabilities. In this regard, Molson Coors' 1Q05 10-Q disclosed:

> Kaiser is party to a number of claims from the Brazilian tax authorities involving federal excise (IPI), social contribution (PIS and COFINS) and value-added state (ICMS) taxes. <u>We have made a preliminary evaluation of these contingencies as part of our allocation of the purchase price following the merger, resulting in a recorded estimated liability of $176 million. An additional $65 million of claims has been specifically identified for further evaluation as to the probability of loss. Beyond these amounts, there are $273 million of claims whose probability of loss was considered remote.</u> [Emphasis added].

164.    As a result of accounting improprieties, defendants caused Molson Coors' reported financial results to violate, among other things, the following provisions of GAAP for which each defendant is necessarily responsible:

(a)    The principle that financial reporting should provide information that is useful to present and potential investors and creditors and other users in making rational investment, credit and similar decisions. (Concepts Statement No. 1, ¶ 34);

(b)    The principle that financial reporting should provide information about how management of an enterprise has discharged its stewardship responsibility to owners (stockholders) for the use of enterprise resources entrusted to it.  To the extent that management offers securities of the enterprise to the public, it voluntarily accepts wider responsibilities for accountability to prospective investors and to the public in general.  (Concepts Statement No. 1, ¶ 50);

(c)    The principle that financial reporting should provide information about an enterprise's financial performance during a period.  Investors and creditors often use information about the past to help in assessing the prospects of an enterprise.  Thus, although investment and credit decisions reflect investors' expectations about future enterprise performance, those expectations are commonly based at least partly on evaluations of past enterprise performance. (Concepts Statement No. 1, ¶ 42);

(d)    The principle that financial reporting should be reliable in that it represents what it purports to represent.  The notion that information should be reliable as well as relevant is central to accounting.  (Concepts Statement No. 2, ¶¶ 58-59);

(e)    The principle of completeness, which means that nothing is left out of the information that may be necessary to ensure that it validly represents underlying events and conditions.  (Concepts Statement No. 2, ¶ 80);

(f)    The principle that conservatism be used as a prudent reaction to uncertainty to try to ensure that uncertainties and risks inherent in business situations are adequately considered.  The best way to avoid injury to investors is to try to ensure that what is reported represents what it purports to represent.  (Concepts Statement No. 2, ¶¶ 95, 97); and

(g)    The principle that contingencies that might result in gains are not reflected in accounts since to do so might be to recognize revenue prior to its realization and that care should be used to avoid misleading investors regarding the likelihood of realization of gain contingencies.  (SFAS No. 5, Accounting for Contingencies).

## ADDITIONAL ALLEGATIONS REGARDING FALSE AND MISLEADING STATEMENTS AND OMISSIONS

165.    Plaintiffs hereby incorporate the above paragraphs by reference, as if set forth fully herein.

### Statements And Omissions Regarding Coors' Financial Condition

166.    On July 22, 2004, Coors filed with the SEC a form 8-K attaching a press release that quoted Coors president and CEO Kiely as follows:

> "Overall, second quarter results for Coors Brewing Company showed improving trends in several key areas of the business, but a few, largely temporary, factors negatively impacted our overall results. Improved pricing in our major markets, solid margin and profit growth in the U.K., continued strong performance of our Coors Light business in Canada, and favorable foreign exchange rates drove higher operating income in the quarter. These positive factors were partially offset by the negative impacts of U.S. distributor inventory dynamics and higher logistics-related costs in our Americas business. In the Americas, while our sales to retail declined slightly, our sales to wholesalers declined 5.2 percent due to a significant year-over-year shift in distributor inventory patterns. In addition, our consolidated earnings per share were negatively impacted by a higher tax rate this year versus a one-time reduction in our effective tax rate last year, as well as higher diluted shares outstanding this year.

> "While U.S. retail volume declined slightly, the challenges were focused in select markets—particularly in Pennsylvania and Texas—where we face unique local issues. Sales to retail grew during the quarter in five of our largest seven states, including California and New Jersey, where trends rebounded from declines early in the year. In addition, we're pleased with the performance of recent U.S. product introductions, including our Aspen Edge low-carbohydrate lager. Now that Aspen Edge and its advertising support have been rolled out nationally, this great-tasting beer has

been gaining volume. Additionally, our high-margin Zima XXX brand has returned to double-digit percentage sales-to-retail growth since the introduction of new flavors earlier in the year.

167.    The above statements were materially false and misleading when made because Kiely knew or recklessly disregarded that:

(a)    Prior to the Merger, Coors was not experiencing improving trends in key areas of its business.  Rather, as Coors knew and discussed internally, prior to the Merger, Coors' overall business was weak because Coors was experiencing a general decrease in sales, particularly in key markets such as Texas, and a significant increase in expenses, particularly in shipping and distribution costs;

(b)    The factors that impacted Coors' overall results were not merely "temporary" as evidenced by the fact that Coors had been forecasting difficulties for the Dallas/Ft. Worth market, since as early as 2000;

(c)    Aspen Edge was not gaining volume and, in fact, sales of Aspen Edge were so poor that, in the summer of 2004, Coors began a policy of buying back the product and reimbursing every wholesaler in the country for any Aspen Edge product that went out of date;

(d)    The decrease in Coors sales volume was not focused in certain states. Therefore, the representation regarding Texas is misleading and omits material facts in that 2004 was the worst year Coors had ever experienced in Texas and Texas is one of Coors' largest markets.  Sales in Texas were down at least 5% and had been forecast to fall since at least 2000; and

(e)    Any modest growth in sales of minor products such as Zima XXX, to the extent any such growth actually occurred, would have been immaterial in comparison with the negative effects of Coors' decrease in sales, increase in costs and the failure of Aspen Edge.

168.    According to a former Coors director of supply chain management, this information was discussed at senior management meetings attended by, among others, defendants Wolf and Barnes.  Moreover, Kiely was aware or recklessly disregarded the above described information because senior management who directly reported to him, including Caseria, also attended these meetings.

169.    On October 28, 2004, Coors CFO Wolf stated on an investor conference call that:

> "[w]e have been encouraged so far with how some of our higher margins, higher priced products, Blue Moon, Zima, Aspen Edge, are running on us.  And we obviously look for more of the same next year."

170.    This statement was materially false and misleading when made because Wolf knew or recklessly disregarded that Aspen Edge was not gaining volume and, in fact, sales of Aspen Edge were so poor that, in the summer of 2004, Coors began a policy of buying back the product and reimbursing every wholesaler in the country for any Aspen Edge product that went out of date.

171.    On information and belief, this information was presented to some or all of the Individual Defendants, including defendant Wolf.  According to a former Coors director of supply chain management, this information was discussed at senior management meetings attended by, among others, defendants Wolf and Barnes.  Moreover, Kiely was aware or recklessly disregarded the above described information because senior management who directly reported to him, including Caseria, also attended these meetings.

83

**Statements And Omissions Regarding The Expected Merger Synergies**

172.    On July 22, 2004, Coors also filed with the SEC a Schedule 14A, attaching a joint press release with Molson that made the following representations concerning potential merger synergies:

> The combined company expects to achieve annualized synergies of approximately US$175 million by 2007. The principal sources of these synergies include the optimization of brewery networks, increased procurement efficiencies, streamlined organizational design, consolidated administrative functions and greater tax efficiencies. The companies expect to identify additional synergy opportunities between now and closing. These synergies are in addition to cost saving initiatives already underway at both companies.

173.    That same day, Coors and Molson held an investor conference call, a transcript of which was attached to a Schedule 14A that Coors filed with the SEC the following day. On this call, Kiely stated the following regarding potential merger synergies:

> This combination unlocks three phases of value creation. First, we have identified $175 million in annualized synergies, 50% of which we expect to capture in the first 18 months after close. Dan will drill down as to where these synergies will come from shortly. Given the quick ramp up on some of the synergies, we expect this transaction to be accretive to earnings in the first year, excluding purchase price accounting and one-time charges. On a cash EPS basis, we expect the transaction to be significantly accretive in the first year. Second, we will use anticipated additional synergies to make targeted investments behind our core brands and key markets, investments, which we will believe, will drive top line growth.

174.    The Proxy Statement also sets forth these expectations regarding cost saving synergies as follows:

> *Cost Savings.* We expect the merger transaction to deliver immediate tangible benefits to shareholders through substantial synergies, including estimated annual cost savings resulting from

the merger of approximately U.S.$50 million in the first year after the merger transaction, an incremental U.S.$40 million in the second year after the merger transaction (for a total savings of U.S.$90 million in the second year), and an incremental U.S.$85 million in the third year after the merger transaction (for a total savings of U.S.$175 million in the third year). By the fourth year after the merger transaction, the total annual cost savings of U.S.$175 million are expected to be derived from the following areas (1) U.S.$60 million from optimization and consolidation of the combined company's brewery and distribution network (2) U.S.$65 million from improved procurement terms resulting from greater economies of scale. …

175.     On February 9, 2005, Molson Coors issued a press release stating the following:

The company has established an Office of Synergies and Integration to facilitate the development and implementation of plans to achieve the expected benefits of the transaction. Through this Office, chaired by Daniel J. O'Neill, the company expects to achieve annualized synergies of approximately US$175 million over three years. The principal sources of these synergies include the optimization of brewery networks, increased procurement efficiencies, streamlined organizational design and consolidated administrative functions.

176.     In addition, on February 9, 2005, Kiely stated on an investors conference call that "we are more confident than ever that this transaction will deliver substantial value to our shareholders including $175 million of cost synergies over and above the underlying earnings potential of these two great businesses," and stated in a March 2, 2005 interview with Bloomberg that "we're very confident about the synergies."

177.     The above statements were materially false and misleading when made because Coors and Kiely knew or recklessly disregarded that:

(a)     The projected $175 million in cost saving synergies was unlikely to be attained because Coors' increasing distribution costs, including the increasing cost of oil, would adversely affect any possible synergies;

      (b)     The projected $175 million in cost saving synergies was unlikely to be attained because Coors and Molson were already distributing each other's products and therefore the potential for synergies was lower than represented;

      (c)     The projected $175 million in cost saving synergies was unlikely to be attained because the Merger would generate significant costs from the departure of many senior Coors executives; and

      (d)     The projected $175 million in cost saving synergies was unlikely to be attained because the Merger would generate significant costs from Molson's Brazilian operations.

178.    On information and belief, this information was presented to some or all of the Individual Defendants, including defendant Kiely.  According to a former Coors director of supply chain management, this information was discussed among Coors senior management at meetings attended by Erhardt as a member of the Synergies and Integration Group.  On information and belief this information was shared with other members of the Synergies and Integration Group, including, Kiely, among others.  Moreover, with regard to the severance payments, according to a former Coors director of supply chain management, it was known at least three months prior to the Merger that the day after the Merger numerous Coors senior executive would depart Molson Coors with significant severance packages, which would have required approval from Coors' board of directors and therefore certain of the Individual Defendants, including Kiely, among others.

**Statements And Omissions Regarding Molson's Brazilian Losses**

179.    On November 24, 2004, Coors filed with the SEC a Form S-3 which described the extent of Molson's Brazilian operations as follows:

Molson's Brazilian operations recently incurred losses in the quarter ended March 31, 2004 and for the quarters ended June 30, 2004 and September 30, 2004. These losses were a function of the current period costs associated with plans to significantly grow volumes and regain market share associated with the sales centers put in place during the last nine months in Brazil. In light of the continuing challenges presented by the Brazilian beer market, Molson performed an impairment test of assets in the region. As a result of declining sales volumes and loss of market share, Molson announced on September 30, 2004 that it had revised its forecast of net cash flow from operations in Brazil and, as a result, on October 28, 2004 announced that it had recorded an impairment charge of Cdn.$210 million (Cdn.$168 million after minority interest). In addition, Molson announced that it will record a provision for rationalization of approximately Cdn. $50 million against earnings in the coming quarters to account for a plant closing in Brazil and organizational right-sizing. On November 3, 2004, Heineken N.V., the owner of a 20% stake in Molson's Brazilian operations, announced that it provided for an impairment charge for the full amount of its 20% stake stating that it is unable to determine the realizable value of its minority interest with any accuracy or reliability and noting that, as a minority shareholder, it has no effective influence over the management and policies of Molson's Brazilian operations. Molson's Brazilian operations may continue to incur losses and further impairment charges could be required, which could have a material adverse effect on our combined results of operations.

180.   The Proxy Statement filed shortly thereafter stated:

Impairment of Intangible Assets and Goodwill

Molson measures for impairment whenever events or changes in circumstances indicate that the carrying value of indefinite life intangible assets or goodwill may be impaired, using a projected discounted cash flow method and corroborates its assessment using other valuation methods.

* * *

Molson believes that all of its estimates are reasonable. They are consistent with internal planning and reflect management's best estimates, however, there are inherent uncertainties that exist that management may not be able to control.

\*   \*   \*

In the fourth quarter of 2004, Molson completed its annual impairment test for goodwill for all of its reporting units and concluded, based on assumptions noted above, that no impairment charge was warranted.

\*   \*   \*

Under the new management team, Kaiser looks to make gains in expanded distribution, continue the revitalization of the key brands, review the overall commercial structure, eliminate duplications with bottlers and aggressively pursue cost saving projects.

181.    The above statements were materially false and misleading when made because Coors knew or recklessly disregarded that:

(a)    These losses were not merely the result of "current period costs" but rather Molson had been experiencing significant losses from its Brazilian operations for some time;

(b)    The extent of Kaisers' deterioration in financial position was greater than the noted impairment charge taken in October 2004;

(c)    Defendants knew or recklessly disregarded that negative events had adversely impacted Kaiser, necessitating a material write-downs of the goodwill and long-lived assets associated with Kaiser;

(d)    Kaiser had experienced a material decline in demand for its products, as evidenced by its domestic market share declines (from 17% four years ago to 8.7% in December 2005);

(e)    Kaiser lacked a proper distribution network adversely impacting its volumes and sales; and

88

(f)     Kaiser suffered from the aggressive tactics of smaller brewers, resulting in losses of market share.

182.     Each of the forgoing problems related to Kaiser materially impaired its ability to contribute to Molson Coors' consolidated revenues and earnings.  According to a former Coors director of supply chain management, Coors was aware as early as the first quarter of 2004 that Molson's Brazilian operations were "failing" and had the effect of "draining the company." Moreover, this information was discussed among Coors senior management at meetings attended by Erhardt as a member of the Synergies and Integration Group.  On information and belief this information was shared with other members of the Synergies and Integration Group, including, Kiely, among others.

**Statements and Omissions Regarding Molson's Financial Performance and Financial Position Prior to the Merger**

183.     The Proxy Statement also set forth Molson's financial results and financial position prior to the merger.  For example:

|  | (In millions of Canadian Dollars) **For Years Ended March 31,** | |
|  | **2004** | **2003** |
| Total Assets | $3,930.6 | $3,904.1 |
| Shareholders' Equity | 1,219.4 | 1,033.0 |
| Goodwill | 789.6 | 770.4 |
| Net Earnings | 237.0 | 308.0 |

**Per DEFM14A filed on December 10, 2004
Canadian GAAP

184.     The above statements were materially false and misleading when made because defendants knew or recklessly disregarded that:

(a)     Defendants knew or recklessly disregarded that negative events had adversely impacted Kaiser, necessitating a material write-downs of the goodwill and long-lived assets associated with Kaiser;

(b)     Defendants knew or recklessly disregarded that Molson's financial statements were materially false and misleading and in violation of GAAP by failing to properly account for loss contingencies regarding executive severance payments of senior management resignations; and

(c)     Defendants knew or recklessly disregarded that Coors and/or Molson Coors' financial condition was materially overstated and that Molson Coors would incur the tax liabilities from Molson's Brazilian operations.

Each of the forgoing problems related to Molson materially impaired its ability to contribute to Molson Coors' consolidated revenues and earnings.

## ADDITIONAL SCIENTER ALLEGATIONS

185.   The Individual Defendants, by virtue of their positions as managers and/or directors of Coors and/or Molson Coors were controlling persons of Coors and/or Molson Coors, and had the power to influence and/or cause the illegal practices complained of herein.

186.   As discussed above, the Individual Defendants deceived the investing public in the drafting and preparation of the public documents and communications complained of herein and knew of, or recklessly disregarded, the misstatements contained therein and omissions therefrom, and knew or recklessly disregarded, their materially misleading nature.  Because of their board membership and/or executive and managerial position with Coors and/or Molson Coors, the Individual Defendants had access to the adverse non-public information about Coors and/or Molson Coors' business prospects and financial condition.

187. As alleged herein, throughout the Class Period, the Individual Defendants knew or recklessly disregarded that Coors and/or Molson Coors' financial condition was materially overstated and that Molson Coors would incur the costs of senior management resignations and inherit losses and tax liabilities from Molson's Brazilian operations far greater than disclosed to the investing public. For example, in a confidential communication, a former Coors director of supply chain management stated that Coors knew and discussed internally that prior to the Merger Coors' Merger overall business was weak because Coors was experiencing a general decrease in sales, particularly in key markets such as Texas, and a significant increase in expenses, particularly in shipping and distribution costs. He further stated that such information was presented to senior management at Coors, including defendants Wolf and Barnes, and discussed at meetings attended by Erhardt as a member of the Synergies and Integration Group. On information and belief this information was shared with other members of the Synergies and Integration Group, including, defendants Kiely and O'Neill, among others.

188. The undisclosed problems alleged in this Complaint regarding Coors and/or Molson Coors' accounting practices and financial condition were continuous, material, and of a nature that evidences they were known of and in existence during the Class Period and were therefore known to or within the purview of all defendants at all relevant times. The undisclosed problems would have been a matter of utmost concern for any officer, director and/or senior management of Coors and/or Molson Coors.

189. As detailed above, the Individual Defendants, as officers and directors of Coors and/or Molson Coors, were privy to confidential financial information concerning Coors and/or Molson Coors' business, financial condition and future business prospects and outlook. In this

capacity, the Individual Defendants had access to, and knowledge of, material, nonpublic information concerning Coors and/or Molson Coors' true financial condition.

190.    As alleged herein, the Individual Defendants acted with the requisite scienter in that they knew that the public documents and statements issued or disseminated by or in the name of Coors and/or Molson Coors were materially false and misleading; knew or recklessly disregarded that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violators of the federal securities laws.  As set forth elsewhere herein in detail, the Individual Defendants, by virtue of their receipt of information reflecting the true facts regarding Coors and/or Molson Coors' financial condition, their control over and/or receipt of Coors and/or Molson Coors' allegedly materially misleading misstatements and/or their associations with the Coors and/or Molson Coors which made them privy to confidential proprietary information concerning Coors and/or Molson Coors, were active and culpable participants in the fraudulent scheme alleged herein.  The Individual Defendants knew and/or recklessly disregarded the falsity and misleading nature of the information which they caused to be disseminated to the investing public.  The ongoing fraudulent scheme described in this Complaint could not have been perpetrated over a substantial period of time, as has occurred, without the knowledge and complicity of the personnel at the highest level of Coors and/or Molson Coors, including the Individual Defendants.

191.    Defendant P. Coors, in addition to his conscious or reckless disregard for the truth of the statements set forth herein, also possessed the requisite scienter through his motive and opportunity to commit the fraud alleged herein.  P. Coors was motivated by the desire to ensure the completion of a merger that would allow his continued ownership and control of the new

entity, Molson Coors. Indeed, he remains Trustee of the Coors trust which now owns 33.49% of Molson Coors and together with Pentland Securities, controlled by Eric Molson, owns over 67% of the voting shares of Molson Coors. Additionally, P. Coors' daughter, Melissa E. Coors has been added as the youngest member of the Molson Coors board of directors. As a director he possessed the same access to and information as the other defendants and discussed in detail above.

## LOSS CAUSATION AND ECONOMIC LOSS

192.    Members of the Class purchased shares of Coors and/or Molson Coors, or exchanged their Molson shares for shares of Molson Coors, at artificially inflated prices and were damaged when revelations of the true facts caused a decline in the value of their investments.

193.    During the Class Period, as detailed herein, defendants deceived the market and engaged in a course of conduct that resulted in the artificial inflation in the price of Coors and/or Molson Coors' stock, and operated as a misrepresentation or deceit on those former Molson shareholders who exchanged their shares of Molson for shares of Molson Coors in connection with the Merger, and certain open market purchasers of Coors and/or Molson Coors as described herein. In connection with the Merger, defendants misrepresented Coors' financial condition and operational abilities and failed to disclose material facts about Coors and about Molson's Brazilian operations that were known to them prior to the Merger.

194.    The purpose and effect of defendants' illegal and improper conduct was to create the appearance that Coors was performing better than it actually was prior to the Merger, and to create the appearance that the Merger would provide significant value to the shareholders of each company, and that the Merger was not just a self-serving transaction by each companies' family management.

195.    Ultimately, however, when investors realized the full lack of defendants' candor, and began to understand the true, impaired operational and financial condition of Molson Coors, shares of Molson Coors declined precipitously, evincing that the prior artificial inflation in the price of Molson Coors' shares was eradicated.  First, as defendants revealed that Molson Coors was incapable of generating revenues, profits, earnings, merger synergies or cash flow to service debt, in line with guidance previously sponsored or endorsed by defendants in connection with the Merger, shares of Molson Coors suffered a single day decline of 19%.  Second, after it was later revealed that defendants had failed to properly account for the full tax liability of Molson's Brazilian operations, or the real value of those operations, shares of Molson Coors traded even lower, below $60 per share.

196.    Rather than admit the true, impaired condition of Coors prior to the Merger, and rather than accruing for the foreseeable tax liabilities related to Molson's Brazilian operations or the foreseeable number of employees that were planning to leave Molson Coors and accept severance or other bonuses, defendants, prior to the Merger and throughout the relevant period, repeatedly emphasized the financial stability of Coors and/or Molson Coors, and consistently failed to disclose the impaired condition of Coors and potential consequences for Molson Coors. These claims caused and maintained the artificial inflation in Coors, and later Molson Coors' stock price, throughout the relevant period and until the full truth about Molson Coors was ultimately revealed to investors.

197.    Defendants' false and materially misleading statements had the intended effect of causing Coors and later Molson Coors shares to trade at artificially inflated levels throughout the relevant period, reaching a trading high of approximately $80.00 per share in early-April 2005.

198.    On April 28, 2005, however, investors learned the truth about Molson Coors' financial condition, namely that Coors had been operating below plan and therefore could not counter-balance Molson's losses and that Molson Coors would be unable to achieve anything remotely near the projected synergies.  Investors later learned that the Brazilian operations Molson Coors inherited from Molson were worse than reported and would ultimately result in a sale of Molson Coors' Brazilian operations at a loss of over a half a billion dollars.

199.    The eventual disclosure of Coors' and Molson Coors' true financial condition exposed the falsity of defendants' prior statements.  As investors and the market ultimately learned, the Coors and Molson Coors' business prospects had been hugely overstated.  As this adverse information became known to investors, the artificial inflation of Molson Coors' stock price was eliminated and shareholders were damaged as a result of the related share price decline.

200.    As a direct result of defendants' false and misleading statements, after the truth about Molson Coors' financial condition was revealed on April 28, 2005, Molson Coors' stock price collapsed to below $60.50 per share, from a high of approximately $77.50 per share days before - - a decline of over 20%, on very heavy trading volume of over 10 million shares.  This dramatic share price decline, corrected much of the artificial inflation in Molson Coors' share price, causing real economic loss to investors who purchased this stock during the Class Period. In sum, as the truth about defendants' misrepresentations and illegal course of conduct became known to investors, and as the artificial inflation in the price of Molson Coors was eliminated, plaintiffs and the other members of the Class were damaged and suffered economic loss.

201.    The decline in Molson Coors' stock price at the end of the relevant period was a direct result of the nature and extent of defendants' prior misrepresentations being revealed to

investors and to the market. The timing and magnitude of Molson Coors' stock price decline negates any inference that the losses suffered by plaintiffs and the other members of the Class were caused by changed market conditions, macroeconomic or industry factors or even Company-specific facts unrelated to defendants' fraudulent conduct. During the same period in which Molson Coors' share price fell over 20% as a result of defendants' misrepresentations being revealed, the Standard & Poor's 500 securities index was relatively unchanged. The economic loss, *i.e.* damages suffered by plaintiffs and other members of the Class, was a direct result of defendants' illegal course of conduct which artificially inflated the price of Coors' and/or Molson Coors' stock and the subsequent significant decline in the value of Molson Coors' shares when defendants' prior misstatements and other fraudulent conduct was revealed.

## APPLICABILITY OF PRESUMPTION OF RELIANCE: FRAUD-ON-THE-MARKET DOCTRINE

202.    Plaintiffs will rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine in that, among other things:

(a)    Defendants made public misrepresentations or failed to disclose facts during the Class Period;

(b)    The omissions and misrepresentations were material;

(c)    Coors' and Molson Coors' securities traded in an efficient market;

(d)    The misrepresentations alleged would tend to induce a reasonable investor to misjudge the value of Coors' and/or Molson Coors' securities; and

(e)    Plaintiffs and the other members of the Class purchased Coors' and/or Molson Coors' securities, and/or exchanged their shares of Molson for shares of Molson Coors, between the time defendants misrepresented or failed to disclose material facts and the time the true facts were disclosed, without knowledge of the misrepresented or omitted facts.

203.    At all relevant times, the market for Coors' and/or Molson Coors' securities was an efficient market for the following reasons, among others:

(a)    Pursuant to Coors' Form 10-Q filed with the SEC on November 5, 2004, Coors had approximately 37.3 million shares outstanding;

(b)    Coors and Molson Coors securities were listed and actively traded during the Class Period on the NYSE, the world's leading and most technologically advanced equities market.  During the Class Period, prior to the Merger, Coors stock was actively traded on the NYSE with an average daily trading volume of 607,000 and a total trading volume of 8.5 million shares; and during the Class Period, after the Merger, Molson Coors stock was actively traded on the NYSE with an average daily trading volume of 1.1 million shares and a total trading volume of 61.2 million shares;

(c)    As regulated issuers, Coors and Molson Coors regularly made public filings, including Forms 10-K, Forms 10-Q and related press releases, with the SEC;

(d)    Coors and Molson Coors were followed by analysts from major brokerages.  During the Class Period, there were hundreds of research reports written by securities analysts.  The reports of these analysts were redistributed to the brokerages' sales force, their customers, and the public at large;

(e)    There were more than 500 different institutions of sophisticated investors that owned Coors' or Molson Coors' common stock during the Class Period; and

(f)    Coors and Molson Coors regularly communicated with public investors via established market communication mechanisms, including the website postings, regular disseminations of press releases on the major news wire services, and other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services.

204.    As a result, the market for Coors' and/or Molson Coors' securities digested current information regarding Coors and/or Molson Coors from the publicly available sources described above and reflected such information in the prices of Coors' and/or Molson Coors' securities. As would be expected where a security is traded in an efficient market, material news concerning Coors' and/or Molson Coors' business had an immediate effect on the market price of Coors and/or Molson Coors securities, as evidenced by the rapid decline in the market price in the immediate aftermath of Coors' and/or Molson Coors' corrective disclosures as described herein. Under these circumstances, all purchasers of Coors and/or Molson Coors securities during the Class Period suffered similar injury due to the fact that the price of Coors and/or Molson Coors securities was artificially inflated throughout the Class Period. At the times they purchased or otherwise acquired Coors and/or Molson Coors' securities, plaintiffs and other members of the Class were without knowledge of the facts concerning the wrongful conduct alleged herein and could not reasonably have discovered those facts.

205.    All purchasers of Coors' and/or Molson Coors' securities during the Class Period suffered similar injury through their purchase of Coors' and/or Molson Coors' securities in an efficient market at artificially inflated prices and a presumption of reliance applies. Plaintiffs will also rely, in part, upon the presumption of reliance established by a material omission.

## NO SAFE HARBOR

206.    The federal statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to some or all of the allegedly false statements pleaded in this Complaint. Many of the specific statements pleaded herein were not identified as "forward-looking statements" when made. To the extent there were any forward-looking statements, there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements.

Alternatively, to the extent that the statutory safe harbor does apply to any forward-looking statements pleaded herein, defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the particular speaker knew that the particular forward-looking statement was false, and/or the forward-looking statement was authorized and/or approved by an executive officer of Coors or Molson Coors who knew that those statements were false when made. Further, the clear language of the Private Securities Litigation Reform Act expressly excludes from the safe harbor protection statements that are "included in a financial statement prepared in accordance with generally accepted accounting principles." *In re Sunbeam Sec. Litig.*, 89 F. Supp. 2d 1326, 1339 (S.D. Fla. 1999); 15 U.S.C. § 78u-5(b)(2)(A).

## FIRST CLAIM

### (Against All Defendants)
### For Violation of Section 14(a)
### of the Exchange Act and SEC Rule 14a-9

207.    Plaintiffs hereby incorporate the above paragraphs by reference, as if set forth herein, only to the extent, however, that such allegations do not allege fraud, scienter or the intent of the defendants to defraud plaintiffs or members of the Class. This count is predicated upon defendants' strict liability for making false and materially misleading statements in the Proxy Statement and Investors' Prospectus. This count is asserted by plaintiffs against all defendants by and on behalf of persons who acquired shares of the Coors and/or Molson Coors pursuant to the false Proxy Statement and Investors' Prospectus issued in connection with the Merger.

208.    As a result of the foregoing, the defendants named herein violated §14(a) of the Exchange Act and obtained the approval of the Merger by the Molson shareholders, by way of a false and misleading Prospectus.

209.    These defendants prepared, disseminated and/or approved the false Proxy Statement and Investors' Prospectus specified above, which contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

210.    Defendants have violated §14(a) of the Exchange Act and SEC Rule 14a-9 in that they issued the Proxy Statement to solicit and obtain the votes of Molson shareholders, to approve the Merger by making statements which defendants knew or should have known were untrue and/or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

211.    As a consequence of the foregoing course of conduct, plaintiffs and the members of the Class have been damaged.

## SECOND CLAIM

### Violation Of Section 10(b) Of
### The Exchange Act And Rule 10b-5
### Promulgated Thereunder Against All Defendants

212.    Plaintiffs hereby incorporate the above paragraphs by reference, as if set forth fully herein.

213.    During the Class Period, defendants carried out a plan, scheme and course of conduct which was intended to and, did:  (i) deceive the investing public, including plaintiffs and other Class members as alleged herein; (ii) artificially inflate and maintain the market price of Coors' and/or Molson Coors' common stock; and (iii) cause plaintiffs and other members of the Class to purchase Coors' and/or Molson Coors' common stock at artificially inflated prices during the Class Period.  In furtherance of this unlawful scheme, plan and course of conduct, defendants took the actions set forth herein.

214.    Defendants (a) employed devices, schemes, and artifices to defraud; (b) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (c) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of the Coors' and/or Molson Coors' common stock in an effort to maintain artificially high market prices for Coors' and/or Molson Coors' common stock in violation of Section 10(b) of the Exchange Act and Rule 10b-5. Defendants are sued as primary participants in the wrongful and illegal conduct charged herein and as controlling persons as alleged below.

215.    In addition to the duties of full disclosure imposed on defendants as a result of their affirmative statements and reports, or participation in the making of affirmative statements and reports to the investing public, they had a duty to promptly disseminate truthful information that would be material to investors in compliance with the integrated disclosure provisions of the SEC as embodied in SEC Regulation S-X (17 C.F.R. § 210.01 et seq.) and other SEC regulations, including accurate and truthful information with respect to the Coors' and/or Molson Coors' operations, financial condition and performance so that the market prices of Coors' and/or Molson Coors' publicly-traded securities would be based on truthful, complete and accurate information.

216.    Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about the business, business practices, performance, operations and future prospects of Coors and/or Molson Coors as specified herein.

217.    These defendants employed devices, schemes and artifices to defraud, while in possession of material adverse non-public information and engaged in acts, practices, and a course of conduct as alleged herein in an effort to assure investors of Coors and/or Molson Coors' value and performance and continued substantial growth, which included the making of, or the participation in the making of, untrue statements of material facts and omitting to state material facts necessary in order to make the statements made about Coors and/or Molson Coors and their business operations and future prospects in the light of the circumstances under which they were made, not misleading, as set forth more particularly herein, and engaged in transactions, practices and a course of business which operated as a fraud and deceit upon the purchasers of Coors' and/or Molson Coors' securities during the Class Period.

218.    Each of the Individual Defendants' primary liability, and controlling person liability, arises from the following facts: (i) the Individual Defendants were high-level executives and/or directors of Coors and/or Molson Coors during the Class Period, or had control thereof; (ii) each of the Individual Defendants, by virtue of his responsibilities and activities as a senior officer and/or director of Coors and/or Molson Coors was privy to and participated in the creation, development and reporting of the Coors' and/or Molson Coors' internal budgets, plans, projections and/or reports; (iii) the Individual Defendants enjoyed significant personal contact and familiarity with each other and were advised of and had access to other members of the Coors' and/or Molson Coors' management team, internal reports and other data and information about Coors' and/or Molson Coors' finances, financial condition, operations, and sales at all relevant times; and (iv) each of the Individual Defendants was aware of Coors' and/or Molson Coors' dissemination of information to the investing public which they knew or recklessly disregarded was materially false and misleading.

219.    The defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose such facts, even though such facts were readily available to them. Such defendants' material misrepresentations and/or omissions were done knowingly or recklessly, and for the purpose and effect of concealing Coors' and/or Molson Coors' operating condition, business practices and future business prospects from the investing public and supporting the artificially inflated price of Coors' and/or Molson Coors' common stock. As demonstrated by defendants' overstatements and misstatements of Coors' and/or Molson Coors' financial condition and performance throughout the Class Period, defendants, if they did not have actual knowledge of the misrepresentations and omissions alleged, were reckless in failing to obtain such knowledge by refraining from taking those steps necessary to discover whether those statements were false or misleading.

220.    As a result of the dissemination of the materially false and misleading information and failure to disclose material facts, as set forth above, the market price of Coors' and/or Molson Coors' common stock was artificially inflated during the Class Period. Unaware of the fact that the market price of Coors' and/or Molson Coors' shares was artificially inflated, and relying directly or indirectly on defendants' false and misleading statements, or upon the integrity of the market in which the securities trade, and/or on the absence of material adverse information that was known to or recklessly disregarded by defendants (but not disclosed to the public) during the Class Period, plaintiffs and the other members of the Class acquired Coors' and/or Molson Coors' common stock during the Class Period at artificially inflated prices and suffered damages when revelations of the true facts caused a decline in the value of their investment.

221.    At the time of said misrepresentations and omissions, plaintiffs and other members of the Class were ignorant of their falsity, and believed them to be true.  Had plaintiffs and the other members of the Class and the marketplace known the truth regarding the true performance, business practices, future prospects and true value of Coors and/or Molson Coors, which were not disclosed by defendants, plaintiffs and other members of the Class would not have purchased or otherwise acquired their Coors and/or Molson Coors common stock during the Class Period or, if they had acquired such securities during the Class Period, they would not have done so at the artificially inflated prices which they paid.

222.    By virtue of the foregoing, defendants violated Section 10(b) of the Exchange Act, and Rule 10b-5 promulgated thereunder.

223.    As a direct and proximate result of defendants' wrongful conduct, plaintiffs and the other members of the Class suffered damages in connection with their acquisition of Coors and/or Molson Coors securities during the Class Period.

## THIRD CLAIM

### Violation Of Section 20(a) Of
### The Exchange Act Against Individual Defendants

224.    Plaintiffs hereby incorporate each of the above paragraphs by reference, as if set forth fully herein.

225.    The Individual Defendants were, and acted as, controlling persons of Coors and/or Molson Coors within the meaning of Section 20(a) of the Exchange Act as alleged herein. By virtue of their high-level positions with Coors and/or Molson Coors, and their ownership and contractual rights, participation in and/or awareness of Coors' and/or Molson Coors' operations and/or intimate knowledge of Coors' and/or Molson Coors' actual performance, these defendants had the requisite power to directly or indirectly control or influence the specific corporate policy

which resulted in the dissemination of the various statements which plaintiffs contend are false and misleading. The Individual Defendants were provided with or had unlimited access to Coors' and/or Molson Coors' reports, press releases, public filings and other statements alleged by plaintiffs to be false and misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

226.    In addition, the Individual Defendants had direct involvement in the day-to-day operations of Coors and/or Molson Coors and, therefore, are presumed to have had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.

227.    As forth above, the Individual Defendants violated Section 10(b) and Rule 10b-5 by their acts and omissions as alleged in this Complaint. By virtue of their positions as controlling persons, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act. As a direct and proximate result of defendants' wrongful conduct, plaintiffs and other members of the Class suffered damages in connection with their purchases of Coors and/or Molson Coors' securities during the Class Period.

## **PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiffs, on their own behalf and on behalf of the Class, pray for relief and judgment, as follows:

(a)    Declaring this action to be a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of the Class defined herein;

(b)    Awarding plaintiffs and the other members of the Class damages in an amount which may be proven at trial, together with interest thereon;

(c)     Awarding plaintiffs and the other members of the Class pre-judgment and post-judgment interest, as well as their reasonable attorneys' fees, expert witness fees and other costs;

(d)     Awarding extraordinary, equitable and/or injunctive relief as permitted by law, equity and the federal statutory provisions sued hereunder, pursuant to Rules 64 and 65 and any appropriate state law remedies to assure that the Class has an effective remedy; and

(e)     Such other and further relief as the Court may deem just and proper.

## JURY TRIAL DEMANDED

Plaintiffs hereby demand a trial by jury.

Dated: February 6, 2006                    Respectfully submitted,

**MILBERG WEISS BERSHAD
& SCHULMAN LLP**

/s/ Seth D. Rigrodsky (#3147)
Seth D. Rigrodsky (#3147)
Ralph N. Sianni (#4151)
Brian D. Long (#4347)
Sean M. Brennecke (#4686)
919 N. Market Street, Suite 980
Wilmington, DE 19801
(302) 984-0597 (Tel)
(302) 984-0870 (Fax)

- and -

Steven G. Schulman
**MILBERG WEISS BERSHAD
& SCHULMAN LLP**
One Pennsylvania Plaza
New York, NY 10119
(212) 594-5300 (Tel)
(212) 868-1229 (Fax)

*Plaintiffs' Lead Counsel*

Of Counsel

**MURRAY, FRANK & SAILER LLP**
Eric J. Belfi
275 Madison Avenue, 8th Floor
New York, NY 10016
(212) 682-1818 (Tel)
(212) 682-1892 (Fax)

## CERTIFICATE OF SERVICE

I, Ralph Sianni, an associate with the law firm Milberg Weiss Bershad & Schulman LLP,

hereby certify that on this 6th day of February 2006, I caused a true and correct copy of the

**Consolidated Amended Class Action Complaint For Violation Of The Federal Securities**

**Laws** to be electronically filed with the Clerk of Court using CM/ECF, which will send

notification of such filing(s) to the following:

Charles F. Richards, Jr.
Elizabeth Tucker
**Richards, Layton & Finger, P.A.**
One Rodney Square
P.O. Box 551
Wilmington, DE 19899
(302) 658-6541
Email: richards@rlf.com
       tucker@rlf.com

*Counsel for Defendants*

Carmella P. Keener
**Rosenthal, Monhait, Gross & Goddess, P.A.**
Citizens Bank Center, Suite 1401
P.O. Box 1070
Wilmington, DE 19899-1070
(302) 656-4433
Email: CKeener@rmgglaw.com

Paul Anthony Fioravanti
**Prickett, Jones & Elliott, P.A.**
1310 King Street
Wilmington, DE 19801
(302) 888-6326
Email: pafioravanti@prickett.com

Service has also been made upon additional defendant Daniel J. O'Neill via registered agent:

Daniel J. O'Neill
c/o Corporation Service Company
(Registered Agent For Molson Coors Brewing Company)
2711 Centerville Road, Suite 400
Wilmington, DE 19808
(302) 636-5401

/s/ Ralph N. Sianni
Ralph N. Sianni (#4151)
MILBERG WEISS BERSHAD
  & SCHULMAN LLP
919 N. Market Street, Suite 980
Wilmington, DE 19801
(302) 984-0597
E-mail: rsianni@milbergweiss.com