# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

----------------------------------------------------------  x
                         :

**IN RE MOLSON COORS BREWING**      :    Civil Action No. 1:05-cv-00294-KAJ
**COMPANY SECURITIES LITIGATION**    :    (Consolidated)
                         :

----------------------------------------------------------  x

# DEFENDANTS' OPENING BRIEF IN SUPPORT
## OF THEIR MOTION TO DISMISS THE COMPLAINT

OF COUNSEL:

Michael R. Young
Antonio Yanez, Jr.
Darren Gibson
Willkie Farr & Gallagher LLP
787 Seventh Avenue
New York, NY 10019-6099
(212) 728-8000

Charles F. Richards, Jr. (#701)
Jeffrey L. Moyer (#3309)
Elizabeth C. Tucker (#4468)
Richards, Layton & Finger, P.A.
One Rodney Square
Wilmington, DE 19899
(302) 651-7700
Fax: (302) 651-7701
Email:  richards@rlf.com
          moyer@rlf.com
          tucker@rlf.com

*Attorneys for Defendants*

**TABLE OF CONTENTS**

**PAGE**

TABLE OF AUTHORITIES ................................................................................. ii

NATURE AND STAGE OF PROCEEDINGS ...................................................... 1

SUMMARY OF ARGUMENT .............................................................................. 2

STATEMENT OF FACTS ..................................................................................... 4

ARGUMENT ........................................................................................................ 12

I.   The Complaint Identifies No Misrepresentation Of Material Fact ........................................... 13

    A.  The Synergies ......................................................................................... 14

    B.  Coors' Pre-Merger Performance ............................................................ 16

    C.  The Brazil Business ............................................................................... 21

    D.  Executive Departures ............................................................................. 26

II.  The Complaint Does Not Adequately Allege Scienter ............................................................. 27

CONCLUSION ..................................................................................................... 33

i

### TABLE OF AUTHORITIES

**CASES**                                                                                    **PAGE(S)**

*In re Advanta Corp. Sec. Litig.*, 180 F.3d 525 (3d Cir. 1999) ........................................13, 14, 22, 29

*In re Alpharma Inc. Sec. Litig.*, 372 F.3d 137 (3d Cir. 2004)...................................................12, 27

*In re Am. Bus. Fin. Servs., Inc. Sec. Litig.*, 413 F. Supp. 2d 378 (E.D. Pa. 2005).........................32

*Basic, Inc. v. Levinson*, 485 U.S. 224 (1988) ...............................................................................13

*In re Bio-Tech. Gen. Corp. Sec. Litig.*, 380 F. Supp. 2d 574 (D.N.J. 2005)...........................31, 32

*Cal. Pub. Employees' Ret. Sys. v. Chubb Corp.*,
    394 F.3d 126 (3d Cir. 2004) ...........................................................................12, 13, 19, 20, 25

*In re Digital Island Sec. Litig.*, 223 F. Supp. 2d 546 (D. Del. 2002).......................................31, 32

*In re Digital Island Sec. Litig.*, 357 F.3d 322 (3d Cir. 2004) ..........................................................12

*Dwoskin v. Rollins, Inc.*, 634 F.2d 285 (5th Cir. 1981) ...................................................................27

*Elliott Assocs., L.P. v. Hayes*, 141 F. Supp. 2d 344 (S.D.N.Y. 2000) ...........................................30

*Ernst & Ernst v. Hochfelder*, 425 U.S. 185 (S.D.N.Y. 2000)...................................................12, 27

*In re Exxon Mobil Corp. Sec. Litig.*, 387 F. Supp. 2d 407 (D.N.J. 2005)................................20, 24

*Freed v. Universal Health Servs., Inc.*, No. Civ. A. 04-1233, 2005 WL 1030195
    (E.D. Pa. May 3, 2005)..............................................................................................19, 20, 25

*GSC Partners CDO Fund v. Washington*, 368 F.3d 228 (3d Cir. 2004) .............................16, 28, 29

*In re Goodyear Tire & Rubber Co. Sec. Litig.*, Civ. A. No. 88-8633, 1993 WL 130381
    (E.D. Pa. Apr. 22, 1993) ...........................................................................................................30

*Kennilworth Partners L.P. v. Cendant Corp.*, 59 F. Supp. 2d 417 (D.N.J. 1999)........................28

*Key Equity Investors, Inc. v. Sel-Leb Mktg. Inc.*, No. Civ. A. 04 CV 1675 DMC,
    2005 WL 3263865 (D.N.J. Nov. 30, 2005)..............................................................................16

*In re Ligand Pharm., Inc. Sec. Litig.*, No. 04CV1620, 2005 WL 2461151
    (S.D. Cal. Sept. 27, 2005)..........................................................................................................29

*In re Loral Space & Commc'ns Ltd. Sec. Litig.*, No. 01 Civ. 4388, 2004 WL 376442
    (S.D.N.Y. Feb. 27, 2004) ...........................................................................................................29

*In re Lowen Group, Inc. Sec. Litig.*, No. Civ. A. 98-6740, 2003 WL 22436233
(E.D. Pa. July 16, 2003) ...................................................................................30

*In re Merck & Co., Inc. Sec. Litig.*, 432 F.3d 261 (3d Cir. 2005).................................12

*In re NAHC, Sec. Litig.*, 306 F.3d 1314 (3d Cir. 2002) ..............................................4, 13

*In re Nice Sys., Ltd. Sec. Litig.*, 135 F. Supp. 2d 551 (D.N.J. 2001) .............................13

*Plevy v. Haggerty*, 38 F. Supp. 2d 816 (C.D. Cal. 1998)..............................................30

*In re Rockefeller Ctr. Props., Inc. Sec. Litig.*, 311 F.3d 198 (3d Cir. 2002)............................13, 28

## Statutes

15 U.S.C. § 78j(b) (2000) ...............................................................................12

15 U.S.C. § 78n(a) (2000)................................................................................12

15 U.S.C. § 78t (2000)...................................................................................12

15 U.S.C. § 78u-4 (2000).............................................................................14, 28

15 U.S.C. § 78u-5(c) (2000) ...........................................................................16

17 C.F.R. § 240.10b-5 (2005)........................................................................12, 13

17 C.F.R. §240.14a-9 (2005) .........................................................................12, 13

## Other Authorities

141 Cong. Rec. S17966 (daily ed. Dec. 5, 1995)........................................................14

H.R. Conf. Rep. No. 104-369 (1995).....................................................................14

## NATURE AND STAGE OF PROCEEDINGS

Defendants Molson Coors Brewing Company ("Molson Coors"), Peter H. Coors, W. Leo Kiely III, Charles M. Herington, Franklin W. Hobbs, Randall Oliphant, Pamela Patsley, Wayne Sanders, Albert C. Yates, Timothy V. Wolf, Peter Swinburn, David G. Barnes, Peter M.R. Kendall, and Daniel J. O'Neill respectfully submit this opening brief in support of their motion to dismiss plaintiffs' February 6, 2006 Consolidated Amended Class Action Complaint pursuant to Federal Rule of Civil Procedure 12(b)(6) and the Private Securities Litigation Reform Act of 1995.

This action was commenced in May 2005 with the filing of several securities class action complaints in this Court. The Court ordered those actions consolidated on November 7, 2005, and on December 2, 2005 appointed Meltzer Investment GmbH and Drywall Acoustic Lathing and Insulation Local 675 Pension Fund as lead plaintiffs and approved their selection of lead counsel. On March 13, 2006, a securities class action based on the same conduct was transferred to this Court from the United States District Court for the District of Colorado. The parties have agreed that the transferred case should be consolidated with this action and that the February 6, 2006 Consolidated Amended Class Action Complaint in this action will be the operative complaint.

## SUMMARY OF ARGUMENT

Rarely has so much been premised upon so little. As the Court is already aware, this putative class action arises out of the merger of the Adolph Coors Company ("Coors") and Molson Inc. ("Molson") to form Molson Coors. The central contention of the complaint is that Molson's shareholders were duped into approving the merger, most prominently with regard to anticipated "synergies" that the merger would provide. Thus, for example, the complaint emphasizes repeatedly that defendants improperly represented that they had "identified pre-existing synergies between Molson and Coors that would save Molson Coors $175M in costs by 2007." This, the complaint suggests, was both groundless and unduly optimistic and therefore constitutes securities fraud.

There are two main problems with that contention. One is that the complaint cannot allege that the statements regarding anticipated synergies were actually untrue. It is a matter of public record (indeed, plainly disclosed in the very documents upon which plaintiffs seek to rely) that the anticipated synergies are not only being realized but that the merger will provide synergies potentially beyond those described. The other problem is that the statements about anticipated synergies were quintessentially the kinds of "forward-looking statements" upon which a securities claim cannot be premised when they are accompanied by adequate warnings (which they plainly were here). And while the complaint also seeks to describe lesser, more isolated instances of inaccurate disclosure, the documents themselves -- and the piercing public scrutiny of those documents by shareholders, analysts, and others -- demonstrates that not a single false statement can be found and that no one was misled. Nor, to the extent it seeks to state a claim for deliberate fraud, does the complaint otherwise satisfy the prerequisites for

- 2 -

pleading such a claim, failing altogether to sufficiently allege that any defendant acted with the intent to defraud.

There is no securities claim here. The complaint should be dismissed.

## STATEMENT OF FACTS

The plaintiffs fall into three categories: (1) former Molson shareholders who received shares of Molson Coors in the merger; (2) open market purchasers of Coors stock prior to the merger; and (3) open market purchasers of Molson Coors stock after the merger.[1] The defendants are Molson Coors itself, together with a number of current and former officers and directors of the company. All but one of the individual defendants are former officers or directors of Coors;[2] the remaining defendant was a Molson officer.[3]

The seminal event in the complaint is the creation of Molson Coors, which today is the fifth largest manufacturer of beer and other malt beverages in the world.[4] The company was created through the February 9, 2005 merger of two then relatively smaller players in the global brewing industry.[5] Molson – a family-owned brewery founded in Canada in 1786 – was the fourteenth largest brewer in the world.[6] United States-based Coors was number eight on the list of international brewers.[7]

---

[1]     *See* Compl. ¶ 1.

[2]     *See* Compl. ¶¶ 19-31.

[3]     *See* Compl. ¶ 32.

[4]     *See* April 6, 2006 Affidavit of Michael R. Young ("Young Aff.") Exh. 1 at 1 (5/18/05 Molson Coors Press Release). The Court may consider this press release and the other materials submitted with this motion to dismiss as all but one of these documents are "explicitly relied upon in the complaint." *See In re NAHC, Sec. Litig.*, 306 F.3d 1314, 1331 (3d Cir. 2002) (quoting *In re Burlington Coat Factory Sec. Litig*, 114 F.3d 1410, 1426 (3d Cir. 1997)). The remaining document – Molson Coors' 2005 Form 10-K – is a public disclosure document filed with the SEC, which the Third Circuit has held may also be considered on a motion to dismiss. *See NAHC*, 306 F.3d at 1331.

[5]     *See* Compl. ¶ 3; *see also* Young Aff. Exh. 2 at 8 (7/21/04 Prudential Equity Group, LLC Company Report).

[6]     *See* Young Aff. Exh. 3 at 181 (Joint Proxy Statement).

[7]     *See* Young Aff. Exh. 7 at 4 (7/23/04 Coors Sched. 14A, Molson and Coors Conf. Call).

The catalyst for the merger was both companies' need to compete effectively in light of substantial beer industry consolidation and the increasingly apparent benefits of scale in that industry.[8]  As of June 2004, "[t]he top 10 brewers. . . [had] an estimated combined 62% share of global consumption versus 52% in March of 2003 and 43% in 1999."[9]  Then-recent examples of beer industry consolidation included the purchase by South African Breweries – maker of Peroni and Pilsner Urquell – of the Miller Brewing Company in the United States; the purchase by Interbrew – maker of Stella Artois – of the Beck's (Germany) and Labatt's (Canada) brands; and the acquisition by Heineken of assets in Europe, South America, and New Zealand.[10]  These larger breweries enjoyed more favorable cost structures than their smaller rivals owing to economies of scale, and were better poised to weather changes in consumer tastes by offering more brands in more countries.[11]

Molson and Coors thus found themselves seeking to grow in recent years and making acquisitions.  Molson's main acquisitions were in South America.  Molson entered the Brazilian beer market in 2000 with the purchase of Bavaria, S.A. and in 2002 became Brazil's second largest brewer by acquiring Cervejarias Kaiser Brasil S.A.[12]  Coors' expansion was principally in the United Kingdom with the 2002 acquisition of Bass Holdings Limited.[13]

---

[8]    *See* Young Aff. Exh. 3 at 5 (Joint Proxy Statement).

[9]    Young Aff. Exh. 3 at 183 (Joint Proxy Statement).

[10]   *See* Young Aff. Exh. 4 at 6 (11/09/04 UBS Investment Research Report).

[11]   *See* Young Aff. Exh. 5 at 10 (1/14/05 Bernstein Research Call Report).

[12]   *See* Compl. ¶¶ 6, 136; *see also* Young Aff. Exh. 3 at 182 (Joint Proxy Statement).

[13]   *See* Young Aff. Exh. 6 at 6, 72 (3/12/04 Coors Form 10-K).

Even with these acquisitions, however, both Molson and Coors were among the relatively smaller, and therefore less competitive, players in the global beer industry.[14] At the same time, both companies faced increasingly difficult industry conditions (which, as it turns out, would persist and ultimately cause the negative results that prompted this lawsuit). Overall beer market volume was effectively flat in Canada in 2003 and the United States beer market saw volume decline from the year before as consumer tastes shifted from beer to wine and spirits, among other things.[15] These and other challenges affected Coors' results with the company reporting that net income, earnings per share, and volume were down at various points in time and identifying specific problems in the large Texas market[16] – though Coors was generally able to deliver solid results.[17] For its part, Molson reported "below plan" results despite the strength of the Molson brands.[18] Molson was also struggling with its acquisitions in Brazil, which later came to be viewed as "wrecked" and prompted a C$210 million impairment charge.[19]

It was against this backdrop that merger discussions between Molson and Coors began in 2004. The companies had been joint venture partners for years – Molson had

---

[14]    *See* Young Aff. Exh. 7 at 4 (7/23/04 Coors Sched. 14A, Molson and Coors Conf. Call); Young Aff. Exh. 3 at 181 (Joint Proxy Statement).

[15]    *See* Young Aff. Exh. 3 at 242, 248 (Joint Proxy Statement).

[16]    *See* Compl. ¶¶ 65, 70; *see also* Young Aff. Exh. 8 at 28 (8/6/04 Coors Form 10-Q) ("US retail volume declines were focused in select markets—particularly in Pennsylvania and Texas—where we face unique local issues."); Young Aff. Exh. 9 at 6 (2/5/04 Coors Form 8-K, Press Release) (reporting decreasing volumes in U.S. during 2003).

[17]    *See* Young Aff. Exh. 9 at 6 (2/5/04 Coors Form 8-K, Press Release); Young Aff. Exh. 10 at 6 (7/22/04 Coors Form 8-K, Press Release); Young Aff. Exh. 11 at 1 (2/9/05 Molson Coors Press Release).

[18]    Compl. ¶¶ 47-49; *see also* Young Aff. Exh. 12 at 1-3 (10/28/04 Molson Press Release); Young Aff. Exh. 13 at 1-2 (*Molson Issues Earnings Warnings: Slow Sales in Canada, Weak Profit in Brazil*, Canadian Press, Sept. 30, 2004).

[19]    Compl. ¶ 52, 78; *see also* Young Aff. Exh. 14 at 7 (11/24/04 Coors Form S-3); Young Aff. Exh. 3 at 5, 202, 292 (Joint Proxy Statement).

manufactured and sold Coors Light in Canada since 1998, and Coors had sold Molson products in the United States since 2001[20] – and during that time the prospect of a Molson-Coors merger had come up more than once. But discussions began in earnest in the spring of 2004, first between Peter H. Coors (Chairman of Coors) and Eric H. Molson (Chairman of Molson), and later with other members of both companies' management teams.[21] The companies settled on terms over the course of a few months.[22] And a "merger of equals" between Molson and Coors was announced on July 22, 2004.[23]

The Molson-Coors merger made good business sense for a number of reasons. Foremost, the merger would result in a significantly larger and more competitive company.[24] The merged company would have leading positions in a number of top global beer markets: number one in Canada, number two in the UK, and number three in the US.[25] Significant cost-saving synergies were expected – $50 million during the first year of the merger, $90 million in the second year, and $175 million in the third year and every subsequent year.[26] The merger built on the companies' strong existing joint venture relationship.[27] And there were other reasons for the merger as well.

That is not to say that the market's reaction to the Molson-Coors merger was entirely favorable. Far from it. Many analysts were strident in their opposition to the merger and

---

[20]    *See* Young Aff. Exh. 3 at 72 (Joint Proxy Statement).

[21]    *See* Compl. ¶¶ 46, 64; *see also* Young Aff. Exh. 3 at 72 (Joint Proxy Statement).

[22]    *See* Young Aff. Exh. 3 at 72-73 (Joint Proxy Statement).

[23]    *See* Compl. ¶¶ 47, 93.

[24]    *See* Young Aff. Exh. 3 at 5 (Joint Proxy Statement).

[25]    *See* Young Aff. Exh. 7 at 3 (7/23/04 Coors Sched. 14A, Coors and Molson Conf. Call).

[26]    *See* Compl. ¶ 5; *see also* Young Aff. Exh. 3 at 79-80 (Joint Proxy Statement).

[27]    *See* Young Aff. Exh. 3 at 72 (Joint Proxy Statement).

dedicated themselves to exposing every potential drawback starting in July 2004 and continuing

through the shareholder votes on the merger in January and February 2005.[28]  Among other

things, analysts voiced doubts as to whether the merger addressed the operational issues facing the

companies.  Thus, one analyst opined that the "transaction fails to resolve either company's

underlying performance issues,"[29] and another observed:

> We do not think that a merger of these two companies resolves any of the
> problems they face or provide [sic] them a better platform for surviving in
> the current landscape of the industry. . . .  A merger seems to take two
> medium-sized problems and creates one new major complication.[30]

Analysts further noted that the merger would do nothing to ameliorate Molson's problems in

Brazil:  "Coors can't do much for Molson in Brazil."[31]  And they raised questions as to whether

cost-saving synergies could be realized:

> Given that Coors and Molson are already a combined entity since they
> operate two joint ventures, one in Canada and one in the US, we question
> "where is the value and/or cost savings/synergies?"[32]

> Shareholders too – or at least certain factions among the Molson shareholders –

likewise expressed opposition.[33]  The chairman of Montreal-based institutional shareholder

Jarislowsky, Fraser Limited declared:  "This transaction doesn't make any sense long-term."[34]

Shareholder and former Molson director Ian Molson also announced his opposition and even

---

[28]    *See* Compl. ¶ 52.

[29]    Compl. ¶ 52.

[30]    Compl. ¶ 52.

[31]    Compl. ¶ 52.

[32]    Compl ¶ 52.

[33]    *See* Young Aff. Exh. 15 at 1 (*Molson Holder Advises Rejection of Coors Merger, Globe Reports*,
Bloomberg News, Jan. 4, 2005) ; Young Aff. Exh. 16 at 1 (*Molson Holder TAL Global Opposes
Coors Merger*, Bloomberg News, Jan. 6, 2005).

[34]    Compl. ¶ 61.

attempted to put together a competing offer for Molson in order to avoid the merger.[35]  And, as the complaint points out, a number of other significant shareholders came out against the merger as well.[36]

One result of all of this was a flurry of newspaper and other media coverage dissecting the proposed merger and the various dissenters' bases for opposing it.[37]  Another result was that the transaction terms were modified in response to criticisms – among other things, the voting procedures that would be used to approve (or disapprove) the merger were changed[38] and plans to award merger bonuses to executives were dropped.[39]  Yet another result was that Molson shareholders were offered a special dividend in connection with the transaction (the merger was originally structured as a straight stock-for-stock swap) and the dividend was increased just weeks before Molson shareholders were to vote in light of continuing opposition.[40]

By January 2005, whether the merger would be approved was still very much in doubt.[41]  But shareholder sentiment ultimately turned in favor of the merger – whether owing to the changes in transaction terms or the dividend or the straightforward conclusion that the deal made sense.  Molson and Coors shareholders thus voted to approve the merger on January 28 and February 1, 2005, respectively.[42]  The merger became effective on February 9, 2005.[43]

---

[35]    *See* Compl. ¶ 54.

[36]    *See* Compl. ¶ 59.

[37]    *See* Compl. ¶¶ 54, 57-59, 61.

[38]    *See* Compl. ¶ 53; *see also* Young Aff. Exh. 17 at 2 (11/17/04 Coors Form 8-K).

[39]    *See* Compl. ¶¶ 53, 112; Young Aff. Exh. 3 at 88-89 (Joint Proxy Statement).

[40]    *See* Compl. ¶¶ 55, 60.

[41]    *See* Compl. ¶ 59.

[42]    *See* Compl. ¶¶ 9, 93.

[43]    *See* Compl. ¶ 93.

Then, some three months later, came the announcement which forms the basis of this lawsuit. On April 28, 2005, Molson Coors announced a net loss of $46.5 million for the first quarter of 2005, disappointing results by any measure.[44] The losses were principally attributable to the industry-wide downturn which began before the merger and has persisted since. Overall beer volume – which had been flat or declining in advance of the merger – did not recover and, in the first quarter of 2005, Molson Coors saw a "lack of volume growth in each of [its] major markets."[45] The first quarter 2005 results also reflected $40.7 million in merger-related charges, including $27.2 million in payments and benefits to departing Coors executives under pre-existing (and disclosed) severance arrangements.[46] And subsequent quarters brought additional bad news as an apparent industry slump continued and particularly bad news developed in Brazil where the business deteriorated, liabilities grew, and Molson Coors ultimately decided to sell the bulk of its interest for substantially less than what had been paid several years earlier.[47]

None of this, however, suggests that the Molson-Coors merger is a failure or that shareholders were in any way misled. Among other things, the company is enjoying increased global reach, in addition to benefiting from improved costs structures and the like.[48] Molson Coors is also seeing the cost-saving synergies expected from the merger.[49] The documents cited in the complaint themselves are explicit that the company had "achieved approximately $37

---

[44]    *See* Compl. ¶ 109.

[45]    Young Aff. Exh. 18 at 2 (4/28/05 Molson Coors Press Release).

[46]    *See* Compl. ¶¶ 109, 113; *see also* Young Aff. Exh. 19 at 2-4 (4/28/05 Molson Coors Earnings Conf. Call); Young Aff. Exh. 20 at 11, 17-18 (5/11/05 Molson Coors Form 10-Q).

[47]    *See* Compl. ¶¶ 120, 123, 124; *see also* Young Aff. Exh. 21 at 2-3 (8/2/05 Molson Coors Press Release); Young Aff. Exh. 22 at 4-5 (11/1/05 Molson Coors Earnings Conf. Call); Young Aff. Exh. 23 at 1 (1/16/06 Molson Coors Press Release).

[48]    *See* Young Aff. Exh. 22 at 1, 9 (11/1/05 Molson Coors Earnings Conf. Call).

[49]    *See* Young Aff. Exh. 19 at 5 (4/28/05 Molson Coors Earnings Conf. Call).

million" in synergy savings by the end of the third quarter 2005 and was well on its way to delivering the $50 million expected for the year.[50]  And more recent news is even more encouraging.  Molson Coors recently reported that in 2005 it had "captured $59 million in merger-related synergies, surpassing the company's 2005 goal of $50 million" and that the company had identified $75 million in anticipated future synergies beyond the original $175 million annual target.[51]

Plaintiffs have nevertheless latched onto Molson Coors' first quarter 2005 results as the basis for securities claims, the thrust of which is that the Molson-Coors merger and everything said in support of the merger are the products of fraud.

---

[50]    Young Aff. Exh. 22 at 6 (11/1/05 Molson Coors Earnings Conf. Call).

[51]    Young Aff. Exh. 24 at 30 (3/10/06 Molson Coors Form 10-K).

**ARGUMENT**

The complaint seeks to allege substantive claims under two provisions of the

Securities Exchange Act of 1934. The first is section 14(a) which through its implementing rule

imposes liability in connection with a proxy solicitation that contains "any statement which . . . is

false or misleading with respect to any material fact, or which omits to state any material fact

necessary in order to make the statements therein not false or misleading." 17 C.F.R. §240.14a-9

(2005); *see also* 15 U.S.C. § 78n(a) (2000). The second is section 10(b), which makes it

unlawful to "make any untrue statement of a material fact or to omit to state a material fact

necessary in order to make the statements made . . . not misleading." 17 C.F.R. § 240.10b-5

(2005); *see also* 15 U.S.C. § 78j(b) (2000). Section 10(b) requires pleading (and proof) of

scienter. *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 193 (1976). Section 14(a) requires only

negligence. *Cal. Pub. Employees' Ret. Sys. v. Chubb Corp.*, 394 F.3d 126, 168 (3d Cir. 2004)

(citing *Gould v. Am. Hawaiian S.S. Co.*, 535 F.2d 761, 777 (3d Cir. 1976)).[52]

The complaint here fails to state a claim under either section. First, the complaint

fails to identify any actionable misstatement in the securities filings and other public statements

at issue. Second, as to the section 10(b) claim, the complaint fails adequately to allege scienter.

---

[52]    The complaint also asserts a claim against the individual defendants pursuant to Securities
Exchange Act section 20(a), which "imposes joint and several liability on any person who
'controls a person liable under any provision of the [Exchange Act].'" *In re Alpharma Inc. Sec.
Litig.*, 372 F.3d 137, 153 (3d Cir. 2004) (quoting *Shapiro v. UJB Fin. Corp.*, 964 F.2d 272, 279
(3d Cir. 1992)); *see also* 15 U.S.C. § 78t (2000). There must be a claim against the "controlled
person" – here, Molson Coors – in order to state a claim under section 20(a). *In re Merck & Co.,
Inc. Sec. Litig.*, 432 F.3d 261, 275 (3d Cir. 2005); *see also In re Digital Island Sec. Litig.*, 357
F.3d 322, 337 (3d Cir. 2004) ("Liability under Section 20(a) is derivative and must be predicated
upon an independent violation . . . .") (citation omitted). Because the complaint's section 14(a)
and 10(b) claims fail to state a cause of action against Molson Coors as set forth in the text, the
section 20(a) claim against the individual defendants must be dismissed as well.

I.     **THE COMPLAINT IDENTIFIES NO MISREPRESENTATION OF MATERIAL FACT.**

The starting point under both section 14(a) and section 10(b) is the existence of a false or misleading statement, which is an essential prerequisite under both sections. *See* 17 C.F.R. §§ 240.10b-5, 240.14a-9. To state a cause of action, securities complaints must identify either false statements or statements rendered misleading by omission. *See In re NAHC, Inc. Sec. Litig.*, 306 F.3d 1314, 1328-29 (3d Cir. 2002) (citing *Oran v. Stafford*, 226 F.3d 275, 282 (3d Cir. 2000) and *Gen. Elec. Co. v. Cathcart*, 980 F.2d 927, 932 (3d Cir. 1992)). Such statements must relate to existing facts – statements about the future or that convey opinions typically are not actionable. *See NAHC,* 306 F.3d at 1330; *In re Advanta Corp. Sec. Litig.*, 180 F.3d 525, 540 (3d Cir. 1999); *In re Nice Sys., Ltd. Sec. Litig.*, 135 F. Supp. 2d 551, 586 (D.N.J. 2001). The misstatements or omissions must also be "material," which means that they would be "viewed by the reasonable investor as having significantly altered the 'total mix' of information made available." *Basic, Inc. v. Levinson,* 485 U.S. 224, 231-32 (1988) (citation omitted).

Securities complaints, moreover, cannot rely on bare conclusions or generic assertions in pleading the existence of material misstatements or omissions. *See Cal. Pub. Employees' Ret. Sys. v. Chubb Corp.*, 394 F.3d 126, 144, 155 (3d Cir. 2004); *In re Rockefeller Ctr. Props., Inc. Sec. Litig.*, 311 F.3d 198, 224 (3d Cir. 2002) ("vague" and "unspecific" allegations are insufficient to support a securities claim). The Public Securities Litigation Reform Act of 1995 – enacted to "weed out" meritless claims and to prevent "abuse of the securities laws" – instead requires that securities complaints specifically identify misleading statements, provide detail as to the reasons those statements are misleading, and supply particularized facts in support of all allegations asserted on information and belief. *See* 15

U.S.C. § 78u-4 (2000); 141 Cong. Rec. S17966 (daily ed. Dec. 5, 1995) (statement of Sen.

Hatch); H.R. Conf. Rep. No. 104-369 at 41 (1995).[53]   The Reform Act provides:

> [T]he complaint shall specify each statement alleged to have been
> misleading, the reason or reasons why the statement is misleading, and, if
> an allegation regarding the statement or omission is made on information
> and belief, the complaint shall state with particularity all facts on which
> that belief is formed.

15 U.S.C. § 78u-4(b)(1) (2000).

Here, the complaint relies upon four main sets of supposed misstatements – all of

which, the complaint contends, misled shareholders as to the benefits of the Molson-Coors

merger and the prospects of the combined company.[54]   The most prominent set of supposed

misstatements relates to cost-saving synergies expected to result from the merger.[55]   The second

relates to Coors' financial condition before the merger.[56]   The third relates to Molson's Brazilian

business and the accounting for that business.[57]   The fourth relates to payments to departing

executives.[58]   As set forth below, there is not an actionable misstatement in all of this.

A.    **The Synergies**

As mentioned above, the most prominent set of supposed misstatements relates to

cost-saving synergies anticipated from the merger.   The complaint alleges that defendants

"consistently represented that the Merger would create specific cost saving synergies" of "$50

---

[53]    *See also In re Advanta Corp. Sec. Litig.*, 180 F.3d 525, 531 (3d Cir. 1999) ("The purpose of the
Act was to restrict abuses in securities class-action litigation . . . .").

[54]    *See* Compl. ¶¶ 3-6, 13.

[55]    *See* Compl. ¶¶ 74-77, 93, 97, 100, 172-177.

[56]    *See* Compl. ¶¶ 65-67, 69, 70-71, 73, 93, 96-98, 100, 166-171.

[57]    *See* Compl. ¶¶ 78-83, 129-149, 157-164, 179-184.

[58]    *See* Compl. ¶¶ 113-114, 150-156.

million in the first year, $90 million in the second year, and $175 million in the third year."[59]
The complaint then goes on to allege that shareholders were misled because operational and
other factors would prevent the synergies from being achieved.[60]

        The problem – and the main reason defendants' statements about synergies are
not actionable – is that the complaint cannot allege that the statements are false. To be more
specific, it is a matter of public record that synergies are being realized even beyond those
originally anticipated. The very documents plaintiffs cite in support of their claims reflect that,
by the end of the third quarter of 2005, Molson Coors had "achieved approximately $37 million"
in synergy savings and was "well on [its] way to exceeding [its] $50 million" goal for 2005.[61]
And the company announced more recently that synergies realized in 2005 actually exceeded
what was anticipated ($59 million actual versus $50 million anticipated) and that future
synergies likely would exceed expectations as well.[62] Nor, to the extent it even matters, does the
complaint identify anything that calls defendants' pre-merger synergy-related statements into
doubt. Certainly, Molson Coors' disappointing results in the first quarter of 2005 prove nothing
about whether synergies were being achieved. Those results were the product of industry-wide
factors that affected beer sales generally, and had nothing at all to do with the anticipated
synergies.[63]

---------------------------------

[59]    Compl. ¶ 5.

[60]    *See* Compl. ¶¶ 5, 74-77, 93, 97, 100, 172-177

[61]    Young Aff. Exh. 22 at 6 (11/1/05 Molson Coors Earnings Conf. Call).

[62]    See Young Aff. Exh. 24 at 30 (3/10/06 Molson Coors Form 10-K).

[63]    *See* Compl. ¶¶ 109, 112-113; *see also* Young Aff. Exh. 18 at 1-3 (4/28/05 Molson Coors Press
Release). The complaint also seeks to cast doubt on defendants' pre-merger statements about
synergies based on information supposedly supplied by a "former Coors director of supply chain
management." Compl. ¶¶ 77, 178. Those allegations are wholly lacking in detail and provide no

For that matter, the synergy-related statements would not support a securities claim even if they had not been borne out. The reason is that forward-looking statements like these are not actionable where they are "accompanied by meaningful cautionary statements identifying important factors that could cause actual results to differ," as they clearly were here. 15 U.S.C. § 78u-5(c)(1)(A) (2000); *see also GSC Partners CDO Fund v. Washington*, 368 F.3d 228, 242-43 (3d Cir. 2004); *Key Equity Investors, Inc. v. Sel-Leb Mktg. Inc.*, No. Civ. A. 04 CV 1675 DMC, 2005 WL 3263865, at *7 (D.N.J. Nov. 30, 2005). To take just one example, Coors made the following straightforward disclosure about potential difficulties in achieving anticipated synergies:

> We may not be able to realize the cost savings and other benefits we currently anticipate due to challenges associated with integrating operations, technologies, sales and other aspects of the companies.[64]

We will spare the Court a recitation here of the innumerable other warnings in the disclosure documents available to plaintiffs.[65]

There was nothing misleading about defendants' pre-merger statements about synergies, nor could those statements support securities claims in all events.

## B.    Coors' Pre-Merger Performance

The complaint fares no better with respect to the second set of supposed misstatements, those relating to Coors' pre-merger performance. The thrust of these allegations is that investors were misled into believing that the "purported financial and operational strength

---

basis to conclude anything defendants said was false for the reasons set forth in section I.B. below.

[64]    Young Aff. Exh. 14 at 5 (11/24/04 Coors Form S-3).

[65]    *See, e.g.*, Young Aff. Exh. 3 at 38-39, 47 (Joint Proxy Statement); Young Aff. Exh. 10 at 5 (7/22/04 Coors Form 8-K, Press Release); Young Aff. Exh. 7 at 8 (7/23/04 Coors Sched. 14A, Molson and Coors Conf. Call); Young Aff. Exh. 11 at 3 (2/9/05 Molson Coors Press Release).

of Coors would enable Molson Coors to reach its projected goals" notwithstanding consistently "below plan" performance by Molson.[66] More precisely, the complaint alleges that Coors improperly portrayed itself as "outperforming the market" and experiencing "improving trends" while suffering from undisclosed problems "in key markets such as Texas."[67] The complaint also asserts that Coors misled the market to the extent it disclosed that its Aspen Edge product was "gaining volume."[68]

These allegations too fail to point to any actionable misstatement. As an initial matter, the core supposed misrepresentation – that investors were misled into believing that "below plan" Molson results would be buoyed by strong results from Coors – is not something any of the defendants ever said. What was said had to do with "mak[ing] the company more competitive in the global consolidating beer business," "deliver[ing] substantial value to [the] shareholders," and the like.[69] The idea was to create a stronger combined entity by "build[ing] on the strengths of both companies," not by using Coors' results to prop up Molson.[70]

The complaint also fails to identify misstatements in what actually was said about Coors. It is true that Coors announced positive results at various points before the merger (none of which are challenged by the complaint).[71] But the company's "financial and operational strength" was in no way falsely portrayed. Far from it, Coors candidly disclosed problems and issues to the extent they existed. Among other things, Coors disclosed "lower net income and

---

[66]    Compl. ¶ 4.

[67]    *See, e.g.,* Compl. ¶¶ 65, 69(a).

[68]    *See, e.g.,* Compl. ¶¶ 69(c), 73.

[69]    *See, e.g.,* Compl. ¶¶ 70-71, 97.

[70]    Compl. ¶ 70.

[71]    *See* Compl. ¶ 96.

earnings per share for the second quarter of 2004" compared to the year-earlier period and "lower consolidated volume for the third quarter of 2004."[72]  Coors further disclosed "weak trends in both . . . [its] Americas and Europe segments,"[73] lower "sales to retail,"[74] problems with wholesalers,[75] "increases in transportation costs,"[76] and other issues.

Of particular relevance, Coors made specific mention of its difficulties in Texas, as even the complaint is forced to concede.[77]  The following is just one example of Coors' disclosure of those difficulties:

> In the Americas, while our sales to retail declined slightly in the first half of the year, our sales to wholesalers declined 5.2% in the second quarter and 3.0% in the first half of the year, due to a significant year-over-year shift in distributor inventory patterns. *US retail volume declines were focused in select markets—particularly in Pennsylvania and Texas— where we face unique local issues.*[78]

Nor, finally, is there anything misleading about the company's disclosures as to Aspen Edge. While the complaint asserts that Coors misrepresented that Aspen Edge was gaining volume in the period preceding the merger,[79] Aspen Edge was then first being introduced as a new product with the result that *any* sales represented volume gains.[80]

None of this changes because the complaint seeks to bolster its allegations as to Coors' pre-merger performance – and the other alleged misrepresentations here – by reference to

---

[72]    Compl ¶ 70.

[73]    Young Aff. Exh. 25 at 1 (10/28/04 Coors Press Release).

[74]    Compl. ¶ 70.

[75]    *See* Young Aff. Exh. 8 at 28 (8/6/04 Coors Form 10-Q).

[76]    Compl. ¶ 70.

[77]    *See* Compl. ¶¶ 65, 166.

[78]    Young Aff. Exh. 8 at 28 (8/6/04 Coors Form 10-Q) (emphasis added); *see also* Compl. ¶ 65.

[79]    *See* Compl. ¶¶ 69(c), 73(c), 100(c).

[80]    Young Aff. Exh. 26 at 23 (5/7/04 Coors Form 10-Q).

a supposed confidential informant. We are well aware that plaintiffs have been canvassing

former employees looking for internal gossip, and have apparently found some. Thus, the

complaint asserts on the basis of information supplied by a "former Coors director of supply

chain management" that "financial and operational difficulties" were discussed at Coors "senior

management meetings" thereby supposedly demonstrating the falsity of defendants' statements

about Coors' pre-merger performance.[81] But the complaint fails to identify particulars tending to

demonstrate the informant's reliability – which the Reform Act requires in connection with a

pleading on information and belief like the complaint here. *See Cal. Pub. Employees' Ret. Sys.*

*v. Chubb Corp.*, 394 F.3d 126, 147-48, 155-56 (3d Cir. 2004). More precisely, what is required

to sufficiently allege a misstatement on the basis of confidential informant-supplied information

is that the source be "described with sufficient particularity to support the probability that a

person in the position occupied by the source would possess the information alleged." *Id.* at 155;

*see also Freed v. Universal Health Servs., Inc.*, No. Civ. A. 04-1233, 2005 WL 1030195, at *8

(E.D. Pa. May 3, 2005) ("[T]he particularity demanded by the PSLRA" requires facts showing

"that a person in the position occupied by the confidential sources would possess information"

supporting the allegations.).

No such particulars are supplied here. The complaint does not allege that the

informant participated in the Coors "senior management meetings" he purports to describe (and

it is painfully obvious he did not), nor does it specify how a director of supply chain management

– an employee multiple levels removed from top management – would have any idea what was

discussed at those meetings.[82] The complaint further fails to describe how anything discussed at

---

[81]    *See, e.g.*, Compl. ¶ 69(d).

[82]    *See* Compl. ¶¶ 69(d), 73(d), 77, 83, 100(d).

those meetings casts doubt on defendants' statements as to Coors' pre-merger performance; indeed, the complaint provides no detail about the supposed discussions at these meetings at all. Nor does the complaint specify who attended which meetings, when the meetings took place, where they were held, or any other particulars – all of which suggests that the informant is, at best, passing along second- or third-hand information, or, more likely, simply relaying rumor. In essence, this contention boils down to little more than, "I have a friend who knows someone who went to a meeting and heard someone (not sure who) say something but I'm not sure what." More specificity is required.

That is precisely what the Third Circuit held in *California Public Employees' Retirement System v. Chubb Corporation*, 394 F.3d 126 (3d Cir. 2004). There, as here, investors sued Chubb Corporation following a merger alleging that the prospects of the merged company were misrepresented. *Id.* at 135. And, as here, the complaint relied on statements by confidential informants to demonstrate the falsity of a number of pre-merger statements. *Id.* at 146-56. The district court dismissed the complaint. *Id.* at 142. The Third Circuit affirmed, finding that the falsity of the pre-merger statements was not sufficiently alleged. *Id.* at 148, 155. The Third Circuit stated:

> As a general matter, almost all of the anonymous sources are former Chubb employees. Plaintiffs fail to aver, however, when any of them were employed by Chubb. Nor do Plaintiffs allege the dates that these sources acquired the information they purportedly possess, or how any of these former employees had access to such information. . . . Plaintiffs' failure to make these allegations is also significant because we are left to speculate whether the anonymous sources obtained the information they purport to possess by firsthand knowledge or rumor.

*Id.* at 148; *see also In re Exxon Mobil Corp. Sec. Litig.*, 387 F. Supp. 2d 407, 426-27 (D.N.J. 2005); *Freed v. Universal Health Servs., Inc.*, No. Civ. A. 04-1233, 2005 WL 1030195, at *6-*8 (E.D. Pa. May 3, 2005).

No different result follows here, nor have plaintiffs identified anything even arguably misleading as to Coors' performance in the first place.

## C.    The Brazil Business

The same is true with respect to the next set of allegations – those relating to Molson's Brazilian business.  The allegations here are that defendants supposedly "misrepresented the extent of Molson's significant losses in Brazil and the clear threat this posed to Molson Coors' prospects for success."[83]  The complaint goes on to allege that Molson Coors (and presumably Molson too) violated generally accepted accounting principles ("GAAP") by failing to earlier record goodwill and asset impairment charges, and by failing to accrue for and disclose some $500 million in Brazilian tax liabilities.[84]

We will pause only momentarily with the observation that these allegations directly undercut the complaint's central theme that Molson's shareholders were duped by Coors in connection with the merger.[85]  The Brazil allegations suggest that Molson was itself conveying false information to make the merger look more attractive (though the complaint goes to considerable lengths to avoid saying so explicitly).  The Brazil allegations also conflict with the assertion that Molson's shareholders suffered any damages – if true, they would show that Molson shareholders received a bargain in the merger because Molson shares were inflated when they were exchanged for Molson Coors shares.

Be that as it may, the notion that shareholders somehow were misled about Molson's Brazilian business is belied by virtually every Molson and joint Molson-Coors

---

[83]    Compl. ¶ 78.

[84]    *See* Compl. ¶¶ 5, 129-149, 157-164.

[85]    *See, e.g.*, Compl. ¶¶ 4, 6.

disclosure leading up to the merger. Those disclosures – not to mention the media and analyst commentary that accompanied them – made perfectly clear that the Brazilian business was nothing but a drain on Molson, and gave no reason to believe that the situation would be any different after the merger.[86] The complaint itself, in fact, concedes that Molson reported quarter after quarter of losses, "declining sales volumes," and "loss of market share" in Brazil;[87] that reports of difficulties went back years;[88] and that everyone had caught on that the Brazilian business was a problem, with the media noting that Molson's "Brazilian adventure ha[d] become a quagmire" and analysts referring to the "wrecked Brazilian business."[89]

True, the complaint does manage to identify some vague statements of optimism about Brazil in the midst of all of this – reference to "improved trends" and other such statements.[90] But those statements must be considered in the context in which they were made: a steady drumbeat of candid disclosures about serious problems in the Brazilian business. No one was misled about the problems by general statements of optimism at the margins. Nor are such immaterial statements sufficient to support securities liability in all events. *In re Advanta Corp. Sec. Litig.*, 180 F.3d 525, 538 (3d Cir. 1999) ("[V]ague and general statements of optimism 'constitute no more than 'puffery' and are understood by reasonable investors as such.' Such statements, even if arguably misleading, do not give rise to a federal securities claim because they are not material.") (quotations omitted).

---

[86]     *See, e.g.,* Compl. ¶¶ 48-49, 52; *see also* Young Aff. Exh. 3 at 43, 51-52, 201-202 (Joint Proxy Statement).

[87]     Compl. ¶¶ 143, 179; *see also* Young Aff. Exh. 12 at 2 (10/28/04 Molson Press Release).

[88]     *See* Compl. ¶ 139 (describing 19% volume declines and related market share loss in first half of 2002).

[89]     Compl. ¶¶ 49, 52.

[90]     Compl. ¶ 145; *see also* Compl. ¶¶ 80, 81, 97, 146, 148, 180.

Indeed, the complaint must resort to selective quotation even to suggest there were misstatements about the prospects of the Brazil business or anything else. For example, the complaint seeks to challenge as misleading a statement during a quarterly earnings call that Molson was "seeing great inroads being made" in Brazil.[91] But what was also said during that call – which the complaint does not mention – was that "Brazil net sales revenue decreased 13 percent … as a result of [a] 9.6 percent drop in volume" and that "[g]iven recent declines in volume and market share losses in Brazil, Molson [had] revised its long-term forecast," all of which resulted in a C$210 million impairment charge relating to the Brazil business.[92] The complaint similarly seeks to challenge a statement during another call that Molson Coors would attempt to maximize "the near and long-term potential for [its] Kasier business in Brazil,"[93] but only by ignoring that that statement was qualified by explicit reference to both "negative top and bottom-line trends in Brazil."[94]

The goodwill and asset impairment allegations likewise point to no actionable misstatement. The basis for these allegations is that Molson paid $765 million for its Brazilian business in 2002, but that Molson Coors only received $68 million for its stake in the business in 2006 – which, according to the complaint, demonstrates that some pre-merger write-off should have been recorded.[95] There are a number of problems with this assertion. First, the Brazilian assets were written down before the merger. As the complaint itself concedes, Molson publicly disclosed three months before the merger that it had recorded an impairment charge of C$210

---

[91]    Compl. ¶ 81.

[92]    *See* Young Aff. Exh. 27 at 4-5 (10/28/04 Molson Earnings Conference Call).

[93]    Compl. ¶ 97.

[94]    *See* Young Aff. Exh. 28 at 5 (2/9/05 Molson Coors Earnings Conference Call).

[95]    *See* Compl. ¶¶ 134-149.

- 23 -

million (and warned that "further impairment charges could be required").[96]  Second, the fact

that Molson Coors sold part of its interest in the Brazil business in 2006 for less than the original

purchase price says nothing about whether an additional impairment was needed a year earlier.

GAAP itself contemplates that impairment tests typically be performed annually because

changed circumstances may require a write-down of assets properly recorded in an earlier

period.[97]  Third, the best the complaint musters in support of a larger pre-merger write-down are

conclusory assertions about problems in Brazil and allegations from the supposed confidential

informant that defendants discussed those problems – which are entirely too generic to support

securities claims.[98]  *See, e.g., In re Exxon Mobil Corp. Sec. Litig.*, 387 F. Supp. 2d 407, 426-27

(D.N.J. 2005) (dismissing confidential source-based securities claim for failure to record

---

[96]    *See* Compl. ¶¶ 143, 179.  The complaint also seeks to challenge the announcements surrounding the Brazil impairment charge taken by Molson.  According to the complaint, defendants attributed the impairment charge to "current period costs" – which, the complaint contends, was false "as evidenced by Molson Coors' eventual post-Merger impairment charge of $500 million and eventual sale of 68% of its Brazilian interest for only $68 million."  Compl. ¶ 78.  But that is not what was said.  Losses in Brazil were attributed to current period costs.  *See* Young Aff. Exh. 14 at 7 (11/24/04 Coors Form S-3).  The reported reasons for the impairment charge were "declining volume and loss of market share" which caused Molson to "revise[] its forecast of net cash flow from operations in Brazil."  Young Aff. Exh. 14 at 7 (11/24/04 Coors Form S-3).

[97]    *See, e.g.,* Young Aff. Exh. 29 ¶¶ 26, 28 (Financial Accounting Standards Board, Statement of Financial Accounting Standards No. 142, June 1, 2004) ("Goodwill . . . shall be tested for impairment on an annual basis and between annual tests" where "an event occurs or circumstances change that would more likely than not reduce the fair value of a reporting unit below its carrying amount.").

[98]    *See* Compl. ¶¶ 78, 83.  The complaint separately asserts that Heineken – a minority partner in Molson's Brazilian business – wrote off its investment in 2002, and seeks to use that as a basis for asserting that Molson too should have taken a write-off.  *See* Compl. ¶¶ 6, 144.  But the reasons for Heineken's write off, which the complaint separately recites, were unique to that company:  Heineken concluded that "it [was] unable to determine the realizable value of its minority interest with any accuracy or reliability and not[ed] that, as a minority shareholder, it ha[d] no effective influence over the management and policies of Molson's Brazilian operations."  Compl. ¶ 179.

impairment charge where plaintiffs failed to specify what information the source possessed or why that information required an impairment).[99]

The result is no different with respect to the tax liability allegations, that is, that Molson Coors failed to disclose and accrue for $500 million in Brazilian taxes.[100] Again, there was in fact an accrual for Brazilian taxes, some $176 million.[101] And while Molson Coors subsequently disclosed the existence of an additional $338 million in potential tax liabilities,[102] there is no basis for asserting that any pre-merger financial statements should have reflected an accrual for those potential liabilities. The complaint concedes, as it must, that accrual under GAAP is triggered only once it is determined that a liability is "probable."[103] Here, the financial disclosures reflect the determination that the additional $338 million was not probable (indeed, the likelihood that a good portion of those liabilities would materialize was then considered "remote"),[104] and the complaint provides absolutely nothing explaining why that conclusion was supposedly wrong as required by the Reform Act. *See Cal. Pub. Employees' Ret. Sys. v. Chubb Corp.*, 394 F.3d 126, 153-54 (3d Cir. 2004).

---

[99]  *See also Cal. Pub. Employees' Ret. Sys. v. Chubb Corp.*, 394 F.3d 126, 152-53 (3d Cir. 2004) ("Plaintiffs fail to identify with particularity any source for their accounting fraud claims that would reasonably have knowledge supporting the allegations that Chubb's financial statements were false."); *Freed v. Universal Health Servs., Inc.*, No. Civ. A. 04-1233, 2005 WL 1030195, at *9 (E.D. Pa. May 3, 2005) (dismissing claims of alleged GAAP violations based on confidential source-supplied information lacking particularity).

[100]  *See Compl. ¶¶ 157-164.*

[101]  *See Young Aff. Exh. 3 at Annex R-18 (Joint Proxy Statement) (reporting in Canadian dollars).*

[102]  *See Compl. ¶ 163.*

[103]  Compl. ¶ 132.

[104]  *See Compl. ¶ 119.*

D.    **Executive Departures**

The last set of supposed misrepresentations relates to some $27 million in severance payments to Coors executives who left Molson Coors after the merger.[105]  The complaint alleges that Molson Coors (and Coors before it) departed from GAAP in accounting for these severance payments and, more generally, failed to disclose "the expected exodus of Coors senior executives" and the possibility that severance payments would have to be made.[106]

To begin with the GAAP-based allegations, those fail because an accrual need only be taken (again) when a contingency becomes "probable,"[107] which the severance payments plainly were not prior to the merger's approval.  Specifically, Coors was required to make the severance payments only upon a change of control, which could not reasonably have been deemed probable before the merger was approved;[108] indeed, as the complaint points out, predictions as late as January 2005 were that "the Merger would fail."[109]  Nor, beyond that, does the complaint provide any indication that the subsequently-departed executives suggested their

---

[105]    The complaint alleges that severance payments by Molson Coors totaled $29 million in the first quarter of 2005.  *See* Compl. ¶ 113.  The documents plaintiffs rely upon, however, make clear that $29.6 million of the merger-related charge in that quarter was comprised of $27.2 million in severance payments and $2.5 million in other charges.  *See* Young Aff. Exh. 20 at 17-18 (5/11/05 Molson Coors Form 10-Q).

[106]    Compl. ¶ 5; *see also* Compl. ¶¶ 113-114, 150-156.  The complaint gives particular prominence to the departure of former Molson CEO Daniel J. O'Neill who headed Molson Coors' Office of Synergies and Integration and announced his departure the day after Molson Coors announced its disappointing first quarter 2005 results.  *See* Compl. ¶ 112.  But there is nothing unique about the complaint's severance payments allegations with respect to Mr. O'Neill.  Nor is there anything particularly noteworthy about his decision to leave Molson Coors insofar as his departure came after achieving his mandate with the Office of Synergies and Integration, namely, delivering a plan that would permit Molson Coors to achieve the cost-saving synergies expected to result from the merger.  *See* Young Aff. Exh. 19 at 5 (4/28/05 Molson Coors Earnings Conf. Call).

[107]    Compl. ¶ 151.

[108]    *See* Young Aff. Exh. 3 at 98-99 (Joint Proxy Statement).

[109]    Compl. ¶ 59.

intentions before merger approval beyond statements by the supposed confidential informant,[110]
which are insufficient for the reasons already discussed.

The complaint's contention that the possibility of severance payments was not
disclosed is likewise meritless. The proxy statement plainly disclosed that such payments were a
possibility not only as to Coors executives but as to Molson executives as well:

> Coors will incur approximately $27.2 million of direct merger transaction
> costs and assume liabilities of approximately $5.7 million related to
> Molson employee change-of-control payments, which are recognized as
> liabilities. Certain Coors executives have change-of-control agreements
> for which liabilities may be incurred as a result of the merger with Molson
> and in the event executives exercise their options under the change-of-
> control agreements.[111]

## II.     THE COMPLAINT DOES NOT ADEQUATELY ALLEGE SCIENTER.

Quite apart from all of this, the section 10(b) claim should be dismissed for the
additional reason that the complaint fails adequately to allege scienter.

Of the prerequisites to a section 10(b) claim, none is more fundamental than
scienter. For more than a quarter-century, the federal courts have remained steadfast in their
commitment to the Supreme Court's holding that a section 10(b) claim requires affirmative proof
of "a mental state embracing intent to deceive, manipulate, or defraud." *Ernst & Ernst v.
Hochfelder*, 425 U.S. 185, 193 n.12 (1976); *see also Alpharma Inc. Sec. Litig.*, 372 F.3d 137,
148 (3d Cir. 2004). Even to the extent recklessness will suffice, the Supreme Court-mandated
standard requires that such recklessness be "equivalent to willful fraud." *Dwoskin v. Rollins,*

---

[110]     *See* Compl. ¶ 150.

[111]     Young Aff. Exh. 3 at 310 (Joint Proxy Statement); *see also* Young Aff. Exh. 3 at 88-89, 98-99
(Joint Proxy Statement). The complaint mentions, almost in passing, that the SEC commenced an
inquiry relating to Molson Coors and that the company restated its first quarter 2005 results. *See*
Compl. ¶¶ 122-123. Those matters post-date the class period and have nothing whatsoever to do
with the misrepresentations alleged by plaintiffs.

*Inc.*, 634 F.2d 285, 290 (5th Cir. 1981) (quotations omitted). As the Third Circuit has explained, what is required is "an extreme departure from the standards of ordinary care, and which presents a danger of misleading buyers or sellers that is either known to the defendant or is so obvious that the actor must have been aware of it." *GSC Partners CDO Fund v. Washington*, 368 F.3d 228, 239 (3d Cir. 2004) (quoting *In re Advanta Corp. Sec. Litig.*, 180 F.3d 525, 535 (3d Cir. 1999)).

Such fraud or recklessness must additionally be supported by particularized allegations of fact as a matter of pleading. *See In re Rockefeller Ctr. Props., Inc. Sec. Litig.*, 311 F.3d 198, 224 (3d Cir. 2002) (plaintiffs "may not benefit from inferences flowing from vague or unspecific allegations" under the Reform Act). Specifically, the Reform Act requires the pleading of particularized facts giving rise to a "strong inference" that the defendants acted with fraudulent intent. The Reform Act states:

> In any private action arising under this chapter in which the plaintiff may recover money damages only on proof that the defendant acted with a particular state of mind, the complaint shall, with respect to each act or omission alleged to violate this chapter, *state with particularity facts giving rise to a strong inference* that the defendant acted with the required state of mind.

15 U.S.C. § 78u-4(b)(2) (2000); *see also Kennilworth Partners L.P. v. Cendant Corp.*, 59 F. Supp. 2d 417, 430 (D.N.J. 1999) (securities fraud complaints must allege "incidents or circumstances which, apart from [defendants'] positions or roles within [the company], connect them to wrongdoing").

The requisite "strong inference" of scienter can be pled in one of two ways. First, the complaint can allege "facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness." *GSC Partners CDO Fund v. Washington*, 368 F.3d 228, 237 (3d Cir. 2004) (quotations and citations omitted). Second, the complaint can allege facts showing

- 28 -

"that defendants had both motive and opportunity to commit fraud." *Id.* The complaint here does neither.

The entire basis for the complaint's allegations as to "conscious misbehavior or recklessness" is the information supplied by the confidential informant, basically, that defendants knew they were making false statements and discussed as much in "senior management meetings."[112] These allegations fail to raise a strong inference of scienter for the same reasons they were insufficient to establish the falsity of defendants public statements in the first place: they are entirely lacking in particularity. All the supposed confidential informant-based allegations boil down to is the assertion that "senior management meetings" took place coupled with the unsupported conclusion that the discussion at those meetings somehow was inconsistent with public statements. The Reform Act requires more.[113] *See In re Loral Space & Commc'ns Ltd. Sec. Litig.*, No. 01 Civ. 4388 (JGK), 2004 WL 376442, at *11 (S.D.N.Y. Feb. 27, 2004) (undetailed confidential informant-based allegations failed to "suggest that the defendants knew, or were reckless in not knowing" of the falsity of their statements); *In re Ligand Pharms., Inc. Sec. Litig.*, No. 04CV1620MS (LSP), 2005 WL 2461151, at *11-*14 (S.D. Cal. Sept. 27, 2005) (scienter inadequately pled where allegations based on confidential informant lacked particularity).

---

[112]  *See* Compl. ¶¶ 69, 73, 77, 83, 100, 168, 171, 178, 182.

[113]  The complaint separately seeks to allege conscious misbehavior or recklessness by the individual defendants on the basis that their "board membership" and "executive and managerial positions" gave them "access to [] adverse non-public information about Coors and/or Molson Coors' business prospects and financial condition." *See* Compl. ¶ 186. Courts routinely reject precisely these kinds of allegations as too generic to allege scienter. *See, e.g., In re Advanta Corp. Sec. Litig.*, 180 F.3d 525, 539 (3d Cir. 1999) ("[A]llegations that a securities-fraud defendant, because of his position within the company, 'must have known' a statement was false or misleading are 'precisely the types of inferences which [courts], on numerous occasions, have determined to be inadequate to withstand Rule 9(b) scrutiny.'") (citation omitted).

The same is true as to the complaint's "motive and opportunity" allegations –
which are principally directed at the individual defendants. The complaint alleges that the
individual defendants were motivated to commit fraud in order "to protect two struggling
companies against potential hostile takeover action."[114] But courts have consistently held that
such generally held motivations as this do not raise a strong inference of scienter. *See Plevy v.
Haggerty*, 38 F. Supp. 2d 816, 833 (C.D. Cal. 1998); *see also In re Goodyear Tire & Rubber Co.
Sec. Litig.*, Civ. A. No. 88-8633, 1993 WL 130381, at *16 (E.D. Pa. Apr. 22, 1993) ("Most, if
not all publicly traded companies, are interested in maintaining high stock prices and avoiding
hostile takeovers. Plaintiffs' attempt to attach sinister motives to such interests is without
merit."). That, moreover, is before getting to the fact that neither Coors nor Molson was subject
to a hostile takeover as it was impossible to acquire enough shares on the open market to gain
control of the companies' boards.[115] The complaint separately alleges that one of the defendants
(at least) – Peter Coors – was further motivated by the desire to complete a merger "that would
allow his continued ownership and control of the new entity, Molson Coors."[116] Numerous
courts have rejected that supposed motive too. *See, e.g., In re Lowen Group, Inc. Sec. Litig.*, No.
Civ. A. 98-6740, 2003 WL 22436233, at *18 (E.D. Pa. July 16, 2003); *Elliott Assocs., L.P. v.
Hayes*, 141 F. Supp. 2d 344, 359 (S.D.N.Y. 2000).

---

[114]    Compl. ¶ 12.

[115]    *See* Compl. ¶ 20; Young Aff. Exh. 3 at 59 (Joint Proxy Statement). The voting class of Coors
        stock – which was 100% controlled by Peter Coors – had the right to elect Coors' entire board of
        directors *See* Compl. ¶ 20; Young Aff. Exh. 3 at 141 (Joint Proxy Statement). And at the time
        of the merger, Eric Molson indirectly controlled 50.45% of the voting shares of Molson, which
        elected the majority of Molson's board. *See* Young Aff. Exh. 3 at 59, 342 (Joint Proxy
        Statement).

[116]    Compl. ¶ 191

To the extent directed at the individual defendants, finally, the complaint fails to allege scienter for yet another reason:  It fails to specify each defendants' role in the alleged wrongdoing.  Plaintiffs ignore that the complaint must supply particularized allegations as to *each* individual's supposed involvement in false or misleading statements.  *See In re Digital Island Sec. Litig.*, 223 F. Supp. 2d 546, 553 (D. Del. 2002), *aff'd* 357 F. 3d 322 (3d Cir. 2004).  Thus, the complaint must allege particularized wrongdoing by each of Peter H. Coors, W. Leo Kiely III, Charles M. Herington, Franklin W. Hobbs, Randall Oliphant, Pamela Patsley, Wayne Sanders, Albert C. Yates, Timothy V. Wolf, Peter Swinburn, David G. Barnes, Peter M.R. Kendall, and Daniel J. O'Neill.  But here, once they are listed in the obligatory introductory section,[117] most of these individuals are never mentioned again and those few who are mentioned are not connected to the alleged wrongdoing in any meaningful way.  The complaint instead relies on the now-discredited "group pleading doctrine" to plead scienter as to the individual defendants as a group based on their positions within the company – which numerous courts have held does not suffice under the Reform Act.[118]  *See In re Digital Island Sec. Litig.*, 223 F. Supp. 2d 546, 553 (D. Del. 2002), *aff'd,* 357 F. 3d 322 (3d Cir. 2004); *In re Bio-Tech. Gen. Corp. Sec. Litig.*, 380 F. Supp. 2d 574, 584 (D.N.J. 2005) ("[T]he PSLRA has abolished group pleading, and [] allegations premised solely on group pleading fail to create a strong inference of scienter.").

The decision in *In re Digital Island Securities Litigation*, 223 F. Supp. 2d 546 (D. Del. 2002), *aff'd,* 357 F. 3d 322 (3d Cir. 2004), is particularly instructive.  In that case, investors asserted securities fraud claims against a technology company and, as here, a long list of

---

[117]    Compl. ¶¶ 20-32.

[118]    *See* Compl. ¶¶ 34-39, 189-190.

individual defendants, alleging that disclosures in advance of a merger were false or misleading.
*Id.* at 552-53. As here, the investors sought to rely on the group pleading doctrine rather than
supplying specific allegations of wrongdoing by the individual defendants. *Id.* at 553. The court
dismissed the complaint for failure to plead scienter with particularity (among other things) and
specifically rejected the investors' efforts to rely upon the group pleading doctrine. *Id.* at 553,
556. It stated:

> Although the Third Circuit has not addressed the applicability of
> group pleading under the PSLRA, numerous district courts within
> this Circuit have held that the PSLRA has effectively abolished the
> group pleading doctrine. In rejecting group pleading under the
> PSLRA, courts have reasoned that the requirement under the
> PSLRA that scienter be pled with particularity as to each defendant
> would be rendered meaningless should group pleading survive.

*Id.* at 553 (citations omitted); *see also In re Bio-Tech. Gen. Corp. Sec. Litig.*, 380 F. Supp. 2d
574, 583-84 (D.N.J. 2005); *In re Am. Bus. Fin. Servs., Inc. Sec. Litig.*, 413 F. Supp. 2d 378, 394
(E.D. Pa. 2005). The same result follows here.

## CONCLUSION

For the reasons set forth above, defendants respectfully request that the

consolidated amended complaint be dismissed with prejudice.

OF COUNSEL:

Michael R. Young
Antonio Yanez, Jr.
Darren G. Gibson
Willkie Farr & Gallagher LLP
787 Seventh Avenue
New York, NY 10019-6099
(212) 728-8000

Charles F. Richards, Jr. (#701)
Jeffrey L. Moyer (#3309)
Elizabeth C. Tucker (#4468)
Richards, Layton & Finger, P.A.
One Rodney Square
Wilmington, DE 19899
(302) 651-7700
Fax: (302) 651-7701
Email:   richards@rlf.com
           moyer@rlf.com
           tucker@rlf.com

*Attorneys for Defendants*

Dated:  April 7, 2006

3180897 6

- 33 -

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on April 7, 2006, a copy of the foregoing

Defendants' Opening Brief in Support of Their Motion to Dismiss the Complaint was filed

electronically with the Clerk of Court using CM/ECF, which will send notification of this

filing to the following counsel of record:

> Seth D. Rigrodsky
> Milberg Weiss Bershad & Schulman LLP
> 919 North Market Street
> Suite 980
> Wilmington, DE 19801

Elizabeth C. Tucker (#4468)
Tucker@rlf.com