# EXHIBIT 3, Part 1

Use these links to rapidly review the document

Table of Contents
TABLE OF CONTENTS 2
Annex R
Annex S

**UNITED STATES**
**SECURITIES AND EXCHANGE COMMISSION**
**Washington, D.C. 20549**

# SCHEDULE 14A

Proxy Statement Pursuant to Section 14(a) of
the Securities Exchange Act of 1934

Filed by the Registrant    ☒

Filed by a Party other than the Registrant    ☐

Check the appropriate box:

☐    Preliminary Proxy Statement

☐    **Confidential, For Use of the Commission Only (as permitted by Rule 14(a)–6(e)(2))**

☒    Definitive Proxy Statement

☐    Definitive Additional Materials

☐    Soliciting Material Pursuant to §240.14a–12

## ADOLPH COORS COMPANY

(Name of Registrant as Specified in its Charter)

(Name of Person(s) Filing Proxy Statement, if other than the Registrant)

Payment of Filing Fee (Check the appropriate box):

☐    No fee required.

☒    Fee computed on table below per Exchange Act Rules 14a–6(i)(4) and 0–11.

(1)    Title of each class of securities to which transaction applies:
Class A non–voting shares of Molson Inc. (including associated options)

Class B common shares of Molson Inc.

(2)    Aggregate number of securities to which transaction applies:
113,716,607 Class A non–voting shares of Molson Inc. (including shares issuable upon exercise of outstanding options to purchase Class A non–voting shares), which represents the number of such shares to be exchanged, in a series of transactions, for shares representing interests in the combined company pursuant to the Combination Agreement (the "Combination Agreement"), dated July 21, 2004, as amended, by and among Adolph Coors Company, Molson Coors Canada Inc. and Molson Inc.

19,856,822 Class B common shares of Molson Inc., which represents the number of such shares to be exchanged, in a series of transactions, for shares representing interests in the combined company pursuant to the Combination Agreement

(3)    Per unit price or other underlying value of transaction computed pursuant to Exchange Act Rule 0–11 (set forth the amount on which the filing fee is calculated and state how it was determined):
$25.71 per Class A non–voting share of Molson Inc., which is the average of the high and low sales prices reported on the Toronto Stock Exchange for such shares on September 13, 2004, converted to U.S. dollars by applying the exchange rate on such date, which was 0.7692 U.S. dollars for each Canadian dollar (the "Exchange Rate")

$25.79 per Class B common share of Molson Inc., which is the average of the high and low sales prices reported on the Toronto Stock Exchange for such shares on September 13, 2004, converted to U.S. dollars by applying the Exchange Rate

(4)    Proposed maximum aggregate value of transaction:
       $3,436,728,815, which is the maximum value calculated pursuant to Rule 0−11 of the Exchange Act of
       1934, as amended

(5)    Total fee paid:
       $435,434

☒    Fee paid previously with preliminary materials.

☐    Check box if any part of the fee is offset as provided by Exchange Act Rule 0−11(a)(2) and identify the filing for
     which the offsetting fee was paid previously. Identify the previous filing by registration statement number, or the
     Form or Schedule and the date of its filing.

(1)    Amount previously paid:

(2)    Form, Schedule or Registration Statement No.:

(3)    Filing Party:

(4)    Date Filed:

**Q:  Why are Molson and Coors proposing to combine?**

A:  We believe that the trend toward consolidation in the international brewing industry will continue and that scale and ability to operate internationally will be increasingly essential to compete effectively. The proposed merger transaction builds on the strategic and cultural fit between the two companies and provides us with the added scale, resources and geographic coverage necessary to compete more effectively in this changing competitive environment. It leverages the solid existing business relationship between the two companies.

We expect the merger transaction to deliver immediate tangible benefits to shareholders through substantial synergies, including estimated annual cost savings resulting from the merger of approximately U.S.$50 million in the first year after the merger transaction, an incremental U.S.$40 million in the second year after the merger transaction (for a total savings of U.S.$90 million in the second year), and an incremental U.S.$85 million in the third year after the merger transaction (for a total savings of U.S.$175 million in the third year). Thereafter, we expect total annual cost savings resulting from the merger of approximately U.S.$175 million. While these cost savings estimates are based on management's estimates, information available currently and assumptions which we believe to be reasonable, there is no assurance that these cost savings and other benefits of the merger will be attained. We believe that the enhanced financial strength expected to result from the anticipated cost savings will provide the combined company with the opportunity to grow revenue through added investments in marketing and other support for key brands. We also believe that our larger operating scale and enhanced financial strength resulting from the merger transaction will create a platform for our continued value-added participation in the global brewing industry consolidation.

**Q:  Are there risks I should consider in deciding whether to vote for the proposed merger transaction?**

A:  Yes. The proposed merger is subject to a number of risks and uncertainties. We may not realize the benefits we currently anticipate, including the annual estimated cost savings described above, due to the challenges associated with integrating the companies. We may be unable to coordinate sales, distribution and marketing efforts to effectively promote the products of the combined company. Molson has recorded impairment charges and may have to take further impairment charges as a result of its Brazilian operations. The proposed governance arrangements of the combined company, which provide that voting control would be shared by Pentland and the Adolph Coors Jr. Trust dated September 12, 1969, which we refer to in this document as the Coors Trust in this document, may result in stalemates between them. In addition, the proposed merger transaction is subject to the receipt of consents and approvals from government entities that could delay completion of the merger transaction or impose conditions on the combined company. Certain, but not all, of these regulatory approvals have already been received. See "Regulatory Matters" beginning on page 100 and other information included in this document.

Before deciding whether to vote for or against the proposed transaction, you should carefully consider these and other risks as well as the more detailed discussion of "Risk Factors" beginning on page 47 and other information included in this document.

**Q:  What will I receive in the merger transaction?**

A:  *Molson Class A Shareholders.* A holder of Molson Class A non-voting shares who is a Canadian resident for Canadian income tax purposes may elect to receive for each of those shares:

- 0.360 of a Class B exchangeable share of Molson Coors Exchangeco (and ancillary rights),

- through a series of exchanges, 0.360 of a share of Class B common stock of Molson Coors, or

*Exchange of Molson Options.*   The exchange of Molson options for options to acquire shares of Molson Coors common stock will generally not be a taxable event to a Canadian resident holder of Molson options.

### United States (See page 170)

The exchange of Molson shares for Molson Coors common stock, through a series of exchanges, will be fully taxable for United States federal income tax purposes. Molson intends to take the position that the gross amount of the special dividend paid to U.S. holders of Molson shares (including amounts withheld to reflect Canadian withholding taxes) will be treated as dividend income for U.S. federal income tax purposes to the extent paid out of current or accumulated earnings and profits, as determined under U.S. federal income tax principles. It is possible the special dividend could instead be treated as consideration paid by Molson in exchange for a portion of such U.S. holders' Molson shares for U.S. federal income tax purposes. For more information see "Material Income Tax Consequences— Material U.S. Federal Income Tax Consequences to Molson Shareholders" beginning on page 170.

### Court Approval Will Be Required to Complete the Merger Transaction (See page 99)

Under the CBCA, a Canadian court must approve the arrangement set forth in the form of plan of arrangement. Prior to the mailing of this document, Molson obtained an interim order from the Superior Court, District of Montréal, Province of Québec providing for the calling and holding of the Molson special meeting and the Molson optionholders meeting and other procedural matters. If the Molson shareholders approve the Molson shareholders resolution and the Coors stockholders approve the Coors share issuance and the Coors charter amendments, the court will hold a hearing regarding a final order. The court will consider, among other things, the fairness and reasonableness of the arrangement. The court may approve the arrangement in any manner the court may direct, subject to compliance with such terms and conditions, if any, as the court deems fit. Subject to the approval of the Molson shareholders resolution at the Molson special meeting and approval of the Coors share issuance and the Coors charter amendments at the Coors special meeting, the hearing to obtain the final order of the Superior Court of Québec is scheduled to take place on or about January 21, 2005 at 9:30 a.m. (Montréal time) at the Montréal courthouse located at 1 Notre-Dame Street East, Montréal, Québec, Canada.

### Conditions to Closing (See page 118)

Molson's and Coors' obligations to complete the merger transaction are subject to conditions that must be satisfied or waived before the completion of the merger transaction, including:

- the approval of the Molson shareholders resolution by the Molson shareholders and the approval of the Coors share issuance and the Coors charter amendments by the Coors stockholders;

- receipt of interim and final orders approving the plan of arrangement from the Superior Court of Québec in form and terms reasonably acceptable to Coors and Molson, and those orders having not been set aside or modified in a manner unacceptable to Coors and Molson;

- receipt of orders required from the applicable Canadian securities regulatory authorities permitting the issuance and first resale of the shares issuable as part of the merger transaction and the issuance from time to time of Molson Coors common stock in exchange for the exchangeable shares or on the exercise of replacement options;

- absence of injunctions, orders or laws restraining, enjoining or making illegal the completion of the merger transaction;

- receipt of necessary regulatory approvals referred to under "Regulatory Matters" below;

To become effective, the Class A certificate amendments require the affirmative vote of the holders of a majority of the outstanding shares of Coors Class A common stock.

Unless each of the proposals is approved and the merger transaction is completed, no proposal will be implemented.

### Stock Ownership of Directors and Executive Officers of Coors (See page 282)

On the record date, directors and executive officers of Coors and their affiliates beneficially owned and had the right to vote 1,820,043 shares of Coors Class B common stock, representing approximately 5% of that class outstanding on the record date.

In addition, the Coors Trust, for which Peter H. Coors, chairman of Coors, is a trustee, beneficially owns 1,260,000 shares of Coors Class A common stock, representing 100% of that class outstanding on the record date and 1,470,000 shares of Coors Class B common stock, representing 4.05% of that class outstanding on the record date. Peter H. Coors disclaims beneficial ownership of the 1,260,000 shares of Coors Class A common stock and the 1,470,000 shares of Coors Class B common stock held by the Coors Trust.

The Coors Trust, Peter H. Coors and Keystone Financing LLC, holders of 100% of the Class A common stock and 29.57% of the Class B common stock in the aggregate as of the record date, have entered into a voting agreement with Molson and Pentland, under which they have committed to vote all of their shares of Coors Class A common stock and Coors Class B common stock, in favor of the Coors share issuance and the Coors charter amendments. As a result of the agreed-upon votes, the Coors share issuance is assured of approval at the Coors special meeting.

### Risk Factors (See page 47)

There are certain risks that should be considered by the Coors stockholders and the Molson shareholders in evaluating whether to approve the merger transaction. These risks should also be considered by the Molson optionholders in evaluating whether to approve the Molson optionholders resolution. Some of these risks relate directly to the merger transaction while others relate to the business of the combined company. These risks include:

- we may not realize the cost savings and other benefits we currently anticipate due to challenges associated with integrating operations, technologies, sales and other aspects of the companies;

- because the market price of Coors common stock will fluctuate and the exchange ratio is fixed, you cannot be sure of the market value of the Molson Coors common stock or the exchangeable shares that will be outstanding following completion of the merger transaction;

- members of management and the boards of directors of Molson and Coors have interests in the merger transaction that are different from those of other shareholders and that could influence their decision to approve the merger transaction;

- the merger transaction is subject to consents and approvals from government entities that could delay completion of the merger transaction or impose conditions on the combined company, which could result in an adverse effect on the business or financial condition of the combined company;

- Molson Coors' public stockholders will have no ability to influence the outcome of most matters presented to Molson Coors stockholders due to members of the Coors and Molson families collectively holding a controlling interest in the combined company after the merger;

- if Pentland and the Coors Trust do not agree on a matter submitted to stockholders, generally the matter will not be approved, even if beneficial to the company or favored by other shareholders;

- if either Pentland or the Coors Trust ceases to beneficially own a specified minimum number of shares of Molson Coors stock, that party may forfeit the right to instruct the trustees with respect to voting on matters presented to Molson Coors stockholders and thereby vest the other party with a sole controlling interest in Molson Coors Class A common stock and the Class A exchangeable shares;

- the trading prices of the exchangeable shares and the Molson Coors common stock may not reflect equivalent values;

- Molson shareholders who receive exchangeable shares will experience a delay in receiving shares of Molson Coors common stock from the date that they request an exchange, which may affect the value of the shares the holder receives in an exchange;

- because we will continue to face intense competition, operating results may be negatively impacted;

- our operating results may be negatively impacted by foreign currency risk;

- our operations face significant commodity price change and foreign exchange rate exposure which could materially and adversely affect our operating results;

- Molson has recently incurred losses in its Brazilian operations, recorded an impairment charge of Cdn.$210 million in the quarter ended September 30, 2004, announced that it will record a provision for rationalization of approximately Cdn.$50 million and could suffer further impairment charges as a result of the Brazilian operations, which could have a material adverse effect on our combined results of operations;

- Molson may be required to exercise control over the entity that owns the entertainment business and the Montréal Canadiens pursuant to the undertakings given to its lenders;

- we will continue to rely on a small number of suppliers to operate our business and the inability of one of them to meet our production needs could have a negative impact on our business;

- litigation directed at the alcohol beverage industry may adversely affect our sales volume and our business;

- if the independent distributors on which we depend fail to effectively sell our products, our revenue could be adversely affected;

- we are and will continue to be subject to contingent tax, environmental and other liabilities and cannot predict with certainty that our reserves for those liabilities will be sufficient. If actual costs for these contingent liabilities are higher than expected, we could be required to accrue for additional costs;

- we will be subject to changes in laws, taxation and other normal risks associated with investing and carrying on business in various countries which could negatively impact our business; and

- changes in tax, environmental or other regulations or failure to comply with existing licensing, trade and other regulations could have a material adverse effect on our financial condition.

**Per Share Equivalent Share Prices**

The table below shows the closing prices of the Coors Class B common stock and each class of Molson shares and the pro forma equivalent per share value of each class of Molson shares at the close

**Comparative Per Share Data**

The following table sets forth certain historical per share data for Molson and Coors and pro forma combined per share data after giving effect to the merger transaction at an exchange ratio of 0.360 shares of Molson Coors common stock or Molson Coors Exchangeco exchangeable shares for each Molson share. This data should be read in conjunction with the Molson audited financial statements, the Molson interim unaudited financial statements, the Coors audited financial statements and the Coors interim unaudited financial statements that are attached to this document as Annexes R and S, respectively, and the Molson Coors unaudited pro forma condensed combined financial statements included beginning on page 291 in this document. The unaudited pro forma condensed combined financial statements reflect adjustments to conform Molson's data to U.S. GAAP, presented in U.S.$ and to give effect to the merger transaction as if it had occurred on December 30, 2002 with respect to the income statement, and as of September 26, 2004 with respect to the balance sheet. The unaudited pro forma condensed combined financial data are not necessarily indicative of the operating results or financial position that would have occurred had the merger transaction been completed at the beginning of the earliest period presented and should not be construed as indicative of future operations. For more information see "Information Concerning Molson" beginning on page 181 and "Information Concerning Coors" beginning on page 239.

| Historical—Molson Canadian GAAP (Cdn.$) | Years ended March 31, | | | Six months ended | |
|---|---|---|---|---|---|
| | 2004 | 2003 | 2002 | September 30, 2004 | September 30, 2003 |
| Basic income per share . . . . . . . . | 1.86 | 2.42 | 1.48 | (0.39) | 1.19 |
| Diluted income per share . . . . . . | 1.84 | 2.38 | 1.45 | (0.39) | 1.17 |
| Book value per share at end of period(2) . . . . . . . . . . . . . . . . | 9.57 | 8.12 | 9.19 | 8.80 | 9.29 |
| Dividends per share . . . . . . . . . . | 0.56 | 0.42 | 0.38 | 0.30 | 0.28 |

| Historical—Coors U.S. GAAP (U.S.$) | Years ended | | | Thirty-nine weeks ended | |
|---|---|---|---|---|---|
| | 2003 | 2002(1) | 2001 | September 26, 2004 | September 28, 2003 |
| Basic income per share . . . . . . . | 4.81 | 4.47 | 3.33 | 3.81 | 3.81 |
| Diluted income per share . . . . . | 4.77 | 4.42 | 3.31 | 3.74 | 3.79 |
| Book value per share at end of period(2) . . . . . . . . . . . . . . . . | 34.80 | 27.02 | 26.46 | 40.42 | 31.57 |
| Dividends per share . . . . . . . . . | 0.82 | 0.82 | 0.80 | 0.615 | 0.615 |

| Pro forma per share data U.S. GAAP (U.S.$) | Pro Forma Combined | | Molson Equivalent(4) | |
|---|---|---|---|---|
| | Year ended 2003 | Thirty-nine weeks ended September 26, 2004 | Year ended 2003 | Thirty-nine weeks ended September 26, 2004 |
| Basic income per share . . . . . . . . | 3.52 | 1.09 | 1.27 | 0.39 |
| Diluted income per share . . . . . . | 3.46 | 1.06 | 1.25 | 0.38 |
| Book value per share at end of period(3) . . . . . . . . . . . . . . . . | — | 56.31 | — | 20.27 |
| Dividends per share . . . . . . . . . . | 1.27(5) | 0.63(5) | 0.46 | 0.23 |

(1) Results prior to February 2, 2002 exclude Coors Brewers Limited, the business acquired from InBev on that date.

(2) The historical book value per share is computed by dividing total stockholders' equity as of the end of each period for which the computation is made by the number of common shares outstanding at the end of each period.

(3) The pro forma book value per share is computed by dividing pro forma stockholders' equity by the pro forma number of shares outstanding at the end of the period totalling 83.5 million common shares.

(4) The Molson pro forma equivalent share amounts are computed by multiplying the Molson Coors pro forma combined per share amounts by the 0.360 exchange ratio.

(5) The pro forma dividends per share amounts are based upon the agreement of Molson and Coors for Molson Coors to adopt Molson's dividend policy in effect on July 21, 2004, subject to applicable law and adjustment for (i) the exchange rate of U.S.$0.7616 per Canadian dollar on that date and (ii) the exchange ratio of 0.360.

**Molson Selected Historical Financial Information**

We are providing the following financial information to assist you in your analysis of the financial aspects of the merger transaction. We derived the annual Molson historical financial information from the audited consolidated financial statements of Molson as of and for each of the fiscal years ended March 31, 2000 through 2004. Molson prepares its financial statements in accordance with Canadian GAAP, which differs in significant respects from U.S. GAAP. See note 24 to Molson's historical annual financial statements and Note 12 to Molson's interim historical financial statements in Annex R. We derived the data as of and for the six months ended September 30, 2004 and 2003 from unaudited interim financial statements of Molson. In the opinion of Molson management, this information includes adjustments (consisting only of normal and recurring adjustments) that are considered necessary for the fair presentation of the results for the interim periods.

The information below is in Cdn.$ and is only a summary and is qualified by reference to, and should be read in conjunction with, Molson audited financial statements and the Molson unaudited financial statements that are attached to this document in Annex R. The historical results included below and elsewhere in this document are not indicative of the future performance of Molson or the combined company.

| Canadian GAAP | As of and for the six months ended September 30, | | As of and for the years ended March 31, | | | | |
|---|---|---|---|---|---|---|---|
| | 2004 | 2003 | 2004 | 2003(3) | 2002(3,4) | 2001 | 2000 |
| | (In Cdn.$ millions, except per share data) | | | | | | |
| **Consolidated Statement of Earnings Data:** | | | | | | | |
| Net sales revenue . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 1,349.4 | 1,377.4 | 2,525.5 | 2,515.2 | 2,102.3 | 1,857.1 | 1,753.7 |
| Net earnings (loss) from continuing operations(1,2,5,7) . . . . . | (49.6) | 151.2 | 237.0 | 308.7 | 175.6 | 137.2 | (65.8) |
| Net earnings (loss)(1,2,5,7) . . . . . . . . . . . . . . . . . . . . . | (49.6) | 151.2 | 237.0 | 308.7 | 177.6 | 133.9 | (44.0) |
| Net earnings (loss) per share from continuing operations— basic(1,2,5,7,8) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | (0.39) | 1.19 | 1.86 | 2.42 | 1.46 | 1.15 | (0.56) |
| Net earnings (loss) per share from continuing operations— diluted(1,2,5,7,8) . . . . . . . . . . . . . . . . . . . . . . . . . . . | (0.39) | 1.17 | 1.84 | 2.38 | 1.43 | 1.14 | (0.55) |
| Net earnings (loss) per share—basic(1,2,5,7,8) . . . . . . . . . . | (0.39) | 1.19 | 1.86 | 2.42 | 1.48 | 1.12 | (0.37) |
| Net earnings (loss) per share—diluted(1,2,5,7,8) . . . . . . . . . | (0.39) | 1.17 | 1.84 | 2.38 | 1.45 | 1.11 | (0.36) |
| Dividends declared per share(8) . . . . . . . . . . . . . . . . . . . | 0.30 | 0.28 | 0.56 | 0.42 | 0.38 | 0.36 | 0.36 |
| Cash dividends paid per share(8) . . . . . . . . . . . . . . . . . . | 0.29 | 0.27 | 0.53 | 0.41 | 0.37 | 0.34 | 0.34 |
| **Consolidated Balance Sheet Data:** | | | | | | | |
| Cash and cash equivalents . . . . . . . . . . . . . . . . . . . . . . | 18.7 | 50.6 | 21.2 | 12.2 | 71.0 | 70.1 | 61.7 |
| Total assets(1,2,5,6) . . . . . . . . . . . . . . . . . . . . . . . . . . | 3,614.2 | 3,930.8 | 3,930.6 | 3,904.1 | 4,506.3 | 3,280.8 | 3,111.8 |
| Current portion of long-term debt . . . . . . . . . . . . . . . . . | 407.2 | 65.4 | 347.0 | 40.6 | 58.9 | — | — |
| Total long-term debt . . . . . . . . . . . . . . . . . . . . . . . . . . | 992.9 | 1,099.6 | 1,135.4 | 1,220.6 | 1,746.1 | 1,204.4 | 1,111.9 |
| Shareholders' equity(1,2,5,6,7) . . . . . . . . . . . . . . . . . . . . | 1,124.4 | 1,180.5 | 1,219.4 | 1,033.0 | 1,173.9 | 795.4 | 1,025.7 |

43

| U.S. GAAP | As of and for the six months ended September 30, | | As of and for the years ended March 31, | |
|---|---|---|---|---|
| | 2004 | 2003 | 2004 | 2003 |
| | (In Cdn.$ millions, except per share data) | | | |
| **Consolidated Statement of Earnings Data:** | | | | |
| Net sales revenue . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 1,371.0 | 1,377.4 | 2,525.5 | 2,515.2 |
| Net earnings (loss)(1,2,7) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | (47.4) | 158.8 | 248.5 | 294.1 |
| Net earnings (loss) per share—basic(1,2,7,8) . . . . . . . . . . . . . . . . . . . . . | (0.37) | 1.25 | 1.96 | 2.34 |
| Net earnings (loss) per share—diluted(1,2,7,8) . . . . . . . . . . . . . . . . . . . . | (0.37) | 1.23 | 1.93 | 2.27 |
| Dividends declared per share(8) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 0.30 | 0.28 | 0.56 | 0.42 |
| Cash dividends paid per share(8) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 0.29 | 0.27 | 0.53 | 0.41 |
| **Consolidated Balance Sheet Data:** | | | | |
| Cash and cash equivalents . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 50.7 | 50.6 | 21.2 | 12.2 |
| Total assets(1,2) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 3,881.1 | 3,912.1 | 3,914.2 | 3,877.0 |
| Current portion of long-term debt . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 407.2 | 65.4 | 347.0 | 40.6 |
| Total long-term debt . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 1,192.9 | 1,099.6 | 1,135.4 | 1,220.6 |
| Shareholders' equity(1,2,7) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 1,008.9 | 1,043.8 | 1,083.2 | 892.3 |

(1) In the fiscal years presented, Molson recorded provisions for rationalization consisting primarily of brewery closure costs and asset writedowns. For the year ended March 31, 2004, these provisions resulted in a pre-tax charge to earnings of $36.3 (2003—$63.5, 2002—$50.0, 2001—$nil, 2000—$224.0). For the six months ended September 30, 2004 includes $16.0 of merger related costs and a $3.4 charge for rationalization costs.

(2) During the quarter ended September 30, 2004, Molson recorded an impairment charge of $210.0 ($168.0 after minority interest).

(3) During the year ended March 31, 2002, Molson acquired all of the outstanding shares of Cervejarias Kaiser Brasil S.A. in Brazil. In a separate transaction, which closed in fiscal 2003, Molson sold 20% of its operations in Brazil to Heineken N.V.

(4) During the year ended March 31, 2002, Molson completed the sale of its sports and entertainment business consisting of the Montréal Canadiens and the Molson Centre.

(5) Effective April 1, 2001, Molson adopted the Canadian Institute of Chartered Accountants, or CICA, handbook section 3062 "Goodwill and Other Intangible Assets" prospectively in which goodwill and other indefinitive lived intangible assets are not amortized, but tested for impairment. Included in the fiscal 2001 and 2000 net earnings are $38.5 and $34.2 of amortization of intangible assets, respectively.

(6) During the year ended March 31, 2001, Molson adopted CICA handbook section 3461 "Employee Future Benefits" and section 3465 "Income Taxes" retroactively, without restatement. The result of adopting these standards were an increase in total assets of $123.0, an increase in total liabilities of $443.0 and a decrease in retained earnings of $320.0.

(7) Effective April 1, 2002, Molson adopted CICA handbook section 3870 "Stock-Based Compensation and Other Stock-Based Payments" on a prospective basis and began expensing stock options. Stock option expense for the fiscal year ended March 31, 2004 amounted to $5.2. Stock option expense for the fiscal year ended March 31, 2003 was restated by $3.7 to reflect the adoption of this standard. Prior years have not been restated.

(8) All per share information is after a 2-for-1 stock split which took effect in September 2001. Prior years have been restated.

## Risk Factors

*You should carefully consider the following risk factors, which we believe are all of the significant risks related to the merger transaction and the anticipated business of Molson Coors, as well as the other information contained in this document, including the attached annexes, in evaluating whether to approve the proposals relating to the merger transaction. By voting in favor of the merger transaction, Molson shareholders and optionholders will be choosing to invest in Molson Coors common stock or in the exchangeable shares, which are ultimately exchangeable for Molson Coors common stock. By voting in favor of the Coors share issuance and the Coors charter amendments, Coors stockholders will be choosing to combine Molson's operations with Coors' operations.*

### Risks Related to the Merger Transaction

***We may not realize the cost savings and other benefits we currently anticipate due to challenges associated with integrating operations, technologies, sales and other aspects of the companies.***

The success of the merger transaction will be dependent in large part on the success of the management of the combined company in integrating the operations, technologies and personnel of the two companies following the merger transaction. The failure of the combined company to meet the challenges involved in successfully integrating the operations of Molson and Coors or otherwise to realize any of the anticipated benefits of the merger transaction, including the estimated annual cost savings described elsewhere in this document, could impair the results of operations of the combined company. In addition, the overall integration of the two companies may result in unanticipated operations problems, expenses and liabilities and diversion of management's attention. The challenges involved in this integration include the following:

- integrating successfully each company's operations, technologies, products and services;

- reducing the costs associated with each company's operations;

- coordinating sales, distribution and marketing efforts to effectively promote the products of the combined company;

- preserving distribution, marketing or other important relationships of both Coors and Molson and resolving potential conflicts that may arise;

- coordinating and rationalizing research and development activities to enhance introduction of new products;

- assimilating the personnel of both companies and persuading employees that the business cultures of both companies are compatible; and

- building employee morale and motivation.

***Because the market price of Coors common stock will fluctuate and the exchange ratio is fixed, you cannot be sure of the market value of the Molson Coors common stock or the exchangeable shares that will be outstanding following completion of the merger transaction.***

In the arrangement, each Molson share will, through a series of exchanges, be exchanged for a fixed number of shares of the applicable class or classes of shares of Molson Coors common stock or exchangeable shares (which will be eligible for exchange into shares of Molson Coors common stock). The exchange ratios in the merger transaction will not be adjusted for changes in the market prices of the shares of Coors or Molson. Changes in the market price of the Coors Class B common stock, the Molson Class A non-voting shares or the Molson Class B common shares or changes in the exchange rate between the U.S. and Canadian dollar prior to the completion of the arrangement will affect the market value of the Molson Coors common stock and the exchangeable shares to be received by

Molson shareholders. Stock price changes may result from a variety of factors, including general market and economic conditions and changes in our businesses, operations and prospects, many of which conditions and changes are beyond our control. Neither Molson nor Coors is permitted to terminate the combination agreement solely because of changes in the market prices of any of our shares or changes in the exchange rate between the U.S. and Canadian dollar.

Furthermore, none of the shares of Coors Class A common stock or exchangeable shares are currently traded on a stock exchange. As a result, no market value is available for those classes of shares, except by reference to the publicly traded shares of Class B common stock and the Molson shares.

If the merger transaction is completed, it will not be completed until after the date of the Coors and Molson special meetings and the satisfaction or waiver of all conditions to the arrangement. Therefore, at the time of your special meeting, you will not know the precise value of the Molson Coors shares or the exchangeable shares. The closing prices of the Coors Class B common stock and each class of Molson shares and the pro forma equivalent per share value of each class of Molson shares at the close of the regular trading session on July 21, 2004, the last trading day before the public announcement of the merger transaction, and December 8, 2004, the most recent day for which that information was available prior to mailing this document, are set out in "Per Share Equivalent Share Prices" beginning on page 39. Based on such closing prices, the value of 0.360 shares of Coors Class B common stock was U.S.$26.90 (Cdn.$35.51) and U.S.$26.69 (Cdn.$32.06) on July 21, 2004 and December 8, 2004, respectively. We urge you to obtain current market prices for the Coors Class B common stock and Molson Class A non-voting shares and Class B common shares.

***Members of the management and boards of directors of Molson and Coors have interests in the merger transaction that are different from those of other shareholders and that could influence their decision to approve the merger transaction.***

In considering whether to approve the merger transaction, Molson's securityholders and Coors' stockholders should recognize that some of the members of management and the boards of directors of Molson and Coors have interests in the merger transaction that differ from, or are in addition to, their interests as Molson securityholders or Coors stockholders. These interests include:

- rights of certain officers and directors to receive termination payments or other benefits, including vesting of options, following a change of control;

- future board of directors membership;

- future executive officer positions; and

- indemnification of officers and directors against certain liabilities.

These interests are described in "Description of the Merger Transaction—Interests of Molson's Directors and Management in the Merger Transaction" beginning on page 88, "Governance and Management of Molson Coors—Other Governance Matters—Voting Trust Agreements Among Principal Shareholders" beginning on page 138 and "Description of the Merger Transaction—Interests of Coors' Directors and Management in the Merger Transaction" beginning on page 98.

***The merger transaction is subject to the receipt of consents and approvals from government entities that could delay completion of the merger transaction or impose conditions on the combined company, which could result in an adverse effect on the business or financial condition of the combined company.***

Completion of the merger transaction is conditioned upon the expiration or termination of the applicable waiting period under the HSR Act, and the receipt of consents, orders, approvals or clearance, as required, under the competition laws of Canada and certain other regulatory authorities.

The conditions relating to the HSR Act and clearance under competition laws of Canada have been satisfied. A substantial delay in obtaining satisfactory approvals or the imposition of unfavorable terms or conditions in the approvals could have an adverse effect on the business, financial condition or results of operations of Molson Coors.

*Molson Coors' public stockholders will have no ability to influence the outcome of most matters presented to Molson Coors stockholders due to members of the Coors and Molson families collectively holding a controlling interest in the combined company after the merger.*

The Coors Trust, which is controlled by members of the Coors family, currently owns all of the voting stock of Coors, and Pentland, which is indirectly controlled by Eric H. Molson, owns approximately 50.45% of the voting shares of Molson. Following the merger transaction, Pentland and the Coors Trust will be the beneficial owners of a controlling interest in the Molson Coors Class A common stock and the Class A exchangeable shares. Based on their shareholdings on the record date, the Coors Trust and Pentland will collectively hold approximately 67.05%, of the combined voting power of Molson Coors Class A common stock and special Class A voting stock (the votes of which are directed by holders of Class A exchangeable shares). Peter H. Coors, the chairman of Coors, is a trustee for the Coors Trust, and Eric H. Molson, the chairman of the Molson board of directors, indirectly controls Pentland. Pentland and the Coors Trust have agreed to enter into voting trust agreements to vote their shares as a bloc. As a result of these ownership levels and voting trust agreements, the remaining holders of Molson Coors Class A common stock and Class B common stock and Class A exchangeable shares and Class B exchangeable shares will have no ability to influence the outcome of most matters presented to the combined company's stockholders and holders of exchangeable shares, other than limited matters in which the holders of Molson Coors Class B common stock and special Class B voting stock vote separately.

Because Pentland and the Coors Trust will collectively own a controlling interest in the Molson Coors Class A common stock and the Class A exchangeable shares, a third party may be deterred from pursuing a tender offer, change in control or take-over attempt in respect of Molson Coors that is not supported by them.

*If Pentland and the Coors Trust do not agree on a matter submitted to stockholders, generally the matter will not be approved, even if beneficial to the Company or favored by other stockholders.*

Pentland and the Coors Trust, which will be Molson Coors' two largest stockholders, will enter into voting trust agreements upon the completion of the merger transaction through which they will combine their voting power over the Molson Coors Class A common stock and Class A exchangeable shares they will own upon completion of the merger transaction. However, in the event that these two stockholders do not agree to vote in favor of a matter submitted to a stockholder vote (other than the election of directors), the voting trustees will be required to vote all of the Molson Coors Class A common stock and Class A exchangeable shares deposited in the voting trusts against the matter. There is no other mechanism in the voting trust agreements to resolve a potential deadlock between these stockholders. Therefore, if either Pentland or the Coors Trust are unwilling to vote in favor of a transaction that is subject to a stockholder vote, we may be unable to complete the transaction even if our board, management or other stockholders believe the transaction is beneficial for Molson Coors.

*If either Pentland or the Coors Trust ceases to beneficially own a specified minimum number of shares of Molson Coors stock, that party may forfeit the right to instruct the trustees with respect to voting on matters presented to Molson Coors stockholders and thereby vest the other party with a sole controlling interest in Molson Coors Class A common stock and the Class A exchangeable shares.*

If Pentland and its permitted transferees cease to beneficially own a specified minimum number of shares of Molson Coors Class A common stock and Class A exchangeable shares, then Pentland will

49

forfeit the right to instruct the trustees with respect to voting on matters presented to Molson Coors stockholders, and lose rights relating to the nomination of directors to the Molson Coors board of directors. Similarly, if the Coors Trust and its permitted transferees cease to beneficially own a specified minimum number of shares of Molson Coors Class A common stock and Class A exchangeable shares, they will forfeit the right to instruct the trustees with respect to voting on matters presented to Molson Coors stockholders, and lose rights relating to the nomination of directors to the Molson Coors board of directors.

In the event that one party forfeits its right to instruct the trustees with respect to voting on matters presented to Molson Coors stockholders, while the other party retains its right to so instruct the trustees, the party that retains its right to give voting instructions to the trustees will be vested with the sole controlling interest in Molson Coors Class A common stock and the Class A exchangeable shares held in the voting trusts and the sole ability to direct the outcome of most matters presented to Molson Coors' stockholders, other than limited matters on which the holders of Molson Coors Class B common stock and special Class B common stock vote separately.

For a detailed description of these voting trust agreements, see "Governance and Management of Molson Coors—Other Governance Matters—Voting Trust Agreements Among Principal Shareholders" beginning on page 138.

*The trading prices of the exchangeable shares and the Molson Coors common stock may not reflect equivalent values.*

Holders of exchangeable shares will have dividend, liquidation and voting rights that are economically equivalent to the rights of holders of shares of Molson Coors common stock. Coors has submitted listing applications to the New York Stock Exchange for the listing of the Molson Coors Class A and Class B common stock. The Toronto Stock Exchange has conditionally approved the listing of the Molson Coors common stock and the exchangeable shares subject to the fulfillment of all of the requirements of the Toronto Stock Exchange on or before February 3, 2005, including distribution of these securities to a minimum number of public shareholders.

Because these are separate listings on different exchanges, the trading prices of the exchangeable shares on the Toronto Stock Exchange and the Molson Coors common stock on the New York Stock Exchange and the Toronto Stock Exchange may not reflect equivalent values after taking into account the exchange rate between the Canadian dollar and U.S. dollar. This may result in your having to exchange your exchangeable shares for Molson Coors common stock in order to maximize the value of your investment prior to a sale.

*Molson shareholders who receive exchangeable shares will experience a delay in receiving shares of Molson Coors common stock from the date that they request an exchange, which may affect the value of the shares the holder receives in an exchange.*

Molson shareholders who receive exchangeable shares in the arrangement and later request to receive Molson Coors common stock in exchange for their exchangeable shares will not receive Molson Coors common stock for 10 to 15 business days after the applicable request is received. During this 10- to 15-business day period, the market price of Molson Coors common stock may increase or decrease. Any such increase or decrease would affect the value of the consideration to be received by the holder of exchangeable shares on the effective date of the exchange.

**Risks Related to the Molson Coors Business and Operations**

*Because we will continue to face intense competition, operating results may be negatively impacted.*

The brewing industry is highly competitive and requires substantial human and capital resources. Competition in our various markets could cause us to reduce prices, increase capital and other expenditures or lose market share, any of which could have a material adverse effect on our business and financial results. In addition, in some of our markets, our primary competitors have substantially greater financial, marketing, production and distribution resources than Molson Coors will have. In all of the markets where Molson Coors will operate, aggressive marketing strategies by our main competitors could adversely affect our financial results.

*Our results may be negatively impacted by foreign currency risk.*

Molson Coors will hold assets and incur liabilities, earn revenues and pay expenses in a variety of currencies other than the U.S. dollar, primarily the Canadian dollar, the Brazilian real and the British pound. Because our financial statements will be presented in U.S. dollars, we must translate our assets, liabilities, income and expenses into U.S. dollars at then-applicable exchange rates. Consequently, increases and decreases in the value of the U.S. dollar will affect, perhaps negatively, the value of these items in our financial statements, even if their value has not changed in their original currency.

*Our operations face significant commodity price change and foreign exchange rate exposure which could materially and adversely affect our operating results.*

Molson Coors will use a large volume of agricultural and other raw materials to produce its products, including malt, hops and water. The supply and price of these raw materials can be affected by a number of factors beyond our control, including frosts, droughts and other weather conditions, economic factors affecting growth decisions, plant diseases and theft. To the extent any of the foregoing factors affect the prices of ingredients, our results of operations could be materially and adversely impacted. In addition, in Brazil agricultural and other raw materials are priced based on the U.S. dollar and, since Molson's sales in Brazil are made in local currency, fluctuations in the exchange rate between the U.S. dollar and the Brazilian real may negatively impact our earnings in Brazil.

Both companies have active hedging programs to address commodity price and foreign exchange rate changes. However, to the extent we fail to adequately manage the foregoing risks, including if our hedging arrangements do not effectively or completely hedge changes in foreign currency rates or commodity price risks, our results of operations may be negatively impacted.

*Molson has recently incurred losses in its Brazilian operations, recorded an impairment charge of Cdn.$210 million in the quarter ended September 30, 2004, announced that it will record a provision for rationalization of approximately Cdn.$50 million and could suffer further impairment charges as a result of the Brazilian operations, which could have a material adverse effect on our combined results of operations.*

Molson's Brazilian operations recently incurred losses in the quarter ended March 31, 2004 and for the quarters ended June 30, 2004 and September 30, 2004. These losses were a function of the current period costs associated with plans to significantly grow volumes and regain market share associated with the sales centers put in place during the last nine months in Brazil. In light of the continuing challenges presented by the Brazilian beer market, Molson performed an impairment test of assets in the region. As a result of declining sales volumes and loss of market share, Molson announced on September 30, 2004 that it had revised its forecast of net cash flow from operations in Brazil and, as a result, on October 28, 2004 announced that it had recorded an impairment charge of Cdn.$210 million (Cdn.$168 million after minority interest). In addition, Molson announced that it will record a provision for rationalization of approximately Cdn.$50 million against earnings in the coming quarters to account for a plant closing in Brazil and organizational right-sizing. On November 3, 2004, Heineken N.V., the

51

owner of a 20% stake in Molson's Brazilian operations, announced that it provided for an impairment charge for the full amount of its 20% stake stating that it is unable to determine the realizable value of its minority interest with any accuracy or reliability and noting that, as a minority shareholder, it has no effective influence over the management and policies of Molson's Brazilian operations. Molson's Brazilian operations may continue to incur losses and further impairment charges could be required, which could have a material adverse effect on our combined results of operations.

*Molson may be required to exercise control over the entity that owns the entertainment business and the Montréal Canadiens pursuant to the undertakings given to its lenders.*

On July 25, 2001, Molson sold the entertainment business operated in the Bell Centre in Montréal and the Montréal Canadiens hockey team, which may be financially adversely affected as a result of the National Hockey League work stoppage. As part of the sale transaction, Molson agreed to, among other things, give undertakings to the team's lenders for loans which as of March 31, 2004 were in the amount of Cdn.$92 million.

In addition, Molson is the guarantor of the 99 year lease arrangements on the Bell Centre related to the land on which the Bell Centre is located (the amount of lease payments varies based on prevailing interest rates and changes in the Consumer Price Index—in Molson's 2004 fiscal year the payments under the lease made by the purchaser totaled Cdn.$3.2 million).

If the purchaser is unable to meet its obligations, Molson will exercise control over the entities that own the entertainment business and the Montréal Canadiens and make required payments and fund cash flow deficiencies, which could have a material adverse effect on our liquidity position and our combined results of operations.

*We will continue to rely on a small number of suppliers to operate our business, and the inability of one of them to meet our production needs could have a negative impact on our business.*

We purchase most of our packaging and container supplies from a single supplier or a small number of suppliers. In addition, consolidation of the glass bottle industry in North America has reduced local supply alternatives and increased risks of glass bottle supply disruptions. The inability of any of these suppliers to meet our production requirements without sufficient time to develop an alternative source could have a material adverse effect on our business.

*Litigation directed at the alcohol beverage industry may adversely affect our sales volumes and our business.*

Coors and many other brewers and distilled spirits manufacturers have been sued in several courts regarding advertising practices and underage consumption. The suits allege that each defendant intentionally marketed its products to "children and other underage consumers." In essence, each suit seeks, on behalf of an undefined class of parents and guardians, an injunction and unspecified money damages. We will vigorously defend these lawsuits and it is not possible at this time to estimate the possible loss or range of loss, if any, in these lawsuits.

*If the independent distributors on which we depend fail to effectively sell our products, our revenue could be adversely impacted.*

We sell all of our products in the United States to distributors for resale to retail outlets. Some of our distributors are at a competitive disadvantage because they are significantly smaller than the largest distributors in their markets. Our distributors also sell products that compete with our products. We cannot control or provide any assurance that these distributors will not give our competitors' products higher priority, thereby reducing sales of our products. In addition, the regulatory environment of many states makes it very difficult to change distributors. Consequently, if we are not allowed or are unable

to replace unproductive or inefficient distributors, our business, financial position, and results of operation may be adversely affected.

***We are and will continue to be subject to various contingent tax, environmental and other liabilities and cannot predict with certainty that our reserves for those liabilities will be sufficient. If actual costs for these contingent liabilities are higher than expected, we could be required to accrue for additional costs.***

In the course of our respective businesses, we are subject to various litigation claims and other contingent liabilities. These include, among others, (i) claims asserted against Molson's subsidiary, Cervejarias Kaiser Brasil S.A., by Brazilian tax authorities, including claims for income taxes, federal excise taxes, value-added tax, revenue taxes (PIS/federal unemployment insurance contribution) and federal social security tax, (ii) claims by the U.S. Environmental Protection Agency that Coors is a potentially responsible party at the Lowry Superfund Site and (iii) various other legal claims arising in the ordinary course of our businesses.

While we have estimated and accrued for costs expected to be incurred in connection with our contingent liabilities, if actual costs are higher than expected, we could be required to accrue for additional costs and make additional cash payments.

***We will be subject to changes in laws, taxation and other normal risks associated with investing and carrying on business in various countries which could negatively impact our business.***

We conduct activities in the United States, Canada, the United Kingdom and Brazil. Our investments are subject to the risks normally associated with any conduct of business in foreign countries including: uncertain political and economic environments; changes in laws or policies of particular countries; taxation; delays in obtaining or failure to obtain necessary governmental permits; limitations on repatriation of earnings; and increased financing costs.

***Changes in tax, environmental or other regulations or failure to comply with existing licensing, trade and other regulations could have a material adverse effect on our financial condition.***

Our business is regulated by federal, state, provincial and local laws and regulations in various countries regarding such matters as licensing requirements, trade and pricing practices, labeling, advertising, promotion and marketing practices, relationships with distributors, environmental matters and other matters. Failure to comply with these laws and regulations could result in the loss, revocation or suspension of our licenses, permits or approvals. In addition, changes in tax, environmental or any other laws or regulations which affect our products or their production, handling or distribution could have a material adverse effect on our business, financial condition and results of operations.

("BAX") and 9,000 Molson Class B common shares from DJS Holdings Ltd. ("DJS"). The shareholders of each of BAX and DJS are the Estate of the late T.H.P. Molson and certain of his descendants. Eric H. Molson and Stephen T. Molson are directors of BAX and DJS, and trustees of trusts of the Estate of the late T.H.P. Molson. In addition, on November 9, 2004 BAX and DJS converted an aggregate of 2,278,654 Molson Class B common shares into Molson Class A non-voting shares.

The Molson voting agreement provides that, in the event that the merger transaction is not completed solely as a result of Pentland's failure to terminate the agreement with the Swiftsure Trust, Pentland will indemnify Coors for specified expenses of Coors and the Coors Trust relating to the merger transaction, up to an aggregate of U.S.$15 million.

For more information about the Molson voting agreement, see "The Combination Agreement and Related Agreements—Voting Agreements" beginning on page 121.

**Voting Securities and Principal Holders of Securities**

On the record date, there were outstanding (i) 107,935,727 Molson Class A non-voting shares and (ii) 19,856,822 Molson Class B common shares. Each Molson Class A non-voting share and Class B common share carries the right to one vote.

The only shareholder that, to the knowledge of Molson management, as of the record date, owned beneficially, or exercised control or direction over more than 10% of the total outstanding Molson Class A non-voting shares was AIM Funds Management Inc. which, as of the record date, controlled 15,225,750 Molson Class A non-voting shares or approximately 14.11% of the total outstanding Molson Class A non-voting shares as of that date.

The only shareholders that, to the knowledge of Molson management, as of the record date, owned beneficially, or exercised control or direction over more than 10% of the total outstanding Molson Class B common shares were:

- Eric H. Molson, chairman of the Molson board of directors, who indirectly through Pentland controlled 10,018,000 Molson Class B common shares or approximately 50.45% of the total outstanding Molson Class B common shares. Pentland is owned by Lincolnshire Holdings Inc. and Nooya Investments Inc., which are respectively owned by Eric H. Molson and his brother Stephen T. Molson; and

- R. Ian Molson, who controls Nantel Investments Ltd. which beneficially owned, through Swiftsure Trust, 2,300,000 Molson Class B common shares or approximately 11.58% of the total outstanding Molson Class B common shares.

On the record date, directors and executive officers of Molson and their affiliates beneficially owned and had the right to vote:

- 529,776 Molson Class A non-voting shares, representing approximately 0.49% of the class outstanding on the record date; and

- 10,018,002 Molson Class B common shares, representing approximately 50.45% of the class outstanding on the record date.

**Solicitation of Proxies**

**The management of Molson is soliciting proxies for use at the Molson special meeting and has designated the individuals listed on the enclosed form of proxy as persons whom Molson securityholders may appoint as their proxyholders. If you are a Molson shareholder and wish to appoint an individual not listed on the enclosed form of proxy to represent you at the Molson special**

shares will be amended in connection with the merger transaction, as described under "Amendment to Coors' Certificate of Incorporation" beginning on page 141.

In accordance with the requirements of the Toronto Stock Exchange, Molson will be required to give to the exchange prior notice of the record date for determining Molson shareholders to whom the special dividend will be paid. The Toronto Stock Exchange will issue a notice to its members with respect to the record date for payment of the special dividend. In accordance with the policies of the exchange, the Molson shares will trade on a "ex-dividend" basis at the beginning of the second trading day prior to the record date for the payment of the special dividend. Molson will also issue a news release announcing the record date and the date of closing of the merger transaction once they have been determined.

### Background of the Merger Transaction

During the past several years, the international brewing industry has undergone substantial consolidation. The Molson and Coors boards of directors have each periodically discussed and reviewed their respective businesses, strategic directions, performances and prospects in the context of developments in the brewing industry, including the continuing trend toward consolidation in the industry, and have periodically discussed ways to enhance their competitive position and shareholder value. The strategy for both Molson and Coors has been to grow their businesses organically while also supplementing that growth through strategic transactions designed to strengthen competitive position in key markets. In the course of these strategic reviews, both companies concluded independently that the status quo did not represent the best alternative to long term shareholder value.

Coors and Molson and their respective senior managements have become familiar with each other's businesses through their licensing arrangement, which began in the 1980s, and their distribution partnerships, through which Molson has been manufacturing, marketing, distributing and selling Coors Light™ in Canada since 1998. Coors began to market, distribute and sell Molson products in the United States in 2001. During the course of the working relationships built through those distribution arrangements and partnerships, senior management of the two companies from time to time in the past have informally discussed the possible benefits of a strategic combination of the two companies. Management of both companies recognized many potential strategic benefits of a combination, including benefits from the complementary product mix, geographic profiles and distribution networks of the two companies as well as their cultural compatibility as breweries with long operating histories as family-controlled companies.

On March 16, 2004, Leo Kiely, the president and chief executive officer of Coors, wrote to Daniel O'Neill, the president and chief executive officer of Molson, inviting Mr. O'Neill to consider pursuing discussions on a merger-of-equals between the two companies.

On April 15, 2004 and May 7, 2004, Peter H. Coors, the chairman of Coors, and Eric H. Molson, the chairman of the board of Molson, held initial meetings to discuss the basic principles to guide any merger discussions. Based on these discussions, Messrs. Molson and Coors concluded that a transaction between the two companies would have to:

- offer long term value for all shareholders;

- be fair to, and in the best interests of, all shareholders;

- maintain the heritage of each company;

- continue a commitment to brewing as the core of the business; and

- allow each family to play a continued role in the combined company.

72

In May 2004, with the authorization of the Molson board of directors, Molson engaged Citigroup Global Markets Inc. to assist it in identifying and evaluating various strategic or financial alternatives for Molson. In June 2004, Molson's board of directors reviewed with Molson's senior management and Citigroup various potential strategic and financial alternatives, including continuation of Molson's existing business strategy, a merger of equals transaction and the sale of the company as well as other alternatives such as the creation of an income trust structure, acquisitions of smaller competitors and the sale of Molson's Brazilian operations. Citigroup was subsequently engaged as one of Molson's financial advisors in connection with the proposed merger transaction with Coors. Molson engaged Citigroup because of its reputation and experience with mergers and similar transactions generally, and particularly in the brewing industry worldwide.

On June 1, 2004, Messrs. Kiely and O'Neill met in Chicago to discuss the preliminary guidelines for a potential transaction.

During June 2004, the parties and their respective advisors discussed the structure and mechanics of a potential business combination, including the form of the transaction to be pursued, the tax treatment of the transaction to the various shareholders of each company, the capital structure of the combined company, and possible governance arrangements designed to achieve meaningful participation by both companies in the future strategic direction of the combined company. The parties preliminarily agreed that, conceptually, the transaction would provide for a fixed exchange ratio based on a range of recent market prices of the companies' shares. In the course of the discussions during this period, the parties reached tentative agreement on a transaction structure contemplating a plan of arrangement under Canadian law that would provide Molson's Canadian resident securityholders the ability to receive tax deferred treatment and also made substantial progress concerning governance arrangements for the combined company which would result in the current controlling shareholders of each company relinquishing their sole control in favor of shared governance of the combined company.

In early June, Molson retained the services of BMO Nesbitt Burns to assist it in evaluating the proposed merger transaction with Coors. In engaging BMO Nesbitt Burns, Molson determined that, as a major Canadian company, it was important to have specific Canadian capital markets expertise.

In early June, Coors retained the services of Deutsche Bank Securities Inc. to assist it in evaluating the proposed merger transaction with Molson.

On June 11, 2004, the parties signed a confidentiality agreement, authorized the commencement of reciprocal due diligence and authorized their legal advisors to prepare and negotiate the terms of definitive transaction documents.

Following execution of the confidentiality agreement, a committee of senior management from each company was established to further quantify and identify synergies that could result from the combination. Under the auspices of this committee, working groups were formed to identify and quantify specific cost savings and other financial synergy opportunities in various areas, including operations or manufacturing, supply chain functions and integration of technology platforms.

From mid-June to early July, a number of due diligence and management meetings and presentations were held among the parties and their respective legal and financial advisors. From time to time throughout June and July, senior management of Molson and Coors, including Messrs. O'Neill and Kiely, as well as the principal financial, corporate development and legal officers of Molson and Coors, discussed various financial aspects and other terms of the merger transaction.

On June 22, 2004, at a regular meeting of the Molson board of directors, also attended by representatives of Citigroup and BMO Nesbitt Burns, senior management reviewed with the Molson board of directors the broad parameters of the proposed combination. The Molson board of directors authorized management to continue discussions with Coors.

73

At that meeting, the Molson board of directors also formed an independent committee comprised of Francesco Bellini, John Cleghorn, Daniel Colson, Robert Ingram, David O'Brien and H. Sanford Riley, as chairman. The Molson independent committee was formed to review the terms and conditions of the proposed merger transaction and make recommendations to the Molson board of directors, including as to the fairness of the transaction to the shareholders of Molson, other than Pentland and Eric H. Molson, from a financial and non-financial point of view. On July 28, 2004, Mr. Ingram resigned as director of Molson and member of the independent committee.

Following its formation, the Molson independent committee retained the services of Fasken Martineau DuMoulin LLP and Shearman & Sterling LLP to act as its legal counsel. With the assistance and advice of its legal advisors, the members of the Molson independent committee concluded that each of the members was independent of Molson management and Pentland. The independent committee determined that it was necessary to obtain the advice and expertise of a financial advisor in connection with its review of the proposed transaction and, further, that it was appropriate to engage its own independent financial advisor. The independent committee selected Merrill Lynch based principally on Merrill Lynch's overall institutional strength, expertise and experience, and its independence from Molson, Coors and their respective management groups. The Molson independent committee concluded that Merrill Lynch was qualified and independent of Molson and Coors.

On June 25, 2004, at a special meeting of the Coors board of directors, senior executive management of Coors briefed the board on the status of their discussions to date and various strategic considerations relating to the transaction, including the proposed governance and other terms of the transaction, and presented a preliminary financial analysis regarding the proposed transaction. Following discussion, the Coors board authorized management to continue discussions with Molson. On the same day, at a meeting of the trustees of the Coors Trust, the trustees also were briefed on the proposed transaction by Mr. Coors and Coors management and authorized further discussions regarding the proposed shareholder arrangements contemplated in connection with the merger transaction.

On June 26, 2004, the Molson independent committee held a meeting with its legal advisors by telephone. During that meeting, the Molson independent committee's legal advisors made a presentation to the Molson independent committee with respect to the role and obligations of the Molson independent committee in evaluating the proposed merger.

On June 30, 2004 and July 1, 2004, meetings took place in Evergreen, Colorado between members of senior management of Molson and Coors, along with the companies' respective financial advisors, to review business plans and strategic objectives for each of the companies.

Negotiation of definitive transaction documents, including the combination agreement, the proposed amended and restated certificate of incorporation and bylaws of the combined company and the other agreements to be entered into by the companies and their respective principal shareholders, began on July 8, 2004 and continued through July 21. During this period, the parties and their financial advisors also had further discussions regarding the appropriate method for determining the exchange ratio for the proposed transaction. Initially, Coors proposed an exchange ratio of 0.351. In July, Molson suggested that such exchange ratio reflected a recent low price for Molson stock during such 90 day trading period and asked that the exchange ratio be fixed at 0.360.

In meetings held during July 2004, with the assistance of its legal advisors, the Molson independent committee conducted a detailed review of the terms and conditions of the proposed merger transaction, including with respect to proposed governance arrangements for the combined company. The Molson independent committee also discussed with Merrill Lynch the value of Molson and Coors, as well as the value of the synergies anticipated by management in connection with the proposed merger transaction and the potential costs arising from the combination of Molson and Coors.

At the request of the Molson independent committee, throughout July 2004 Molson's management provided the Molson independent committee with updates on the status of merger discussions and discussed with the Molson independent committee potential benefits and risks of the proposed merger. At a meeting held on July 16, 2004, the Molson independent committee received detailed presentations from Molson's management which provided an overview of the proposed merger with Coors, an analysis of the strategic rationale for the transaction, a detailed review of the anticipated synergies to be derived, including:

- synergies within our purchasing functions, as we expect to have increased purchasing power;

- synergies from optimizing our North American manufacturing operations, including re-evaluation and rationalization of existing plants, sourcing the right products from the right plants, and applying observed best practices across all plants;

- synergies from a combined information technology platform; and

- synergies derived from the elimination of duplicative positions within the combined organization.

The potential costs reviewed included additional capital expenditures and/or asset write-offs necessary to optimize our North American manufacturing operations, as well as potential restructuring and severance costs. The presentations also included discussions about the anticipated impact of those synergies on the work force of each company, which will include a reduction of the combined workforce partially accomplished through attrition and early retirement, and the proposed management organization and allocation of responsibilities among the executives of the combined entity. Representatives of Citigroup and BMO Nesbitt Burns also attended the meeting and discussed with the Molson independent committee financial aspects of the merger transaction and the combined company.

Two of the members of the Molson independent committee also discussed with the chairman of Coors' audit committee the governance and board practices of each company and their compatibility.

Throughout this time period, the Molson independent committee informed Molson and its management and legal and financial advisors of the Molson independent committee's questions and comments on various aspects of the merger transaction. Molson's management and financial advisors were present by invitation and did not participate in the deliberations of the Molson independent committee.

From July 16, 2004 to July 21, 2004, the chairman and other members of the Molson independent committee received oral and written communications from Mr. Ian Molson indicating that he was in discussions with a group of investors, including Onex Corporation, in connection with a possible offer to acquire all of the shares of Molson for potential cash consideration of Cdn.$40 per share. The price of Cdn.$40 per share represented a premium of 15.3% to the market price of Molson's Class A non-voting shares on July 21, 2004. After considering these communications, the members of the Molson independent committee noted, among other things, that the communications received from Mr. Ian Molson assumed the continuance of a strong commercial relationship between Molson and Coors but provided no further information regarding structure or other terms and conditions nor did any of the communications indicate whether the required financing had been secured. After consultation with its advisors, the Molson independent committee determined that these communications did not constitute an offer for the Molson shares.

As the members of the independent committee received communications from Mr. Ian Molson, the substance of those communications was conveyed to members of Molson's senior management, including Mr. Eric Molson and Mr. Daniel O'Neill, and by Molson to representatives of Coors. On July 21, 2004, Coors informed representatives of the independent committee that, in the event that the independent committee sought to delay the progress of the negotiations between Molson and Coors in order to enter into discussions with Mr. Ian Molson, Coors could not provide any assurance that a

Molson-Coors transaction would go forward on the same terms as those then being discussed between Molson and Coors, or at all. Coors also informed the independent committee that if Molson was acquired by a competitor or other party in a financial buyout Coors could exercise its right to terminate its Coors Light and other brands partnership agreement with Molson. In light of the advanced stage of the negotiations between Molson and Coors, as well as the independent committee's determination that the communications received from Mr. Ian Molson did not constitute an offer for the Molson shares and the fact that, under the terms of the combination agreement, Molson could in certain circumstances enter into discussions with third parties regarding alternative transaction proposals and terminate the combination agreement in order to enter into a superior transaction proposal, the independent committee determined not to enter into discussions with Mr. Ian Molson or members of his investor group.

On July 19, 2004, at a special meeting of Coors' board of directors, Coors' senior executive management and Deutsche Bank provided an update on the merger discussions to date and discussed with Coors' board the strategic implications and potential benefits and risks of the proposed merger transaction. Coors' management also reviewed and discussed with Coors' board the results of its due diligence review of Molson and discussed in detail various matters relating to the structure and terms reflected in the proposed combination agreement and related documents. Senior management responded to questions from directors. Deutsche Bank presented the Coors board with its financial analysis of the merger transaction, responded to questions by the board and provided its oral opinion to the effect that, as of that date, based upon and subject to the assumptions made, matters considered and limits of the review undertaken by Deutsche Bank, the 0.360 exchange ratio was fair, from a financial point of view, to holders of each class of Coors common stock. After this presentation and further discussion and deliberation, the Coors board of directors determined that, subject to the parties agreeing to the final terms of the definitive transaction then under negotiation, the board believed that the merger transaction (including the issuance of Coors shares in the transaction and the contemplated amendments to Coors' certificate of incorporation and bylaws) was advisable and in the best interests of the company and its stockholders. Accordingly, the Coors' board of directors authorized management to continue its negotiation of the merger transaction and delegated to an independent special committee of the board of directors on July 19, 2004, comprised of Albert C. Yates and Pamela H. Patsley, the authority to give final approval of the merger transaction upon agreement of the final terms of the transaction agreements.

Between July 19, 2004 and July 21, 2004, the parties continued their negotiations and reached agreement on the terms of the definitive transaction documents.

On July 21, 2004, the Coors special committee met telephonically. Coors' chief legal officer presented the final terms of the proposed merger and responded to questions by the special committee members. After discussion and deliberation, the special committee, on behalf of the board, approved the merger agreement and the transactions contemplated by that agreement and authorized Coors' management to execute the combination agreement and other related agreements.

On July 21, 2004, the Molson independent committee met to review the final terms of the proposed merger. At this meeting, Mr. Kiely made a presentation to the Molson independent committee in which he described his strategic vision for the combined company and responded to questions of the Molson independent committee members. Eric H. Molson made a presentation to the Molson independent committee in which he confirmed that he and Pentland were supportive of the merger transaction and were committed to remaining involved as shareholders of a significant participant in the global brewing industry. Eric H. Molson further indicated that neither he nor Pentland had any intention of selling their interests in Molson. Subsequently, Merrill Lynch provided the Molson independent committee with a financial analysis of the merger transaction and an oral opinion, which was subsequently confirmed in writing, to the effect that, as of July 21, 2004, based upon, and subject to, the assumptions made, matters considered and limits of the review undertaken by

Merrill Lynch, the 0.360 exchange ratio in the merger transaction was fair, from a financial point of view, to the holders of Molson shares, other than Pentland and Eric H. Molson. The Molson independent committee voted unanimously that the merger transaction, to be implemented through an arrangement made under the provisions of the CBCA, was fair to, and in the best interests of Molson shareholders, other than Pentland and Eric H. Molson, from a financial and non-financial point of view. The Molson independent committee subsequently recommended that the Molson board of directors authorize the combination agreement and recommend to Molson shareholders that they vote in favor of the combination.

On July 21, 2004 at a special meeting of Molson's board of directors, held immediately after the meeting of the Molson independent committee, Molson's financial advisors, Citigroup and BMO Nesbitt Burns, each reviewed with the Molson board of directors its financial analysis of the 0.360 exchange ratio provided for in the merger transaction and each delivered a written opinion to the board of directors to the effect that, as of July 21, 2004 and based on and subject to the matters described in its opinion, the 0.360 exchange ratio was fair, from a financial point of view, to the holders of Molson shares. The chairman of the Molson independent committee also reported on the opinion received from Merrill Lynch, the Molson independent committee's financial advisor, on the recommendation of the Molson independent committee and on the reasons for its recommendation. After these presentations and further discussion, the Molson board of directors voted unanimously to authorize the execution of the combination agreement and other related agreements.

The combination agreement was thereafter executed on behalf of each of the companies, and the companies and their respective principal shareholders entered into the voting agreements contemplated by the merger transaction. The merger transaction was publicly announced on July 22, 2004.

On September 9, 2004, Molson and Coors agreed to make technical revisions to the forms of amended and restated certificate of incorporation and bylaws attached to this document as Exhibits G and H, respectively, and the Coors board of directors met by telephone to approve the final documents.

On October 14, 2004, Molson announced that the approval procedure relating to the merger transaction would be modified to address concerns raised by certain institutional shareholders. Under the modified terms, optionholders will vote at a separate optionholders meeting solely to approve the exchange of their options to purchase Molson Class A non-voting shares for options to purchase shares of Molson Coors Class B common stock as part of the plan of arrangement. Molson executive officers and board members, who together own more than 66⅔% of all outstanding options, have irrevocably undertaken to vote in favor of the Molson optionholders resolution.

Molson also announced that Mr. Daniel J. O'Neill agreed that he will not receive any payment upon completion of the merger transaction. Rather, in the event of his resignation or termination from Molson Coors within 24 months of the merger transaction, Mr. O'Neill will be entitled to his change of control payment in lieu of a severance payment. In addition, Mr. Robert Coallier agreed to receive a change of control payment in lieu of a severance payment only upon his resignation or termination. Mr. O'Neill has also recommended, and the board of directors of Molson has agreed, that his performance-based options and restricted share units be converted into Molson Coors options and restricted share units, respectively, and be subject to similar performance-related triggers.

On October 27, 2004, the board of directors of Coors met to discuss whether Coors would agree to permit Molson to provide the Molson shareholders with a special dividend in connection with the merger transaction. At that Coors board meeting, the Coors board delegated responsibility to a committee of the board to approve the final terms of amendments to the combination agreement and transaction documents to permit a special dividend. On November 4, 2004, the committee approved the amendments to permit a special dividend to be paid by Molson to its shareholders of record at the close of business on the last trading day immediately prior to the closing of the merger transaction in the amount of Cdn.$3.00 per share (a total of approximately Cdn.$381 million (U.S.$316 million)) and

to limit the vote of optionholders to the exchange of their options for options to purchase shares of Molson Coors Class B common stock. On that same date, Deutsche Bank delivered its oral opinion to the special committee of the Coors board of directors, subsequently confirmed in a written opinion addressed to the Coors board of directors dated as of the same date, to the effect that, as of that date, based upon and subject to the assumptions made, matters considered and limits of the review undertaken by Deutsche Bank, the exchange ratio was fair, from a financial point of view, to holders of the Coors Class A common stock and holders of the Coors Class B common stock.

On November 4, 2004, at a meeting of the Molson board of directors, senior management of Molson reported to the board of directors that Coors agreed to the payment of a special dividend to Molson shareholders in connection with the plan of arrangement. At this meeting, Eric H. Molson, who indirectly controls Pentland, reported to the board of directors that Pentland would waive participation in a special dividend paid to Molson shareholders. On this basis, and after further discussion, the Molson board of directors agreed to the payment of the special dividend of Cdn.$3.26 per share, or a total of approximately Cdn.$381 million (U.S.$316 million), in connection with the plan of arrangement. Had Pentland not agreed to waive its participation in the special dividend, the special dividend to be declared would have been Cdn.$3.00 per share instead of Cdn.$3.26 per share. On November 5, 2004, Molson and Coors announced that they had agreed to include a special dividend to Molson shareholders as part of the merger transaction.

On November 10, 2004, the Molson independent committee met to consider the proposed transaction taking into account recent events, including the announcement of the special dividend. At the meeting, the independent committee discussed the terms and conditions of an amendment to the combination agreement which incorporated, among other things, provisions relating to the special dividend to Molson shareholders. The independent committee also requested that Merrill Lynch confirm its opinion dated July 21, 2004 in light of the special dividend. Merrill Lynch reviewed with the Molson independent committee its updated financial analysis of the 0.360 exchange ratio provided for in the merger transaction and delivered to the independent committee an oral opinion, which was subsequently confirmed in writing, to the effect that, as of November 10, 2004, based upon, and subject to, the assumptions made, matters considered and limits of the review undertaken by Merrill Lynch, the 0.360 exchange ratio in the merger transaction was fair, from a financial point of view, to the holders of Molson shares other than Pentland and Eric H. Molson. After discussion, the Molson independent committee recommended that the Molson board of directors authorize amendments to the combination agreement incorporating, among other things, provisions relating to the special dividend to Molson shareholders and reaffirmed its recommendation that the Molson board of directors recommend to Molson shareholders that they vote in favor of the combination.

On November 11, 2004, the board of directors of Coors approved certain amendments to the Coors charter, which amendments were technical in nature.

On November 11, 2004, Molson's board of directors met to consider the amendment to the combination agreement. In light of the special dividend to Molson shareholders provided for in the amendment, updated opinions, confirming their earlier opinions dated July 21, 2004, were requested from each of Citigroup and BMO Nesbitt Burns. In connection with this meeting, each of Citigroup and BMO Nesbitt Burns delivered a written opinion dated November 11, 2004 to the board of directors to the effect that, as of that date and based on the subject matters described in its opinion, the 0.360 exchange ratio was fair, from a financial point of view, to the holders of Molson shares. The chairman of the Molson independent committee also reported on the updated opinion received from Merrill Lynch, the Molson independent committee's financial advisor, and on the recommendation of the Molson independent committee and the reasons for its recommendation. After discussion, the Molson board of directors voted unanimously to authorize the execution of the amendment to the combination agreement and recommended that the Molson shareholders vote in favor of the Molson shareholders

resolution and that the Molson optionholders vote in favor of the Molson optionholders resolution. The parties executed the first amendment to the combination agreement and related amendments.

**Our Reasons for the Merger Transaction**

Our boards of directors believe that the trend of consolidation in the international brewery industry will continue in the future and that scale and ability to operate internationally will be increasingly essential to compete effectively. We have summarized below the key benefits identified by both of our boards of directors during their individual evaluations of the merger transaction. Because both of our boards considered and reached the same conclusions on the common benefits of the merger transaction described below, we have presented this information in a single section that reflects the views of each of our boards.

*Strategic Benefits*

- *Economies of Scale and Global Reach.* The merger transaction will create one of the world's largest brewers with the operational scale and global diversity necessary to compete more effectively in today's consolidating market. On a pro forma basis, the combined entity will be the fifth largest brewing company in the world in terms of annual volume, with pro forma combined annual beer sales of approximately 60 million hectoliters, or 51 million barrels, for the year ended December 28, 2003 and pro forma sales for the same period of approximately U.S.$6 billion.

- *Leading Brands.* The merger transaction will result in a stronger combined product portfolio with more than 40 brands, including leading brands in Canada and the United Kingdom, the third-ranked brands in the United States and Brazil and the seventh-ranked brand worldwide.

- *Geographic Diversification.* The merger transaction will create a company with strong brands in a number of important global markets, including the United States, Canada, the United Kingdom and Brazil, as well as distribution arrangements with brewers in a number of additional key markets. This geographic presence ensures that the combined company's revenue sources are diversified, thereby reducing volatility of earnings and improving the combined company's ability to compete effectively with major multinational competitors.

- *History and Corporate Culture.* The merger transaction builds on the strategic and cultural fit between the two companies. Both companies have rich and lengthy heritages as family controlled breweries and share common values and operating philosophies.

- *Existing Relationship.* The two companies have an existing strong working relationship in Canada and the United States, jointly marketing and selling Coors Light in Canada and Molson products in the United States. We believe the merger will cement these working relationships and lead to streamlined, more efficient cooperation in these markets.

*Expected Financial Synergies*

- *Cost Savings.* We expect the merger transaction to deliver immediate tangible benefits to shareholders through substantial synergies, including estimated annual cost savings resulting from the merger of approximately U.S.$50 million in the first year after the merger transaction, an incremental U.S.$40 million in the second year after the merger transaction (for a total savings of U.S.$90 million in the second year), and an incremental U.S.$85 million in the third year after the merger transaction (for a total savings of U.S.$175 million in the third year). By the

fourth year after the merger transaction, the total annual cost savings of U.S.$175 million are expected to be derived from the following areas:

- U.S.$60 million from optimization and consolidation of the combined company's brewery and distribution network,
- U.S.$65 million from improved procurement terms resulting from greater economies of scale,
- U.S.$25 million from elimination of duplicative overhead functions (we do not expect to have duplicative functions at our dual headquarters), and
- U.S.$25 million from integration of the companies' technology platform and other synergies.

- *Growth Opportunities*. While the two companies' U.S.$175 million forecasted synergies do not include any assumptions for incremental profit derived from revenue growth or market share gains, we believe that the enhanced financial strength expected to result from the anticipated cost savings will provide the combined company with the opportunity to grow revenue through added investments in marketing and other support for key markets.

- *Additional Opportunities*. We anticipate that the merger transaction will build an enhanced growth platform, balance sheet and cash flow to fund future investment, including continued participation in brewing industry consolidation. In addition, the combined company will be able to make renewed investments in product innovations and disciplined capital improvements to drive productivity.

**Factors Considered by the Molson Independent Committee**

On July 21, 2004, Molson's independent committee, after an extensive review and thorough discussion of all facts and issues it considered relevant with respect to the proposed merger transaction, concluded unanimously that the proposed merger transaction is fair to, and in the best interests of, the shareholders of Molson, other than Pentland and Eric H. Molson, from a financial and non-financial point of view. The Molson independent committee subsequently proposed that Molson's full board of directors authorize Molson to enter into the proposed combination agreement and recommend to shareholders of Molson that they vote in favor of the Molson shareholders resolution. On November 10, 2004, the Molson independent committee reaffirmed the conclusions reached on July 21, 2004 as well as the recommendations to Molson's full board of directors regarding the proposed combination agreement, as amended, and the Molson shareholders special resolution.

In reaching their conclusion and making their recommendation, the members of the Molson independent committee relied on their personal knowledge of Molson and the industry in which it is involved and on the advice of its legal and financial advisors. The Molson independent committee also reviewed the information provided by Molson and its advisors. The Molson independent committee considered numerous factors to be in favor of the merger, including among other things, the following:

- the fairness opinions provided by Merrill Lynch on July 21, 2004 and November 10, 2004 to the effect that, as of the dates of and based upon the assumptions made, matters considered and limits of review set forth in the opinions, the 0.360 exchange ratio in the merger transaction was fair, from a financial point of view, to the holders of Molson shares other than Pentland and Eric H. Molson;

- the current economic, industry and market trends affecting each of Molson and Coors in their respective markets, including those which favor the concentration of business in the hands of a small number of large companies;

80