# EXHIBIT 3, Part 2

- the fact that Molson is controlled by a family group and has a dual class of voting and non-voting securities, and that the governance arrangements and shareholder voting structure of the combined company are in the aggregate no less favorable to the holders of Class A non-voting shares of Molson than those currently in place;

- the statements by Eric H. Molson to the effect that he and Pentland were supportive of the merger transaction and were committed to remaining involved as shareholders of a significant participant in the global brewing industry, and that neither Mr. Molson nor Pentland were considering selling their interests in Molson;

- the fact that, in connection with the proposed merger, holders of Class A non-voting shares of Molson and Class B common shares of Molson, excluding Pentland, who hold their shares of record on the last trading day prior to the closing date of the proposed merger will receive a special dividend of Cdn.$3.26 per share, and that Pentland has agreed to waive any participation in the special dividend. Had Pentland not agreed to waive participation in the special dividend, the special dividend to be declared would have been Cdn.$3.00 per share instead of Cdn.$3.26;

- the fact that management responsibilities within the combined company would be allocated among an experienced management team selected from Molson and Coors management and that senior members of Molson management would have a continuing role within the combined company;

- the fact that the all-share consideration offered in connection with the transaction provides Molson's shareholders with an opportunity to participate in the ownership of a larger, financially stronger company that is expected to be better positioned to respond to opportunities and developments in an industry in which size is increasingly important;

- the fact that the combined company would be geographically diversified as it would have significant businesses in Canada, the United States, Brazil and the United Kingdom, making it a stronger entity than Molson individually;

- the fact that the merger transaction secures the current commercial relationship between Molson and Coors and that Coors would have the ability to terminate that relationship in the event of a change of control of Molson;

- the significant opportunities for the combined company to realize the estimated annual cost savings resulting from the merger of approximately U.S.$50 million and $90 million, respectively, in the first two years following the merger and U.S.$175 million in annual cost savings thereafter;

- the ability of the shareholders of Molson to continue to participate in future earnings and growth of the combined company after completion of the merger transaction through their ownership of shares of the combined company's stock or exchangeable shares of Molson Coors Exchangeco;

- the structure of the merger transaction, which effectively permits Molson shareholders who are Canadian residents to elect to receive exchangeable shares and make a valid tax election to defer Canadian income tax at the time of the merger transaction;

- the fact that Molson could in certain circumstances enter into discussions with third parties regarding alternative transaction proposals and terminate the combination agreement in order to enter into a transaction with a third party on terms more favorable to Molson shareholders, other than Pentland and Eric H. Molson, upon the payment to Coors of a termination fee of U.S.$75,000,000;

- the various incentive and benefits plans currently available to the employees of each company and the fact that the merger transaction is not expected to materially adversely impact the terms and conditions of those plans;

- the current and historical trading prices of Molson shares; and

- the approval process for the merger transaction, including the requirement for the approval of holders of 66⅔% of each of the Class A non-voting shares of Molson and the Class B common shares of Molson, voting as separate classes, and the requirement for the Superior Court of Québec to approve the merger transaction and to issue a final order concerning its approval.

The Molson independent committee also considered a variety of risks and other potentially negative factors concerning the merger, including the following:

- the proposed governance arrangements of the combined company, which would provide that voting control would be shared by Pentland and the Coors Trust, and the associated risks of a stalemate between them;

- the risk that the estimated cost savings will not be achieved;

- the fact that, in a merger of equals, the exchange ratio would not provide shareholders of Molson with a premium to the current market price of Molson's shares; and

- the fact that the merger transaction would constitute a taxable event for U.S. federal income tax purposes for U.S. resident shareholders of Molson.

This discussion of the information and factors considered by the Molson independent committee is not intended to be exhaustive but addresses the major information and factors considered by the Molson independent committee in its consideration of the merger transaction. In reaching its conclusion, the Molson independent committee did not find it practical to assign, and did not assign, any relative or specific weight to the different factors that were considered, and individual members of the Molson independent committee may have given different weight to different factors.

**Opinions of Molson's Financial Advisors**

*Citigroup Opinion*

Citigroup has been retained by Molson to act as one of its financial advisors in connection with the merger transaction. In connection with this engagement, Molson requested that Citigroup evaluate the fairness, from a financial point of view, of the 0.360 exchange ratio provided for in the merger transaction. On July 21, 2004, at a meeting of the Molson board of directors held to evaluate the proposed merger transaction, Citigroup delivered to the Molson board of directors a written opinion dated July 21, 2004 to the effect that, as of that date and based on and subject to the matters described in its opinion, the 0.360 exchange ratio was fair, from a financial point of view, to the holders of Molson shares. On November 11, 2004, in connection with the execution of the amendment to the combination agreement, Citigroup confirmed its opinion dated July 21, 2004 by delivery of a written opinion dated November 11, 2004.

*The full text of Citigroup's written opinion dated November 11, 2004, which describes the assumptions made, procedures followed, matters considered and limitations on the review undertaken, is attached to this document as Annex M and is incorporated into this document by reference. Citigroup's opinion was provided to the Molson board of directors in connection with its evaluation of the 0.360 exchange ratio and relates only to the fairness of the 0.360 exchange ratio from a financial point of view, does not address any other aspect of the merger transaction and does not constitute a recommendation to any securityholder as to the shares of Molson Coors or Molson Coors Exchangeco a securityholder should elect to receive or how a securityholder should vote or act on any other matters relating to the proposed merger transaction.*

date of its opinion. Merrill Lynch assumed that in the course of obtaining the necessary regulatory or other consents or approvals (contractual or otherwise) for, or in connection with, the merger transaction, no restrictions, including any divestiture requirements or amendments or modifications, would be imposed that would have a material adverse effect on the contemplated benefits of the merger transaction, including the expected synergies.

In connection with the preparation of its opinion, Merrill Lynch was not authorized by Molson, its board of directors or the Molson independent committee to solicit, nor did Merrill Lynch solicit, any third-party indications of interest for the acquisition of all or any part of Molson.

In addition, Merrill Lynch was not asked to address, and Merrill Lynch's opinion did not address, the fairness to, or any other consideration of, the holders of any class of securities, creditors or other constituencies of Molson, other than the holders of Molson Class A non-voting shares and Class B common shares (other than Pentland and Eric H. Molson). Merrill Lynch did not express any opinion as to the prices at which Molson Class A non-voting shares and Class B common shares or Coors Class A common stock and Class B common stock will trade following announcement or completion of the merger transaction. In addition, Merrill Lynch's opinion does not address the tax consequences of the merger transaction to the holders of Molson Class A non-voting shares and Class B common shares.

Merrill Lynch acted as financial advisor to the Molson independent committee in connection with the merger transaction and will receive fees from Molson for its services, which fees are not contingent on completion of the merger transaction. In addition, Molson has agreed to reimburse Merrill Lynch for its reasonable out-of-pocket expenses incurred in connection with the engagement (including the reasonable fees and disbursements of legal counsel) and to indemnify Merrill Lynch for liabilities arising out of its engagement. Merrill Lynch has, in the past, provided financial advisory and financing services to Molson and Coors and their respective affiliates and may continue to do so and has received, and may receive, fees for the rendering of those services. In addition, in the ordinary course of its business, Merrill Lynch may actively trade Molson shares and other securities of Molson, as well as Coors common stock and other securities of Coors, for its own account and for the accounts of customers and, accordingly, may at any time hold a long or short position in those securities.

### Interests of Molson's Directors and Management in the Merger Transaction

#### *Change of Control Payments*

Under certain circumstances, Daniel J. O'Neill, president and chief executive officer of Molson, under the terms of his February 22, 1999 employment agreement, would become entitled to 36 months of salary (Cdn.$1,000,000 per year) as a result of the merger transaction. In the interest of facilitating the timely approval and success of the merger transaction, Mr. O'Neill has voluntarily agreed that he will not receive this payment upon completion of the merger transaction. Rather, in the event of his resignation or termination from Molson Coors within 24 months of the merger transaction, Mr. O'Neill will be entitled to receive this payment in lieu of a severance payment. Mr. O'Neill has also recommended, and the board of directors of Molson has agreed, that his performance-based options and restricted share units be converted into Molson Coors options and restricted share units, respectively, and be subject to similar performance-related triggers. The other terms of Mr. O'Neill's employment agreement will remain unchanged when he assumes his role as vice-chairman, synergies and integration of Molson Coors.

In the event of a change of control, which will occur as a result of the merger transaction, Molson is obligated to pay Robert Coallier 18 months of salary, annual bonus, benefits and pension accrual. In the interest of facilitating the timely approval and success of the merger transaction, Mr. Coallier has agreed to waive his right to receive this payment upon completion of the merger transaction. Rather,

Mr. Coallier will only be entitled to this payment upon his resignation or termination in lieu of a severance payment.

### Retention Program

Molson has put in place an employee retention program under which 37 employees will receive in early 2005 cash payments of Cdn.$1.98 million in the aggregate. No single cash payment to any employee is material.

### Treatment of Options

If you hold exercisable Molson options and wish to exercise them to acquire Molson Class A non-voting shares in order to receive exchangeable shares and/or Molson Coors common stock and the special dividend payable to Molson shareholders in connection with the plan of arrangement, then prior to 4:00 p.m. (Montréal time) on the second trading day immediately prior to the date of closing of the merger transaction you should exercise your options through your Solium E-SOAP account at *www.solium.com* or by telephone at the following toll-free number: 877-380-7793. Upon completion of the merger transaction, all Molson options, other than Mr. O'Neill's performance-based options, will vest and will be exercisable at the option of the holders.

### Board and Management Arrangements

As described under "Governance and Management of Molson Coors" beginning on page 123, the combination agreement and related documents provide for arrangements regarding the composition of Molson Coors' board of directors and senior management. Those arrangements provide that some of the current directors and officers of Molson will have director and/or management positions with Molson Coors.

### Indemnification and Insurance

The combination agreement provides that Molson Coors will:

- honor all indemnification agreements between Molson and its directors and officers in effect prior to the completion of the merger transaction;

- honor all indemnification provisions in the certificate of incorporation and bylaws of Molson and not amend in an adverse manner any of those provisions for six years following completion on the merger transaction; and

- maintain in effect, if available, directors' and officers' liability insurance covering persons currently covered under Molson's policy with respect to events arising prior to the completion of the merger transaction on terms comparable to those applicable to the current directors and officers of Molson.

### Indemnity with Respect to Special Dividend

Molson has agreed to indemnify, and Molson and Coors have agreed that Molson Coors will indemnify, Pentland and its subsidiaries with respect to certain U.S. or Canadian tax liabilities, if any, and related costs and expenses that Pentland and its subsidiaries may incur as a result, in connection with or attributable to a waiver of participation in the special dividend.

## Factors Considered by Coors' Board of Directors and Special Committee

In reaching its decision to recommend the Coors share issuance and Coors charter amendments, and in reaching its decision to approve the merger transaction and related transactions, the Coors

supplemented by an addendum dated June 17, 2004, we refer to as the engagement letter. Deutsche Bank will be paid a fee for its services as financial advisor to Coors in connection with the merger transaction, a substantial portion of which is contingent upon completion of the merger transaction. Deutsche Bank was paid $1,500,000 for its services as a result of the execution of the combination agreement. If the merger transaction closes, an additional fee will be payable to Deutsche Bank consisting of $7 million. A portion of this fee will be paid by Molson Coors Exchangeco in the form of preferred shares of Molson Coors Exchangeco in consideration for services provided by Deutsche Bank to Molson Coors Exchangeco. If the merger transaction closes and, in the sole discretion of Coors, Deutsche Bank has performed an appropriate portion of additional services specified in the addendum, Deutsche Bank shall be paid an additional cash fee equal to, at the discretion of Coors, $1.5 million to $5.5 million. The additional services specified in the addendum, which Deutsche Bank has performed to the extent so requested, consist of rendering financial advisory services as reasonably requested by Coors to successfully execute the merger transaction, including rendering financial advisory services in connection with seeking shareholder or other approvals of the merger transaction, and advising and/or assisting Coors (i) in developing and implementing a general strategy for accomplishing the merger transaction, (ii) in the course of its negotiation of the merger transaction and participating in such negotiations as requested, (iii) in determining the optimal structure for the merger transaction and domicile of the combined entity, (iv) on the positioning of the new enterprise with investors and communication of the key elements of the merger transaction to the capital markets, including advice on investor reaction, (v) on the desirability and general strategy of effecting any asset disposals or divestitures following the consummation of the merger transaction, and (vi) in the preparation of documents related to the merger transaction, including the combination agreement and this joint proxy statement/management information circular.

Deutsche Bank is an affiliate of Deutsche Bank AG, which together with its affiliates we refer to as the DB Group. Deutsche Bank is an internationally recognized investment banking firm experienced in providing advice in connection with mergers and acquisitions and related transactions. One or more members of the DB Group have, from time to time, provided investment banking, commercial banking (including extension of credit) and other financial services to Coors and Molson or their affiliates for which it has received compensation, including Coors' June 2003 U.S.$500 million commercial paper program for which a member of the DB Group acted as co-dealer. In the ordinary course of business, members of the DB Group may actively trade in the securities and other instruments and obligations of Coors and Molson for their own accounts and for the accounts of their customers. Accordingly, the DB Group may at any time hold a long or short position in those securities, instruments and obligations.

**Interests of Coors' Directors and Management in the Merger Transaction**

You should be aware that members of the management and board of directors of Coors have interests in the merger transaction that may be in addition to or different from the interests of Coors stockholders generally, which will present them with actual or potential conflicts of interest. These interests include the following:

*Rights on Change of Control*

In June 2002, Coors entered into agreements with its executive officers, including each of the Coors named executive officers listed in "Information Concerning Coors—Executive Compensation" beginning on page 277 other than Messrs. Gannon and Swinburn, and other members of management relating to employment upon a change of control of Coors. The terms of these agreements provide that there is a change of control of Coors at a time when either (a) the Coors Trust ceases to have voting control of Coors and another party acquires more than 20% of voting power of Coors or (b) the current members of Coors' board of directors (and successors nominated by them) cease to constitute a majority of Coors' board of directors. Both of these events will occur as part of the merger transaction.

The change of control agreements provide for continued employment for a period of two years following a change of control on terms which, in general, maintain the officer's compensation and duties and responsibilities at levels not less favorable than those in effect before the change in control. In addition, the officer will be entitled to specified compensation if triggering events set forth in the agreement were to occur. These events include direct or constructive termination without cause, resignation for good reason or resignation by the officer during a 30-day period beginning one year after the change of control. Upon a triggering event, the officer would be paid a multiple of the officer's annual salary and bonus and would receive continued health, pension, life insurance and other benefits. The agreement also provides the value received upon stock option exercises would be subject to a floor based on the value equal to the price of Coors' stock on the date of a change of control. For each of Coors' chairman and chief executive officer, the compensation would equal three times annual salary and bonus, plus the equivalent of three years continued benefits coverage, plus three years additional service credit toward pension benefits. All other officers who are party to these agreements would receive two times annual salary and bonus, plus two years continued benefits coverage, plus vesting and credit for two years additional service toward pension benefits.

In addition, under Coors' Equity Incentive Plan, all stock options granted under the plan vest upon a change in control, which will occur upon completion of the merger transaction.

The severance compensation (based upon the above multiples of salary and bonus, continued benefits and pension service credit) that would be payable to the five named executive officers, W. Leo Kiely, Peter H. Coors, Timothy V. Wolf, Peter M.R. Kendall, and Robert M. Reese, and the other seven Coors executive officers, assuming involuntary termination of employment after the merger transaction would be $5,943,786, $6,190,881, $2,200,388, $1,871,498, $1,673,722 and $4,384,774, respectively. As described more fully under "Governance and Management of Molson Coors—Officers of Molson Coors" beginning on page 132, except as noted below, we anticipate that each of the above named executive officers and the other seven executive officers will remain with Molson Coors following the merger transaction. Although Mr. Coors will remain a director of Molson Coors following the merger transaction, his employment as a full-time executive will terminate at the time the merger transaction is closed, and he will be entitled to receive the severance benefit under his agreement at that time.

*Board and Management Arrangements*

As described under "Governance and Management of Molson Coors" beginning on page 123, the combination agreement and related documents provide for arrangements regarding the composition of Molson Coors' board of directors and senior management. Those arrangements provide that some of the current directors and officers of Coors will have director and/or management positions with Molson Coors.

**Court Approval of the Arrangement and Completion of the Merger Transaction**

Under the CBCA, the arrangement requires court approval. Prior to the mailing of this document, Molson obtained an interim order from the Superior Court, District of Montréal, Province of Québec, providing for the calling and holding of the Molson special meeting, the Molson optionholders meeting and other procedural matters. A copy of each of the interim order and the notice of application for a final order is attached as Annex C.

Subject to the approval of the Molson shareholders resolution by the Molson shareholders at the Molson special meeting and the approval of the Coors share issuance and Coors charter amendments by the Coors stockholders at the Coors special meeting, the hearing in respect of a final order is expected to take place on or about, January 21, 2005 at 9:30 a.m. (Montréal time) in room 16.10 at the Montréal courthouse at 1 Notre Dame Street East, Montréal, Québec.

## Amendments to Coors' Certificate of Incorporation

This section of the document describes the material differences between the proposed restated certificate of incorporation of Molson Coors to become effective upon completion of the merger transaction and the current certificate of incorporation of Coors but does not purport to describe all of the differences between, or terms of, those documents. You should read the complete text of the proposed restated certificate of incorporation of Molson Coors, which is attached as Annex G to this document and incorporated into this document by reference in conjunction with the following summary.

The combination agreement requires that Coors amend and restate its certificate of incorporation at the completion of the merger transaction in the form attached to this document as Annex G. The amendments to Coors' certificate of incorporation that will be reflected in the restated certificate of incorporation of Molson Coors to be adopted upon completion of the merger transaction are summarized below.

### Number of Shares of Authorized Capital Stock

An amendment is proposed to the existing Coors certificate of incorporation to increase the number of authorized shares of Molson Coors Class A common stock and Class B common stock to 500,000,000 for each class from 1,260,000 shares of Class A common stock and 200,000,000 shares of Class B common stock. The changes in the number of authorized Class A and Class B shares are necessary to accommodate the number of shares being issued in the merger transaction (including shares reserved for stock options held by Molson optionholders) or to be issued upon the exchange of exchangeable shares, a desire for flexibility for necessary corporate actions (including any stock splits in the future based on market conditions) and the fact that each class is convertible into the other class under specified circumstances, as described below under "—Conversion of Class A Common Stock" and "—Conversion of Class B Common Stock."

### Voting Rights to Elect Directors

An amendment is proposed to the existing Coors certificate of incorporation to provide that holders of the Class B common stock and the special Class B voting stock (acting upon the instructions of the holders of Class B exchangeable shares), voting together as a class, will be entitled to elect three members of the Molson Coors board of directors while the Class A common stock and the special Class A voting stock (acting upon the instructions of the holders of Class A exchangeable shares), voting together as a class, will elect the remaining directors. The existing Coors certificate of incorporation provides that the holders of Class A common stock elect all of the directors.

### Dividends

It is proposed that the existing Coors certificate of incorporation be amended to provide that no dividend may be declared or paid on the Class A common stock or Class B common stock unless an equal dividend is declared or paid on the Class B common stock or Class A common stock, as applicable. The existing certificate of incorporation of Coors provided that no dividend may be declared or paid on the Class A common stock unless an equal dividend is declared or paid on the Class B common stock. This provision reflects the intent of the parties that the holders of each class of common stock will receive the same dividends and that holders of the exchangeable shares will receive the economic equivalent of those dividends through their ownership of exchangeable shares but no additional dividends by virtue of the special voting shares.

### Stockholder Voting Rights

The authority of holders of Class A common stock and special Class A voting stock (acting upon the instructions of the holders of Class A exchangeable shares), voting together as a class, to vote on

## Information Concerning Molson

*Unless otherwise indicated, all dollar amounts used under this "Information Concerning Molson" are expressed in Canadian dollars.*

### Business of Molson

Molson is Canada's largest brewer and one of the world's leading brewers of quality beer, ranking fourteenth in the world as measured by volume in fiscal 2004, with operations in Canada, Brazil and the United States. A global brewer with $3.5 billion in gross annual sales, Molson traces its roots back to 1786, making it North America's oldest beer company. Committed to brewing excellence, Molson combines the finest ingredients with the highest standards of quality to produce an award-winning portfolio of beers including Molson Canadian®, Molson Export™, Molson Dry®, Rickard's™, A Marca Bavaria™, Kaiser® and Bavaria®. Molson brews, distributes and sells the Coors Light® brand in Canada under agreements with Coors.

#### Molson Corporate Group

Molson and its wholly-owned subsidiary, Carling O'Keefe Breweries of Canada Limited, collectively have a 100% interest in Molson Canada and a 49.9% interest in Coors Canada both of which are Ontario general partnerships. In addition, Molson indirectly owns an 80% interest in Cervejarias Kaiser Brasil S.A., which is incorporated under the laws of Brazil, and a 50.1% interest in Molson USA, LLC, which is incorporated in Delaware in the United States.

##### *Molson Canada*

Molson's brewing operations are carried on in Canada through Molson Canada, an Ontario general partnership that is owned by Molson and Carling O'Keefe Breweries of Canada Limited, a wholly-owned subsidiary.

Molson Canada also has an exclusive license to brew Foster's Lager® in Canada for sale in Canada and the United States, and to brew Foster's Special Bitter® in Canada for sale in the United States. Molson Canada has the right to produce Asahi® for the United States market and also brews Molson's trademark products in Canada for sale in the United States.

On April 14, 2004, Molson announced a reorganizational change at Molson Canada, giving priority to strengthening the national core brands and adding emphasis to the development of key markets across the country. The new organization is headed by Kevin Boyce, the newly appointed president and chief operating officer of Molson North America, Les Hine, chief marketing officer, and David Perkins, president market development North America.

##### *Coors Canada*

Coors Canada, an Ontario partnership, is owned 50.1% by Molson Coors Exchangeco and 49.9% by Molson. Coors Canada is responsible for the management of the Coors brands in Canada. Under agreements between Molson and Coors, Molson is authorized to brew, distribute and sell Coors brands in Canada and currently brews, distributes and sells the Coors Light® brand. In fiscal 2001, the partnership and licensing agreements between Molson and Coors were extended for an indefinite period and included the addition of Molson performance standards for the Coors brand. These agreements enabled Molson to test and, if successful, to launch light beers in Canada. During fiscal 2004, sales volumes of Coors Light® and Coors Canada earnings achieved strong growth despite an aggressive competitive environment.

*Cervejarias Kaiser Brasil S.A.*

On December 21, 2000, Molson entered the South American beer market with the purchase of 100% of the shares of Bavaria S.A., a Brazilian company, with assets that included the Bavaria brand and brewing facilities from Companhia de Bebidas das Américas ("AmBev").

On March 18, 2002, Molson purchased 100% of the shares of Cervejarias Kaiser Brasil S.A., the second largest brewer in Brazil, for U.S.$765 million which includes transaction costs and is net of cash acquired. The acquisition included the Kaiser brands and eight brewing facilities in Brazil. The acquisition was financed with U.S.$182 million in cash, U.S.$150 million in Molson Class A non voting shares (or 7,785,878 of these shares) and debt of approximately U.S.$395 million. As part of the transaction, Kaiser continues to have access to the Coca-Cola distribution system in Brazil. Responsibility for the distribution of the Bavaria brand, which was assumed by AmBev, was transferred to Kaiser. Following the Kaiser acquisition, Molson combined the Kaiser and Bavaria operations.

On April 17, 2002, Heineken N.V. acquired 20% of Molson's total operations in Brazil, including Bavaria, for a purchase price of U.S.$218.3 million. As part of the transaction, Molson and Heineken signed a new licensing agreement for the Heineken brands in Brazil and extended the Canadian distribution agreement of Heineken products for 10 years to 2012.

Molson's market share in Brazil increased from approximately 3.1% prior to the acquisition to approximately 14.6% as at March 31, 2003 with the Kaiser acquisition. Following significant investment in marketing and advertising by one of its competitors during fiscal 2004, Molson's market share in Brazil decreased to 12.4% as at March 31, 2004, making it the third largest brewer in Brazil.

At the end of the first quarter of fiscal 2004, following poor volume performance, Kaiser, in conjunction with the related Coca-Cola bottlers, undertook to implement a strategy to establish a beer-dedicated sales force in six regions in Brazil. The main purpose of this strategy was to improve sales execution while taking full advantage of the Coca-Cola distribution system. The six selling regions were established and all sales centers were fully operational at year-end of fiscal 2004, with more than 1,200 sales employees covering approximately 30% of Kaiser's total volume. In addition, as a result of a detailed review of consumer preferences and in response to competitors' activities, the Kaiser brand was re-launched in the fourth quarter of fiscal 2004 with a new beer recipe, new advertising and new packaging.

On June 15, 2004, Kaiser announced the appointment of Fernando Tigre as president and chief executive officer effective July 1, 2004. Robert Coallier, who held that position for the two prior years, took on the new position of executive vice president corporate strategy and international operations of Molson. Mr. Tigre has vast experience in turning around, growing and improving the results of companies he has managed. He joins Kaiser at a time when the competitive environment is intense and sales and market share growth are one of the biggest challenges facing the brewer. Kaiser looks to make gains in expanded numeric distribution and continue the revitalization of the key brands.

*Molson USA*

Molson USA is the dedicated business unit with responsibility for Molson brands in the United States and is established in Golden, Colorado. Molson USA markets and distributes Molson owned brands which include Canadian®, Canadian Light®, Molson Ice™ and Golden® in the United States. Under the partnership agreement, Coors provides certain sales, distribution and administrative services required by this organization.

While Molson trademark products are available throughout the United States, including Alaska and Hawaii, the majority of sales are concentrated in the eastern region of the United States. During fiscal 2004, Molson USA's first priority was to increase momentum on the Canadian® trademark while reducing the decline of the Golden® and Molson Ice™ brands. Molson USA also introduced Molson

XXX™ in fiscal 2004 at super premium pricing in select Northeast and Midwest markets. The Canadian® trademark grew its volume by 26% in fiscal 2004. Molson USA improved the alignment of its distributor network with Coors. It has approximately 545 distributors of which, as of June 2004, 451 were Coors distributors compared to 422 last year. Approximately 89% of Molson USA's current volume is now covered by its own dedicated sales force.

### Trends

A trend toward consolidation has been taking place in the global brewing industry in recent years in the international beer markets. This trend accelerated in fiscal 2004. The top 10 brewers, as of June 2004, have an estimated combined 62% share of global consumption versus 52% in March of 2003 and 43% in 1999. As consolidation continues, the top 10 brewers are likely to capture a greater share of the overall market.

We estimate that Molson currently ranks fourteenth in the global brewing industry (measured by volume) and Molson Coors will rank fifth when the merger transaction is completed, permitting it to compete more effectively in the international beer markets.

In the Canadian beer market, volumes have been gradually migrating from premium brands to super premium brands and value brands since fiscal 2001. In fiscal 2004, Molson also saw a growing price gap between premium brands and the value segment, especially in the provinces of Ontario and Alberta.

### Description of the Business

Molson, with five breweries in Canada and eight breweries in Brazil, brews, bottles, packages, markets and distributes over 75 owned or licensed brands of beer in Canada, Brazil and the United States, and exports to the United Kingdom, Australia and New Zealand.

#### *Canada*

The Canadian brewing industry is a mature market. It is characterized by aggressive competition for volume and market share from regional brewers, microbrewers and certain foreign brewers, as well as Molson's main domestic competitor. These competitive pressures require significant annual investment in marketing and selling activities.

There are three major beer segments based on price: super premium, which includes imports and represents 16% of total sales of the industry and 13% of total sales of Molson; premium, which includes the majority of domestic brands and the light subsegment and represents 65% of total sales of the industry and 68% of total sales of Molson; and the discount segment which represents 19% of total sales of the industry and 19% of total sales of Molson.

Total industry volume in Canada is sensitive to factors such as weather, changes in demographics and consumer preferences. Consumption of beer in Canada is also seasonal with approximately 40% of industry sales volume occurring during the four months from May to August. For the year ended March 31, 2004, estimated industry sales volume in Canada, including sales of imported beers, increased by approximately 2% to approximately 21.5 million hectoliters.

Imported beer volume in Canada increased by 42% over the past five years, achieving approximately 9% share of total industry volume during the year ended March 31, 2004. During this same timeframe, domestically produced volume remained fairly stable.

The domestic brewing industry is comprised principally of two major brewers whose combined market share is approximately 86% of beer sold in Canada. In comparison, the top three brewers in the United States represent approximately 79% of that market.

Foreign brands licensed for brewing and sale in Canada play a larger role domestically than direct imports. The three major U.S. brewers are among the foreign producers which license Canadian brewers, including Molson, to brew, market and distribute their brands in Canada.

The Ontario and Québec markets account for approximately 63% of the total beer market in Canada. The top ten brands in Canada account for approximately 56% of the packaged market in Canada in fiscal 2004, including Canadian® which remains a leading brand in English Canada with a market share of approximately 11%.

In order to eliminate excess capacity, Molson has closed a number of breweries since 1989, including the Barrie brewery which closed in September 2000, and the Regina brewery, which closed in July 2002. In Ontario, the distribution and retail system operated by Brewers Retail Inc. (of which Molson is a shareholder) is pursuing opportunities to modernize the retail business to enhance industry sales, while seeking increased efficiencies in the wholesale operation.

As part of Molson's efforts to increase efficiencies, two significant cost savings initiatives have been launched in Canada since fiscal 2000.

The first was announced in September 1999, following a comprehensive benchmarking assessment of Molson's financial and administrative processes against 85 other companies. The objective of this $100 million cost savings program, increased to $150 million in March 2002, involved the areas of capacity utilization, procurement, distribution, organization and marketing. This three-year program was completed by the end of fiscal 2003 and exceeded its target by delivering $152 million in savings.

The second cost savings program, with $100 million in additional savings expected over the fiscal 2004 to 2006 timeframe, was announced in March 2002 and increased to $125 million in March, 2003. This further initiative is expected to deliver cost savings benchmarked against major breweries in four areas: production, procurement, distribution and organizational effectiveness.

The production module, with approximately $38 million in expected savings during the period of fiscal 2004 to fiscal 2006, covers brewing, packaging, shrinkage, warehousing, maintenance practices and utilities. In order to achieve these efficiencies, this module has undertaken a project designated as a "Renaissance in Brewing" to modernize Molson's production equipment and processes. In fiscal 2003, Molson modernized its Vancouver can line which is now operating at its targeted levels. A new packing line in Toronto was also completed and put into operation in the fourth quarter of fiscal 2003. During fiscal 2005, the bottling line in Edmonton is planned to be modernized followed by an additional line in Toronto in fiscal 2006. In Montréal and St. John's, upgrades were completed in brewing and utilities in collaboration with the union.

The procurement module, with approximately $35 million in expected savings, builds on the strategies and initiatives begun in the original cost savings project and continues to move Molson towards strategic sourcing of materials and services. Molson also expects to capitalize on its growing global profile through synergies between its Canadian and Brazilian operations. Supply agreements with global partners will benefit from Molson's North-American and South-American businesses' affecting high and low seasons by maximizing the total supply chain's capacity utilization.

The distribution module, with approximately $40 million in expected savings, covers Molson's warehouse and distribution network across Canada. As part of this module, Molson announced, on March 24, 2003, the opening of a new major distribution center in Montréal and the commensurate downsizing of its regional warehouse network in the Province of Québec.

The organizational effectiveness module covers the implementation of the SAP system which will allow Molson to improve its business processes and significantly reduce its costs of business. The SAP system implementation was announced in April 2001 and when fully implemented, will provide immediate integrated data regarding company activities, allowing for more informed decision-making.

Phase 1 of the implementation, completed in April 2002, addressed financial processes and gave employees access to a new Business Data Warehouse. Phase 2 addresses the following functional areas: supply chain, planning module and sales and distribution business processes. Phase 2 was implemented in the Montréal and St. John's plants in fiscal 2004 and will be implemented in the Edmonton, Vancouver and Toronto plants in a sequential roll-out during fiscal 2005.

Additional cost-saving opportunities are generated by a team of senior executives responsible for the identification and development of new savings initiatives.

Molson and the majority of Canadian brewers make use of a common returnable bottle in Canada, which Molson believes is financially advantageous to all brewers, resulting in environmental benefits and significantly lower distribution, warehousing and sorting costs.

### Brazil

Brazil with its approximate consumption of 82.2 million hectoliters of beer annually is the world's fourth largest beer market, about four times the size of the Canadian market. The Brazilian beer market is highly concentrated with one major competitor holding over 66% of the market and features a growing young adult market. The per capita consumption of beer in Brazil was approximately 47 liters in 2003. With a volume of approximately 10 million hectoliters of annual beer production in fiscal 2004, Molson is the third largest brewer in Brazil. Approximately 60% of Kaiser's sales are concentrated in Brazil's southern region and in its south-eastern region (São Paulo).

Kaiser and the majority of Brazilian brewers make use of a common returnable bottle in Brazil, which Molson believes is financially advantageous to all brewers, resulting in environmental benefits and significantly lower distribution, warehousing and sorting costs.

### United States

In the United States, Molson markets its brands in the import segment which represents over 11% of the total U.S. beer market. The import segment in the United States grew approximately 2% in 2003 and is the largest import market in the world. Distributors play an important role in the growth of the Molson brands in individual regions. As a result, in fiscal 2004, Molson continued to align itself selectively with local market distributors committed to and focused on the growth of the Molson brands.

### Brands

Molson markets a wide range of brands in its different markets designed to appeal to a variety of consumer preferences.

### Canada

### Molson Owned Brands

Molson's major owned brands in Canada are Canadian®, Export™, Molson Dry®, Rickard's™, Molson Ultra and Carling Black Label. Molson took a number of initiatives over the last four years with respect to these brands, including advertising campaigns for both Canadian® and Export™ and a re-launch of Rickard's Red™ together with the line extensions, Rickard's Honey Brown™ and Rickard's India Pale Ale™ and the launch in March 2003 of A Marca Bavaria™, a Brazilian import.

Canadian® is a classic lager which is slowly fermented to produce a clear, crisp and refreshing beer with a genuine taste. It has long been a leading brand in English Canada. In fiscal 2004, the brand continued to be supported by advertising which emphasized the quality of the brand and built on the

185

to previous year levels. The overall region's market share declined 2.4 share points from 44.9% to 42.5%. The Ontario and Alberta markets continue to experience strong competitor discount activity and continues to expand supported by regional brewers and beer companies which benefit from preferential tax rates. Molson is undertaking significant actions to address this growing segment. In Ontario, Molson has introduced Bohemian to compete with deep discount brands and stem the softening of the market share due to the growth of the value segment. In addition, there continues to be strong momentum and consumer response to the launch of Canadian Cold Shots® and re-launch of Canadian Light®.

### Brazil

The following table summarizes the operating results of Molson's Brazilian business in Brazilian reais and the equivalent Canadian dollar amounts:

|  | Three months ended September 30 | | | | Six months ended September 30 | | | |
|  | Brazilian Reais | | Cdn.$ | | Brazilian Reais | | Cdn.$ | |
|  | 2004 | 2003 | 2004 | 2003 | 2004 | 2003 | 2004 | 2003 |
|  | (Currency in millions) | | | | | | | |
| Sales from external customers ....... | 368.2 | 382.0 | 162.0 | 179.7 | 704.0 | 696.7 | 311.8 | 327.2 |
| Net sales revenue ................. | 181.0 | 208.8 | 79.7 | 98.2 | 348.3 | 381.3 | 154.2 | 179.0 |
| EBIT(i) ......................... | (60.3) | 11.1 | (26.4) | 5.1 | (120.1) | 4.2 | (53.2) | 1.9 |

(i) Results for the quarter ended September 30, 2004 exclude the impairment charge of $210.0 million and the rationalization provision of $1.2 million, before minority interest.

Due to declining sales volumes and the loss of market share, Molson revised its long-term forecast of net cash flows from operations in Brazil. The resulting decline in the value of the investment was reflected by a $210.0 million ($168.0 million after minority interest) impairment charge which reduces the goodwill by $130.0 million ($104.0 million after minority interest) and other intangible assets by $80.0 million ($64.0 million after minority interest).

Total sales volume for the quarter was 2.13 million hectoliters compared to 2.36 million hectoliters last year representing a decline of 9.6%. Approximately 66% of the quarter's volume decline occurred in July, which had been a stronger month in fiscal 2004 as Kaiser price increases at that time lagged behind general market increases. While Kaiser continues to experience challenging market conditions, there are encouraging signs under the first full quarter of leadership of Fernando Tigre, CEO of Cervejarias Kaiser Brasil. The declines in monthly volumes have slowed, as evidenced by September results with a volume reduction of 2.4% when compared to the same period in last year.

Volume and market share in the geographic areas where Kaiser has implemented sales centers have generally improved, however the incremental contribution margin is not sufficient to cover the additional operating costs.

Year-to-date volume was 4.10 million hectoliters compared to 4.41 million hectoliters for the same period last year, a decline of 7.1%, which represents an improvement in trend against the 17.7% decline in the same period last year.

Total estimated Molson market share in Brazil was 10.6% for the three-month period ended September 30, 2004 compared to 13.1% for the same period last year and 10.9% for the six months ended September 30, 2004 compared to 13.0% last year, according to ACNielsen data.

Net sales revenue decreased 13.3% from R$208.8 million to R$181.0 million reflecting primarily the 9.6% volume decline in the quarter. Although Kaiser experienced an overall increase in gross revenue per hectoliter in reais of 5.0% for the quarter versus last year, tax increases implemented in

certain regions in the latter part of Molson's fourth quarter of fiscal 2004 were not fully passed on to the consumer and continue to negatively affect net sales revenue and margin. For the six-month period ended September 30, 2004, net sales revenue decreased 8.6% from R$381.3 million to R$348.3 million.

Net sales revenue, as measured in Canadian dollars, decreased 18.8% in the current quarter and 13.8% year-to-date reflecting the variance in the Brazilian real exchange rate in addition to the above-noted factors.

EBIT in the current quarter was adversely affected by the operating costs of the sales centers established in the latter part of fiscal 2004 and reflected a net variance of approximately R$18 million to the same period last year. In addition, Kaiser incurred higher marketing costs of approximately R$11 million when compared to the same period last year primarily related to increased television advertising during the Olympic Games. General and administrative costs increased marginally reflecting higher depreciation expense while fixed costs were flat with last year.

During the first quarter of fiscal 2004, Molson recorded a charge of $43.3 million relating to the closure of the Ribeirão Preto plant in Brazil represented by a $37.5 million write-down of fixed assets to net recoverable amount and employee severance and other closure costs of $5.8 million. There is no remaining accrual.

As part of its continuing strategic review of the Brazilian operations, Molson will record a charge of approximately $50.0 million against earnings in the coming quarters, relating to the closure of the Queimados brewery and organization right-sizing including sales centres.

On October 28, 2004, the Board of Directors of Molson approved the closure of the Queimados plant. The earnings charge relating to the plant closure, which is estimated at $35 million, will consist mainly of a fixed asset write down.

Kaiser's competitive environment remains intense and sales and market share growth as well as profitability are the biggest challenges facing the brewer. Molson is reviewing its overall corporate debt structure as it relates to Brazilian operations to reduce net interest expense and minimize overall risk. Given recent operating losses, Molson is planning to refinance a portion of its Brazilian debt with a capital injection from Canada of $45.0 million. Under the new management team, Kaiser looks to make gains in expanded distribution, continue the revitalization of the key brands, review the overall commercial structure, eliminate duplications with bottlers and aggressively pursue cost saving projects.

### United States

Molson USA, which is owned 50.1% by Molson and 49.9% by the Coors Brewing Company ("Coors"), is a dedicated business unit in the United States focused on clear operating objectives and a well-defined brand portfolio—Canadian®, Canadian Light®, Golden®, Molson Ice® as well as Molson XXX®. Molson USA is responsible for the marketing and selling of these brands in the United States with Coors providing the sales, distribution and administrative support.

*Other Packaging*

Most of the remaining 12% of volume Coors sold in 2003 was packaged in quarter and half-barrel stainless steel kegs.

Coors purchases most of its paperboard and label packaging from Graphic Packaging Corporation (GPC), a related party. These products include paperboard, multi-can pack wrappers, bottle labels and other secondary packaging supplies.

### Seasonality of the Business

Coors' U.S. sales volumes are normally lowest in the first and fourth quarters and highest in the second and third quarters.

### Competitive Conditions

*Known Trends and Competitive Conditions*

Industry and competitive information in this section and elsewhere in this report was compiled from various industry sources, including beverage analyst reports (Beer Marketer's Insights, Impact Databank and The Beer Institute). While Coors management believes that these sources are reliable, they cannot guarantee the accuracy of these numbers and estimates.

*2003 Americas Beer Industry Overview*

The beer industry in the United States is extremely competitive, with three major brewers controlling about 80% of the market. Therefore, growing or even maintaining market share requires substantial and perhaps increasing investments in marketing and sales efforts. U.S. beer industry shipments had an annual growth rate during the past 10 years of less than 1%. The industry's pricing environment continued to be positive in 2003, with modest price increases on specific brands and packages in select markets.

Two major trends impacted the U.S. beer market in 2003. First, overall U.S. beer shipments declined for the first time since 1995, driven by a weak national economy, unusually cool weather in many regions of the country, and the war in Iraq. The net effect of all these factors was a decline in the U.S. beer industry sales of about 1% during 2003 from the year before. The second industry trend was the growth in beers with low-carbohydrate positioning. Because none of Coors' brands was positioned as low-carbohydrate last year, both of these industry trends negatively impacted beer volume in 2003.

The U.S. brewing industry has experienced significant consolidation in the past several years, which has removed excess production capacity. In 2003, beer industry consolidation at the wholesaler level continued. This consolidation generally improves business economics for these combined wholesalers.

Over the past several years, the Canadian beer industry volume has been effectively flat with growth of less than 1% in 2003. The industry's pricing environment continued to be positive in 2003, with price increases in several markets across the country.

The beer market in Puerto Rico had extraordinary growth in the 1970s and 1980s. Since then, the market has experienced periodic growth and decline cycles. This market has traditionally been split between local brewers, U.S. imports, and other imports. In mid 2002, Puerto Rico implemented a 50% excise tax increase. This tax increase contributed to a 10% contraction in total beer consumption and disproportionately affected imports, since the most significant local brand was exempt from the tax increase. Coors Light is the market leader in Puerto Rico, with an approximate 50% market share.

242

*Europe*

Coors is subject to the requirements of government and local environmental and occupational health and safety laws and regulations. Compliance with these laws and regulations did not materially affect its 2003 capital expenditures, earnings or competitive position, and Coors does not anticipate that it will do so in 2004.

### Employees and Employee Relations

*Americas*

Coors has approximately 5,400 employees in its Americas business. Memphis hourly employees, who constitute about 5% of Coors' Americas work force, are represented by the Teamsters union; and a small number of other employees are represented by other unions. The Memphis union contract expires in 2005. Coors believes that relations with its Americas employees are good.

*Europe*

Coors has approximately 3,100 employees in its Europe business. Approximately 31% of this total workforce is represented by trade unions, primarily at Coors' Burton-on-Trent and Tadcaster breweries. Separate negotiated agreements are in place with the Transport and General Workers Union at the Tadcaster Brewery and the Burton-on-Trent Brewery. The agreements do not have expiration dates, and negotiations are conducted annually. Coors believes that relations with its European employees are good.

### Management's Discussion and Analysis of Financial Condition and Results of Operations

#### Executive Summary

*This discussion summarizes the significant factors affecting Coors' consolidated results of operations, liquidity, and capital resources for the thirteen and thirty-nine weeks ended September 26, 2004, and September 28, 2003, and the years ended December 28, 2003 and December 29, 2002. You should read the following in conjunction with the related financial statements and notes included elsewhere in this document, as well as Coors' Annual Report on Form 10-K for the year ended December 28, 2003. Coors' results in the first nine months of 2004 are affected by the adoption of FIN 46, which required consolidation of some of Coors' joint ventures. (See Note 2 in the accompanying financial statements of Coors attached to this document as Annex S.)*

*3rd Quarter 2004.*   Compared to the third quarter of 2003, the third quarter of 2004 was a challenging quarter for Coors, with weak volume trends in both the Americas and Europe segments. Coors' net income in the quarter was higher due to improved beer pricing, one-time non-operating income (consisting primarily of non-operating gains and an accelerated royalty payment), a lower effective tax rate and favorable exchange rates compared to the third quarter of last year. Year-to-date, Coors' effective tax rate is comparable to 2003, and net income has improved due to beer pricing and favorable exchange rate comparisons throughout 2004.

In Europe, Coors' results in local currency were impacted substantially by the extreme comparison of colder and very wet weather in the third quarter of this year versus unusually hot, dry weather in the same period last year, which adversely impacted the entire UK beer industry. The negative impact was offset partly by continued strong pricing gains in the on-trade. Even with the volume challenges, Coors' top-selling Carling brand gained share during the third quarter.

In the Americas, sales to retail were down slightly, consistent with trends earlier in the year. Although Coors Light sales declined at a low-single-digit rate, the brand's trends improved in several key areas of the United States. Americas cost of goods per barrel were higher, primarily due to increases in transportation costs, lower sales volume, the related loss of fixed cost leverage and a sales

mix shift toward more-expensive, higher-margin brands and packages. Europe's cost of goods per barrel was also higher due to loss of fixed cost leverage and increases in transportation costs.

*2003.*   Overall, 2003 was a difficult year for Coors, especially in the U.S. Coors faced extremely soft industry demand throughout the year in the U.S., and, although Coors made significant progress in key areas of Coors' business, Coors' Americas segment profits came in only slightly above Coors' prior year results.

The U.S. beer industry faced many challenges in 2003, including:

- Continued weakness in the U.S. economy during 2003 and, specifically, high unemployment levels among the key 21-24-year-old male consumer population,

- Unfavorable weather, particularly in the Northeast, for a significant part of the peak summer selling season,

- The popularity of low-carbohydrate diets that softened demand for beer,

- The rise in popularity of distilled spirits and other alternative beverages, particularly among 21-29-year olds, and

- A protracted grocery store strike in California that likely impacted sales in the largest beer state.

Two additional issues were unique to Coors' U.S. business during 2003. First, Coors did not offer a product with "low-carbohydrate" positioning. Second, late in the year, when most of the industry was showing signs of recovery, Coors experienced significant product-supply problems that left Coors unable to meet all the needs of Coors' wholesale and retail customers.

Coors' 2003 performance in the Europe segment, specifically in the UK, reflected strong volume and market share growth. Results were negatively impacted by the lack of benefits in 2003 from revenue-producing transitional activities, which occurred in 2002 following Coors' acquisition of the UK business, as well as high levels of discounting in the off-trade channel during the first two-thirds of the year. Later in the year, however, Coors' performance in the UK showed the positive profit impact of Coors' strong volume growth, reduced off-trade discounting levels, and productivity improvements from supply chain initiatives.

One critical area of accomplishment in 2003 was Coors' cash generation and debt reduction. Full-year debt repayments totaled $272 million, more than 30% greater than the $208 million Coors repaid in 2002. Cash flow during the year benefited from higher operating cash flow, a temporary reduction in cash taxes, improvements in working capital, and improving capital spending disciplines in the U.S.

*Looking Forward.*   In addition to the merger transaction, Coors has four major strategies that it is focused on to succeed in the global beer industry:

- First, Coors is striving to capture an increasing share of each new generation of legal-drinking-age beer drinkers in order to gain their brand loyalty for the long-term. Coors intends to accomplish this by building Coors' big brands in big markets—Coors Light in the Americas, Carling and Grolsch in the UK—which are the young-adult beer drinker's point of entry into Coors' portfolio. To achieve this goal, Coors continued during 2003 to refine Coors' sales and marketing initiatives supporting Coors' flagship brands. As a result, volume momentum in the UK behind Carling and Grolsch has been positive. In Canada, Coors Light has continued to grow volume and market share. Despite a poor volume year in the U.S., Coors has made progress among key demographics and retail channels, and Coors is taking steps to further enhance the effectiveness of these initiatives.

- Second, Coors intends to capture more than Coors' fair share of the product news opportunities in the category each year through both new products and brands, or product developments with

248

existing brands, such as Coors Light and Carling. In March 2004, Coors launched Aspen Edge—Coors' entry in the low-carb segment in the U.S. Coors is also repositioning Zima in the U.S., continuing to expand Carling Extra Cold in the UK, and launching Coors Fine Light beer in the UK.

- Third, Coors needs to strengthen its access to retail by building the capabilities that are key to partnering and being successful with its wholesalers and retailers. Coors' biggest investment to strengthen Coors' access to retail in 2003 was the initiative to improve Coors' Americas supply-chain systems and processes. Making these investments was a necessity for the long-term success of Coors' business. Coors' start-up problems were greater than expected, but in early 2004, product supply improved as wholesale and retail stock-outs were reduced to a fraction of what they were in Coors' most difficult period early in the fourth quarter of 2003. When the capabilities of Coors' new supply-chain systems and processes are more fully optimized later this year, Coors' distributors will have more control over their orders, better visibility throughout the shipping process, and better service, which Coors anticipates will result in efficiencies and cost savings for Coors and for Coors' distributors.

- Fourth, Coors needs to lower its cost structure so that it can grow profits and afford the investments needed to grow and succeed. In 2003, Coors made significant progress in both the Americas and Europe. Productivity from operations in the U.S. was solid in 2003, despite soft volume. In the UK, Coors right-sized its production assets in 2003, and it expects to see the benefits in 2004.

### Results of Operations

Coors' consolidated results are driven by the results of Coors' two operating segments, Americas and Europe, and Coors' unallocated corporate expenses. When comparing 2003 to 2002, note that Coors has only included CBL results since February 2, 2002, the date of acquisition, thus excluding CBL's January 2002 results.

### The Americas Segment

The Americas segment is focused on the production, marketing, and sales of the Coors portfolio of brands in the United States and its territories, including the results of the RMMC and RMBC joint ventures consolidated in 2004 under FIN 46. This segment also includes the Coors Light™ business in Canada that is conducted through the Coors Canada partnership with Molson, Coors Canada, and the sale of Molson products in the United States that is conducted through Molson USA. The Americas segment also includes the small amount of Coors brand volume that is sold outside of the United States and its territories, including primarily Japan, China, Mexico and the Caribbean. During the second quarter of 2004, Cerveceria Cuauhtemoc Moctezuma, S.A. de C.V., a subsidiary of FEMSA

## Unaudited Pro Forma Condensed Combined Financial Statements

Molson and Coors have entered into a business combination agreement, dated July 21, 2004, as amended and as may be further amended, including a plan of arrangement under Section 192 of the Canada Business Corporations Act, under which the businesses of the two companies will be combined. The merger transaction will form the world's fifth largest brewing company by volume.

The following unaudited pro forma condensed combined financial statements and notes are presented to give effect to the merger transaction between Molson and Coors and represent the combined company's unaudited pro forma condensed combined balance sheet as of September 26, 2004 and unaudited pro forma condensed combined income statements for the year ended December 28, 2003 and the thirty-nine weeks ended September 26, 2004.

The following unaudited pro forma condensed combined balance sheet gives effect to the merger transaction between Molson and Coors as if it occurred on September 26, 2004. The accompanying unaudited pro forma condensed combined income statements give effect to the merger transaction between Molson and Coors as if it occurred on December 30, 2002, the first day of Coors' fiscal year ended December 28, 2003. The unaudited pro forma condensed combined financial statements include adjustments directly attributable to the merger transaction. The pro forma adjustments are described in the accompanying notes. The pro forma adjustments are based upon available information and assumptions that are factually supportable, including the completion of the merger transaction. These unaudited pro forma condensed combined financial statements are not necessarily indicative of the results of operations that would have been achieved had the transaction actually taken place at the dates indicated and do not purport to be indicative of future financial position or operating results.

Molson's historical consolidated financial statements are presented in Canadian dollars and were prepared in accordance with Canadian GAAP, which differs in certain respects from U.S. GAAP. Coors' consolidated financial statements were prepared in accordance with U.S. GAAP and are presented in U.S. dollars. As described in Notes 3 and 4 to these unaudited pro forma condensed combined financial statements, Molson's historical consolidated financial statements were reconciled to U.S. GAAP and were translated from Cdn.$ to U.S.$. As presented in Notes 3 and 4 to the unaudited pro forma condensed combined financial statements, pro forma adjustments have been made to the financial statements of Molson to conform with Coors' presentation under U.S. GAAP.

The unaudited pro forma condensed combined financial information was prepared using the purchase method of accounting, with Coors treated as the "acquiror" for accounting purposes. Although the current Molson shareholders will receive more shares in the combined company than Coors shareholders, a voting trust will provide equal contractual voting control of Molson Coors by the Coors and Molson families. Coors was determined to be the "acquiror" for accounting purposes since it is the entity issuing shares in the combination, is effectively paying a premium through the special dividend, and based on an evaluation of other qualitative factors, including senior management positions and the relative sizes of the companies.

Under purchase accounting, the purchase price, including directly related transaction costs, is allocated to the tangible and intangible assets acquired and liabilities assumed based upon their respective fair values at the effective date of the merger transaction. An allocation of the purchase price has been made based upon preliminary estimates of fair value by management, including approximately U.S.$5.7 million related to integration actions that include potential reorganization and restructuring actions. Additional costs related to potential reorganization and restructuring have not been reflected in this initial purchase price allocation since final decisions have not been made. Obligations for pension and other post-retirement benefits have been determined based upon preliminary actuarial assessments. As discussed in Note 3 to the accompanying Molson historical financial statements for the six months ended September 30, 2004 included in Annex R, Molson

announced an estimated Cdn.$50 million rationalization provision related to the closure of the Queimados brewery in Brazil and changes to its Brazilian sales center network.

Molson also revised its long-term forecast of cash flows for its Brazilian business and recorded an impairment charge of Cdn.$210 million for its quarter ended September 30, 2004. Molson's revised cash flow forecasts are based on its best estimates, which include sales volume, pricing, and other expenses. These estimates are subject to significant measurement uncertainty, including the impact of extremely competitive trade practices, the complex tax regime and management's evolving views of product positioning and alternative sales initiatives.

The purchase price accounting included in these pro forma financial statements reflects a preliminary enterprise value of U.S.$365 million for the Brazilian business.

Management will reevaluate the Brazilian cash flow forecast subsequent to the date the merger is completed, which if changes are made to the foregoing cash flow estimates could have a material impact on the amounts estimated in these pro forma financial statements.

The final purchase price allocation, which will be determined subsequent to the closing of the merger, and its effect on results of operations may differ significantly from the pro forma amounts included in this section, although these amounts represent management's best estimates as of the date of this document.

The unaudited pro forma financial information is based on historical financial statements. Molson's fiscal year ends on March 31, while Coors' fiscal year ends on the last Sunday of each December. As described in Note 1 to the unaudited pro forma condensed combined financial statements, the period covered by Molson's historical financial information has been adjusted to more closely correspond to Coors' fiscal year-end in the accompanying pro forma condensed combined financial statements. Molson's historical financial statements included elsewhere in this document represent Molson's historical fiscal year ends. The unaudited pro forma condensed combined financial statements do not purport to represent the combined company's financial position or results of operations or financial condition had the merger transaction between Molson and Coors actually occurred as of these dates or the results that the combined company would have achieved after the merger transaction. The unaudited pro forma condensed combined financial statements should be read in conjunction with the historical consolidated financial statements (and notes) of Molson and Coors in Annexes R & S, respectively, and "Management's Discussion and Analysis of Financial Condition and Results of Operations" of Molson and Coors, respectively, beginning on pages 196 and 247.

Unless otherwise stated, all amounts shown in this section are in U.S.$ and in accordance with U.S. GAAP.

**Notes to Unaudited Pro Forma Condensed Combined Financial Statements (Continued)**

### 7.  Pro Forma Adjustments

The unaudited pro forma condensed combined financial statements give effect to the merger transaction described in Note 2, as if it had occurred on September 26, 2004, for purposes of the unaudited pro forma condensed combined balance sheet and December 30, 2002, the first day of Coors' fiscal year ended December 28, 2003, for purposes of the unaudited pro forma condensed combined income statements. The unaudited pro forma condensed combined income statements do not include any non-recurring charges that will arise as a result of the transaction described in Note 2. Adjustments to the unaudited pro forma condensed combined financial statements are as follows (in U.S.$ millions):

   A    To reflect preliminary purchase accounting, as discussed in Note 2. Specifically, the following adjustments have been made to reflect the preliminary purchase accounting to record:

| | |
|---|---:|
| Inventory at fair value less costs to sell | $    20.9 |
| Properties at fair value | 38.1 |
| Intangible assets at fair value related to the acquisition | 2,265.8 |
| Pension and other retirement liabilities at fair value | 139.8 |
| Investments in joint ventures at fair value | 12.2 |
| Debt at fair value | 35.8 |
| Recognize goodwill related to the acquisition, net of historical goodwill reversed | 623.1 |

The non-cash inventory purchase accounting adjustment of $20.9 million will impact cost of goods sold during the approximate one-month period after the closing of the acquisition, during which time the inventory on hand on the date of the merger is sold.

   B    To reflect the new equity structure of the combined company, including the following:

| | Common Stock, par | Paid-in-Capital | Restricted Stock | Other Comprehensive Income | Retained Earnings | Total Shareholders' Equity |
|---|---:|---:|---:|---:|---:|---:|
| | | | | (in millions and U.S.$) | | |
| Coors balances at September 26, 2004 | $    0.4 | $    91.1 | $(0.3) | $    71.5 | $1,350.0 | $1,512.7 |
| Molson balances at September 30, 2004 | 584.5 | 9.8 | — | (368.7) | 574.4 | 800.0 |
| Special dividend(4) | — | — | — | — | (316.0) | (316.0) |
| Eliminate Molson historical equity balances | (584.5) | (9.8) | — | 368.7 | (258.4) | (484.0) |
| Molson Class A and B shares exchanged(1)(2) | 0.5 | 3,183.7 | — | — | — | 3,184.2 |
| Coors Restricted Stock Vests(3) | — | — | 0.3 | — | (0.3) | — |
| Issue Molson Coors stock options | — | 5.4 | — | — | — | 5.4 |
| Molson Coors balances at September 26, 2004 | $    0.9 | $3,280.2 | $  — | $    71.5 | $1,349.7 | $4,702.3 |

(1)  Exchange of 0.360 of a share of Molson Coors Class B common stock (or 0.360 of a Class B exchangeable share of Molson Coors Exchangeco (and ancillary rights)) for every Molson Class A non-voting share.

(2)  Exchange of 0.126 of a share of Molson Coors Class A common stock (or 0.126 of a Class A exchangeable share of Molson Coors Exchangeco (and ancillary rights)) and 0.234 of a share of Molson Coors Class B common stock (or 0.234 of a Class B exchangeable share of Molson Coors Exchangeco (and ancillary rights)) for every Molson Class B common share.

309

**Notes to Unaudited Pro Forma Condensed Combined Financial Statements (Continued)**

7.  **Pro Forma Adjustments (Continued)**

(3)  Coors restricted stock will vest upon the merger, in accordance with the plan's change-of-control provisions.

(4)  Payment of special dividend in conjunction with merger transaction (see Note 7M).

In addition an exchange of Molson Coors options to purchase 0.360 of a share of Molson Coors Class B common stock for every Molson option outstanding will occur at the date of the merger transaction, and each Molson option will become fully vested upon the change-of-control. Upon completion of the merger, approximately 92,800,000 fully diluted shares of Molson Coors common stock and approximately 1,000 preferred shares of Molson Coors Exchangeco would have been outstanding as of September 26, 2004, including the shares of Molson Coors common stock issuable on exchange of exchangeable shares.

**C**   Coors will incur approximately $27.2 million of direct merger transaction costs and assume liabilities of approximately $5.7 million related to Molson employee change-of-control payments, which are recognized as liabilities. Certain Coors executives have change-of-control agreements for which liabilities may be incurred as a result of the merger with Molson and in the event executives exercise their options under the change-of-control agreements. No executives have, as yet, expressed interest in exercising their options and, therefore, no liability has been accrued.

**D**   To adjust for retirement plan amortization expense that will be eliminated as a result of purchase accounting, which requires recording the excess of the projected benefit obligation over the fair value of the plan assets as a liability, thus eliminating amortization of previously unamortized balances. Expense reduction has been allocated 65% to cost of goods sold and 35% to marketing, general and administrative expenses.

**E**   As described in Notes 6 "f" and "g," Coors owns two joint ventures with Molson – Coors Canada and Molson USA – that have been accounted for using the equity method of accounting by Coors. Coors was required to adopt FIN 46 beginning the thirty-nine week period ended September 26, 2004 and determined that consolidation of its investments in Coors Canada and Molson USA was not required. Adjustment E reflects the consolidation of the Molson USA and Coors Canada joint ventures for all periods, as these would be wholly-owned subsidiaries of Molson Coors as a result of the merger transaction.

**F**   The pro forma income tax adjustments to the unaudited pro forma condensed combined income statements are comprised of the following amounts:

|  | (Expense) Benefit U.S. $ Millions | |
| --- | --- | --- |
|  | Thirty-nine weeks ended September 26, 2004 | Year ended December 28, 2003 |
| Proforma adjustment at 39% tax rate . . . . . . . . . . . | $ 32.2 | $ 31.9 |
| Items not tax effected . . . . . . . . . . . . . . . . . . . . . . . | (11.1) | 0.5 |
| U.S. Tax on Molson's earnings . . . . . . . . . . . . . . . . | (16.4) | (19.6) |
| Pro forma tax adjustment . . . . . . . . . . . . . . . . . . | $ 4.7 | $ 12.8 |

Items not tax effected include losses in the Brazilian operations as there is not sufficient certainty as to their future use, the income from consolidating the Coors Canada and Molson USA ventures under FIN 46 which is offset in the minority interests line item of the income statement, and those related to stock appreciation rights where Canadian tax law does not provide a tax

Notes to Unaudited Pro Forma Condensed Combined Financial Statements (Continued)

### 7.  Pro Forma Adjustments (Continued)

deduction. A six percent incremental U.S. tax expense has been provided on Molson's Canadian-based earnings to reflect Coors' historical accounting policy of not permanently reinvesting earnings.

Pro forma adjustments to the unaudited pro forma condensed combined income statements are tax effected at the combined U.S. federal and state statutory rate of 39%, and include an adjustment to reflect the tax expense related to Molson earnings at the U.S. statutory rate totaling $16.4 million and $19.6 million for the thirty-nine weeks ended September 26, 2004 and the year ended December 28, 2003, respectively. The application of the U.S. federal and state statutory rate to the Molson earnings reflects the expectation that Molson Coors will not elect to permanently reinvest earnings. Coors expects to elect for U.S. tax purposes to step up the U.S. tax basis in the Molson assets. The effect of this election to provide U.S. deferred tax on Molson earnings is reflected in the pro forma adjustments to the unaudited pro forma condensed combined balance sheet. The pro forma adjustment on the unaudited pro forma condensed combined balance sheet reflects the establishment of a deferred tax liability and, as a result of the step up election, a deferred tax asset for the tax effect of the difference between the Canadian tax basis and the estimated fair market value of the acquired net assets. In connection with this adjustment, we have recorded a $45.0 million valuation allowance to reduce the amount of the deferred tax asset to the amount that is more likely than not to be realized.

Currently, Molson and Coors are partners in a separate partnership that manufacturers, markets and sells Coors beer in Canada. In connection with the closing of the Plan of Arrangement and the implementation of plans to achieve synergies, Molson and Coors anticipate undertaking a reorganization to combine their respective businesses in Canada into a single partnership. Through a number of steps, a new partnership will be formed that will carry on the business currently being carried on by the Molson Canada partnership and the Coors Canada partnership. It is anticipated that all the assets and liabilities of the two existing partnerships on the date of the reorganization will be combined into the new partnership. It is also anticipated that steps necessary to integrate the Molson Coors partnership to import and distribute beer into the U.S. into Coors U.S. operations would also be taken. In connection with these activities, a deferred tax liability of approximately Cdn.$195.0 (U.S.$154.8) would have been due and payable at September 26, 2004 and is classified as a current liability in the pro forma balance sheet.

**G**  The amortization of Molson's identifiable intangible assets (brand assets and distribution agreements) having finite lives is reflected as a pro forma adjustment to the unaudited pro forma condensed combined income statements. The combined company expects to amortize the estimated fair value of the identified intangibles with finite lives of approximately $474.8 million on a straight-line basis over an estimated, average useful life of 7.5 years for brand assets and Canadian distribution arrangements and over 17 years for the Brazilian distribution arrangement. In addition, Molson Coors expects to amortize the estimated $979.9 million fair value of Molson's tangible assets on a straight-line basis over an estimated, average useful life of 25 years for real property and 11 years for machinery and equipment. Upon finalization of all asset valuations, specific useful lives will be assigned to the acquired assets, and depreciation and amortization will be adjusted accordingly. The net effect of this increased amortization and depreciation of $51.5 million and $76.9 million for the thirty-nine weeks ended September 26, 2004 and the year ended

311

| Molson Shareholder Rights | Molson Coors Stockholder Rights |
|---|---|
| **Number of Directors** Molson's articles of amalgamation and bylaws state that the minimum number of directors is 8 and the maximum number of directors is 15. The actual number of directors, within that range, is determined by the board of directors from time to time. The CBCA provides that any amendment to increase or decrease this minimum or maximum number of directors requires the approval of shareholders of Molson by special resolution.<br><br>Molson's articles of amalgamation provide that the holders of the Molson Class A non-voting shares are entitled, voting separately as a class, to annually elect three members of the board of directors of Molson. | Delaware law provides that a corporation's board of directors must consist of one or more members and that the number of directors will be fixed by, or in the manner provided in, the corporation's bylaws, or the certificate of incorporation.<br><br>Molson Coors' certificate of incorporation and bylaws together will provide that the number of directors will be determined by resolution of the board of directors, adopted by the affirmative vote of at least two-thirds of the authorized number of directors (including vacancies), except that any decrease in the number of directors below 15 must be approved by the affirmative vote of a majority of the votes entitled to be cast by holders of the Class A common stock and special Class A voting stock (the votes of which are directed by the holders of the Class A exchangeable shares), voting together as a single class, and that any increase in the number of directors must be by a number divisible by three.<br><br>The Molson Coors bylaws will provide that at the effective time of the merger transaction the board of directors will have 15 members.<br><br>The composition of the board of directors following the effective time of the merger transaction and other related matters are described in "Governance and Management of Molson Coors—Board of Directors of Molson Coors" beginning on page 123. |
| **Removal of Directors** Under the CBCA, unless the articles of a corporation provide for cumulative voting (which is not the case for Molson), shareholders of the corporation may, by ordinary resolution passed at a special meeting, remove any director or directors from office. If holders of a class or series of shares have the exclusive right to elect one or more directors, a director elected by them may only be removed by an ordinary resolution at a meeting of the shareholders of that class or series.<br><br>Molson's bylaws provide that directors will be elected yearly at the annual meeting of shareholders and will hold office until the next annual meeting of shareholders or until their respective successors are elected or appointed. Each director then in office will retire, but will be eligible for re-election. | Delaware law generally provides that any director may be removed, with or without cause, by the affirmative vote of a majority of the shares then entitled to vote at an election of directors, except in the case of a corporation that has a classified board of directors or which has cumulative voting in elections of directors (which will not be the case for Molson Coors).<br><br>Molson Coors' certificate of incorporation will provide that any director or the entire board of directors may be removed with cause by a majority of the total votes entitled to be cast by holders of all of the classes of Molson Coors' stock entitled to vote at an election of directors, voting together as a single class. The certificate of incorporation also provides that any director may be removed without cause by a vote of the holders of a majority of the total votes entitled to be cast by the holders of the class or classes of stock that elected the director. |

MOLSON INC.

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (Continued)

For the years ended March 31, 2004, 2003 and 2002

(In millions of Canadian dollars, except share and per share amounts)

### 13. Intangible Assets, excluding Goodwill

|  | 2004 | 2003 |
|---|---|---|
| Brand names | **$1,536.5** | $1,529.9 |
| Distribution network access(i) | **22.2** | 22.6 |
|  | **$1,558.7** | $1,552.5 |

(i) The balance is being amortized over the contractual term of the distribution agreement of 40 years (note 3). The original cost amounted to $35.0. The accumulated amortization at March 31, 2004 amounted to $1.2 (2003—$0.6).

(ii) The change in the book value of the brand names and of the distribution network access reflecting the fluctuation of the Brazilian real in relation to the Canadian dollar was $6.6 (2003—($125.1)) and $0.2 (2003—($12.2)) respectively.

### 14. Long-Term Debt

|  | 2004 | 2003 |
|---|---|---|
| Molson Inc. |  |  |
| Term loan(i) | $ **59.9** | $ 329.3 |
| Debentures(ii) |  |  |
| $150—5.5% due May 3, 2004 | **150.0** | 149.7 |
| Floating rate notes(iii) |  |  |
| $50—due October 19, 2004 | **50.0** | — |
| $200—due September 16, 2005 | **200.0** | — |
| Molson Canada |  |  |
| Term loan(iv) | **—** | 99.9 |
| Debentures(v) |  |  |
| $200—6.0% due June 2, 2008 | **199.7** | 199.6 |
| $100—9.1% due March 11, 2013 | **99.9** | 99.9 |
| $150—8.4% due December 7, 2018 | **149.9** | 149.8 |
| $100—6.7% due June 2, 2028 | **99.5** | 99.5 |
| Fair value adjustment(vi) | **28.6** | 31.7 |
| Brazil(vii) | **97.9** | 61.2 |
|  | **1,135.4** | 1,220.6 |
| Less current portion(viii) | **347.0** | 40.6 |
|  | $ **788.4** | $1,180.0 |

(i) Represents borrowings under a $1,125.0 Senior Credit Facility arranged with a syndicate of banks. The facility was used to finance the acquisition of Kaiser on March 18, 2002 and was originally comprised of a $500.0 non-revolving 18-month bridge loan which can be extended by the

R-16

## MOLSON INC.

### NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (Continued)

### For the years ended March 31, 2004, 2003 and 2002

### (In millions of Canadian dollars, except share and per share amounts)

**14. Long-Term Debt (Continued)**

Corporation for an additional six months and a $625.0 three-year revolving tranche. The bridge loan was permanently reduced by $200.0 to $300.0 on June 21, 2002, using a portion of the proceeds from the sale of 20% of the Corporation's Brazilian operations (note 3), while the terms of the three-year revolving tranche remained unchanged. The bridge loan expired on September 17, 2003 and was not extended. The interest rate on the term loans is floating based on either prime or banker's acceptance. The average interest rate in fiscal 2004 was 3.9% (2003—3.7%, 2002—4.3%). The facility is a direct, unsecured obligation of the Corporation. Also, the Corporation has a $50.0, 364-day revolving credit facility with a syndicate of banks for general corporate purposes. The Corporation can extend the facility, subject to the approval of the lenders. Effective September 16, 2003, the facility was extended for an additional period of 364 days.

(ii) This debenture is redeemable at the option of the Corporation and was repaid on maturity with drawings from the term loan. The debenture is a direct, unsecured obligation of the Corporation.

(iii) On September 16, 2003, the Corporation issued $200.0 in two-year floating rate notes as part of a $500.0 medium-term note program. On October 17, 2003, the Corporation issued an additional $50.0 in one-year floating rate notes. The $50.0 notes are redeemable, at the option of the Corporation, and retractable, at the option of the noteholder, on any interest payment date commencing April 19, 2004. Neither party exercised their redemption/retraction provisions on April 19, 2004. The notes bore interest at average rates of 3.0% in fiscal 2004. On September 30, 2003, the Corporation entered into an interest rate swap for $100.0 which converted the Corporation's floating rate note due September 16, 2005 to a fixed rate. This swap is cancellable on a quarterly basis at the option of a third party. At March 31, 2004, the interest rate swap had an unrealized loss of $0.6.

(iv) Represents a $100.0 credit facility with a syndicate of banks, which matured on August 31, 2003 and was fully repaid. Loans under this facility bore interest at rates averaging 3.7% in fiscal 2004 (2003—4.2%).

(v) Represents direct, unsecured debentures which are redeemable at the option of Molson Canada. During fiscal 2002, the Corporation entered into two interest rate swap agreements for a nominal value of $100.0 each, which converted the $200.0 debenture due in June 2008 with a fixed rate of 6.0% to a variable rate. In December 2002, a third party bank exercised its right to cancel a $100.0 swap agreement, after which interest expense was recorded at the debentures' fixed rate. The average variable interest rate on the swap in fiscal 2004 was 2.7% (2003—3.2%, 2002—3.4%). At March 31, 2004, the variable interest rate swap had a fair value of $11.0 (2003—$6.8).

(vi) Represents the adjustment required to arrive at the fair market value of the Molson Canada debentures as of June 23, 1998, being the date of the acquisition of the additional 50% interest in Molson Canada. This amount is being amortized over the remaining terms of the debentures on a weighted-average basis, which at the acquisition date, was approximately 15 years.

(vii) Represents various facilities denominated in Brazilian reais bearing interest at rates averaging 20.2% during the year (2003—18.5%). Of the amounts drawn, $87.1 (2003—$40.6) is due within

MOLSON INC.

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (Continued)

For the years ended March 31, 2004, 2003 and 2002

(In millions of Canadian dollars, except share and per share amounts)

### 14. Long-Term Debt (Continued)

the next year and is classified as current. Certain loans are secured by liens on the machinery and equipment and by real estate mortgaged.

(viii) The aggregate maturities of long-term debt during the next five years are estimated to be $347.0, $202.8, $3.1, $2.6 and $202.4. Long-term debt of $259.9 has been included in the current liabilities, however the Corporation intends to refinance this debt with either the term loan or the floating rate notes. Since the terms and conditions of the floating rate notes are only determinable at the time of the placement of the debt, it does not allow for classification as non-current portion of long-term debt.

### 15. Deferred Liabilities

|  | 2004 | 2003 |
|---|---|---|
| Contingent tax liabilities(i) | $198.9 | $188.0 |
| Discontinued operations(ii) | 76.0 | 84.1 |
| Deferred gain(iii) | 32.5 | 38.7 |
| Deferred sales tax payable(iv) | 30.2 | 29.7 |
| Net pension liability | 16.1 | 29.0 |
| Deferred compensation(v) | 5.4 | 11.0 |
|  | $359.1 | $380.5 |

(i) Relates to provisions in Brazil primarily for excise (IPI), social security (COFINS), and value-added state (ICMS) taxes.

(ii) Remaining provisions for loss and deferred liabilities relating to the discontinued operations of the Retail, Chemical Specialties, and Sports and Entertainment businesses (see note 8).

(iii) The deferred gain arose from the non-cash consideration received on the exchange of brewing assets at the time of the formation of the Molson Canada partnership. Amortization of the balance of the deferred gain will be brought into earnings in equal installments over the next five years or earlier if the non-cash assets are realized.

(iv) Relates to long-term sales tax payable in certain regions in Brazil and is interest bearing.

(v) Includes the long-term portion of employee bonuses payable and the DSU liability.