# EXHIBIT 6

# US SECURITIES AND EXCHANGE COMMISSION

**Washington, D.C. 20549**

# FORM 10-K

☒    **ANNUAL REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

**For the Fiscal year ended December 28, 2003**

**OR**

☐    **TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

**For the transition period from            to         .**

**Commission file number 1-14829**

# ADOLPH COORS COMPANY

(Exact name of registrant as specified in its charter)

| | |
|---|---|
| **DELAWARE** | **84-0178360** |
| (State or other jurisdiction of incorporation or organization) | (I.R.S. Employer Identification No.) |
| **311 Tenth Street, Golden, Colorado** | **80401** |
| (Address of principal executive offices) | (Zip Code) |

**303-279-6565**

(Registrant's telephone number, including area code)

Securities registered pursuant to Section 12(b) of the Act:

| Title of each class | Name of each exchange on which registered |
|---|---|
| **Class B Common Stock (non-voting), $0.01 par value** | **New York Stock Exchange** |

Securities registered pursuant to Section 12(g) of the Act:

**Title of class**
**None**

Indicate by check mark whether the registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days.

YES  ☒                          NO  ☐

Indicate by check mark if disclosure of delinquent filers pursuant to Item 405 of Regulation S-K is not contained herein, and will not be contained, to the best of registrant's knowledge, in definitive proxy or information statements incorporated by reference in Part III of this Form 10-K or any amendment to this Form 10-K.

YES  ☒                          NO  ☐

Indicate by check mark whether the Registrant is an accelerated filer (as defined in Rule 12(b)-2 of the Act).

YES ☒                    NO ☐

The aggregate market value of Class B non–voting stock held by non–affiliates of the registrant at the close of business on June 29, 2003, was $1,718,375,932 based upon the last sales price reported for such date on the New York Stock Exchange. For purposes of this disclosure, shares of Class B Common Stock held by persons holding more than 5% of the outstanding shares of Class B Common Stock and shares owned by officers and directors of the registrant as of June 29, 2003 are excluded in that such persons may be deemed to be affiliates. This determination is not necessarily conclusive of affiliate status.

The number of shares outstanding of each of the registrant's classes of common stock, as of February 27, 2004:

Class A Common Stock— 1,260,000 shares
Class B Common Stock— 35,620,229 shares

**ADOLPH COORS COMPANY AND SUBSIDIARIES**

**INDEX**

**PART I.**

| | |
|---|---|
| Item 1. | Description of Business |
| Item 2. | Properties |
| Item 3. | Legal Proceedings |
| Item 4. | Submission of Matters to a Vote of Security Holders |

**PART II.**

| | |
|---|---|
| Item 5. | Market for the Registrant's Common Equity and Related Stockholder Matters |
| Item 6. | Selected Financial Data |
| Item 7. | Management's Discussion and Analysis of Financial Condition and Results of Operations |
| Item 7a. | Quantitative and Qualitative Disclosures About Market Risk |
| Item 8. | Financial Statements and Supplementary Data |
| Item 9. | Changes in and Disagreements With Accountants on Accounting and Financial Disclosure |
| Item 9a. | Controls and Procedures |

**PART III.**

| | |
|---|---|
| Item 10. | Directors and Executive Officers of the Registrant |
| Item 11. | Executive Compensation |
| Item 12. | Security Ownership of Certain Beneficial Owners and Management and Related Stockholder Matters |
| Item 13. | Certain Relationships and Related Transactions |
| Item 14. | Principal Accountant Fees and Services |

**PART IV.**

| | |
|---|---|
| Item 15. | Exhibits, Financial Statement Schedules, and Reports on Form 8–K |

Signatures

PART I

**ITEM 1. Description of Business.**

Unless otherwise noted in this report, any description of us includes Adolph Coors Company (ACC), principally a holding company, its operating subsidiaries, Coors Brewing Company (CBC), operating in the United States (US); and Coors Brewers Limited (CBL), operating in the United Kingdom (UK); and our other corporate entities.

**(a) General Development of Business**

*Global Expansion*
Since our founding in 1873, we have been committed to producing the highest–quality beers. Our portfolio of brands is designed to appeal to a wide range of consumer tastes, styles and price preferences. Until our acquisition of CBL in February 2002, we operated and sold our beverages predominately in North America and in select international markets. The CBL acquisition expanded our international presence to include significant operations and sales in the United Kingdom.

*Joint Ventures and Other Arrangements*
To sharpen focus on our core competencies in manufacturing, marketing and selling malt beverage products, we have entered into various arrangements with third parties over the past decade to leverage their strengths in areas like can and bottle manufacturing, transportation, packaging, engineering, energy production and information technology.

*Our Products*
We own or license all of our trademarks for all of our brands. Brands sold primarily in the Americas include: Coors Light®, Coors Original®, Coors® Non–Alcoholic, Extra Gold®, Zima®, George Killian's® Irish Red [TM] Lager, Keystone®, Keystone Light®, Keystone Ice®, Blue Moon[TM] Belgian White Ale and Mexicali®. We also sell the Molson family of brands in the United States through a joint venture. Brands sold primarily through CBL include: Carling®, Worthington®, Caffrey's®, Reef®, Screamers[TM] and Stones®. We also sell Grolsch® in the United Kingdom through a joint venture.

In the United Kingdom in 2003, we achieved considerable success with the continued roll–out of Carling Extra Cold, which is dispensed at on–trade locations (pubs, clubs, restaurants and hotels) at two degrees centigrade, four degrees cooler than traditional English draft lagers. Additionally, in the last quarter of the year, we introduced Coors Fine Light Beer to the on–trade channel. In January 2004, we launched this beer into the off–trade channel (retail and wholesale) and commenced television advertising for the product. In the United States in 2004, we plan to introduce a low–carb beer called Aspen Edge[TM], and a variety of new flavored Zima products, collectively called Zima XXX[TM] (in select US markets).

In the United Kingdom, in addition to supplying our own brands, we sell other beverage companies' brands to our on–premise customers so as to be able to provide them with a full range of products for their retail outlets. These factored brand sales are included in our financial results, increasing our net sales and cost of goods sold, but the related volume is not included in our reported sales volumes.

**(b) Financial Information About Segments**

Prior to our acquisition of CBL, we reported results of operations in one segment. We now categorize our operations into two operating segments: the Americas and Europe. These segments are managed by separate operating teams, even though both segments consist of the manufacture, marketing, and sale of beer and other beverage products.

See Item 8, Financial Statements and Supplementary Data, for financial information relating to our segments and operations, including geographic information.

**(c) Narrative Description of Business**

*Some of the following statements may describe our expectations of future products and business plans, financial results, performance and events. Actual results may differ materially from these forward–looking statements. Please see Item 7, Management's Discussion and Analysis – Cautionary Statement Pursuant to Safe Harbor Provisions of*

3

the Private Securities Litigation Reform Act of 1995, for factors that may negatively impact our performance. The following statements are expressly made, subject to those and other risk factors.

We sold approximately 68% of our 2003 reported volume in the Americas segment and 32% in the Europe segment. In 2003, Coors Light accounted for about 51% of reported volume and Carling for approximately 22%.

Our sales volume totaled 32.7 million barrels in 2003, compared to 31.8 million barrels in 2002 and 22.7 million barrels in 2001. The barrel sales figures for each year do not include barrel sales of our products sold in Canada by the non-consolidated Coors Canada Partnership (Coors Canada) or volume from our joint venture with Molson sold in the United States. An additional 1.5 million, 1.4 million and 1.3 million barrels of beer were sold by Coors Canada in 2003, 2002 and 2001, respectively. Our Molson venture sold 0.9, 0.9 and 0.8 million barrels in 2003, 2002 and 2001, respectively. Our sales volumes also do not include the CBL factored brands business. See Item 7, Management's Discussion and Analysis, for a discussion of volume changes.

No single customer accounted for more than 10% of our consolidated or segmented sales in 2003, 2002 or 2001.

**Americas Segment**

The Americas business segment is focused on the production, marketing and sales of the Coors portfolio of brands in the United States and its territories. This segment also includes the Coors Light business in Canada that is conducted through a partnership investment with Molson, Inc. (Molson) and the sale of Molson products in the United States that is conducted through a joint venture investment (Molson USA) with Molson. The Americas segment also includes a small amount of volume that is sold outside of the United States and its territories.

**Sales and Distribution**

*United States*
In the United States, beer is generally distributed through a three-tier system consisting of manufacturers, distributors and retailers. A national network of 472 independent distributors (537 including branch locations) purchases our products and distributes them to retail accounts. We also own three distributorships that handled less than 3% of our total domestic volume in 2003, and we sell Molson branded beers through our Molson USA joint venture which utilizes additional independent distributors.

*Canada*
Coors Canada is our partnership with Molson that manages all marketing activities for our products in Canada. We own 50.1% of this partnership, and Molson owns 49.9%. The partnership contracts with Molson for the brewing, distribution and sale of our products. Coors Light currently has an 8.7% market share, and is the largest-selling light beer and the 4th-best selling beer brand overall in Canada.

*Puerto Rico and the Caribbean*
In Puerto Rico, we market and sell Coors Light through an independent distributor. A team of our employees manages the marketing and promotional efforts in this market, where Coors Light is the number-one brand. We also sell our products in a number of other Caribbean markets, including the US Virgin Islands, through local distributors.

*Asia*
We have small developing markets in Japan, China and Taiwan. The Japanese business is currently focused on Zima and Coors Original and we sell Coors Light in Taiwan. We sell Coors Light and Coors Original in China and have contracted with Lion Nathan for the production of finished goods for the Japanese and Chinese markets.

**Manufacturing, Production and Packaging in the United States**

*Brewing Raw Materials*
We use the highest quality water, barley and hops to brew our products. The majority of the water we use is naturally filtered from underground aquifers. We have acquired water rights to provide for long-term strategic growth and to sustain brewing operations in case of a prolonged drought. We buy barley under long-term contracts from a network of independent farmers located in five western US states.

4

*Brewing and Packaging Facilities*
We have three domestic production facilities and one small brewery located in Mexico. We own and operate the world's largest single–site brewery located in Golden, Colorado. In addition, we own and operate a packaging and brewing facility in Memphis, Tennessee, and a packaging facility located in the Shenandoah Valley in Virginia. We brew Coors Light, Coors Original, Extra Gold, Killian's and the Keystone brands in Golden, and package about 60% of the beer brewed in Golden. The remainder is shipped in bulk from the Golden brewery to either our Memphis or Shenandoah facility for packaging.

**Packaging Materials**

*Aluminum Cans*
Approximately 59% of our domestic products were packaged in aluminum cans in 2003. A substantial portion of those cans were purchased from a joint venture with Ball Corporation (Ball), Rocky Mountain Metal Container, LLC (RMMC). In addition to our supply agreement with RMMC, we also have commercial supply agreements with Ball and other third–party can manufacturers to purchase cans and ends in excess of what is supplied through RMMC. In 2003, we purchased the significant majority of the cans and ends produced by the RMMC facilities.

*Glass Bottles*
We used glass bottles for approximately 29% of our products in 2003. We operate a joint venture with Owens–Brockway Glass Container, Inc. (Owens), the Rocky Mountain Bottle Company (RMBC), to produce glass bottles at our glass manufacturing facility. On July 29, 2003, we signed a new agreement, effective for 12 years beginning August 1, 2003, with Owens extending this joint venture, as well as a supply agreement with Owens for the glass bottles we require in excess of joint venture production.

*Other Packaging*
Most of the remaining 12% of volume we sold in 2003 was packaged in quarter and half–barrel stainless steel kegs.

We purchase most of our paperboard and label packaging from a subsidiary of Graphic Packaging Corporation (GPC), a related party. These products include paperboard, multi–can pack wrappers, bottle labels and other secondary packaging supplies.

**Seasonality of the Business**

Our US sales volumes are normally lowest in the first and fourth quarters and highest in the second and third quarters.

**Competitive Conditions**

*Known Trends and Competitive Conditions*
Industry and competitive information in this section and elsewhere in this report was compiled from various industry sources, including beverage analyst reports (*Beer Marketer's Insights, Impact Databank and The Beer Institute*). While management believes that these sources are reliable, we cannot guarantee the accuracy of these numbers and estimates.

*2003 Americas Beer Industry Overview*
The beer industry in the United States is extremely competitive, with three major brewers controlling about 80% of the market. Therefore, growing or even maintaining market share requires substantial and perhaps increasing investments in marketing and sales efforts. US beer industry shipments had an annual growth rate during the past 10 years of less than 1%. The industry's pricing environment continued to be positive in 2003, with modest price increases on specific brands and packages in select markets.

Two major trends impacted the US beer market in 2003. First, overall US beer shipments declined for the first time since 1995, driven by a weak national economy, unusually cool weather in many regions of the country, and the war in Iraq. The net effect of all these factors was a decline in the US beer industry sales of about 1% during 2003 from the year before. The second industry trend was the growth in beers with low–carbohydrate positioning. Because none of our brands was positioned as low–carbohydrate last year, both of these industry trends negatively impacted our volume in 2003.

5

The US brewing industry has experienced significant consolidation in the past several years, which has removed excess production capacity. In 2003, beer industry consolidation at the wholesaler level continued. This consolidation generally improves business economics for these combined wholesalers.

Over the past several years, the Canadian beer industry volume has been effectively flat with growth of less than 1% in 2003. The industry's pricing environment continued to be positive in 2003, with price increases in several markets across the country.

The beer market in Puerto Rico had extraordinary growth in the 70s and 80s. Since then, the market has experienced periodic growth and decline cycles. This market has traditionally been split between local brewers, US imports, and other imports. In mid 2002, Puerto Rico implemented a 50% excise tax increase. This tax increase contributed to a 10% contraction in total beer consumption and disproportionately affected imports, since the most significant local brand was exempt from the tax. Coors Light is the market leader in Puerto Rico with an approximate 50% market share.

*Our Competitive Position*

Our malt beverages compete with numerous above–premium, premium, low–calorie, popular–priced, non–alcoholic and imported brands. These competing brands are produced by national, regional, local and international brewers. We compete most directly with Anheuser–Busch (AB) and SABMiller (Miller), the dominant beer companies in the US industry. According to *Beer Marketer's Insights* estimates, we are the nation's third–largest brewer, selling approximately 11% of the total 2003 US brewing industry shipments (including exports and US shipments of imports). This compares to AB's 50% share and Miller's 18% share.

### Europe Segment

The Europe segment consists of our production and sale of the CBL brands principally in the United Kingdom, our joint venture arrangement relating to the production and distribution of Grolsch in the United Kingdom and Republic of Ireland, and our joint venture arrangement with Tradeteam for the physical distribution of products throughout Great Britain.

CBL has headquarters in Burton–on–Trent, England, and is the United Kingdom's second–largest beer company with unit volume sales of approximately 10.3 million US barrels in 2003. CBL holds approximately 20% of the UK beer market, Western Europe's second–largest market. The CBL sales are primarily in England and Wales, with the Carling brand (a mainstream lager) representing approximately two–thirds of CBL's total beer volume.

**Sales and Distribution**

Over the past three decades, volumes have begun to shift from the on–trade channel, where products are consumed "on–premise," to the off–trade channel, also referred to as the "take–home" market. Revenue per barrel in the on–trade channel tends to be higher, but the off–trade channel can offer similar returns to brewers because selling, servicing and distribution costs are generally lower. Unlike the United States, where manufacturers are generally not permitted to distribute beer directly to retail, the large majority of our beer in the United Kingdom is sold directly to retailers.

Distribution activities for CBL are conducted by Tradeteam, which operates a system of satellite warehouses and a transportation fleet. Tradeteam also manages the transportation of certain raw materials such as malt to the CBL breweries.

*On–trade*

The on–trade channel accounted for approximately 64% of our UK sales volumes in 2003. The installation and maintenance of draught beer dispense equipment in the on–trade channel is generally the responsibility of the brewer in the United Kingdom. CBL retains ownership of equipment required to dispense beer from kegs to consumers. This includes beer lines, line cooling, taps and countermounts.

Similar to other UK brewers, CBL has traditionally used loans to secure supply relationships with customers in the on–trade market. Loans have been granted at below–market rates of interest, with the outlet purchasing beer at lower–than–average discount levels to compensate. Such loans are typically secured by a proprietary interest in the borrower's property. We reclassify a portion of sales revenue to interest income to reflect the economic substance of these loans.

### Off–trade
The off–trade channel accounted for approximately 36% of our UK sales volume in 2003, up 2% from 2002. The off–trade market includes sales to supermarket chains, convenience stores, liquor store chains, distributors and wholesalers.

## Manufacturing, Production and Packaging

### Brewing Raw Materials
We use the highest quality water, barley and hops to brew our products. Water for our three UK breweries, located in Burton–on–Trent, Alton and Tadcaster, comes from dedicated supplies, filtered through the local underground aquifers. Barley for CBL brewing operations is high quality two–row seed grown exclusively in England to strict standards. We believe we have sufficient access to raw materials to meet our quality and production requirements.

### Brewing and Packaging Facilities
We operate three breweries in the United Kingdom. The Burton–on–Trent brewery, located in the Midlands, is the largest brewery in the United Kingdom. Other smaller breweries are located in Tadcaster and Alton.

## Packaging Materials

### Kegs
We used kegs and casks for approximately 61% of our UK product in 2003. We purchase our kegs and casks through supply contracts with third–party suppliers. The high level of volume packaged in kegs and casks contrasts with the Americas business, and reflects a higher percentage of product sold on–premise.

### Cans
Approximately 31% of our products were packaged in cans in 2003. Virtually all of our cans were purchased through supply contracts with Ball.

### Other Packaging
The remaining 8% of our product is primarily packaged in glass bottles purchased through supply contracts with third–party suppliers.

## Seasonality of Business

In Great Britain, the beer industry is subject to seasonal sales fluctuation primarily influenced by holiday periods, weather and by certain major televised sporting events. There is a peak during the summer and during the Christmas and New Year period. The holiday peak is most pronounced in the off–trade channel. Consequently, our largest quarters are the third and fourth quarters, and the smallest are the first and second.

## Competitive Conditions

### 2003 UK Beer Industry Overview
Beer consumption in the United Kingdom has been in long–term decline since 1980, falling by an average of 0.8% per annum. This decline has been mainly attributable to the on–trade channel, where volumes are now 40% lower than in 1980. Over the same period, off–trade volume has increased by 278%. This trend is expected to continue and has been influenced by a number of factors, including the increasing price difference between beer in the on– and off–trade channels and changes in consumers' lifestyles. 2003 represented a continuation of these trends with off–trade market growth of 7.4% and a decline in the on–trade market of 2.7%, with the off–trade now representing one third of the market. The total UK beer market grew 1.1% in 2003, which represented the third consecutive year of growth, a contributing factor to this growth in 2003 being the unusually hot summer weather.

## 15. Quarterly Financial Information (Unaudited)

The following summarizes selected quarterly financial information for each of the two years in the period ended December 28, 2003:

| | First | Second | Third | Fourth | Year |
|---|---|---|---|---|---|
| | | (In thousands, except per share data) | | | |
| **2003** | | | | | |
| Sales – domestic and international | $ 1,100,855 | $ 1,469,371 | $ 1,420,191 | $ 1,396,803 | $ 5,387,220 |
| Beer excise taxes | (272,714) | (368,995) | (371,467) | (373,931) | (1,387,107) |
| Net sales | 828,141 | 1,100,376 | 1,048,724 | 1,022,872 | 4,000,113 |
| Cost of goods sold | (559,474) | (683,087) | (658,016) | (686,206) | (2,586,783) |
| Gross profit | $ 268,667 | $ 417,289 | $ 390,708 | $ 336,666 | $ 1,413,330 |
| Net income | $ 806 | $ 76,342 | $ 61,428 | $ 36,081 | $ 174,657 |
| Net income per share – basic | $ 0.02 | $ 2.10 | $ 1.69 | $ 1.00 | $ 4.81 |
| Net income per share – diluted | $ 0.02 | $ 2.09 | $ 1.68 | $ 0.98 | $ 4.77 |
| **2002** | | | | | |
| Sales – domestic and international | $ 944,256 | $ 1,363,025 | $ 1,322,722 | $ 1,326,944 | $ 4,956,947 |
| Beer excise taxes | (198,434) | (315,256) | (321,124) | (345,811) | (1,180,625) |
| Net sales | 745,822 | 1,047,769 | 1,001,598 | 981,133 | 3,776,322 |
| Cost of goods sold | (482,344) | (640,020) | (636,094) | (656,072) | (2,414,530) |
| Gross profit | $ 263,478 | $ 407,749 | $ 365,504 | $ 325,061 | $ 1,361,792 |
| Net income | $ 27,203 | $ 67,616 | $ 46,619 | $ 20,215 | $ 161,653 |
| Net income per share – basic | $ 0.76 | $ 1.87 | $ 1.29 | $ 0.55 | $ 4.47 |
| Net income per share – diluted | $ 0.75 | $ 1.84 | $ 1.28 | $ 0.55 | $ 4.42 |

## 16. Coors Brewers Limited Acquisition

On February 2, 2002, we acquired 100% of the outstanding shares of Bass Holdings Ltd. and certain other intangible assets from Interbrew, for a total purchase price of 1.2 billion GBP (approximately $1.7 billion at then prevailing exchange rates), plus associated fees and expenses. The acquisition supported one of our key strategic goals of growing our beer business internationally to broaden our geographic platform; diversify revenues, profits and cash flows and increase our brand portfolio, which we believe will significantly enhance our competitive position in a consolidating worldwide beer industry.

One of the factors that contributed to a purchase price that resulted in the recognition of goodwill was the existence of financial and operating synergies. In addition to these synergies, there were a number of other factors – including the existence of a strong management team, a proven track record of introducing and marketing successful brands, an efficient sales and distribution system, complementary products and a good sales force.

The business, renamed CBL, included the majority of the assets that previously made up Bass Brewers, including the Carling, Worthington and Caffrey's beer brands; the United Kingdom and Republic of Ireland distribution rights to Grolsch (via and subject to the continuation of a joint venture arrangement, in which CBL has a 49% interest, with Royal Grolsch N.V.); several other beer and flavored–alcohol beverage brands; related brewing and malting facilities in the United Kingdom; and a 49.9% interest in the distribution logistics provider, Tradeteam. CBL is the second–largest brewer in the United Kingdom based on total beer volume, and Carling lager is the best–selling beer brand in the United Kingdom. The brand rights for Carling, which is the largest acquired brand by volume, are mainly for territories in

Europe. The addition of CBL creates a stronger, broader, more diversified company in a highly competitive and consolidating global beer market.

The results of CBL operations have been included in the consolidated financial statements since February 2, 2002, the date of acquisition. The following table shows the unaudited proforma results of our consolidated operations for the fiscal year ended December 29, 2002, as if the business combination had occurred at the beginning of that fiscal year, as well as comparative actual consolidated results for the fiscal year ended December 28, 2003, when we owned CBL for the whole period. The 2002 proforma results are not necessarily indicative of the results of operations that would have occurred if the business combination had occurred at the beginning of that year and are not intended to be indicative of future results of operations.

| | For the Years ended | | | |
|---|---|---|---|---|
| | December 28, 2003 | | December 29, 2002 | |
| | (In thousands, except per share data) | | | |
| | | | | (Unaudited) |
| Net sales | $ | 4,000,113 | $ | 3,857,593 |
| Pretax income | $ | 253,818 | $ | 234,833 |
| Net income | $ | 174,657 | $ | 148,452 |
| Net income per common share: | | | | |
| Basic | $ | 4.81 | $ | 4.11 |
| Diluted | $ | 4.77 | $ | 4.06 |

The following table summarizes the fair values of the assets acquired and liabilities assumed at the date of acquisition:

| | As of February 2, 2002 (In millions) | |
|---|---|---|
| Current assets | $ | 546 |
| Property, plant and equipment | | 442 |
| Other assets | | 398 |
| Intangible assets | | 415 |
| Goodwill | | 637 |
| Total assets acquired | | 2,438 |
| Current liabilities | | (425) |
| Non-current liabilities | | (279) |
| Total liabilities assumed | | (704) |
| Net assets acquired | $ | 1,734 |

Of the $415 million of acquired intangible assets, approximately $390 million has been assigned to brand names and distribution rights. The remaining $25 million was assigned to patents and technology and distribution channels. Approximately $286 million of the $390 million brand name and distribution rights value has been determined to have an indefinite life and accordingly will not be amortized. The remaining $104 million brand names and distribution rights value will be amortized over a weighted average useful life of approximately 12 years. The $25 million value for patents and technology and distribution channels will be amortized over a weighted average useful life of approximately 8 years.

We engaged the services of a professional appraiser to assist us in determining the value of the intangible assets acquired in the acquisition of CBL. The fair value of the acquired intangible brand assets were determined primarily from the discounted value of projected cash flows. A weighted average cost of capital of 8.75% was used to discount projected cash flows. Cash flows were projected using management's best estimates of sales growth or declines for each brand over its expected life. The lives of the assets were determined by an evaluation of significant factors that could impact the life of the brand.

The cost approach was used to determine the value of the customer base using the estimated cost to recruit a customer. Technology, unfavorable leaseholds, contracts and other less significant intangible assets were valued using a present value approach of the returns or costs of the underlying assets. Goodwill was valued using the residual method.

73

We finalized the purchase price accounting relative to the CBL acquisition in the fourth quarter of 2002. Significant purchase price adjustments included an $83.4 million increase of goodwill related to the pension plan actuarial valuation, a $2.7 million decrease of goodwill for certain restructuring plans and a $4.3 million increase of goodwill for adjustments to the fair value of assets acquired.

Goodwill of $637 million was assigned to the Europe and Americas segments in the amounts of approximately $522 million and $115 million, respectively (See Note 17, Goodwill and Intangible Assets, for further discussion of allocation). It is currently expected that none of the goodwill will be deductible for tax purposes. A valuation allowance of approximately $40 million was recorded against deferred tax assets arising from the acquisition.

In 2002, we closed our Cape Hill brewery and Alloa malting facility acquired as part of CBL. The Alloa malting facility was closed in June 2002 and was sold in July 2002 for $375,000. The majority of the production at the Cape Hill brewery related to brands that were retained by Interbrew, the previous owner of CBL. Liabilities recorded as part of purchase price accounting are (in millions):

|  | Amount |
|---|---|
| **Cape Hill:** | |
| Employee severance and related costs | $ 15.6 |
| Contract cancellation costs | 0.2 |
| Total | **15.8** |
| **Alloa Maltings:** | |
| Employee severance and related costs | 0.7 |
| Lease termination costs | 0.8 |
| Total | **1.5** |
| **Grand Total** | **$ 17.3** |

Closure of the Cape Hill brewery commenced in July 2002 with the shut down of the kegging line. All production ceased in December 2002, at which time the assets were re–classified as held–for–sale. The site is currently being held for sale at a carrying value of approximately $39 million. The payment of severance and other termination benefits started in July 2002 with the closure of the kegging line, and were substantially completed in 2003. We have a potential buyer and we expect disposition to be completed during 2005, possibly earlier, depending on obtaining agreement with government authorities on zoning issues. The costs associated with these closures that were paid during 2003 and 2002 consisted predominately of severance costs and approximated $5.5 million and $3.2 million, respectively.

We funded the acquisition with approximately $150 million of cash on hand and approximately $1.55 billion of debt as described below at the prevailing exchange rate as of the date of acquisition:

| Term | | Facility Currency Denomination | Amount |
|---|---|---|---|
| | | | (In millions) |
| 5 year | Amortizing term loan | USD | $ 478 |
| 5 year | Amortizing term loan (228 million GBP) | GBP | 322 |
| 9 month | Bridge facility | USD | 750 |
| | | | $ 1,550 |

In conjunction with the term loan and bridge facility, we incurred financing fees of approximately $9.0 million and $0.5 million, respectively. These fees were amortized over the respective terms of the borrowings using the effective interest method. On May 7, 2002, we repaid our nine–month bridge facility through the issuance of long–term financing. We also repaid the balance of our GBP–denominated amortizing term loan during 2003. See Note 4, Debt, for further information about debt–related activity.

74

# EXHIBIT 7

QuickLinks — Click here to rapidly navigate through this document

**UNITED STATES**
**SECURITIES AND EXCHANGE COMMISSION**
**Washington, D.C. 20549**

# SCHEDULE 14A

Proxy Statement Pursuant to Section 14(a) of the
Securities Exchange Act of 1934

Filed by the Registrant ☒

Filed by a Party other than the Registrant ☐

Check the appropriate box:

☐    Preliminary Proxy Statement

☐    **Confidential, for Use of the Commission Only (as permitted by Rule 14a–6(e)(2))**

☐    Definitive Proxy Statement

☐    Definitive Additional Materials

☒    Soliciting Material Pursuant to §240.14a–12

---

**Adolph Coors Company**

---

(Name of Registrant as Specified In Its Charter)

Payment of Filing Fee (Check the appropriate box):

☒    No fee required.

☐    Fee computed on table below per Exchange Act Rules 14a–6(i)(1) and 0–11.

    (1)    Title of each class of securities to which transaction applies:
        N/A

    (2)    Aggregate number of securities to which transaction applies:
        N/A

    (3)    Per unit price or other underlying value of transaction computed pursuant to Exchange Act Rule 0–11 (set forth the amount on which the filing fee is calculated and state how it was determined):
        N/A

    (4)    Proposed maximum aggregate value of transaction:
        N/A

    (5)    Total fee paid:
        N/A

☐    Fee paid previously with preliminary materials.

☐    Check box if any part of the fee is offset as provided by Exchange Act Rule 0–11(a)(2) and identify the filing for which the offsetting fee was paid previously. Identify the previous filing by registration statement number, or the Form or Schedule and the date of its filing.

    (1)    Amount Previously Paid:
        N/A

    (2)    Form, Schedule or Registration Statement No.:
        N/A

    (3)    Filing Party:
        N/A

    (4)    Date Filed:
        N/A

This filing consists of the following materials:

*(1)*

a transcript of a conference call held on July 22, 2004 in connection with the announcement of the proposed combination of Adolph Coors Company and Molson Inc.; and

*(2)*

biographies of certain management personnel posted as of July 22, 2004 on a website regarding the proposed combination.

# Conference Call Transcript

**Molson Inc. and Adolph Coors Company Proposed Combination**

Event Date/Time: Jul. 22. 2004 / 9:30AM ET

**CORPORATE PARTICIPANTS**

**Eric Molson**
*Molson Inc.—Chairman*

**Peter Coors**
*Adolph Coors Company—Chairman*

**Daniel O'Neill**
*Molson Inc.—President and CEO*

**Leo Kiely**
*Adolph Coors Company—CEO*

**Tim Wolf**
*Adolph Coors Company—CFO*

**Bob Reese**
*Adolph Coors Company—Chief Legal Officer*

**CONFERENCE CALL PARTICIPANTS**

**Jim Durran**
*National Bank Finance—Analyst*

**Richard Grubman (ph)**
*High Fields Capital (ph)—Analyst*

**David Hayes**
*Lehman Brothers—Analyst*

**Michael VanAelst**
*CIBC World Markets—Analyst*

**James Black (ph)**
*TD Newcrest (ph)—Analyst*

**Irene Nattal**
*RBC Capital—Analyst*

**Andrew Conway (ph)**
*Credit Suisse First Boston—Analyst*

**Alan (ph)**
*Bloomberg Television—Analyst*

**Jeff (ph)**
*Prudential—Analyst*

**Carlos Laboy**
*Bear, Stearns—Analyst*

**Mark (ph)**
*Legg Mason—Analyst*

**Rob Davis**
*Keysam (ph)—Analyst*

**PRESENTATION**

Eric Molson—*Molson Inc.—Chairman*

Good morning ladies and gentlemen, my name is Eric Molson, I'm non–executive Chairman of the Board of Molson Inc. A month ago, nearly to the day, I stood in front of the Molson shareholders at our annual meeting and reiterated my family's commitment to controlling shareholder to the long–term growth of Molson. Today, I am very pleased to announce a merger of equals that creates a uniquely positioned Canadian–American company that delivers on that promise. The Molson Coors Brewing Company proposed today will be the fifth largest brewer in the world. From its dual headquarters in Denver and Montreal, the combined Company will have net sales of US$6.0 billion, volume of approximately 60 million hectoliters, and annual EBITDA of over US$1.0 billion. Since Molson's first stock issuance in 1945, the Molson family has not wavered in its commitment to build a company that will withstand the test of time. That commitment remains strong, especially over the past 18 months, as we witnessed an increase in the pace of consolidation in the brewing industry. Rather than shake our resolve, the reshaping of this industry has increased our determination to participate in that consolidation, but, as some would say, in our own terms and on terms that would be favorable to all our shareholders. We stand firm in our belief that Molson, as a Canadian icon, has to continue to grow and build on its rich longstanding brewing heritage and the enduring commitment and loyalty of Canadians have always shown us towards our Company and our products. Over the past few months, the senior management team of Molson supported by the Board went through the exercise of identifying a clear set of principles that were to guide us in reviewing the corporation's options for participating in this industry consolidation and for maximizing value for all of our shareholders. And let me briefly review some of these principles with you. First, with more than 200 years of brewing behind us and a rich Canadian heritage, it was important to ensure the continuity of the Molson name and to leverage the strength of the corporate plans. Second, brewing had to be the core of the business going forward, and this is consistent with the Molson corporate strategy for growth. Third, as Molson's founding family, the Molson's as a family have been committed to long–term investors to the company. We are not interested in exiting the business. Rather, the family wants to play a role in building a major global brewer and in driving greater value for all of our shareholders. Fourth was the requirement that the transaction be attractive and fair to all shareholders. And last, but probably the most important of all, the transaction must provide significant potential for long–term value creation for all shareholders. As Molson executives started to take a serious look at the possibilities and the scenarios in the light of these guidelines, one option clearly emerged: the Coors Brewing Company. Today, the agreement between Molson and Coors to create the Molson Coors Brewing Company through a merger of equals, delivers on all the guiding principles I have just enumerated. Both companies are brewing business with a family background, have complementary strengths, a heritage and a commitment to the brewing business, rigid adherence to the highest quality standards of integrity of product, and a common vision for the future growth. Merging these two companies provides several solid prospects of sustained returns in the short, medium, and long term. Finally, the merged company has all the potential to move to the next level and to succeed as an industry consolidator. The merger of equals between Molson and Coors is truly a compelling proposition and I am proud to present to all shareholders of Molson and of Coors. We, as controlling shareholders, are entirely, entirely supportive of this transaction. I want to stress that this is not a family project. This is not a Molson family project. This is a Molson company project and was conceived and developed by management. It was reviewed and unanimously approved by a committee of the Board entirely composed of independent directors and it was unanimously approved by the entire Board of Directors. To all Molson employees to whom I convey an immense sense of gratitude, I say, we all have a clear path for the future and to all Canadians, I say, we are not in a selling mood. This is a great step forward for us; this is a brewing tradition and a national icon that will continue to forge ahead. And, this step is of great benefit to all

3

our shareholders and for our country. We are taking a Canadian company and building it into another level. Thank you very much. Now, Peter, I believe you have some remarks.

**Peter Coors—*Adolph Coors Company—Chairman***

Thank you Eric, and what a great morning it is. I'm Peter Coors, I'm Chairman, non-executive Chairman, I guess, of Adolph Coors Company.

I am also delighted to be here with you today to discuss what can accurately be characterized as one of the most exciting and significant corporate developments in the 130 years history of our company. For those of you who aren't familiar with Coors, like Molson we have a long-standing heritage in the brewing world. The Company was founded in 1873, and we are currently the eighth largest brewer in the world with leading brands in the US and UK beer markets that includes Coors, Coors Light, Keystone, Killian's, Zima, Carling, Grolsch and Aspen Edge. I am very proud to see our company founded by my great grandfather Adolph Coors merge with the great Canadian brewer Molson. I know he would be pleased with the announcement we are making today for the simple reason that this merger of equals makes sense. The things that were most important to him, brewing great beer, commitment to employees and the community, and delivering value to investors, are attributes Coors still holds sacred and they are values shared by Molson. Although Molson is a couple of years older than we are, actually 87 years, actually we have virtually mirror-image roots. We know each other very well, we partnered with Molson on various marketing and distribution initiatives for over two decades. Perhaps more importantly, Molson is the company that we can unite with to take us to new levels. Together we will be financially stronger, we'll be leaner, and together we will continue to have some of the best and greatest talent in the industry. We can clearly leverage immediate opportunities to be more efficient, but that is the obvious part of the story. The exciting part comes from harnessing the power of a company that will overnight essentially double in size and have the capacity to support aggressive and creative marketing campaigns, innovative product innovations, and geographic expansion, all focused on driving growth and creating value. I'll let Leo, Dan, and Tim elaborate, but, I know I speak for all the members of the Coors family when I say we are thrilled that Coors is joining forces with Molson. We look forward to a rapid, constructive melding of each company's strengths and importantly in part of a Molson Coors Brewing Company that we'll all be proud of a hundred year hence. Now, I would like to introduce Leo Kiely, CEO of Coors and the man who will become CEO of Molson Coors Brewing Company. Leo?

**Leo Kiely—*Adolph Coors Company—CEO***

Thank you, Eric, Peter for summarizing so well the unique attributes of these two great beer companies and for your resounding endorsement of this transaction. Welcome and greetings everybody, nice to have you here on such short notice. One thing I would like to do is acknowledge the Coors team that is in the room today, if you stand up for a second, I am not going to make to individual introductions, but you should look at these people because they are the ones who will answer your really tough questions. And thanks for being here. I want to spend the next ten minutes or so outlining for all of you, why all of us are so excited about this merger of equals—why combining these companies is so right and what the combination will mean for our company's ability to create meaningful shareholder returns. First things first, this combination is about unlocking value for shareholders, all shareholders. It's about ensuring that our company can deliver near-term returns while positioning itself to drive growth and improve the results over the long-term. This combination unlocks three phases of value creation. First, we have identified $175 million in annualized synergies, 50% of which we expect to capture in the first 18 months after close. Dan will drill down as to where these synergies will come from shortly. Given the quick ramp up on some of the synergies, we expect this transaction to be accretive to earnings in the first year, excluding purchase price accounting and one-time charges. On a cash EPS basis, we expect the transaction to be significantly accretive in the first year. Second, we will

4

use anticipated additional synergies to make targeted investments behind our core brands and key markets, investments, which we will believe, will drive top line growth. As you all know, our brands are highly responsive to advertising and marketing, and we will have great resources to support innovative new campaigns that will increase awareness and therefore growth share and volume. And third, this merger gives us the operating scale and balance sheet strength to play a significant role in the consolidation of the global brewing business. Both Molson and Coors individually have made important acquisitions in the past couple of years. And this transaction gives us the critical mass to be a real player in a rapidly consolidating industry. In short, this combination is logical, compelling, and transformational for both of our companies. As Eric stated, we jumped to the top five position worldwide with the operating scale and financial strength to succeed as a major player in the global brewing industry, but it's not just about scale. This merger brings together two highly successful players with strong market positions in some of the world's largest and most profitable beer markets. This expanded geographic base provides diversified sources of revenue, profit, and cash generation. This is also a management team filled with consumer industry veterans, we have experienced integrating international beer operations. And maybe most importantly, we know how to brew great beer and build leading beer brands. Additionally, these companies are a unique strategic and cultural fit. Our operating geographies are complementary and both of our management teams have experience working together. We share common values, operating philosophies, and heritages focused on delivering significant value to our shareholders, while preserving the best attributes of a family–run business. As Eric and Pete touched on, Coors and Molson were both founded by pioneering families who are still active in the business today. Both have deep roots in their respective countries and share a passion for beer, and a commitment to quality supported by over 350 combined years of brewing experience. Eric aptly described Molson's strategic mandates, and Coors' were very similar, but we've even been more explicit about our goal to be a top five worldwide player. This gets each of us there far faster than we could have even envisioned even 12 months ago. Coors goes from being a number eight player and Molson from the 13th position. There is no magic in the five by the way, it simply represents a threshold that we think is critical if you want to thrive in today's very competitive, very rigorous, global beer market. So, what we look like as a top five player, looking at the 12 months ended March 31, 2004, the company had pro forma net sales of about $6 billion, EBITDA of approximately $1 billion, and a combined 2003 volume of 60 million hectos or 51 million US barrels. We'll have a product portfolio of more than 40 brands including Coors Light, Molson Canadian, Carling, Coors Original, Keystone, Aspen Edge, Zima XXX, Worthingtons, Molson Ultra, Export, Molson Dry, Rickards, A Marca Bavaria, and Kaiser. Additionally, the companies have distribution and licensing agreements with leading international brewers including Heineken, Grupo Modelo, Grolsch, Foster's, SABMiller and FEMSA. We will have important positions in four of the top six key global markets. As you can see from the charts on this slide, no matter how you slice it, by volume, revenue, or cash flow, we will be a strongly diversified company with an expanded profit base, which we believe will provide the Molson Coors Brewing Company with more stable results and the ability to expand our presence in high–potential markets around the world. Our markets in addition to being sizeable are very profitable, in fact, they are four of the top eight most profitable beer markets in the world. And we have a significant presence in these high margin markets. We have the number one brand in two of these markets, Molson Canadian brands in Canada, and Carling in the UK, and the number three brand in both the US, with Coors Light, and in Brazil with Kaiser. And if you look at all of our brands, we have a market share of 43% in Canada, making us the number one player in that region, a 21% share in the UK, making us the solid number two, and the US and Brazil where we have 11% market shares, we are ranked number three. Importantly, with our new size comes greater financial strength. Along with higher revenues comes approximately $1 billion in pro forma EBITDA, $700 million in pro forma free cash flow, a net debt–to–EBITDA ratio of 2.1 and significant additional debt capacity. Add to this $175 million in identified cost synergies, and you see a company with substantially enhanced financial strength and, significantly, new found financial flexibility that will allow us to drive growth in revenue, profits, and returns.

5

Before I turn it over to Dan O'Neill, I want to touch on the way we will run this company. This is truly a merger of equals. We are creating a Canadian–American company with headquarters in Montreal and Denver to facilitate our ability to integrate the best of best talent from two strong companies. Our operating divisions will continue to do business in their home countries as Coors and Molson. It is equally balanced from a governance perspective, including the composition of the Board. As you know, both the Coors and Molson families are very involved in this business and will remain active participants in shaping the future direction of the Company, a company in which they are and plan to remain highly invested. That said, in terms of governance, we put together what we believe is a very well balanced group, both in terms of shareholder representation and expertise.

Molson Coors will have a 15 member Board of Directors, most of whom will be drawn from the existing Boards of both companies. There will be five members elected by the Molson family trust shareholders, five members elected by the Coors family trust shareholders, and three directors elected by the Company's non–voting shareholders. And Dan O'Neill and myself will also be directors. Importantly, nine members of the Company's Board will be independent directors, and of course we will have an audit committee composed solely of independent directors. As this slide depicts, we also intend to establish an office of synergies and integration at the Board level. This office will provide a clear point of focus for the realization of cost savings and other synergies, including the alignment of related capital expenditures by applying best practices in global benchmarking. This group will be chaired by Dan and will also include Eric Molson and myself.

With that I'd like to introduce the man heading up this integration and synergy work, the current CEO of Molson Mr. Dan O'Neill. Dan and I have worked together for five years now, building each other's brands, and in the process we have developed a positive working relationship based on mutual respect. We share the same vision for the Molson Coors Brewing Company and we look forward to taking it to the next level together. Dan?.

**Daniel O'Neill—*Molson Inc.—President and CEO***

Good morning everyone. Just before we get started, I'd like to thank all the Molson people who have worked so diligently over the last month or so identifying a lot of the opportunities that we have and really making it happen. So, if the Molson people who are here in the room would stand up, I'd like to thank you and all the people who are at home still working on a lot of activities, we thank them as well, but thanks very much to the whole group.

As you can see this is a transaction that we believe will deliver real value to the shareholders in the near–term and allow us to reinvest and enable us to deliver improved returns in the longer–term as well. One reason that we feel so confident in our ability to deliver these objectives is that we have great management team with the experience necessary to ensure that these businesses as our combined seemlessly. Between Eric, Leo, and myself, we have over a hundred years of consumer industry experience, and we have a proven track record of building leading consumer brands. Over the last 26 years, Coors has built Coors Light into the seventh largest brand in the world. On the Molson side, the Molson Canadian brand has been the leading brand in Canada for several years and Molson as a company is the number one beer company in Canada. In addition, both management teams have demonstrated their ability to capture operational efficiencies and control costs while maintaining sales growth. For example, as you know Coors is on track to achieve the US operations cost goal of $4–$5 per barrel over four to five years. Molson on the other hand, has met or exceeded every cost reduction target it has set forth over the last five years identifying and delivering over CDN$275 million in savings over that five year time period. Both companies have strong experience in international operations, we are sure no one can call in the question the resounding success that Coors has had integrating and operating Carling in the UK business and while Molson has encountered difficulties with its Brazilian company in its overall operations, there is a clear plan in place to revive and move that business ahead. And as Leo discussed, we have created a very specific committee to manage the

6

integration and have a clear focus on executing and delivering the synergies. I personally will be very actively involved in the details associated with delivering and unlocking value available to our new company. Let me take a minute and explain $175 million in synergies already identified, which we plan to capture by fiscal 2007. We identified six primary buckets. The slide lays out the buckets and will put some real numbers against them. These are annualized saving numbers building over three years following the close. First, the team has identified $60 million in cost reductions through the optimization of the combined brewery network. We have an extensive system of breweries, packaging plants, distribution centers and transportation resources throughout North America, and have identified areas where they can be immediately rationalized. We also expect to identify additional areas for consolidation over time, which should and will fall outside and add to the $175 million already noted. Next, the team has a target for procurement savings of approximately $43 million and SG&A savings of approximately $40 million. As a company twice as large as either of us was before, we will simply have more purchasing leverage and greater opportunity of efficiencies. We plan on eliminating duplicate functions at the corporate level and consolidating staff for practical. The fourth bucket we have titled "best in class savings," which represents $12 million expected savings. This relates to electing to go with a best and most efficient of the varying bylaws of the two companies. For instance choosing the best IT system or the best cash management system. We've identified 10 million in synergies in the fifth area, which we have entitled "organizational design," which relates to the costs that can be captured by having one network and utilizing one operations construct. In other words, there is a lot of flexibility to reduce costs by having one major North American organization. We also identified 10 million of other synergies from a variety of sources but very clearly specific projects. Think about it this way, we think we can very easily achieve synergies of roughly 3.3% of the pro forma cost base. It is important to note that the savings are not simply concepts, but numbers developed from teams working together for several weeks to provide us with hardcore numbers. Personally I am very confident that we can achieve these targets. In addition we are confident, we can do it fairly rapidly with very material profit results within the first 12 months and 87% of the initial synergy estimates taken out by the end of year two. We also believe there are significant margin expansion opportunities. Synergies will have a significant impact on the pro forma EBITDA. If you look at the margin of the company, 16.5% without synergies, as compared to the other leading global breweries, Molson and Coors will initially meet that global standard. The combined company will be in a position to capture identified synergies rapidly and the immediately synergy capture will add 300 basis points to the margin reaching 19.5%. In addition to the $175 million, my role would be to identify and capture additional synergies over the mid to longer–term. Take a look here at Ambev at 35% and AB at 29%. You can see that there is room for significant improvement. Molson has taken our Canadian business from 18% margins to 28%, and Coors is improving as well. We have a track record of achievement. The conclusion: The available pot of synergies created by the combination of these two great companies is significant for value creation and there's potentially a large upside to this initial evaluation from our conservative estimates. Our enhanced financial strength will allow us not only to deliver on the bottom line, but allow us to invest in our brands and businesses to better position the combined company for future growth and long–term shareholder value creation. We will use our strong cash flows and synergies to make targeted investments to support our brands. We will put dollars behind advancing Coors Light in Canada. Coors' existing JV with Molson, under which Molson is the sole distributor of Coors Light in Canada, has been very successful. We think, combined, we can do even more to advance the brand. Likewise, we will be in position to provide enhanced support behind Molson Canadian in both Canada and the United States. We will also continue to invest in product innovations. Innovation will be of increased importance to the new company and we believe new products like Aspen Edge, Carling Extra Cold, Zima XXX, Molson Coldshots, and Marca Bavaria, will be important future growth drivers. We will also continue to put money behind capital improvements. Our spending will be more disciplined, strategic and designed to deliver improved efficiencies and drive savings. Finally, our combined stronger overall financial profile provides for long–term success in that it creates, as Leo mentioned, strong platform to continue as a global consolidator. The Molson Coors Brewing Company will have the

7

operating and financial scale to pursue strategic acquisitions and/or joint ventures. We have identified several areas from which to drive revenue growth going forward. In Canada, we will unleash Coors Light, redirect dollars from Canadian Light to Molson Canadian, support value entry to regain share and drive volume savings, utilize the ARC technology from the UK to drive on premise listings and overall performance in Canada. In the US, we will continue to support Coors Light in developmental regions, capitalize on improving brands at attribute ratings. We will expand testing of Marca Bavaria. We will leverage Molson Canadian and Molson XXX in a complete US system. In the UK, we will look at Molson brands to see if there are a fit or a value for the future for needs as a super premium bottled lager. And in Brazil, we plan to continue to invest in Kaiser, to take advantage of the growth opportunity in the country, as well as investigate the appeal of Coors Light. The value creation opportunity is exciting and we at Molson look forward to working together with Coors to drive these values. With that I will turn the meeting over to Tim Wolf, the CFO of Coors Brewing Company and the future CFO of Molson Coors. Tim?

**Tim Wolf—***Adolph Coors Company—CFO*

Good morning and thank you again for being with us. Before I begin, I would like to share our language on forward–looking statements. The presentations that you will hear today and have heard so far include forward–looking statements within the meaning of US Federal Securities laws. Forward–looking statements are commonly identified by such terms and phrases as would, may, will, expects, or expected to, and other terms with similar meanings indicating possible future events or actions or potential impact on the businesses or shareholders of Adolph Coors Company and Molson Inc., separately or together referred to as the "Company." Such statements include, but are not limited to, statements about the anticipated benefits, savings, and synergies of the merger of equals between Adolph Coors Company and Molson Inc., including future financial and operating results, Coors' and Molson's plans, objectives, expectations and intentions, the markets for Coors' and Molson's products, the future development of Coors' and Molson's business, and the contingencies and uncertainties to which Coors and Molson may be subject, and other statements that are not historical facts. The presentation also includes information that has not been reviewed by the Companies' independent auditors, and there is no assurance the transaction contemplated in the presentation that you will hear today will be completed at all, or completed upon the same terms and conditions described. All forward–looking statements in this presentation are expressly qualified by information contained in each Company's filings with regulatory authorities. The Companies do not undertake to publicly update forward–looking statements, whether as a result of new information, future events or otherwise.

So, with that important business out of the way, let me get into my comments. I am the CFO, you can't smile about that stuff. Over the next few minutes, I'd like to take you through a summary of our merger of equals agreement, including ownership, voting rights and governance. I'll also review a snapshot of pro forma financials. And just to be clear, like Dan and Leo, I'll be referring to US dollars and all pro forma numbers are as of March 31, 2004. We will be updating this information to reflect results ending with the June quarter for both Companies in the near future.

Let me start by providing my perspective of why this merger of equals is such a compelling combination from a financial standpoint. You've heard these themes already, but they do bear repeating. First, scale; together, we are creating a company that on a pro forma basis has a combined enterprise value of approximately $8.4 billion; essentially double either company as a standalone entity. You've seen the pro forma numbers on revenues, EBITDA, operating income and free cash flow. Even pre–synergies, our newly combined company immediately will be able to leverage a broader, stronger critical mass of revenue, cash generation, and profits.

Secondly, capacity. We'll have very significant debt capacity, both as a function of each company's inherent cash generation combined with recent aggressive programs to reduce leverage. In fact, day

8

one, debt capacity will be significant. It will provide us with immense financial flexibility to pursue growth aggressively.

Third, opportunities: with a broader, more diverse platform we have far greater ability to reduce costs, manage cash more effectively, reduce vulnerability to risk, and run the business more efficiently. The synergies that Dan outlined today are those we worked on to date, but we will be working hard to develop more of these opportunities, in the months ahead. In short, this is a very attractive combination, from a financial standpoint and we are excited by the great potential of this true merger of equals.

Okay, let me move on to the agreement, if there aren't enough words on that chart, we can add some more—but as we described in the press release, this merger of equals has been structured as a stock–for–stock exchange that will be available on a tax–free basis for Molson shareholders in Canada and Coors shareholders in the United States. I'll address the ownership and voting components in a second. The exchange ratio is 0.360 Coors voting or non–voting share per Molson voting or non–voting share. Both company's boards unanimously approve this merger of equals and we have included a breakup fee of $75 million in our agreement. And significantly, the existing controlling shareholders at Coors and Molson, essentially the Coors and Molson families, have agreed to vote their shares in favor of the merger and have entered into a formal voting trust agreement.

The transaction is subject to the approval of the shareholders of both Companies. Thresholds needed are two–thirds of each class of Molson shareholders and a majority of each class of Coors shareholders. The deal is also subject to other customary closing conditions and a variety of regulatory approvals, including Hart–Scott–Rodino and the Canadian Competition Bureau. We do not expect any significant regulatory issues. Following these approvals and shareholders meetings and votes, we expect to close in the fourth quarter of 2004. Upon close, Molson Coors Brewing Company will be listed jointly on the New York Stock Exchange and the Toronto Stock Exchange, with Molson Coors A and B Shares on the New York Stock Exchange and exchangeable A and B shares on the Toronto exchange. We expect the company to adopt the current Molson quarterly dividend policy, currently US$0.44 per share. Adjusted for the currency exchange rate, and the share exchange ratio I mentioned a moment ago, the dividend is expected to be US$1.21 per Molson Coors share. Now let's walk through ownership starting with a current snapshot. The affiliated Molson family members hold roughly 55% of the voting stock with the public and others owning the balance. All Molson non–voting stock is publicly owned, Coors voting stock of 100% owned by the Coors family. Non–voting Coors stock is 30% owned by the Coors Family, with the balance owned by the public. You can also see the economic ownership percentages here as well.

Under the terms of the agreement, voting and non–voting shareholders of Coors will own one voting or non–voting share, respectively, of Molson Coors Brewing Company for each share of Coors. Let me explain a little bit more about how the 0.36 exchange ratio works. For US based holders of Molson stock, each voting share of Molson will be converted into 0.126 voting shares and 0.234 non–voting shares of Molson Coors Brewing Company. Each non–voting share of Molson will be converted into 0.360 non–voting shares of Molson Coors. Canada based Molson shareholders will have the same economics, but will have the choice of receiving this in the form of primary shares or exchangeable shares. This slide illustrates share exchange hopefully quite simply. The key point here is that there is no change in voting rights for current Coors voting and non–voting shareholders. Molson voting shares get split into voting and non–voting shares, 35% voting and 65% non–voting. Voting rights of Molson non–voting shares do not change. After our merger of equals is complete, a holding company controlled by Eric Molson and the Adolph Coors, Jr. Trust will own together approximately 62% of the voting shares of Molson Coors Brewing Company. So, key take aways. As Leo discussed we have a balanced Board with a majority of independent directors.

9

The management will clearly be running the business, and making the operating decisions. Board oversight and most board actions will be determined by simple majority of the directors. A few critical issues may require voting shareholder approval, and in those instances, the Coors Family Trust and Eric Molson's holding company have agreed to vote their shares together in a voting trust. So, let's look a little closer at the pro forma income statement and balance sheet again using the last 12 months as of March 31, 2004. You will see here what we have shown pro forma numbers both pre and post synergies. The real take away here is that the synergies drive healthy margin expansion, stronger profit and enhanced cash flow, and again mentioned this in some detail before. Combined EBIT jump from almost $675 million pre–synergies to $850 million when you factor in the $175 million of synergies. EBIT margin improves 14.2%, EBITDA from $1.17 billion and operating margin of 19.6%. Even discounting the synergies on a pro forma basis, the combined company will have very healthy margins and nearly $900 million in free cash flow as the synergies come on line.

Now, a moment on the balance sheet. The main message here is about debt capacity. As of March 31, 2004, the combined company would have had total debt just north of $2.1 billion translating into a net debt to EBITDA ratio of 2.1. All in all, a very healthy balance sheet with ample capacity to pursue new value driving opportunities, and in fact, for Coors, debt has been reduced even further in the second quarter. And very importantly, a huge advantage of our merger of equals is that our already strong balance sheet will not be burdened with heavy debt that could very well compromise our futures, and the essential ability to invest and grow for the future. In summary, we believe this merger of equals will result in an enterprise that is stronger, more profitable, and more financially resilient. We have work ahead of us to make it a reality, we're confident in our abilities and in our new team, we are excited by the realistic and achievable plan that we've all developed. Now, Leo let me turn it back to you to wrap this up and take questions.

**Leo Kiely—*Adolph Coors Company—CEO***

Thanks Tim. In sum, everybody, this merger is a strategic move to transform our companies and benefit our shareholders. It's about value creation, critical mass, and a shared vision. It unlocks shareholder value through the realization of significant merger synergies and you have an experienced management team with a cohesive plan to deliver those synergies. We will be number 5 in the world with global scale and geographic diversity, strong cash flow and balance sheet strength will allow us to make further investments in our businesses, and in Molson Coors' future growth. We are a superb strategic and cultural fit with a shared vision centered around growing the business for stakeholders while maintaining the best aspects of two family businesses that began and will continue with a focused dedication on making great beer. So, with that we will take some questions. Are we set with the microphones?

## QUESTION AND ANSWER

**Operator**

Ladies and gentlemen, we will take questions now and then go to the phone and this question and answer period will end promptly at 10:45 AM.

**Leo Kiely—*Adolph Coors Company—CEO***

Very good.

**Jeff (ph)—*Prudential—Analyst***

Good morning Leo, Jeff (ph), Prudential.

10

# EXHIBIT 8

Use these links to rapidly review the document
ADOLPH COORS COMPANY AND SUBSIDIARIES INDEX

# UNITED STATES
# SECURITIES AND EXCHANGE COMMISSION
Washington, D.C. 20549

# FORM 10-Q

☒ **QUARTERLY REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

For the Quarterly period ended June 27, 2004

OR

☐ **TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

For the transition period from      to

Commission File Number: 1-14829

# ADOLPH COORS COMPANY
(Exact name of registrant as specified in its charter)

| | |
|---|---|
| **DELAWARE** | **84-0178360** |
| (State or other jurisdiction of incorporation or organization) | (I.R.S. Employer Identification No.) |
| **311 Tenth Street, Golden, Colorado** | **80401** |
| (Address of principal executive offices) | (Zip Code) |

**303-279-6565**
(Registrant's telephone number, including area code)

Indicate by check mark whether the registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days.

YES ☒   NO ☐

Indicate by check mark whether the registrant is an accelerated filer (as defined in Rule 12b-2 of the Exchange Act).

YES ☒   NO ☐

Indicate the number of shares outstanding of each of the registrant's classes of common stock, as of July 30, 2004:

Class A Common Stock—1,260,000 shares
Class B Common Stock—36,121,728 shares

**ADOLPH COORS COMPANY AND SUBSIDIARIES**

**INDEX**

PART I. FINANCIAL INFORMATION

Item 1.   Financial Statements (Unaudited)
          Condensed Consolidated Statements of Income for the thirteen and twenty-six weeks ended June 27, 2004 and June 29, 2003
          Condensed Consolidated Balance Sheets at June 27, 2004 and December 28, 2003
          Condensed Consolidated Statements of Cash Flows for the twenty-six weeks ended June 27, 2004 and June 29, 2003
          Notes to Unaudited Condensed Consolidated Financial Statements
Item 2.   Management's Discussion and Analysis of Financial Condition and Results of Operations
Item 3.   Quantitative and Qualitative Disclosures About Market Risk
Item 4.   Controls and Procedures

PART II. OTHER INFORMATION

Item 1.   Legal Proceedings
Item 6.   Exhibits and Reports on Form 8-K
          (a) Exhibits
          (b) Reports on Form 8-K

2

ITEM 2. MANAGEMENT'S DISCUSSION AND ANALYSIS OF FINANCIAL CONDITION AND RESULTS OF OPERATIONS

**Executive Summary**

Overall, our second quarter results showed improving trends in several key areas of the business, but a few, largely temporary, factors negatively impacted our overall results. Improved pricing in our major markets, solid margin and profit growth in the United Kingdom, continued strong performance of our Coors Light business in Canada, and favorable foreign exchange rates drove higher operating income in the quarter. These positive factors were partially offset by the negative impacts of US distributor inventory dynamics and higher logistics–related costs in our Americas business.

In the Americas, while our sales to retail declined slightly in the first half of the year, our sales to wholesalers declined 5.2% in the second quarter and 3.0% in the first half of the year, due to a significant year–over–year shift in distributor inventory patterns. US retail volume declines were focused in select markets—particularly in Pennsylvania and Texas—where we face unique local issues. Sales to retail grew during the quarter in five of our seven largest states, including California and New Jersey, where trends rebounded from declines early in the year.

In our Europe segment, volume growth in the second quarter was challenged by the lapping of heavy off–trade price discounting last year, along with a retailer inventory load–in during the first quarter this year ahead of a U.K excise tax increase. Nevertheless, we grew volume during the quarter, led by high–single–digit growth of Carling®, the number–one selling UK beer brand.

In addition, our consolidated earnings per share were negatively impacted by a higher tax rate this year versus a one–time reduction in our effective tax rate last year, as well as higher diluted shares outstanding this year.

**Results of Operations**

This discussion summarizes the significant factors affecting our consolidated results of operations, liquidity, and capital resources for the thirteen and twenty–six week periods ended June 27, 2004, and June 29, 2003, respectively, and should be read in conjunction with the financial statements and notes thereto included elsewhere in this report, as well as our Annual Report on Form 10–K for the year ended December 28, 2003. Our results in the first half of 2004 are affected by the adoption of FIN 46R, which required consolidation of some of our joint ventures. (See Note 2 in the accompanying financial statements.)

**THE AMERICAS SEGMENT RESULTS OF OPERATIONS**

The Americas segment is focused on the production, marketing, and sales of the Coors portfolio of brands in the United States and its territories, including the results of the RMMC and RMBC joint ventures consolidated in 2004 under FIN 46R. This segment also includes the Coors Light business in Canada that is conducted through a partnership with Molson, Coors Canada, and the sale of Molson products in the United States that is conducted through a joint venture, Molson USA. The Americas also include the small amount of Coors brand volume that is sold outside of the United States and its territories and Europe. During the second quarter of 2004, Cerveceria Cuauhtemoc Moctezuma, S.A.

28