IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| IN RE MOLSON COORS BREWING COMPANY SECURITIES LITIGATION | )<br>)<br>)<br>) |  CIVIL ACTION NO. 05-294-KAJ<br>CONSOLIDATED |

PLAINTIFFS' ANSWERING BRIEF IN OPPOSITION TO
DEFENDANTS' MOTION TO DISMISS THE
CONSOLIDATED AMENDED CLASS ACTION COMPLAINT

MILBERG WEISS BERSHAD
& SCHULMAN LLP
Brian D. Long (#4347)
Sean M. Brennecke (#4686)
919 N. Market Street, Suite 980
Wilmington, DE 19801
(302) 984-0597 (Tel)
(302) 984-0870 (Fax)

*Plaintiffs' Lead Counsel*

**Of Counsel**

**LABATON SUCHAROW
 & RUDOFF LLP**
Eric Belfi
100 Park Avenue
New York, NY 10017
(212) 907-0700 (Tel)
(212) 818-0477 (Fax)

Dated:  June 23, 2006

**TABLE OF CONTENTS**

Page

TABLE OF AUTHORITIES ................................................................................ iv

NATURE AND STAGE OF THE PROCEEDING.................................................. 1

SUMMARY OF ARGUMENT ............................................................................. 2

I.      STATEMENT OF FACTS ......................................................................... 3

     A.      PRE-MERGER STATUS OF BOTH COMPANIES ............................................ 3

     B.      INVESTORS INITIALLY OPPOSED THE MERGER ...................................... 5

     C.      DEFENDANTS' FALSE AND/OR MISLEADING  STATEMENTS AND OMISSIONS ......................................................................... 6

           1.     Statements Regarding Coors' Profitability ............................................... 6

           2.     Statements Concerning The Synergies Resulting  From The Merger ...... 8

           3.     Statements Regarding The Deterioration Of Molson's Brazilian Operations............................................................. 9

     D.      DEFENDANTS' IMPROPER ACCOUNTING PRACTICES ........................... 11

           1.     Improper Accounting For Kaiser ........................................................... 11

           2.     Improper Accounting For Executive Severance..................................... 12

           3.     Improper Accounting For Brazilian Tax Liabilities ............................... 13

     E.      COORS WARRANTED AGAINST, AND HAD A DUTY TO REPORT, ANY MATERIAL ADVERSE CHANGE IN COORS' BUSINESS .......................................................................... 13

     F.      INVESTORS ACCEPTED DEFENDANTS' FALSE AND/OR MISLEADING STATEMENTS ....................................................... 13

     G.      THE DISASTROUS TRUTH WAS THEN REVEALED ................................. 14

           1.     Molson Coors Reported Disastrous First Quarter Results...................... 15

           2.     The True Extent Of Molson's Problems  In Brazil Were Revealed ........ 15

           3.     In Addition To Disastrous Results, Molson Coors Announced The Departure Of Numerous Members Of Senior Management............ 16

4.     Analysts Were Stunned, Calling Molson Coors A "Mystery"
       Not An Investment...................................................................... 16

5.     The SEC Began To Investigate Molson Coors ...................................... 17

H.     Significant Harm Befell Molson Coors' Shareholders ........................... 17

II.    ARGUMENT.................................................................................... 18

A.     THE COMPLAINT ADEQUATELY IDENTIFIES SEVERAL FALSE
       AND/OR MISLEADING STATEMENTS OF MATERIAL FACT ................. 18

1.     The Court Must Accept All Facts And Reasonable Inferences In
       Favor Of Plaintiffs ...................................................................... 18

2.     Regarding Merger Synergies ................................................................. 18

a.     Defendants Lacked A Reasonable Basis For Their
       Synergies Statements ................................................................ 19

b.     Defendants' Misstatements and Omissions Are Not
       Protected By the "Bespeaks Caution" Doctrine Or The
       PSLRA's Safe Harbor ............................................................... 21

c.     The Allegations Regarding Lead Plaintiffs' Confidential
       Witness Are Sufficient............................................................... 23

3.     Regarding Coors' Pre-Merger Performance........................................... 25

4.     Regarding Molson's Brazilian Business................................................. 27

5.     Regarding The Departure Of Coors Senior Executives........................... 32

B.     THE COMPLAINT ADEQUATELY ALLEGES SCIENTER .......................... 33

1.     Plaintiffs Allege Actionable Misrepresentations And Omissions
       Contained In Corporate Documents That Are Attributable To
       Each Defendant........................................................................... 33

2.     The Complaint's Allegations Assessed In Their Totality More
       Than Sufficiently Plead Scienter .......................................................... 34

a.     The Complaint More Than Sufficiently Alleges Motive
       and Opportunity........................................................................ 35

(1)    Defendants' Sought to Benefit From a Merger of
       Convenience ................................................................. 35

(2)    Opposition to the Merger Gave Defendants
       Strong Motive to Commit Securities Fraud................... 37

(3)     Defendants Were Motivated to Inflate the Price
        of Coors' Stock to Complete the Stock-for-Stock
        Merger ........................................................................... 37

        b.      The Sarbanes-Oxley Act of 2002 And SEC Rules Hold
                CEOs and CFOs Responsible for Statements In
                Financial Reports ...................................................................... 38

III.    Conclusion ............................................................................................................ 40

## TABLE OF AUTHORITIES

### FEDERAL CASES

*In re Advanta Corp. Sec. Litig,.* 180 F.3d 525 (3d Cir. 1999) ................................................. 28, 34

*In re Aetna, Inc. Sec. Litig.*, 34 F. Supp. 2d 935 (E.D. Pa. 1999) ................................................. 25

*In re American Italian Pasta Co. Sec. Litig.,* No. 05-0725-CV-W-ODS,
    2006 U.S. Dist. LEXIS 40548, (W.D.Mo. June 19, 2006) ................................................. 39

*In re Bristol-Myers Squibb Sec. Litig.*, No. 00-1990, 2005 U.S. Dist. LEXIS
    18448 (D.N.J. Aug. 17, 2005)........................................................................................ 22

*In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410 (3d Cir. 1997) ........................ 18, 19, 29

*Cal. Pub. Emples.' Ret. Sys. v. Chubb Corp.*, 394 F.3d 126 (3d Cir. 2004)................................... 24

*In re Cell Pathways, Inc. Sec. Litig.,* No. 99-CV-752, 2000 U.S. Dist. LEXIS
    8584 (E.D. Pa. June 20, 2000) ................................................................................. 21, 22

*In re Complete Mgmt., Inc. Sec. Litig.*, 153 F. Supp. 2d 314 (S.D.N.Y. 2001) ...................... 25, 37

*Cowit v. Roberts Pharm. Corp.*, No. 95-CV-1506 (MLP),
    1996 U.S. Dist. LEXIS 22506 (D.N.J. June 18, 1996) ................................................. 20

*Death Row Prisoners of Pa. v. Ridge*, 948 F. Supp. 1258 (E.D. Pa. 1996) ................................ 21

*In re Donald J. Trump Casino Sec. Litig.*, 7 F.3d 357 (3d Cir. 1993) .............................. 19, 22, 29

*EP Medsystems v. Echocath, Inc.*, 235 F.3d 865 (3d Cir. 2000) ............................................ 22, 23

*In re Exxon Mobil Corp. Sec. Litig.*, 387 F. Supp. 2d 407 (D.N.J. 2005)..................................... 30

*Fla. State Bd. of Admin. v. Green Tree Fin. Corp.*, 270 F.3d 645
    (8th Cir. 2001) ........................................................................................................... 34, 39

*Ganino v. Citizens Utils., Co.*, 228 F.3d 154 (2d Cir. 2000) ...................................................... 35

*Gary v. Air Group*, 397 F.3d 183 (3d Cir. 2005) ........................................................................ 19

*In re Honeywell Int'l., Inc. Sec. Litig.*, 182 F. Supp. 2d 414 (D.N.J. 2002) ...................... 22, 23, 34

*In re Initial Pub. Offering Sec. Litig.*, 241 F. Supp. 2d 281 (S.D.N.Y. 2003) .............................. 37

*Johnston v. HBO Film Mgmt., Inc.*, 265 F.3d 178 (3d Cir. 2001) ................................................ 26

*In re Lattice Semiconductor Corp. Sec. Litig.*, No. 04-1255-AA,
    2006 U.S. Dist. LEXIS 262 (D. Or. Jan. 3, 2006) ......................................................... 39

*Marsden v. Select Med. Corp.*, No. CV-04-4020, 2006
    U.S. Dist. LEXIS 16795 (E.D. Pa. Apr. 6, 2006) ............................................ 21, 22, 33, 34

*In re Merck & Co., Inc. Sec., Derivative & "ERISA" Litig.*, No. 05-1151,
    2006 U.S. Dist. LEXIS 2345, (D.N.J. Jan. 20, 2006) .................................................. 18

*In re NeoPharm, Inc. Sec. Litig.*, No. 02 C 2976, 2003
    U.S. Dist. LEXIS 1862,  (N.D. Ill. Feb. 7, 2003) ......................................................... 26

*Novak v. Kasaks*, 216 F.3d 300 (2d Cir. 2000) ......................................................... 40

*In re Rent-Way Sec. Litig.*, 209 F. Supp. 2d 493 (W.D. Pa. 2002) ........................... 33

*Rothman v. Gregor*, 220 F.3d 81 (2d Cir. 2000) ...................................................... 37

*In re Scholastic Corp. Sec. Litig.*, 252 F.3d 63 (2d Cir. 2001) ................................ 40

*Sheehan v. Little Switz., Inc.*, 136 F. Supp. 2d 301 (D. Del. 2001) ......................... 23

*Shields v. Citytrust Bancorp., Inc.*, 25 F.3d 1124 (2d Cir.1994) ............................. 35

*In re Smartalk Teleservices, Inc. Sec. Litig.*, 124 F. Supp. 2d 527
    (S.D. Ohio 2000) ......................................................................................... 34

*In re Suprema Specialties, Inc. Sec. Litig.*, 438 F.3d 256 (3d Cir. 2006) ................ 33, 34

*Tracinda v. DaimlerChrylser AG Sec. Litig.*, 197 F. Supp. 2d 42
    (D. Del. 2002) ............................................................................................. 26

*In re Viropharma, Inc., Sec. Litig.*, No. 02-1627, 2003
    U.S. Dist. LEXIS 5623 (E.D. Pa. Apr. 3, 2003) ........................................... 40

*Weiner v. Quaker Oats Co.*, 129 F.3d 310 (3d Cir. 1997) ........................................ 28

## FEDERAL STATUTES

15 U.S.C. § 78j(b) ................................................................................................................. 1

15 U.S.C. § 78n(a) ................................................................................................................ 1

15 U.S.C. § 78t(a) ................................................................................................................ 1

15 U.S.C. § 78u-4(b)(2) ...................................................................................................... 33

15 U.S.C. § 78u-5(c)(1)(A)(i) ............................................................................................ 21

15 U.S.C. § 78u-5(c)(1)(B) ................................................................................................ 21

15 U.S.C. § 78u-5(c)(2) ..................................................................................................... 22

15 U.S.C.S. §§ 7201-7266 ................................................................................................. 38

15 U.S.C.S. §§ 7241 ........................................................................................................... 38

17 C.F.R. § 240.13a-14 ...................................................................................................... 38

17 C.F.R. § 240.15d-14 ...................................................................................................... 38

17 C.F.R. § 240.10b-5 .......................................................................................................... 1

17 C.F.R. § 240.14a-9 ...................................................................................................... 1, 4

## NATURE AND STAGE OF THE PROCEEDING

Lead plaintiffs, Metzler Investment GmbH and Drywall Acoustic Lathing and Insulation

Local 675 Pension Fund, by their counsel and on behalf of all plaintiffs ("Plaintiffs"), respectfully

submit this Answering Brief in Opposition to Defendants' Motion to Dismiss the Consolidated

Amended Class Action Complaint. This is a putative securities fraud class action on behalf of all

persons, other than Defendants[1] and certain other related parties, who are (i) former shareholders

of Molson, Inc. ("Molson") who received shares of Molson Coors Brewing Company ("Molson

Coors" or the "Company") as a result of the February 9, 2005 merger of Molson by and into

Adolph Coors Company ("Coors") (the "Merger"); (ii) open market purchasers of the common

stock of Coors from July 22, 2004 through February 9, 2005, inclusive; and (iii) open market

purchasers of the common stock of Molson Coors, from the completion of the Merger through

April 27, 2005, inclusive,[2] who purchased securities of Coors and/or Molson Coors at artificially

inflated prices and were damaged when the revelation of the true facts regarding Coors and

Molson Coors caused a decline in Molson Coors' stock price.[3]

On April 28, 2005, Molson Coors released its first quarter 2005 financial results. As a

result, that day, Molson Coors suffered a 19% drop in its stock price, from $77.30 to $63. (¶

111.)[4] This decrease was precipitated by the public disclosure of the true financial condition of

Molson Coors, which previously had been masked by a series of false and/or misleading

---

[1] The defendants in this action are: Peter H. Coors, W. Leo Kiely III ("Kiely"), Charles M. Herington, Franklin W. Hobbs, Randall Oliphant, Pamela Patsley, Wayne Sanders, Albert C. Yates, Timothy V. Wolf ("Wolf"), Peter Swinburn, David G. Barnes ("Barnes"), Peter M.R. Kendall, and Daniel J. O'Neill ("O'Neill"), and shall be collectively referred to herein as "Defendants."

[2] "Class Period" refers to the period between and including July 22, 2004 and April 27, 2005.

[3] The claims asserted arise under §§ 10(b), 14(a), and 20(a) of the Securities and Exchange Act of 1934 (the "Exchange Act") (15 U.S.C. §§ 78j(b), 78n(a), and 78t(a)), including Rule 10b-5 (17 C.F.R. § 240.10b-5) and Rule 14a-9 (17 C.F.R. § 240.14a-9).

[4] "¶__" refers to Plaintiffs' Consolidated Amended Class Action Complaint filed in this Court on February 6, 2006 (the "Complaint").

statements made by the Defendants leading up to, and immediately following, the consummation of the Merger. Plaintiffs filed their initial complaints in May 2005. This Court consolidated those complaints on November 7, 2005, and appointed Metzler Investment GmBH and Drywall Acoustic Lathing and Insulation Local 675 Pension Fund lead plaintiffs in an Order dated December 2, 2005. The United States District Court for the District of Colorado transferred a related class action to this Court on March 13, 2005, which, by agreement, was consolidated with the instant action. On April 7, 2006, Defendants filed their Motion to Dismiss the Complaint, and Opening Brief In Support thereof ("DOB"). This is Plaintiffs' Answering Brief in opposition to that Motion.

## SUMMARY OF ARGUMENT

This Court should deny Defendants' Motion for the following reasons:

1.      The Complaint details Defendants' repeated false and/or misleading statements and omissions that kept investors unaware of the true financial condition of Coors, and later Molson Coors, until the Merger was completed and investors had no meaningful recourse. Plaintiffs have attributed all statements to the Defendants who have either signed or adopted the false and/or misleading statements.

2.      The Complaint establishes that Defendants' statements, while purporting to comport with the dictates of Generally Accepted Accounting Principles ("GAAP"), were, in fact, in clear violation of GAAP.

3.      The Complaint successfully identifies numerous, actionable misstatements and omissions of material fact regarding: (a) the projected synergies from the Merger; (b) Coors' pre-merger profitability; (c) the extent of Molson's Brazilian operation's losses and its prospects for future growth; and (d) the seemingly sudden and unexpected departure of several senior level employees immediately following the Merger. These statements and omissions therefrom were materially misleading because the Defendants knew the falsity of these statements when making them and discussed them at high-level meetings. Because the Defendants knew or recklessly

2

disregarded the falsity of their statements when made, the statements lacked a reasonable basis at all times. The "bespeaks caution" doctrine and the "safe harbor" provisions of the Private Securities Litigation Reform Act of 1995 (the "PSLRA") are thus inapplicable.

4.  Plaintiffs have more than sufficiently plead a strong inference of *scienter* by alleging facts that demonstrate motive and opportunity on the part of the Defendants to commit securities fraud. Defendants were motivated to falsely portray the Merger as a mutually beneficial transaction that would provide "immediate tangible benefits" to shareholders so as to further their own narcissistic and financial interests. Defendants' arguments against *scienter* do not affect the Court's analysis because they improperly argue facts not in the Complaint and rely on inapposite case law.

5.  Plaintiffs' Section 20(a) controlling person claim should be sustained because the Complaint more than sufficiently pleads a predicate violation of Section 10(b). This claim also should be sustained because each Defendant was a "controlling" person and was responsible for the dissemination of the statements at issue.

## I.  STATEMENT OF FACTS

### A.  PRE-MERGER STATUS OF BOTH COMPANIES

Molson Coors is a corporation organized under the laws of the state of Delaware, with its principal place of business located in the United States at 1225 Seventeenth Street, Denver, Colorado (formerly 311 Tenth Street, Golden, Colorado), and with its Canadian executive offices located at 1555 Notre Dame Street East, Montreal, Quebec, Canada. (¶ 19.) Molson Coors, formerly Coors, is a holding company engaged in the manufacturing, marketing, and selling of malt beverage products through its principal subsidiaries, Coors Brewing Company, operating in the United States, and Coors Brewers Limited, operating in the United Kingdom. (*Id.*) On February 9, 2005, as a result of the Merger, Coors became the parent of the merged Company, and changed the name of the merged company to Molson Coors Brewing Company. (*Id.*)

Molson was Canada's largest brewer and one of the world's leading brewers of beer, with operations located in Canada, Brazil and the United States. (¶ 46.)  Founded in 1786, Molson was North America's oldest beer company, and one of its largest, with C$3.5 billion in gross sales for the fiscal year ended March 31, 2004. (*Id.*)  Prior to the Merger, Molson also was a licensed, authorized brewer and distributor of Coors brands in Canada under agreements between Molson and Coors. (*Id.*)  Pursuant to this license agreement, one of Molson's most profitable products was the Coors Light brand, which it manufactured and marketed throughout Canada prior to the Merger. (*Id.*)

Despite its size, prior to the Merger, it was publicly known that Molson was operating below plan.  On July 22, 2004, the same day that Molson and Coors announced that they had entered into a definitive merger agreement, Molson revealed that for the three months ending June 30, 2004, earnings before interest and taxes ("EBIT") decreased 4.5%, total beer volume decreased 3.4%, and net earnings per share (excluding certain one time rationalization costs) decreased 19.4%. (¶ 47.)  On September 30, 2004 these results were confirmed in a press release that also revealed that the first quarter results would make attaining the previously announced 10% EBIT growth target "a challenge" and that Molson "could" face a write-down of C$200 million after a reevaluation of its Brazilian business. (¶ 48.)

These negative results were understandably met with substantial criticism.  In a September 30, 2004 report, the *Canadian Press Newswire* referred to Molson's Brazilian operations as "a quagmire" given its dramatic reduction in market share. (¶ 49.)  Coors however, was unfazed by the results, stating that they were "not surprised by Molson's tepid results" given their previous earnings misses. (¶ 50.)

While Molson was reporting its negative results, Coors reported that it was "experiencing above-consensus growth and profitability" and it was "outperforming the market." (¶ 65.)  Contrary to the "tepid results" (¶ 50) Molson reported, for the second quarter fiscal 2004, Coors

reported "an increase of 4.6% over net sales reported in 2Q:03" (¶ 65), followed by "higher net sales and net income" for the third quarter fiscal 2004. (¶ 70.)

## B.    INVESTORS INITIALLY OPPOSED THE MERGER

Investors and analysts initially expressed significant reservations about this so-called "merger of equals." (¶52.) On July 19, 2004, the same day the parties confirmed their advanced negotiations, numerous analysts released statements highly critical of the Merger. Among these were: (1) Citigroup/Smith Barney who stated in part, "'where is the value and/or cost savings/synergies?'" (*id.*); (2) CIBC World Markets who stated in part "'we see little long-term strategic benefit to a Molson/Coors merger...'" (*id.*); (3) National Bank Financial who stated in part "' [the] [p]roposed merger increases scale but doesn't solve the strategic issues.'" (*id.*); (4) Prudential Equity Group who stated in part "'[a] Coors/Molson merger seems like a 'marriage of convenience...'" (*id.*); and (5) J.P. Morgan Securities who stated in part "'we don't think it provides substantial benefit[s] to either companies existing operations.'" (*Id.*)

Investors' reactions were similarly negative. Beginning in the fall of 2004, Molson's large, institutional investors began publicly voicing their opposition to the Merger. (¶ 53.) Specifically, these investors objected to the Merger's structure, whereby Molson option holders (of which Molson officers and directors accounted for 66 2/3%) could vote to approve the Merger alongside the holders of common shares in that company. (*Id.*) Further, investors objected to the size and structure of the bonus that Molson CEO (and defendant) Daniel J. O'Neill was to receive as a result of the Merger. (*Id.*) This dissent was so significant that the terms of the Merger were eventually changed to eliminate the option holders' ability to vote for the Merger and convert O'Neill's bonus to a severance package. (*Id.*)

Institutional investors were not the only ones opposed to the Merger. Ian Molson, the former Deputy Chairman of Molson and controller of approximately 45% of Molson's voting shares, was so opposed to the Merger that he attempted to mount a takeover with a group of partners, later identified as Heineken N.V. (¶ 54.) Ultimately, this takeover attempt failed to

materialize; however, Ian Molson remained opposed to the Merger calling it "'a Coors takeover of Molson, with no premium being paid to Molson shareholders.'" (*Id.*)

The negative reaction to the Merger was so significant that in addition to the structural changes discussed above, on November 5, 2004, Molson announced a special dividend of C$3.26 per share. (¶ 55.) This dividend, however, failed to garner support as Bloomberg reported that approximately 28 million Class A shares would be cast against the Merger. (¶ 59.) Not to be dissuaded, Molson increased the dividend to C$5.44 per share. (¶ 60.) This too was met with significant resistance, being characterized by at least one institutional investor as a "bribe." (¶ 61.) Despite the continued resistance, the increased special dividend was successful in convincing some investors to support the Merger.

**C.      DEFENDANTS' FALSE AND/OR MISLEADING STATEMENTS AND OMISSIONS**

The Company's press releases, Form 8-K's, Form 10-Q's, and conference calls cited herein were incorporated by reference into the Proxy Statement filed with the United States Securities and Exchange Commission ("SEC") on December 10, 2005 (the "Proxy"). Therefore, by way of such incorporation, the Proxy became false and/or misleading. Furthermore, the Investors' Prospectus filed with the SEC on February 11, 2005, and signed by defendants Kiely, Wolf, P. Coors, Hobbs, Oliphant, Patsley, and Sanders (the "Prospectus"), incorporated numerous documents by reference including the Proxy. Thus, by of way of such incorporation, the Prospectus also became false and/or misleading.

**1.      Statements Regarding Coors' Profitability**

In its July 22, 2004 Form 8-K, Coors made numerous statements regarding its profitability while either aware or recklessly disregarding each such statement's falsity. (¶¶ 65, 75-77, 166.) Within that 8-K, Coors stated it was experiencing "improving trends in several key areas of business" while it was aware or recklessly disregarding the omitted facts that Coors' overall business was weak and it was experiencing a general decrease in sales and increase in

expenses. (¶¶ 65, 69(a).) Further, Coors stated that the negative factors affecting its business were "largely temporary" despite the fact that Coors had been forecasting difficulties in the Dallas/Ft. Worth market, one of Coors' largest markets, since 2000. (¶¶ 65, 69(a), 69(b).) Coors also stated that its Aspen Edge product had been gaining volume, despite the fact that sales were so poor that, in the summer of 2004, Coors began a policy of buying back the product and reimbursing every wholesaler in the country for any Aspen Edge product that went out of date. (¶¶ 65, 69(c).)

Coors' pattern of false and/or misleading statements continued in the October 28, 2004, Form 8-K, and a conference call held on that date. (¶¶ 70, 71, 73, 169.) Coors represented that trends were improving despite an actual weak overall business and a general decrease in sales. (¶¶ 70, 73(a)). Coors further stated that any negative factors influencing its results were "merely 'temporary'" while either aware or recklessly disregarding that Coors had been forecasting problems in one of its largest markets since 2000. (¶ 73(b).) Furthermore, Coors stated that it was "encouraged" with Aspen Edge and was "looking for more of the same next year" while aware or recklessly disregarding the fact that sales were so poor that in the summer of 2004, Coors began a policy of buying back the product and reimbursing every wholesaler in the country for any Aspen Edge product that went out of date. (¶¶ 71, 73(c).)

Coors made similar false and/or misleading statements regarding its fiscal 2004 year-end results. In its February 9, 2005 press release and conference call, Coors again referenced its improving trends and volume, while aware of, or recklessly disregarding the previously discussed weak overall business and general decrease in sales. (¶ 96, 100(a).) Further, Coors again stated that the negative factors affecting its business were "largely temporary" when in fact Coors had been forecasting difficulties in one of its largest markets since 2000. Coors also continued to tout the success of Aspen Edge while aware or recklessly disregarding the fact that sales were so poor that in the summer of 2004, Coors began a policy of buying back the product and reimbursing

every wholesaler in the country for any Aspen Edge product that went out of date.  (¶¶ 96, 100(b).)

These statements were reiterated in the Form 10-Q's filed on August 6, 2004, and November 5, 2004, and the Form 10-K filed on March 9, 2005, respectively, in which defendants Kiely and Wolf signed a certification attesting to the accuracy and completeness of the statements made therein.  (¶¶ 67-68, 72, 99.)

According to a former Coors director of supply chain management, prior to dissemination, the above information was discussed at senior management meetings attended by, among others, defendants Wolf and Barnes.  Kiely was aware of, or recklessly disregarded, the above described information because senior management, who directly reported to him, including Supply Officer and Senior Vice President Robert Caseria ("Caseria"), also attended these meetings.  (¶¶ 69(d), 73(d), 100(d).)

       **2.      Statements Concerning The Synergies Resulting From The Merger**

Coors also made false and/or misleading statements regarding the synergies expected from the Merger.  In a July 22, 2004 press release, Coors represented that the Merger was "expected to generate approximately U.S. $175 million in annualized synergies by 2007, with half of these benefits achieved within 18 months following the completion of the merger."  (¶ 75.)  These synergies were to come from "the optimization of brewery networks, increased procurement efficiencies, streamlined organizational design, consolidated administrative functions and greater tax efficiencies'" (¶ 76) and were to be overseen by the newly-created Office of Synergies and Integration chaired by then-Molson CEO O'Neill.  (*Id.*)  Defendants reiterated these statements on an investor conference call held on July 22, 2004 and again in the Proxy.  Furthermore, during the July 22, 2004, conference call, Kiely stated that the transaction would be "accretive to earnings in the first year," and that "[o]n a cash EPS basis, we expect the transaction to be significantly accretive in the first year."  (¶ 173.)  In addition to reiterating

Coors' optimism regarding the attainment of the aforementioned synergies, the Proxy further stated that "we expect the merger to deliver immediate tangible benefits to shareholders through substantial synergies, including annual cost savings resulting from the merger of approximately U.S.$50 million in the first year...." (¶ 174.) In the February 9, 2005, press release and conference call discussing Coors' fiscal 2004 results, Kiely represented that Molson Coors was "more confident than ever that this transaction will deliver substantial value to our shareholders including U.S.$175 million of cost synergies over and above the underlying earnings potential of these two great businesses." (¶ 176.) Even as late as March 2, 2005, mere weeks before Molson Coors announced a 5.6% loss in all markets (¶ 110), Kiely told Bloomberg that he was "very confident about the synergies." (¶ 102.)

The above statements regarding the synergies resulting from the Merger were made while the Defendants were either aware, or recklessly disregarded, that those synergies were unlikely to be attained because, *inter alia*: increased distribution costs would cut into the synergies; Molson and Coors were already distributing each other's products; the Merger would generate significant costs including compensation and benefits for senior Coors executives who were expected to resign after the Merger; [and] Molson Coors would have significant costs from Molson's failed Brazilian operations. (¶ 77.)

According to a former Coors director of supply chain management, this information was discussed among Coors senior management at meetings attended by Brian Erhardt ("Erhardt"), who in addition to being the Director of Supply Chain Planning, was also an integral part of the Synergies and Integration Group. (¶ 77.) This information was shared with other members of the Synergies and Integration Group, including Kiely, among others. (*Id.*)

### 3.    Statements Regarding The Deterioration Of Molson's Brazilian Operations

The Defendants also made false and/or misleading statements regarding Molson's Brazilian business, Kaiser. While Brazil had proven to be a "quagmire" (¶ 49), as early as

October 2004, Molson and Coors were making positive statements regarding the Brazilian operation's future. In an October 28, 2004 conference call, O'Neill referred to a "going forward model" for the Brazilian operations and stated that "Molson was making 'great inroads' with regard to the 'Brazilian situation." (¶¶ 80, 81.) Rather than remain silent, in a Form S-3 filed with the SEC on November 24, 2004, Coors stated that Molson announced a C$210 million impairment charge from its Brazilian operations due to "current period costs" associated with growth plans. (¶ 78.) Following the completion of the Merger, Molson Coors further stated a near term goal was to "continue the near and long term potential for our Kaiser business in Brazil." (¶ 97.)

The statements made regarding the "Brazilian situation" (¶ 81) were made while aware or recklessly disregarding certain facts known by the Defendants. The losses in Brazil were not the result of "current period costs" (¶ 78), rather Molson had continually been experiencing significant losses from its Brazilian operations. (¶ 82(a).) In fact, Molson Coors eventually sold 68% of its 83% interest for a mere U.S.$68 million; an interest it purchased 100% of for U.S.$735 million. (¶ 124.) Furthermore, while Molson took a C$210 million impairment charge for its Brazilian operations, its losses were far greater than that (¶ 82(b)) as evidenced by Molson Coors eventually taking another U.S.$500 million charge. (¶ 78.) Defendants also knew, or recklessly disregarded: (a) that negative events had adversely impacted Kaiser, necessitating a material write-down of the goodwill and long-lived assets, (b) that there was a material decline in demand for Kaiser's products, and (c) that Kaiser suffered from a lack of proper distribution and from the aggressive tactics of smaller brewers. (¶¶ 82(c) - (f).)

According to a former Coors director of supply chain management, Coors was aware as early as the first quarter of 2004 that Molson's Brazilian operations were "failing" and had the effect of "draining the company." (¶ 83.) This information was discussed among Coors senior management at meetings attended by Erhardt as a member of the Synergies and Integration

Group. On information and belief, this information was shared with other members of the Synergies and Integration Group, including Kiely, among others. (Id.)

### D.  DEFENDANTS' IMPROPER ACCOUNTING PRACTICES

#### 1.  Improper Accounting For Kaiser

The Defendants represented that Molson Coors' financial statements were prepared in accordance with GAAP. (¶ 125.) However, to artificially inflate the price of Molson Coors' shares, Defendants used improper accounting practices in violation of GAAP and SEC reporting requirements to falsely inflate Molson Coors' assets, stockholders' equity, and reported income (and falsely deflate reported expenses) for the quarterly and yearly periods during and immediately prior to the Class Period. (¶ 128.)

Molson Coors' reported financial results during the Class Period were materially overstated, in part, because they failed to recognize millions of dollars in impairment losses relating to goodwill and long-lived assets that had been recorded primarily in conjunction with its acquisition of Kaiser. (¶ 129.) While information regarding Kaiser's deterioration began to surface in late 2004 (beginning with a C$210 million impairment charge (¶ 143)), by the beginning of the Class Period, at the latest, Defendants knew or recklessly disregarded, among other things: (a) Kaiser's losses were not merely the result of "current period costs" but rather Molson had been experiencing significant losses from its Brazilian operations for some time; (b) the extent of Kaiser's deterioration in financial position was greater than the noted impairment charge taken in October 2004; (c) that negative events had adversely impacted Kaiser; (d) Kaiser had experienced a material decline in demand for its products, as evidenced by its domestic market share declines (from 17% four years ago to 8.7% in December 2005); (e) Kaiser lacked a proper distribution network adversely impacting its volumes and sales; and (f) Kaiser suffered from the aggressive tactics of smaller brewers, resulting in losses of market share. (¶ 135.)

As further evidence of the problems in Brazil, Heineken, which had acquired 20 percent of Kaiser from Molson in April 2002, announced an impairment charge of €190 million thereby

reducing the carrying value of its Kaiser investment to zero. (¶ 144.) Despite this information, the Defendants continued to make positive statements regarding Kaiser, such as "[t]he Brazil team continues to achieve significant progress" (¶ 148) and "we are encouraged by the improved trends for our lead brand Kaiser...." (¶ 145.)

Eventually, Molson Coors sold a 68 percent equity interest in its Brazilian unit, Kaiser, to Fomento Economico Mexicano SA ("FEMSA") for $68 million cash, including the assumption by FEMSA of certain Kaiser-related debt and contingencies. That sale represented a loss of approximately $225 million. (¶ 134.) Under GAAP, however, Molson was required to recognize this loss long before its January 2006 sale because Kaiser's value had deteriorated below the carrying value of these assets. (*Id.*) Thus, a write down of the difference between the carrying value and the value on Molson's books thus was required. (¶ 133.) By refusing to take such write-offs, Defendants not only failed to comport with GAAP, but in effect falsely represented that no such write-offs were necessary or appropriate. (¶ 149.)

### 2.    Improper Accounting For Executive Severance

To overstate Coors' financial results and the expected performance of Molson Coors, Defendants concealed that the Merger would result in the departure of many senior executives, resulting in a $30 million charge to earnings for the first quarter of 2005 to cover the cost of severance for these individuals. (¶ 150.)

GAAP requires that an estimated loss from a loss contingency be accrued by a charge to income if it is probable that an asset has been impaired or a liability has been incurred and the amount of the loss can be reasonably estimated. (¶ 151.) According to a former Coors director of supply chain management, it was known at least three months before the Merger that on the day after the Merger was approved, Coors would announce the departure of the senior executives and their significant severance packages. (¶ 150.) Nevertheless, Defendants failed to cause Molson Coors to properly accrue for these charges, thus resulting in overstated financial results. (¶ 150.)

3.      **Improper Accounting For Brazilian Tax Liabilities**

In the Proxy, Defendants stated "Molson has either paid, or alternatively made provisions for, the amounts it believes may be ultimately due pursuant to [Brazilian tax authorities'] claims." (¶ 158.)  However, as revealed on May 11, 2005, these amounts were far from accurate.  (¶ 118.) In its first quarter fiscal 2005 Form 10-Q Molson Coors revealed that

> [w]e have made a preliminary evaluation of these contingencies as part of our allocation of the purchase price following the merger, resulting in a recorded estimated liability of $176 million.   An additional $65 million of claims has been specifically identified for further evaluation as to the probability of loss.  Beyond these amounts, there are $273 million of claims whose probability of loss was considered remote."

(¶ 163.)

E.      **COORS WARRANTED AGAINST, AND HAD A DUTY TO REPORT, ANY MATERIAL ADVERSE CHANGE IN COORS' BUSINESS**

Pursuant to the merger agreement, Coors represented that no event had occurred since December 28, 2003, that would likely have a material adverse impact on Coors.  (¶ 90.) Moreover, the Merger was conditioned upon no such event happening.  (¶ 90.)  Additionally, the Proxy reaffirms that the Merger was conditioned upon the absence of any events or changes that would have a material adverse effect on either party, and the representations and warranties of the parties to the Merger included the absence of such events as well as the accuracy of the parties' financial statements and the absence of any undisclosed liabilities.  (¶ 91.)  The Proxy further demonstrates that the Molson Independent Committee specifically relied on the financial condition of Coors and the projected synergies in approving the Merger.  (¶ 92.)

F.      **INVESTORS ACCEPTED DEFENDANTS' FALSE AND/OR MISLEADING STATEMENTS**

Before the truth was revealed, investors and analysts accepted the Defendants' false and/or misleading statements and began to support the Merger.  In fact, by late-October 2004, Coors was perceived by analysts as a company that had already "turned the corner."  (¶ 84.)

Additionally, price estimates of Coors' stock rose dramatically and analyst ratings were raised to "Buy." (¶¶ 85, 86, 88.) Legg Mason raised Coors' price target to $86 stating that Coors was "on the brink of earnings momentum" (¶ 85) and that they "had warmed up to the combination's merits." (*Id.*) Bernstein Research rated Coors 'outperform,' stating that "[i]mproving operating margins, particularly those from the merger synergies with Molson, are the primary drivers of our Outperform rating on Coors." (¶ 88.)

The Defendants' statements also raised expectations for Molson Coors' stock. By January 2005, analysts had Molson Coors' price target as high as $98 per share. (¶ 88.) In addition, two analysts, Bernstein Research and Credit Suisse First Boston rated Molson Coors "Outperform" and assigned a near-term price target of $98 and $100 respectively. (¶¶ 104, 105.) In arriving at this conclusion, Bernstein Research specifically relied on the fact that management was confident in Molson Coors' ability to attain the $175 million in synergies. (¶ 104.) Credit Suisse First Boston also predicted cost savings synergies approaching $200 million by 2007. (¶ 105.) In April 2005, shares of Molson Coors were trading near an all time high of almost $80 per share. (¶ 107.)

### G.    THE DISASTROUS TRUTH WAS THEN REVEALED

On February 9, 2005, Molson Coors issued a press release announcing that both Molson and Coors shareholders had approved the Merger on January 28, 2005 and February 1, 2005, respectively. Molson Coors further reiterated that it was poised for growth and fully expected to realize the projected $175 million in cost saving synergies. (¶ 93.)

Less than three months after the Merger, investors began to learn the disappointing truth, that Coors had been operating below plan and therefore could not counter-balance Molson's losses, that Molson Coors would be unable to achieve anything remotely near the projected synergies, and that Molson's Brazilian operations were worse than reported and would ultimately result in a sale of Molson Coors' majority stake in Kaiser at a loss of over a half billion dollars. (¶ 108.)

14

### 1.    Molson Coors Reported Disastrous First Quarter Results

On April 28, 2005, Molson Coors issued a press release announcing a net loss purportedly due to lower sales volumes in key markets and costs related to the Merger. (¶ 109.) During the conference call that followed Kiely acknowledged, *inter alia*, a 5.6% decline in *pro forma* volume due to lower volume sales in *all* of Molson Coors' major markets, a 6% decline in *pro forma* net sales, and a *pro forma* net loss of $79 million compared to a *pro forma* net gain of $36 million for the first quarter of 2004. (¶ 110.) Significantly, Kiely also acknowledged that *pro forma* U.S. volume year-over-year declined by 3.6% *for Coors' products only.* Thus, while Coors and Molson Coors had led investors to believe that Coors' financial stability would be more than sufficient to counteract Molson's expected losses, it was actually Coors that was responsible for the bulk of Molson Coors' decline in *pro forma* U.S. volume. (*Id.*) Finally, Kiely was forced to acknowledge that Molson Coors' first quarter results were "well below our performance goals." (*Id.*)

### 2.    The True Extent Of Molson's Problems<br>       In Brazil Were Revealed

On May 11, 2005, investors learned that Molson Coors would be responsible for U.S.$500 million in tax liabilities resulting from Molson's failed pre-Merger Brazilian operations that had not been previously quantified in SEC filings regarding the Merger. (¶ 119.) In further recognition of the abysmal situation in Brazil, on May 18, 2005, the Company announced that it would not make any additional investment in Brazil and that Kaiser would be operated "on at least a cash break-even pace" (¶ 120), while the Company "explore[s] a full range of options for Brazil." (*Id.*)[5] As an additional surprise, investors also discovered that Molson's problems in Brazil had only been addressed for a few weeks. (¶ 118.)

---

[5] The "full range of options" ultimately led to Kaiser's sale. *Supra* D.1.

### 3. In Addition To Disastrous Results, Molson Coors Announced The Departure Of Numerous Members Of Senior Management

The same day Molson Coors' first quarter 2005 results were released O'Neill, the Chairman of the Office of Synergies and Integration, announced he was leaving the Company and accepting a severance package worth approximately $4.8 million. (¶ 112.) In addition, the *Rocky Mountain News* reported that prior to April 28, 2005, twelve other former Coors executive exercised change in control provisions in their contracts which cost Molson Coors approximately $29 million in its first quarter of operations. (¶ 113.)

Analysts' reactions to the departure of these executives were similar to their reaction to Molson Coors' first quarter financial results. Specifically, Michael Palmer, of Toronto's Veritas Research told the *Rocky Mountain News* that "[t]he [C]ompany lost 5 market-share points (in Canada) ... I always like to think in a capitalist system, people are rewarded for success, not for (messing up)." (¶ 112.)

Contrary to Molson Coors' contentions, the Defendants knew of these departures for at least three months prior to the Merger. According to a former Coors director of supply chain management, at least three months before the Merger, it was known within Coors that the day after the Merger was approved Molson Coors would announce the departure of the senior executives and their significant severance packages. (¶¶ 100(e), 114, 150.) However, it was only after the release of Molson Coors' first quarter results that investors realized that Molson Coors would be forced to report a "special charge" of almost $30 million, primarily due to change-in-control payments and benefits for the Coors executives who elected to leave Coors following the Merger. (*Id.*)

### 4. Analysts Were Stunned, Calling Molson Coors A "Mystery" Not An Investment

After the announcement of Molson Coors' first quarter results, analysts reversed course, stating that "the potential for seeing $175 in synergies is quite low" (¶ 115), that there was not

much they liked about Molson Coors' prospects, and there was very little cause for optimism (*Id.*)

Prudential Equity Group referred to Molson Coors as "more of a 'mystery' than an investment

right now" and stated that any chance of recognizing first year synergies of $50 million were

"basically gone." (¶ 116.)  Furthermore, J.P. Morgan stated that given the drop in earnings-per-

share and the "flood" of management departures, that Molson Coors was "ill suited to compete"

in the brewing industry.  (¶ 117.)

> ### 5.    The SEC Began To Investigate Molson Coors

The sub-par results of Molson Coors and the departure of numerous members of Coors'

senior management did not escape the attention of the SEC.  On or about June 9, 2005, the SEC

requested documents regarding, *inter alia*, the Merger, Molson Coors' first quarter earnings

report, and its operations in Brazil.  (¶ 122.)

> ## H.    Significant Harm Befell Molson Coors' Shareholders

When the market closed on the day the truth was revealed, the value of Molson Coors'

stock had dropped from a closing price of $77.30 per share the night before, to a closing price of

$63 per share (¶ 111) on heavy trading volume of over 10 million shares.  (¶ 200.)  The *Denver*

*Post* reported on April 29, 2005 that this 19% decrease represented "the biggest daily drop" for

Coors in the past 12 years, and was the fifth largest loss that day among all companies listed on

the New York Stock Exchange.  (¶ 111.)  Furthermore, during the period in which Molson Coors'

share price declined by over 20%, the Standard & Poor's 500 securities index was relatively

unchanged.  (¶ 201.)

II.    **ARGUMENT**

    A.    **THE COMPLAINT ADEQUATELY IDENTIFIES SEVERAL FALSE AND/OR MISLEADING STATEMENTS OF MATERIAL FACT**

        1.    **The Court Must Accept All Facts And Reasonable Inferences In Favor Of Plaintiffs**

The standard for assessing motions filed pursuant to Federal Rule of Civil Procedure 12(b)(6) is well-known.[6] Notwithstanding these well-established principles, Defendants demand the Court to draw no inferences for Plaintiffs from the Complaint. Several of Defendants' arguments, however, are based on improper inferences and "facts" not alleged in the Complaint, which reflect their likely evidentiary merits-based defenses to this lawsuit.[7]

        2.    **Regarding Merger Synergies**

The Complaint alleges that Defendants made numerous false and misleading statements and omissions regarding their stated optimism that the cost-savings expected from various

---

[6] A complaint cannot be dismissed "unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." Conley v. Gibson, 355 U.S. 41, 45-46 (1957). On a motion to dismiss, the Court must "accept as true all of the factual allegations contained in the complaint." Swierkiewicz v. Sorema, N.A., 534 U.S. 506, 508 n.1 (2002). Furthermore, in a Rule 12(b)(6) context, the Court must "resolve all competing allegations and inferences in favor of the Class." Semerenko v. Cendant Corp., 223 F.3d 165, 181 (3d Cir. 2000) ("The issue [under 12(b)(6)] is not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims.") Id. at 173 (citation omitted). In assessing a motion to dismiss, the Court may not consider matters extraneous to the pleadings with the limited exception of documents "integral to or explicitly relied upon in the complaint." In re Burlington Coat Factory Sec. Litig., 114 F.3d 1410, 1426 (3d Cir. 1997) (citations omitted).

[7] In assessing a motion to dismiss, the Court may not consider matters extraneous to the pleadings with the limited exception of documents "integral to or explicitly relied upon in the complaint." In re Burlington Coat Factory Sec. Litig., 114 F.3d 1410, 1426 (3d Cir. 1997) (citations omitted). A court may take judicial notice of SEC filings only to the extent that a plaintiff's claims are based on the document. Burlington, 114 F.3d at 1426. Even then, those materials may not be admitted for their truth on a motion to dismiss. See In re Merck & Co., Inc. Sec., Derivative & "ERISA" Litig., No. 05-1151, 2006 U.S. Dist. LEXIS 2345, at *19 (D.N.J. Jan. 20, 2006) (Attached hereto as Exhibit A).

"synergies" from the Merger ("Synergies Statements") would be achieved.  In response,

Defendants argue that these projected cost-savings *were* achieved.  (DOB at 15.)  While Plaintiffs

contest whether these synergies were achieved, that issue is one of fact and cannot be decided on

this motion.  Here, the Complaint's factual allegations must be accepted as true and all reasonable

inferences drawn in favor of Plaintiffs.  *See Gary v. Air Group*, 397 F.3d 183, 186 (3d Cir. 2005).

Thus, Defendants' factual assertions are irrelevant on this motion, and Defendants' other

arguments are without merit.

### a. Defendants Lacked A Reasonable Basis For Their Synergies Statements

Defendants lacked a reasonable basis for their repeated affirmative claims that synergies

would be achieved.  Specifically, Defendants made numerous false statements that they were

"confident" – and thus that it was very likely – the Merger would immediately benefit the

Company's earnings and generate millions in cost-savings: "We expect the merger transaction to

deliver *immediate tangible benefits* to shareholders through substantial synergies, including

annual cost savings resulting from the merger of approximately U.S.$50 million in the first year."

(¶ 174.) (Emphasis added).[8]  These statements created the false impression that the Merger would

quickly result in accretive earnings.

Such statements become "actionable misrepresentations if the speaker does not genuinely

and reasonably believe them."  *In re Donald J. Trump Casino Sec. Litig.*, 7 F.3d 357, 368-71 (3d

Cir. 1993); *See also In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1428 (3d Cir.

1997) ("[S]tatements of opinion by top corporate officials may be actionable if they are made

without a reasonable basis.").  Thus, the salient inquiry is whether, based on the facts Defendants

---

[8] (See ¶ 173 ("Given the quick ramp up on some of the synergies, we expect this transaction to be
accretive to earnings in the first year" and "[o]n a cash EPS basis, we expect the transaction to be
significantly accretive in the first  year"), see also ¶ 97 ("we are more confident than ever that this
transaction will deliver substantial value to our shareholders including $175 million of cost
synergies"), ¶ 102 ("We're very confident about the synergies"), ¶ 104 ("Management remains
highly confident in its ability to achieve $175MM in annual cost savings by 2007").)

knew at the time, they had a reasonable basis for their confidence that those synergies would be realized. The Complaint alleges that the answer is no. (*See, e.g.,* ¶¶ 5, 77, 79, 114.)

Here, Defendants made their representations while knowing, or recklessly disregarding, key facts that undermined – indeed, contradicted – their expressed confidence that the synergies could be achieved. For example, Coors' senior management knew at the time of these statements that the synergies were unlikely to be attained because: Coors' distribution costs, including the cost of oil, were increasing; Coors and Molson were already distributing each other's products and therefore the potential for synergies was lower than represented; and, as discussed in greater detail *infra*, the Merger would generate significant costs stemming from Molson's disastrous Brazilian operations. (¶¶ 5, 77, 177(b).) Further, Coors' senior management knew at least three months before the Merger that numerous Coors senior executives planned to leave the company shortly after the Merger, departures that would (and did)[9] result in tens of millions of dollars in additional costs in the form of lucrative severance packages. (¶¶ 114, 178.) Likewise, Defendants' failure to disclose these critical facts constitute omissions that are also actionable.

Accordingly, Defendants did not have a reasonable basis for their expressed optimism that those synergies would be achieved, thereby making those statements actionable as false and misleading statements. At a minimum, whether Defendants did have a reasonable basis for their statements is a fact question that cannot be resolved on a motion to dismiss. *See Cowit v. Roberts Pharm. Corp.*, No. 95-CV-1506 (MLP), 1996 U.S. Dist. LEXIS 22506, at *19 (D.N.J. June 18, 1996) (attached hereto as Exhibit B) (denying motion to dismiss because whether defendants "genuinely and reasonably believe[d]" their public statements is "an assessment which the Court is unable to make at this juncture").

Defendants make much of the fact that the Company has supposedly achieved the cost-savings that were predicted before the Merger. (DOB at 15.) The Complaint alleges otherwise

---

[9] The Company was ultimately forced to report a "special charge" of nearly $30 million, comprised of change-in-control payments and benefits for the departing Coors executives. (¶ 114.)

(¶¶ 108-109), and this factual dispute cannot be resolved here. *See Death Row Prisoners of Pa. v. Ridge*, 948 F. Supp. 1258, 1277 (E.D. Pa. 1996) ("[T]o the extent that defendants rely on factual assertions... [they] raise factual issues that cannot be resolved in a motion to dismiss."). Further, as set forth in *Marsden v. Select Med.. Corp.*, No. CV-04-4020, 2006 U.S. Dist. LEXIS 16795, at *28 (E.D. Pa. Apr. 6, 2006) (attached hereto as Exhibit C) "[t]hat defendants achieved the projected results . . . does not negate the misleading effect of their omission. We find no authority that renders projections *per se* inactionable once they have been realized." *See also In re Cell Pathways, Inc. Sec. Litig.*, No. 99-CV-752, 2000 U.S. Dist. LEXIS 8584, at *31 n.7 (E.D. Pa. June 20, 2000) (attached hereto as Exhibit D) ("[A]lthough some of the statements may contain reports of facts which ultimately came true, the statements are being challenged for having been made despite CPI's knowledge of the flaws in the Phase III trials. As such, they do not escape liability as merely statements of historical fact."). Moreover, even if the synergies *were* achieved at some later point, this purported fact did nothing to cure the misleading impression Defendants gave the market between July 2004 and March 2005 in touting those projected synergies – namely that they would substantially and immediately contribute to the merged company's earnings and growth. That misimpression was not corrected until Molson Coors released its surprisingly disappointing financial results on April 28, 2005. (¶¶ 109-112.)

          **b.**      **Defendants' Misstatements and Omissions Are Not Protected By the "Bespeaks Caution" Doctrine Or The PSLRA's Safe Harbor**

       Equally unavailing is Defendants' claim that their synergies statements are protected by the "bespeaks caution" doctrine and the PSLRA's safe harbor provision. (DOB at 16.)

       A statement deemed to be forward-looking only qualifies for protection under the "bespeaks caution" doctrine or the PSLRA's "safe harbor" provision to the extent that the statement (1) is "identified as a forward-looking statement," *and* (2) "is accompanied by *meaningful* cautionary statements identifying important factors that could cause actual results to differ materially from those in the forward-looking statement." 15 U.S.C. § 78u-5(c)(1)(A)(i)

(emphases added). However, a forward-looking statement identified as such and accompanied by sufficient cautionary language will not be immunized from liability if it "was made, or approved by an executive officer of the company, with actual knowledge that the statement was false or misleading," 15 U.S.C. § 78u-5(c)(1)(B), or if "the speaker has no reasonable basis for the belief." *In re Honeywell Int'l, Inc. Sec. Litig.*, 182 F. Supp. 2d 414, 427 (D.N.J. 2002). *See In re Bristol-Myers Squibb Sec. Litig.*, No. 00-1990, 2005 U.S. Dist. LEXIS 18448, at *145 (D.N.J. Aug. 17, 2005) (attached hereto as Exhibit E) ("The doctrine provides no protection to someone who warns his hiking companion to walk slowly because there might be a ditch ahead when he knows with near certainty that the Grand Canyon is one foot away.").[10]

As a threshold matter, as described *supra*, Defendants lacked a reasonable basis for their synergies statements. Accordingly, the protections of the bespeaks caution doctrine and the safe harbor do not apply. Likewise, those statements are not immunized from liability because the cautionary language that accompanied them was not "meaningful." The law is clear that "a vague or blanket (boilerplate) disclaimer which merely warns the reader that the investment has risks will ordinarily be inadequate to prevent misinformation." *EP Medsystems v. Echocath, Inc.*, 235 F.3d 865, 873 (3d Cir. 2000). Specifically, cautionary statements must describe specific, then-existing factors that could undermine the predictive statement – the warnings "must be substantive and tailored to the specific future projections, estimates or opinions in the prospectus which the plaintiffs challenge," (*Id.*), and the defendant must prove that the warnings "discredit the other one so obviously that the risk of real deception drops to nil." *Trump*, 7 F.3d at 372.

---

[10] Moreover, to the extent that the Defendants failed to disclose known facts that made achieving the projected synergies highly unlikely, those omissions cannot be protected by the "bespeaks caution" doctrine or the PSLRA's safe harbor. See Marsden, 2006 U.S. Dist. LEXIS 16795, at *25 ("These protections do not apply to statements challenged on the basis that they omitted 'present facts' – facts known at the time the statement was made."); Cell Pathways, 2000 U.S. Dist. LEXIS 8584, at *39-40 ("As plaintiffs have alleged that CPI made material omissions of existing facts . . . and that these omission were misleading at the time they were made, the bespeaks caution doctrine is inapplicable.").

The Defendants point to language which warns that the synergies might not be achieved. (DOB at 16.) However, this warning was insufficient as it failed to mention the *specific* factors that Defendants knew, at the time of their statements, made the synergies unlikely to occur – *e.g.*, tens of millions of dollars in expected severance costs for departing Coors' executives, Coors' increasing distribution costs, and the massive expense stemming from Molson's disastrous Brazilian operations. (¶¶ 5, 77, 177(b).) The other cautionary language that the Defendants trumpet (*see* DOB at 16

n. 65), are merely vanilla-flavored boilerplate warnings that typically accompany *all* companies' press releases and SEC filings.[11] At a minimum, whether such cautionary language sufficed is a fact question that cannot be resolved at this stage of the litigation. *See EP Medsystems*, 235 F.3d at 877 (finding fact question whether cautionary language was sufficient "to neutralize the initial representation"); *Sheehan v. Little Switz., Inc.*, 136 F. Supp. 2d 301, 312 (D. Del. 2001) (Robinson, J.) (rejecting argument that warnings rendered omission immaterial: "Materiality is a highly fact-intensive issue which makes it difficult to resolve at the pleadings stage.") (citation omitted).

### c.    The Allegations Regarding Lead Plaintiffs' Confidential Witness Are Sufficient

Defendants also seek to challenge the former Coors director of supply chain management, who acted as a confidential witness ("CW") and whose statements confirmed that senior Coors executives were aware of undisclosed facts that: (1) made it unlikely for the synergies to be achieved; and (2) as discussed *infra*, showed Coors' pre-merger performance to be falsely overstated. Defendants claim that the Complaint lacks sufficient specificity with respect to the CW, and they speculate that the CW's basis of knowledge is "third-hand

---

[11] Defendants' oral statements (see ¶ 97 (conference call), ¶ 102 (Bloomberg interview), ¶ 173 (conference call), do not qualify for protection because – the speakers failed to identify which specific statements were forward-looking. See 15 U.S.C. § 78u-5(c)(2) (an oral statement must be accompanied by a cautionary statement "that the particular oral statement is a forward-looking statement; and . . . that the actual results might differ materially from those projected in the forward-looking statement") (emphases added); Honeywell, 182 F. Supp. 2d at 427.

information" or "rumor." (DOB at 15, 18-21.) These arguments are without merit because, as is discussed in greater detail below, the CW learned this information directly from a member of Coors' senior management who attended the meetings of senior management wherein these issues were discussed. As Defendants concede, a plaintiff need only describe a confidential witness "with sufficient particularity to support the probability that a person in the position occupied by the source would possess the information alleged." *Cal. Pub. Emples.' Ret. Sys. v. Chubb Corp.*, 394 F.3d 126, 146 (3d Cir. 2004). The Complaint easily satisfies this standard.

Here, the Complaint alleges that a former Coors Director of Supply Chain Management stated that critical, undisclosed facts regarding projected synergies from the Merger (as well as financial information specific to Coors' and Molson's respective operations), were discussed at meetings of Coors senior management and thus were known to those in attendance. (*See, e.g.*, ¶¶ 69(d), 73(d), 77, 78, 83, 100(d), 114, 150, 168, 171, 178, 182, 187.) The Court can reasonably infer from these allegations that the CW worked at Coors during the relevant time period in a position that entailed frequent discussions with one or more members of senior management, including – given the department of which the CW was a director – Caseria, Coors' Supply Officer and Senior Vice President, who headed the division in which the CW worked.[12] When coupled with the fact that Caseria attended the relevant meetings of Coors senior management (*see, e.g.*, ¶¶ 69(d), 73(d), 100(d), 168, 171), the Court may conclude that the CW learned these facts from discussions with him.[13]

But even without the CW's statements, the Court may infer that the Individual Defendants – as high-ranking officers and executives – knew of the facts that contradicted their public statements because the law "assum[es] that principal managers of a corporation are aware

---

[12] Caseria reported directly to Coors' President and CEO, defendant Kiely. (¶¶ 69(d), 100(d).)
[13] To the extent the Court find these or any other allegations made in the Complaint insufficient, Plaintiffs request leave to amend the Complaint to include additional details about the CW. See *Arthur v. Maersk, Inc.*, 434 F.3d 196, 206 (3d Cir. 2006) ("The liberality of Rule 15(a) counsels in favor of amendment even when a party has been less than perfect in the preparation and presentation of a case.").

of matters central to that business's operation," *In re Complete Mgmt., Inc. Sec. Litig.*, 153 F. Supp. 2d 314, 325-26 (S.D.N.Y. 2001), which includes the synergies from a merger. *See In re Aetna, Inc. Sec. Litig.*, 34 F. Supp. 2d 935, 953 (E.D. Pa. 1999) (finding that allegations of integration problems following a merger "provide strong circumstantial evidence that Defendants . . . had knowledge of undisclosed facts concerning the integration of the . . . merger and its impact on Aetna's financial statements").

### 3.    Regarding Coors' Pre-Merger Performance

The Defendants fare no better with their arguments regarding the false and misleading nature of statements they made about Coors' pre-merger financial condition. Indeed, the Defendants fail to address their numerous statements about Coors' supposedly strong condition that were demonstrably false and misleading at the time they were made.

For example, the Defendants' response to the Complaint's allegations about sales of Aspen Edge are unavailing. The Defendants contend that their statements regarding the "increasing volume" of sales of Aspen Edge and the product's purported overall success are not actionable because "Aspen Edge was then first being introduced as a new product with the result that *any* sales represented volume gains." (DOB at 18 (emphasis in original).)

While it may have been *technically* true that Aspen Edge was a new product such that "any sales" represented volume gains, the Defendants' half-hearted argument ignores the misleading nature of their statements. The Complaint alleges that the Defendants repeatedly portrayed Aspen Edge as a success[14] while knowing (or recklessly disregarding the fact) that, beginning in the summer of 2004, poor sales of Aspen Edge had forced Coors to start *buying back the product and reimbursing wholesalers* for any of the product that went out of date. (*See, e.g.*, ¶ 69(d), 73(c), 100(c), 167(c), 170.) In light of these plainly poor results, Defendants' positive

---

[14] (See ¶ 71 ("We have been encouraged so far with how some of our higher margins, higher products [such as] Aspen Edge, are running on us. And we obviously look for more of the same next year."); ¶ 96 ("Our volume trends also benefited from the introduction of Aspen Edge earlier year."); ¶ 166 ("we're pleased with the performance of recent U.S. product introductions, including . . . Aspen Edge" and "this great-tasting beer has been gaining volume").)

statements regarding Aspen Edge were obviously false and misleading when made. *See Johnston v. HBO Film Mgmt., Inc.*, 265 F.3d 178, 193 (3d Cir. 2001) ("Statements which are technically true may be so incomplete as to be misleading (*e.g.*, half-truths or distortion.)"; *Tracinda v. DaimlerChrysler AG Sec. Litig.*, 197 F. Supp. 2d 42, 57-58 (D. Del. 2002) (Farnan, J.) ("[S]tatements which are literally true may become misleading to investors depending on their context.) (citation omitted).

Moreover, throughout 2004, Coors announced "improved trends" in "key areas" of its business (*see* ¶¶ 65, 70, 96, 166), despite the fact that the Defendants knew Coors' overall business was weak due to a general decrease in sales and significant increases in expenses. (¶¶ 69(a), 73(a), 100(a), 167(a), 187.) The Defendants now argue that Coors disclosed "weak trends in both . . . [its] Americas and Europe segments" and other "issues" at various time in 2004. (DOB at 18.) However, these statements vastly understated the problems that Coors was facing, particularly in Texas, which was one of Coors' most important markets. Indeed, what the Defendants failed to disclose was that 2004 was shaping up (and turned out) to be the worst year that Coors had *ever* experienced in Texas, with sales *down* at least 5%. (¶¶ 69(a), 73(a), 100(a), 167(d).)[15]

Likewise, in reporting Coors' third quarter 2004 results, the company stated: "For the balance of 2004, we are focused on achieving a strong finish to the year. In the U.S., *we will be lapping significant volume declines* and additional costs related to our supply-chain disruptions in

---

[15] The Defendants contend that Coors "candidly disclosed problems and issues" and made "specific mention" of its "difficulties in Texas," pointing to the company's second quarter 2004 10-Q which stated, "US retail volume declines were focused in select markets – particularly in Pennsylvania and Texas – where we faced unique local issues." (DOB at 17-18.) However, as discussed above, this disclosure, too, was misleading because it failed to mention the record poor results Coors was experiencing in Texas at the time. To be sure, there is a material, qualitative difference between disclosing mere "difficulties" in Texas, as opposed to revealing that those difficulties were severe enough to cause historic losses in one of the Company's most important markets. See In re NeoPharm, Inc. Sec. Litig., No. 02 C 2976, 2003 U.S. Dist. LEXIS 1862, at *39 (N.D. Ill. Feb. 7, 2003) (attached hereto as Exhibit F) ("Plaintiff . . . alleges that despite any disclosures, defendants fraudulently downplayed the significance of the LEP delay by not disclosing the serious extent and nature of the problems plaguing LEP. The court agrees with plaintiff . . .") (emphasis added).

the fourth quarter of last year." (¶ 70.)  Yet, when Molson Coors' first quarter 2005 results were announced, Defendants revealed that Coors did not "lap[] significant volume declines." Instead, Molson Coors announced that it was *Coors* that had been responsible for the bulk of Molson Coors' decline in *pro forma* U.S. volume: (1) during Molson Coors' April 28, 2005 conference call with investors, the company revealed that *pro forma* U.S. volume year-over-year declined by 3.6% *for Coors products only* and that the combined company had experienced a 5.6% decline in *pro forma* volume due to lower volume sales in *all* of its major markets (*i.e.*, not just those which were previously Molson's). (¶ 110; *see also* ¶ 109.)  Thus, while Defendants had led investors to believe that Coors' financial strength sufficiently counterbalanced Molson's expected losses,[16] Coors had contributed significantly to the combined company's poor performance. (¶ 110.)

### 4.    Regarding Molson's Brazilian Business

The Defendants' argument that the Complaint fails to identify a false or misleading statement regarding Molson's Brazilian business must fail.  The Complaint highlights the numerous false and/or misleading statements regarding the "Brazilian situation" (¶ 81), that the Defendants made during the Class Period, including: stating that the C$210 million impairment charge taken in November 2004 was "a function of current period costs" (¶ 78), that the Molson was making "great inroads with regard to the Brazilian situation" (¶81), that Molson Coors would "continue the near and long-term potential for its Kaiser business in Brazil" (¶ 97), and stating that "the Brazilian team continues to achieve significant progress" (¶ 144.).

---

[16] Notwithstanding Defendants' arguments to the contrary (see DOB at 17), the reasonable inference to be drawn from Defendants' positive statements regarding Coors' financial performance was that the purported overall strength of Coors' business would more than offset the well-known weaknesses that Molson was experiencing.  Indeed, the Defendants implicitly represented that Coors' performance was sufficiently strong to enable the new company to reach its projected financial goals.  For example, the Defendants stated that "we expect this transaction to be accretive to earnings in the first year" and "[o]n a cash EPS basis, we expect the transaction to be significantly accretive in the first year. . . ." (¶ 173.)  Given Molson's lackluster financial condition, the Merger could not have been "accretive to earnings in the first year" unless Coors' financials were sufficiently strong to offset Molson's losses.

In response to analysts' criticisms of Molson's Brazilian business, the Defendants made numerous statements designed to mislead investors into thinking that the "Brazilian situation" (¶ 81) was improving. The Defendants accuse Plaintiffs of "selective quotation," and argue that the statements in the Complaint are not misleading because they followed negative financial results. On the contrary, Plaintiffs recognize that these statements come on the heels of negative results; it is this fact that renders the statements so egregiously false and/or misleading. If the Defendants statements came after positive results they would not have been misleading at all. However, given that the overall tone of the documents from which the statements were taken was positive[17] and that the statements unequivocally communicated short-term problems (such as those due to "current period costs" (¶ 78)) and positive things to come (such as the "progress" the Brazilian team continued to make (¶144)), the negative results are wholly overshadowed. As the Complaint and the eventual sale of Kaiser for a mere $68 million demonstrate, Kaiser's problems were not short-term, and the Defendants knew or recklessly disregarded that the positive trends would never come to pass. Thus those statements, when made, were false and/or misleading.

Defendants' classifications of their false and/or misleading statements as "vague statements of optimism" are inaccurate. The court in the only case cited by the Defendants, *In re Advanta Corp. Sec. Litig.*, 180 F.3d 525 (3d Cir. 1999), found that statements such as "among the most efficient," (*Id.* at 537), "credit quality has remained excellent" (*Id.*), and "best in the industry" were too vague and general to be actionable. These statements are clearly more vague than the affirmative assurances the Defendants gave in the instant matter, thus rendering *Advanta* readily distinguishable. Furthermore, despite analysts' criticisms, the frequency with which the Defendants made statements in support of their Brazilian operations lends creditability to their statements. *See Weiner v. Quaker Oats Co.*, 129 F.3d 310, 317 (3d Cir. 1997), (stating that when

---

[17] Defendants argue that the documents present solely negative information from which an investor could not find hope. However, one need not look further than the first paragraph of the Executive Vice President's address for the first of many references to "encouraging signs" in Brazil, thus negating Defendants' argument. (Molson Q2 2005 Earnings Call, Oct. 28, 2004.)

taken together a series of statements, all conveying the same message, could have induced a reasonable investor to act on them, hence they were materially misleading.)

Alternatively, as with those statements discussing synergies, these statements were made without a reasonable basis. Therefore, given that the Defendants are all high-ranking corporate officials who knew or recklessly disregarded that the Brazilian business was not "making great inroads," (¶ 81), or that the losses were not the "result of current period costs," (¶ 78), those false and/or misleading statements are actionable without regard to their classification. *See Weiner*, 129 F.3d at 320 (holding that "soft information" from high-ranking corporate officials can be actionable if they are made without a reasonable basis (internal citations omitted).) *See also Trump*, 7 F.3d at 369-71; and *Burlington Coat Factory*, 114 F.3d at 1428 ("[S]tatements of opinion by top corporate officials may be actionable if they are made without a reasonable basis.").

The Defendants also made false and/or misleading statements regarding GAAP mandated goodwill and asset impairment charges. Defendants did cause Molson to take a C$210 million charge prior to the Merger; however, such a charge was wholly insufficient in scope as evidenced by Molson Coors' subsequent $500 million impairment charge. This resulted in Molson Coors' financial results being overstated by millions of dollars. (¶ 129.)

As stated in Exhibit 29 to the Affidavit of Michael R. Young in Support of Defendants' Motion to Dismiss the Complaint (D.I. 68) (the "Young Affidavit"), filed with Defendants' papers, GAAP requires a write down when "an event occurs or circumstances change that would more likely than not reduce the fair value of a reporting unit below its carrying amount. Examples of such events or circumstances include: [a] significant adverse change in legal factors or in the business climate [and] … [u]nanticipated competition." (DOB at 24 n. 97; FASB Statement of Financial Accounting Standards No. 142, Goodwill and Other Intangible Assets, 26, 28 (June 2001); and ¶ 130.) Molson entered Brazil on the assumption that Brazil would be a lucrative market. (¶ 137.) However, as described by the CW, the Defendants knew for some

time that there were significant problems with the Brazilian business, including a reduction in market share, intense competition from smaller brewers, and a material decline in demand for its products. (¶ 82, 83.)[18] Therefore, the Defendants knew that given the business climate was materially different than the Defendants had previously expected and that they faced an unanticipated level of competition, GAAP required a further write-down of goodwill and long-lived assets that the Defendants neglected to take.

The Defendants attack on the CW's ability to support a claim of GAAP violations is similarly unfounded. As discussed above, the CW that Plaintiffs relied on was adequately described in the Complaint. Further, the cases the Defendants cite for this proposition are readily distinguishable. In each of those cases, the informant was not as high-ranking, or as well described in the complaint. Furthermore, in *In re Exxon Mobil Corp. Sec. Litig.*, the plaintiffs relied on the confidential informant to establish the "state of oil prices in 1998 and [that] the actions of Exxon's competitors mandated such action." 387 F. Supp. 2d 407, 426 (D.N.J. 2005). The instant matter is quite different because the CW can actually place the true information and the Defendants in the same meeting, rather than merely attesting to such generalities as those presented in *Exxon Mobil*.

The Defendants also made false and/or misleading statements regarding their handling of Molson Coors' substantial Brazilian tax liability. Again, Defendants argue that they took a $176 million accrual for Brazilian taxes (DOB at 25); however, GAAP required them to do more. GAAP required them to take the accrual when the debt became probable, at some point between the initial accrual of $176 million and the eventual disclosure of the liability in Molson Coors' 1Q:2005 Form 10-Q. Defendants did not do this.

---

[18] As a further warning to the Defendants of the state of business in Brazil, Heineken, which had acquired 20 percent of Kaiser from Molson in 2002, took an impairment charge of €190 reducing its carrying value of its Kaiser investment to zero. (¶144.) This action put the Defendants on inquiry notice of a potential problem in the Brazilian market, thus negating any ignorance defense.

GAAP also requires that a contingency, such as a tax liability, be disclosed in the financial statements "when it is at least reasonably possible (*e.g.* a greater than slight chance) that a loss may have been incurred. (¶ 159.) This disclosure must provide the nature of the contingency and an estimate of the possible loss, a range of loss, or state that such an estimate cannot be provided. (¶ 152.)  In this case, the Defendants utterly failed to comply with the clear dictates of GAAP.  In the Proxy the Defendants classify "a number of claims from the Brazilian tax authorities" and state that provisions have been made for them (¶ 158); however, the amount of such contingencies or a range of such loss was not disclosed.

Additionally, GAAP requires that financial statements disclose significant risks and uncertainties associated with an entity's business.  (¶ 161.)  Therefore, even if the situations were as Defendants present and they considered the liabilities to be remote, there is no denying that the potential loss posed a "significant risk" to the business and as such GAAP mandated its disclosure.

Finally, the Defendants "disclosure" violated the very nature of GAAP in a number of additional ways: it did not "provide information that is useful to present and potential investors and creditors" (¶ 164(a)); it did not provide information on how management "discharged its stewardship responsibility to owners (stockholders) for the use of the enterprise resources entrusted to it" (¶ 164(b)); it did not "provide information about [the] enterprise's financial performance during a period" (¶ 164(c)); it was not "reliable in that it represent[ed] what it purport[ed] to represent" (¶ 164(d)); it was not complete, meaning that "nothing [was] left out of the information that may [have] been necessary to ensure that its validity represent[ed] underlying events and conditions" (¶ 164(e)); it did not follow the principle of "conservatism" to ensure that "uncertainties and risks inherent in business situations are adequately considered" (¶ 164(f)); and it recognized contingencies that might result in gains," something usually omitted from financial statements.  (¶ 164(g).)

### 5.    Regarding The Departure Of Coors Senior Executives

Defendants knew for several months that upon completion of the Merger, several key executives planned to resign their positions. (¶¶ 100(e), 150.)  Rather than disclose this fact in a clear concise way (thus ensuring that investors knew the complete plan for their company), the Defendants proffered false and misleading statements designed to give investors a false sense of security and ensure their own positions within the Company.[19]

The Complaint alleges that it was several *Coors* employees who were planning to, and subsequently did, leave upon completion of the Merger.  (¶¶ 100(e), 150.)  The Proxy on the other hand, as cited by the Defendants, discusses *Molson* employees' respective change-of-control payments, with only a brief note regarding Coors employees' respective change-of-control payments.  This brief note fails to meet the minimal acceptable practices prescribed by GAAP. GAAP requires that the amount of the contingency be disclosed when it is probable that the contingency will occur and the amount can be reasonably estimated.  (¶ 151.)  According to the CW, the Defendants had known for months that the contingency was likely to occur upon completion of the Merger, and it is reasonable to think that a review of the respective contracts would have revealed the amounts due.  Thus, to comport with the mandates of GAAP, the Defendants were required to disclose the liabilities represented by the departing Coors employees' change-of control payments.

The Defendants argue that until January 2005, it was not even probable that the Merger itself would occur, let alone the change-of-control payments associated therewith.  This argument fails in two respects.  First, if it was unlikely that the Merger was going to be completed, why did the Defendants disclose Molson employees' change-of-control provisions?  Second, the tide against the Merger began to change as early as November 2004, not January 2005 (¶ 84), thus the

---

[19] The Defendants again attack the CW, however as discussed *supra*, this argument is without merit.

completion of the Merger was becoming ever more likely with every false and/or misleading statement the Defendants made.

### B. THE COMPLAINT ADEQUATELY ALLEGES SCIENTER

#### 1. Plaintiffs Allege Actionable Misrepresentations And Omissions Contained In Corporate Documents That Are Attributable To Each Defendant

Defendants' argument that Plaintiffs "fail [] to specify each defendants' [sic] role" in the material misstatements and omissions is mistaken.  (DOB at 31.)  The Defendants make the common mistake of confusing the "group pleading doctrine" with *scienter*.  At the pleading stage, the group pleading doctrine allows plaintiffs to "link otherwise *unattributed* corporate statements to individual defendants based solely on their corporate titles and roles."  *Marsden*, 2006 U.S. Dist. LEXIS 16795, at *56 (emphasis added).  The materially false and misleading corporate statements set forth in the Complaint are each attributed to a defendant, and thus the Defendants' argument fails.  (*See, e.g.*, ¶¶ 65, 67, 70-72, 75, 76, 78, 79, 81, 90, 91, 96-99, 101, 102.)

A recent Third Circuit opinion exemplifies that *when scienter is adequately alleged*, group allegations can establish that defendants "spoke" through corporate statements.  *See In re Suprema Specialties, Inc. Sec. Litig.*, 438 F.3d 256, 276, 282 (3d Cir. 2006) (allegations linking defendants to the reckless conduct are sufficient).  Thus, for purposes of this motion to dismiss, Coors' and Molson Coors' company publications, including periodic, quarterly or annual reports and press releases, are presumed to be the collective work of the Defendants so long as they survive the Court's *scienter* analysis.[20]

Even without this presumption, the Complaint more than sufficiently alleges that defendants P. Coors, Kiely, Herington, Hobbs, Oliphant, Patsley, Sanders, Wolf, Barnes and O'Neill either signed or adopted SEC filings containing material misrepresentations or omissions,

---

[20] See also In re Rent-Way Sec. Litig., 209 F. Supp. 2d 493, 518 (W.D. Pa. 2002) ("We see no reason to find that group plead allegations per se cannot meet the heightened pleading standards of Rule 9(b) or the PSLRA…").

participated in senior management meetings during which facts contradicting the material misstatements and omissions were discussed, or participated in conferences with analysts during which material misstatements and omissions therefrom were made. (¶¶ 67-69, 72, 73, 76, 80-81, 100, 101, 137, 168, 171, 187.)  To the extent any Defendant did not speak or did not sign the Class Period SEC filings, each is liable under the securities laws for his material omissions. *In re Smartalk Teleservices, Inc. Sec. Litig.*, 124 F. Supp. 2d 527, 543 (S.D. Ohio 2000) ("a high ranking company official cannot sit quietly at a conference with analysts, knowing that another official is making false statements and hope to escape liability for those statements").

## 2.    The Complaint's Allegations Assessed In Their Totality More Than Sufficiently Plead Scienter

The PSLRA requires Plaintiffs to plead facts that, taken together, give rise to a strong inference that the Defendants acted with the required state of mind. *See* 15 U.S.C. § 78u-4(b)(2)); *Marsden,* 2006 U.S. Dist. LEXIS 16795, at *32-37; *Honeywell,* 182 F. Supp. 2d at 428-29 (allegations in their "totality" sufficiently plead *scienter*).  Obviously, in any one case, there may be some overlap among the facts alleged to support an inference of *scienter* for similarly-situated defendants, but if these facts raise an inference of *scienter* for each, the Plaintiffs have satisfied their burden. *See, e.g., Fla. State Bd. of Admin. v. Green Tree Fin. Corp.*, 270 F.3d 645, 665-67 (8th Cir. 2001) (using same set of facts to infer *scienter* against several defendants).  A plaintiff may establish this strong inference of a defendant's *scienter* by alleging facts that (a) "show that defendants had both motive and opportunity to commit fraud," or (b) "constitute strong circumstantial evidence of conscious misbehavior or recklessness." *Suprema,* 438 F.3d at 276 (citation omitted).[21]

---

[21] The PSLRA does not address the substantive elements of a § 10(b) claim, only how a claim is pled.  Advanta, 180 F. 3d at 535.  Under the PSLRA, "recklessness . . . remains a sufficient basis for liability." Id.

a.    **The Complaint More Than Sufficiently Alleges
Motive and Opportunity**

Plaintiffs more than sufficiently plead a strong inference of *scienter* by alleging facts that

demonstrate motive and opportunity on the part of the Defendants to commit securities fraud.[22]

Motive is properly alleged by pleading the existence of "concrete benefits that could be realized

by one or more of the false statements and wrongful nondisclosures alleged." *Ganino v. Citizens*

*Utils. Co.*, 228 F.3d 154, 170 (2d Cir. 2000) (quoting *Shields v. Citytrust Bancorp., Inc.*, 25 F.3d

1124, 1130 (2d Cir.1994)). The Complaint sets forth the concrete benefits that the Defendants

stood to gain from touting the Merger, and the strong public opposition to the Merger that

threatened to destroy the fruition of those benefits. That is all that is required.[23]

(1)    **Defendants' Sought to Benefit From a
Merger of Convenience**

As Coors and Molson already maintained joint ventures and shared profits (¶¶ 46, 52,

64), the Merger was one of convenience designed to mutually benefit the narcissistic and

financial interests of the members of the Molson and Coors families and executives only. Molson

and Coors' deteriorating market share and financial condition throughout the proposed Class

Period made them prime candidates for a takeover on terms less favorable than the Merger and

further escalated the need to fend-off other potential acquirers, such as Heineken. (¶¶ 7, 12, 54.)

The Coors family's insistence on retaining control of the corporation had been an obstacle for

potential takeovers in the past. (¶ 89.) The Merger, however, presented the Coors family and

executives with an opportunity to maintain significant control of Molson Coors through pre-

arranged voting agreements and board selection powers.

---

[22] The Defendants do not dispute they each had the opportunity to commit securities fraud.

[23] The Defendants' argument against scienter does not affect the Court's analysis because it improperly argues facts not alleged in the Complaint and relies on inapposite case law as a shield to securities fraud. See *supra*, Argument § A.1.

Specifically, after the Merger, Defendant P. Coors, as trustee of the Coors Trust, would control 33.49% of Molson Coors' voting power and 3.27% of Molson Coors' economic ownership. (¶ 20.) Moreover, regarding this already large percentage of control, P. Coors was able to secure a voting agreement with Eric and Stephen Molson that would control over 67% of Molson Coors' voting shares. (¶¶ 20, 191.) If approved, the consummated merger of Molson Coors would also empower P. Coors, as the former Chairman of Coors' board of directors, along with Eric Molson, to nominate ten of the fifteen Molson Coors directors. (¶¶ 12, 20.) This empowerment necessarily aligned the Coors board of director's interests with P. Coors' interest in unlawfully overcoming any public opposition to the Merger. In fact, several Coors' directors, including Kiely, Herington, Hobbs, Patsley, and Yates, participated in the fraudulent scheme alleged herein and were rewarded with board positions at Molson Coors. (¶¶ 12, 21-23, 25, 27.) Further demonstrating P. Coors' motive, the success of the Merger led to the addition of the youngest member ever to sit on the board -- P. Coors' daughter, Melissa E. Coors. (¶¶ 12, 191.)

In addition to risking the reign of each family's respective positions, control and brand name, the Defendants realized that their failure to merge Molson and Coors would risk the substantial proceeds they stood to gain from that corporate negotiation. (¶¶ 46, 64, 112-14.) For example, O'Neill, as CEO of Molson, and other top executives stood to gain millions in retention bonuses or change-of-control severance payments should the Merger gain shareholder approval. (¶¶ 53, 113.) Thus, when opposition to the Molson Coors merger of convenience presented itself in 2004, the Complaint alleges that each Defendant had concrete benefits that could be realized by opting to tout the Merger and delaying disclosure of the need to materially write-down Molson's Brazil operations, the significant obstacles to achieving alleged synergies at Molson Coors, and the apparent need to report that Coors was operating below plan. (*See* ¶¶ 4, 7, 12, 13, 52-54, 57-59, 108, 198.)

(2)    **Opposition to the Merger Gave Defendants
Strong Motive to Commit Securities Fraud**

Plaintiffs set forth facts indicating that there was a real danger that the Merger would not be consummated and, thus, Defendants had a strong motive to defraud the market by inflating the stock of Coors and the benefits of merging Molson with Coors. Given the analysts' initial skepticism, the opposition from large institutional investors, the possible takeover bid by Ian Molson and Heineken, and *The National Post*'s prediction that the Merger would fail, (¶¶ 7, 12, 47, 52-54, 57-59), the Defendants were desperate to garner support for the unpopular idea of merging Molson with Coors.

To overcome this opposition, the Defendants purposefully overstated the financial condition of Coors, overstated the projected synergies between Coors and Molson, understated the problems and significant losses at Molson Coors' Brazilian operations, and avoided recording proper loss contingencies regarding executive severance payments. (¶¶ 2, 6, 13, 134, 154, 184.) As intended, this false portrait of success fostered positive analyst coverage that propagandized the Merger to shareholders, secured investors in the open market at inflated prices, and allowed Defendants to reap the consequential benefits of their fraud. (¶¶ 4, 5, 12, 13, 84-89.)

(3)    **Defendants Were Motivated to Inflate the
Price of Coors' Stock to Complete the Stock-
for-Stock Merger**

Courts have repeatedly held that *scienter* may be inferred from a motive to facilitate a large-scale corporate transaction that is dependent on the value of the company and its shares. *See, e.g., Rothman v. Gregor*, 220 F.3d 81, 93 (2d Cir. 2000); *In re Initial Pub. Offering Sec. Litig.*, 241 F. Supp. 2d 281, 369 (S.D.N.Y. 2003) (citing *Complete Mgmt.*, 153 F. Supp. 2d at 328) (allegation that defendants "sought to maintain the artificially high stock price so that the [company] might use that stock as currency for acquisitions…is sufficiently concrete to support strong inference of scienter")). To this end, the Merger was structured as a stock-for-stock "merger-of-equals" requiring approval by both Coors and Molson shareholders. (¶ 3.) As the

Complaint alleges, had investors known the true value of Coors' and Molson Coors' shares, the

Merger would likely never have received final approval from Coors or Molson shareholders.

Defendants' powerful motive to overcome strong opposition to the completion of the Merger,

standing alone, raises a strong inference of the Defendants' *scienter*.

In an effort to overcome strong Molson shareholder opposition (¶¶ 57-59), the

Defendants increased their previous offer of a special dividend to Molson shareholders by over

66.87% (¶¶ 39, 55, 60, 92). Further, Pentland, the entity that Eric and Stephen Molson controlled

and would command over 67% of Molson Coors' voting shares should the Merger receive

approval, decided to forego participation in the special dividend. (¶¶ 20, 56, 191.) Eric Molson

deceptively depicted Pentland, and consequently himself, as a martyr whose decision to favor the

Merger while abstaining from monetary compensation could only mean that the Merger must be

in the best interests of Molson and the shareholders. (¶ 56.) The truth, however, was that

Pentland's participation in this special dividend would have increased Molson Coors' debt by

well-over the 20% increase that it would incur without Pentland's participation. (¶ 60.) Despite

their statements and omissions indicating otherwise, Defendants efforts to gain Molson

shareholder approval constituted a bribe and did not reflect the true value of Coors or Molson

Coors shares. (¶¶ 61-63.) As the Complaint more than sufficiently alleges strong inferences of

motive and thus, *scienter*, this becomes a question of fact for the jury.[24]

### b.    The Sarbanes-Oxley Act of 2002 And SEC Rules Hold CEOs and CFOs Responsible for Statements In Financial Reports

To assure investors that Defendants had a legitimate basis for making their statements,

*and to prevent them from later claiming to be unaware of material information that rendered a*

*financial report false*, the Sarbanes-Oxley Act of 2002 ("Sarbanes-Oxley") and the related SEC

---

[24] The Defendants do not, and can not, contest the allegations in the Complaint regarding the status of the individual defendants as "controlling persons." Accordingly, because, for reasons stated herein Plaintiffs' §§ 10(b) and 14(a) claims survive, so too must Plaintiffs' § 20(a) claims.

Rules together required Kiely as CEO and Wolf as CFO to, *inter alia*, certify Coors' Form 10-Q and Form 10-K reports filed with the SEC. *See generally* 15 U.S.C.S. §§ 7241 and 7261-62; 17 C.F.R. 240.13a-14 and 240.15d-14. Plaintiffs explicitly plead that Kiely and Wolf were signatories to Coors' 2004 Form 10-Q and Form 10-K SEC filings, which contained materially misleading statements and omissions, thereby authorizing and adopting the statements therein. (¶¶ 67-69, 72.) Further, since Defendants' SEC filings were submitted after the effective date of Sarbanes-Oxley and Exchange Act Rules 13a-14 and 15d-14, Kiely and Wolf, as signatories, cannot escape liability under the securities laws. *See* 15 U.S.C.S. §§ 7201-7266; 17 C.F.R. §§ 240.13a-14 and 240.15d-14; *see also*, *In re Lattice Semiconductor Corp. Sec. Litig.*, No. 04-1255-AA, 2006 U.S. Dist. LEXIS 262, at *50-51 (D. Or. Jan. 3, 2006) (attached hereto as Exhibit G) (Sarbanes-Oxley certifications give rise to an inference of actual knowledge of deliberate recklessness) and *In re American Italian Pasta Co. Sec. Litig.* No. 05-0725-CV-W-0DS, 2006 U.S. Dist. LEXIS 40548, at *20 (W.D. Mo. June 19, 2006) (attached hereto as Exhibit H) (the court found it reasonable to infer that members of upper management were either aware of, alleged fraud, involved in alleged fraud, or were so unaware they were discharging their duties in a reckless manner given the nature of the fraud alleged and the fact that both upper management and the company's audit committee certified annual reports pursuant to Sarbanes-Oxley.)

By requiring Kiely and Wolf to certify the existence of disclosure controls at Coors that "ensure that material information . . . is made known" to them, Sarbanes-Oxley provides courts with substantial authority to infer that both Kiely and Wolf knew or recklessly disregarded the then-present facts concerning Coors' and putative Molson Coors' true financial condition that contradicted their public statements. (¶¶ 68, 69.) Despite this knowledge, their certifications falsely provided investors with assurances that Coors' 2004 SEC filings were accurate, and this compels a strong inference of *scienter*. Furthermore, Wolf's receipt and review of financial data during senior management meetings contrary to his Class Period Statements also compels a finding of *scienter*. *Green Tree Fin. Corp.*, 270 F.3d at 665 ("One of the classic fact patterns

giving rise to a strong inference of *scienter* is that defendants published statements when they knew facts or had access to information suggesting that their public statements were materially inaccurate.").[25]  Similarly, Keily's certifications, coupled with his interactions with both Wolf and Erhardt, as well as others in Coors' and Molson Coors' senior management, also compels an inference of scienter.

## III.    Conclusion

For the reasons set forth above, Plaintiffs respectfully request that the Court deny Defendants' Motion to Dismiss the Complaint or, in the alternative, allow them a reasonable opportunity to replead.

Dated:  June 23, 2006

**MILBERG WEISS BERSHAD
& SCHULMAN LLP**

/s/ Sean M. Brennecke (#4686)
Brian D. Long (#4347)
Sean M. Brennecke (#4686)
919 N. Market Street, Suite 980
Wilmington, DE 19801
(302) 984-0597 (Tel)
(302) 984-0870 (Fax)

***Plaintiffs' Lead Counsel***

**Of Counsel**

**LABATON SUCHAROW & RUDOFF LLP**
Eric Belfi
100 Park Avenue
New York, NY 10017
(212) 907-0700 (Tel)
(212) 818-0477 (Fax)

---

[25] See also Novak v. Kasaks, 216 F.3d 300, at 308 (2d Cir. 2000); In re Scholastic Corp. Sec. Litig., 252 F.3d 63, 76 (2d Cir. 2001) (defendant "had access to internal corporate documents and reports relating to trade sales and return data, conversed with other officers and employees and attended management and committee meetings."); In re Viropharma, Inc., Sec. Litig., No. 02-1627, 2003 U.S. Dist. LEXIS 5623, at *31 (E.D. Pa. Apr. 3, 2003) (attached hereto as Exhibit I) (positions in the company provided "access to several documents which contained the facts that allegedly made defendants' statements materially misleading").  The Complaint sets forth that Wolf and Barnes attended these senior management meetings.  A strong inference may be drawn that the following defendants attended senior management meetings where undisclosed adverse information was discussed: (1) Kiely as CEO of Coors; (2) Swinburn as President of Coors Brewing Worldwide; (3) Kendall as CEO of Coors Brewers Limited; and after the Merger Agreement was entered into, (4) O'Neill as he transitioned from CEO of Molson to the Chair of the Office of Synergies and Integration of Molson Coors.  (See ¶¶ 21, 29, 31, 32.)