# EXHIBIT F

LEXSEE 2003 U.S. DIST. LEXIS 1862

### IN RE NEOPHARM, INC. SECURITIES LITIGATION

### 02 C 2976

### UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION

*2003 U.S. Dist. LEXIS 1862*

**February 7, 2003, Decided**

**SUBSEQUENT HISTORY:** Motion granted by, in part, Motion denied by, in part, Class certification denied by *In re Neopharm, Inc., 2004 U.S. Dist. LEXIS 5814* (N.D. Ill., Apr. 7, 2004)

**DISPOSITION:** [*1] Defendants' motion to dismiss granted in part and denied in part. Plaintiff's motion to strike granted in part and denied in part.

**CASE SUMMARY:**

**PROCEDURAL POSTURE:** Lead plaintiff brought suit individually and on behalf of a putative class of persons who bought common stock of defendant corporation, alleging that the corporation and various individuals violated § 10(b) of the Securities Exchange Act of 1934, Rule 10b-5, and § 20(a) of the Securities Exchange Act of 1934. Defendants moved to dismiss the complaint under Fed. R. Civ. P.12(b)(6), 9(b), and the Private Securities Litigation Reform Act of 1995.

**OVERVIEW:** Plaintiff argued that defendants violated § 10(b) of the Exchange Act, *15 U.S.C.S. § 78j*(b), and Rule 10b-5, 17 C.F.R. § 240.10b-5, by knowingly and/or recklessly making false and misleading statements to plaintiff as to the corporation's experimental drug. Plaintiff also argued that the individuals violated § 20(a) of the Securities Exchange Act of 1934, *15 U.S.C.S. § 78t*(a). Defendants argued, inter alia, that (a) there was no duty to update statements made before the class period; (b) plaintiff failed to properly plead the existence of a materially false statement or omission with respect to the statements made during the class period; and (c) plaintiff had failed to plead control person liability under § 20(a). The court held that the pre-class period statements fell into the duty to update and were not actionable. The court also held that, while some of the statements defendants made may technically have been correct, if they were aware of the problems with the drug

when the statements were made then a reasonable jury could find them misleading. As the underlying § 10(b) claims were adequately pled, the court did not agree that the § 20(a) claims should also be dismissed.

**OUTCOME:** Defendants' motion to dismiss was granted, as to the claims based on the pre-class statements and as to the claims based on the analyst reports published prior to January 12 and the March 21 analyst report. One defendant was dismissed from the action without prejudice. All of the other claims remained.

**LexisNexis(R) Headnotes**

*Civil Procedure > Pleading & Practice > Defenses, Demurrers, & Objections > Failures to State Claims*
*Civil Procedure > Dismissals > Involuntary Dismissals > Failures to State Claims*
[HN1] A motion to dismiss under Fed. R. Civ. P. 12(b)(6) challenges the sufficiency of the complaint for failure to state a claim upon which relief may be granted. Dismissal is appropriate only if it appears beyond a doubt that the plaintiff can prove no set of facts in support of its claim that would entitle it to relief. In ruling on the motion, a court accepts as true all well pleaded facts alleged in the complaint, and it draws all reasonable inferences from those facts in favor of the plaintiff.

*Civil Procedure > Pleading & Practice > Defenses, Demurrers, & Objections > Failures to State Claims*
*Civil Procedure > Pleading & Practice > Pleadings > Heightened Pleading Requirements > Fraud Claims*
*Civil Procedure > Pleading & Practice > Pleadings > Time Limitations > General Overview*
[HN2] In addition to the mandates of Fed. R. Civ. P. 12(b)(6), Fed. R. Civ. P. 9(b) requires all averments of fraud to be "stated with particularity," although malice,

2003 U.S. Dist. LEXIS 1862, *

intent, knowledge, and other condition of mind of a person may be averred generally. The rule requires the plaintiff to state the identity of the person who made the misrepresentation, the time, place, and content of the misrepresentation, and the method by which the misrepresentation was communicated to the plaintiff. Because only a fraction of financial deteriorations reflects fraud, plaintiffs in securities cases must provide enough information about the underlying facts to distinguish their claims from those of disgruntled investors.

*Civil Procedure > Pleading & Practice > Pleadings > Heightened Pleading Requirements > General Overview*
*Securities Law > Liability > Private Securities Litigation > General Overview*
*Securities Law > Liability > Securities Exchange Act of 1934 Actions > Implied Private Rights of Action > Heightened Pleading Requirements*
[HN3] In addition to Fed. R. Civ. P. 9(b), *15 U.S.C.S. § 78u-4(b)* of the Private Securities Litigation Reform Act of 1995, imposes heightened pleading requirements to discourage claims of so-called "fraud by hindsight." Section 78u-4(b) requires a court to dismiss a complaint that fails to (1) identify each of the allegedly material, misleading statements, (2) state facts that provide a basis for allegations made on information and belief, or (3) state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind.

*Civil Procedure > Pleading & Practice > Defenses, Demurrers, & Objections > Failures to State Claims*
[HN4] Transcripts that are not within the allegations of the complaint must be disregarded on a motion to dismiss.

*Evidence > Judicial Notice > Adjudicative Facts > Public Records*
[HN5] Transcripts are not subject to judicial notice, as they are not historical documents, documents contained in public record, or reports, decisions, and regulations of administrative bodies.

*Securities Law > Liability > Securities Exchange Act of 1934 Actions > Implied Private Rights of Action > Deceptive & Manipulative Devices*
[HN6] See *15 U.S.C.S. § 78j(b).*

*Securities Law > Liability > Securities Exchange Act of 1934 Actions > Implied Private Rights of Action > Deceptive & Manipulative Devices*
[HN7] Pursuant to *15 U.S.C.S. § 78j(b),* the Securities and Exchange Commission promulgated Rule 10b-5, which makes it unlawful for any person (a) To employ any device, scheme, or artifice to defraud; (b) to make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or (c) to engage in any act, practice or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security. 17 C.F.R. § 240.10b-5.

*Securities Law > Liability > Securities Exchange Act of 1934 Actions > Implied Private Rights of Action > Deceptive & Manipulative Devices*
[HN8] To establish liability under § 10(b) of the Securities Exchange Act of 1934, *15 U.S.C.S. § 78j(b),* and Rule 10b-5, 17 C.F.R. § 240.10b-5, a plaintiff must prove that (1) the defendant made a false statement or omission, (2) of material fact, (3) with scienter, (4) in connection with the purchase or sale of securities, (5) upon which the plaintiff justifiably relied, (6) and that the false statement proximately caused the plaintiff's damages.

*Securities Law > Liability > Securities Exchange Act of 1934 Actions > Implied Private Rights of Action > Deceptive & Manipulative Devices*
[HN9] With regard to a securities fraud action, only statements made after the alleged fraud began -- that is, during the class period -- are actionable.

*Securities Law > Liability > Securities Exchange Act of 1934 Actions > Implied Private Rights of Action > Deceptive & Manipulative Devices*
[HN10] The Seventh Circuit has defined two types of duties in situations where statements were made prior to the class period: the duty to correct a statement and the duty to update a statement. The former applies when a company makes a historical statement that, at the time made, the company believed to be true, but as revealed by subsequently discovered information actually was not. A duty to update arises when a company makes a forward looking statement--a projection--that because of subsequent events becomes untrue. The Seventh Circuit recognizes the duty to correct, but has rejected the duty to update.

2003 U.S. Dist. LEXIS 1862, *

*Securities Law > Liability > Private Securities Litigation > General Overview*
*Securities Law > Liability > Securities Exchange Act of 1934 Actions > Implied Private Rights of Action > Deceptive & Manipulative Devices*

[HN11] For purposes of § 10(b) of the Securities Exchange Act of 1934, *15 U.S.C.S. § 78j(b)*, and Rule 10b-5, 17 C.F.R. § 240.10b-5, a material misrepresentation is found where a defendant either made a false statement of material fact or failed to make a statement of material fact thereby rendering the statements which were in fact made misleading. A statement is material if it would be viewed by a reasonable investor as significantly altering the total mix of available information. Furthermore, the heightened pleading standard imposed under *15 U.S.C.S. § 78u-4(b)* of the Private Securities Litigation Reform Act of 1995, requires that a plaintiff "specify" the reasons a defendant's statement is false. *15 U.S.C.S. § 78u-4(b)(1)(B)*.

*Securities Law > Liability > Securities Exchange Act of 1934 Actions > Implied Private Rights of Action > Deceptive & Manipulative Devices*
*Securities Law > Liability > Securities Exchange Act of 1934 Actions > Insider Trading > Duty to Abstain & Disclose > Silence*

[HN12] For purposes of § 10(b) of the Securities Exchange Act of 1934, *15 U.S.C.S. § 78j(b)*, and Rule 10b-5, 17 C.F.R. § 240.10b-5, mere silence about even material information is not fraudulent absent a duty to speak.

*Criminal Law & Procedure > Criminal Offenses > Fraud > Securities Fraud > Elements*
*Securities Law > Liability > Securities Exchange Act of 1934 Actions > Implied Private Rights of Action > Deceptive & Manipulative Devices*

[HN13] For purposes of § 10(b) of the Securities Exchange Act of 1934, *15 U.S.C.S. § 78j(b)*, and Rule 10b-5, 17 C.F.R. § 240.10b-5, if a defendant knew that sales to a top buyer were to drop precipitously, it is reasonable to infer that the optimism of the defendant with respect to statements made regarding that buyer are misleading.

*Securities Law > Liability > Securities Exchange Act of 1934 Actions > Implied Private Rights of Action > Deceptive & Manipulative Devices*

[HN14] The disclosure required by the securities law is measured not by literal truth, but by the ability of the material to accurately inform rather than mislead prospective buyers.

*Civil Procedure > Pleading & Practice > Pleadings > Heightened Pleading Requirements > General Overview*

[HN15] It is well established in the Seventh Circuit that a party may be excused from Fed. R. Civ. P. 9(b)'s requirement of pleading with particularity if the information that he is required to plead rests exclusively within the defendants' control or is otherwise unavailable to him.

*Securities Law > Additional Offerings & the Securities Exchange Act of 1934 > Issuer Recordkeeping & Reporting > General Overview*
*Securities Law > Liability > Securities Exchange Act of 1934 Actions > Implied Private Rights of Action > Deceptive & Manipulative Devices*

[HN16] For purposes of § 10(b) of the Securities Exchange Act of 1934, *15 U.S.C.S. § 78j(b)*, and Rule 10b-5, 17 C.F.R. § 240.10b-5, where reports are analyst reports, a plaintiff must plead specific facts demonstrating that defendants adopted the statements or were entangled with them, or have put their imprimatur, express or implied, on the projections.

*Securities Law > Liability > Securities Exchange Act of 1934 Actions > Implied Private Rights of Action > Deceptive & Manipulative Devices*

[HN17] For purposes of § 10(b) of the Securities Exchange Act of 1934, *15 U.S.C.S. § 78j(b)*, and Rule 10b-5, 17 C.F.R. § 240.10b-5, sophisticated investors are expected to understand the limits of a projection. In short, "caveat emptor" applies equally, if not more, in the securities market.

*Securities Law > Liability > Securities Exchange Act of 1934 Actions > Implied Private Rights of Action > Deceptive & Manipulative Devices*

[HN18] For purposes of § 10(b) of the Securities Exchange Act of 1934, *15 U.S.C.S. § 78j(b)*, and Rule 10b-5, 17 C.F.R. § 240.10b-5, scienter may be established either (a) by alleging facts to show that defendants had both motive and opportunity to commit fraud, or (b) by alleging facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness. Reckless conduct is, at the least, conduct which is highly unreasonable and which represents an extreme departure from the standards of ordinary care to the extent that the danger was either known to the defendant or so obvious that the defendant must have been aware of it.

2003 U.S. Dist. LEXIS 1862, *

*Securities Law > Liability > Securities Exchange Act of 1934 Actions > Implied Private Rights of Action > Deceptive & Manipulative Devices*
[HN19] For purposes of § 10(b) of the Securities Exchange Act of 1934, *15 U.S.C.S. § 78j*(b), and Rule 10b-5, 17 C.F.R. § 240.10b-5, the fact that the defendants published statements when they knew facts suggesting the statements were inaccurate or misleadingly incomplete is classic evidence of scienter.

*Securities Law > Liability > Private Securities Litigation > Group Pleading Doctrine*
[HN20] The group pleading doctrine allows plaintiffs to rely on the presumption that certain statements of a company, such as financial reports, prospectuses, registration statements, and press releases, are the collective work of those high-level individuals with direct involvement in the everyday business of the company.

*Securities Law > Liability > Securities Exchange Act of 1934 Actions > Implied Private Rights of Action > Deceptive & Manipulative Devices*
[HN21] In a securities fraud case, the United States District Court for the District of Northern Illinois holds that in context of individual liability, the "proper course" is to examine each individual's liability based on each defendant's own conduct (or, where applicable, on respondeat superior principles).

*Securities Law > Liability > Securities Exchange Act of 1934 Actions > Implied Private Rights of Action > Deceptive & Manipulative Devices*
[HN22] The group pleading doctrine is extremely limited in scope. Courts in the Second Circuit and elsewhere have construed the doctrine as applying only to clearly cognizable corporate insiders with active daily roles in the relevant companies or transactions.

*Securities Law > Liability > Secondary Liability > Controlling Persons > Defenses*
[HN23] See *15 U.S.C.S. § 78t*(a).

*Securities Law > Liability > Secondary Liability > Controlling Persons > General Overview*
[HN24] Section 20(a) of the Securities Exchange Act of 1934, *15 U.S.C. § 78t*(a), control person liability attaches if a defendant exercised control over the operations of the person in general and possessed the power or ability to control the specific transaction or activity upon

which the primary violation was predicated, whether or not that power was exercised.

**COUNSEL:** For MARILYN CARSON, plaintiff: Christopher B Sanchez, Miller Faucher and Cafferty, LLP, Chicago, IL.

For MARILYN CARSON, plaintiff: Joel P Laitman, Jay P Saltzman, Schoengold and Sporn, P.C., New York, NY.

For LARSON CAPITAL MANAGEMENT, plaintiff: David A Thorpe, Helen J Hodges, Steven W Pepich, Milberg Weiss Bershad Hynes & Lerach LLP, San Diego, CA.

For NEOPHARM INC, JOHN N KAPOOR, JAMES M HUSSEY, defendants: Leann Pedersen Pope, Burke, Warren, MacKay & Serritella, P.C., Chicago, IL.

For NEOPHARM INC, JOHN N KAPOOR, JAMES M HUSSEY, defendants: Lucy H Koh, Lloyd Winawer, Dylan J Liddiard, Wilson, Soncini, Goodrich & Rosati, Palo Alto, CA.

For NEOPHARM INC, JOHN N KAPOOR, JAMES M HUSSEY, defendants: Stephen Ryan Meinertzhagen, Burke, Warren, MacKay & Serritella, Chicago, IL.

For AQUILUR [*2] RAHMAN, defendant: David H. Kistenbroker, Leah J. Domitrovic, Katten Muchin Zavis Rosenman, Chicago, Il.

**JUDGES:** JOAN HUMPHREY LEFKOW, United States District Judge.

**OPINIONBY:** JOAN HUMPHREY LEFKOW

**OPINION:**

### MEMORANDUM OPINION AND ORDER

Lead plaintiff, Larson Capital Management, brings suit individually and on behalf of a putative class of persons who purchased common stock of defendant, NeoPharm, Inc. ("NeoPharm"), between the dates of October 31, 2001 and April 19, 2002, alleging that NeoPharm, John N. Kapoor ("Kapoor"), James M. Huffey ("Huffey"), and Inram Ahmad ("Ahmad") (collectively "defendants"), violated § 10(b) of the Securities Exchange Act of 1934, *15 U.S.C. § 78j*(b), and Rule 10b-5 promulgated under 78j(b), by knowingly and/or recklessly making false and misleading statements to plaintiff and others similarly situated regarding NeoPharm's experimental drug Liposome Encapsulated Paclitaxel ("LEP"). Plaintiff n1 also maintains that Kapoor, Huffey and

Ahmad violated § 20(a) of the Securities Exchange Act of 1934, *15 U.S.C. § 78t*(a). Defendants have moved to dismiss the Consolidated Amended Class Action Complaint ("Complaint") under [*3] Rule 12(b)(6), Fed. R. Civ. P., for failure to state a claim upon which relief can be granted; *Rule 9(b), Fed. R. Civ. P.*, for failure to plead fraud with particularity; and the Private Securities Litigation Reform Act of 1995, *15 U.S.C. § 78u*-4(b) ("PSLRA"). For the reasons set forth below, the courts grants the motion in part and denies it in part.

n1 The word "plaintiff" refers to the lead plaintiff and the putative class.

## MOTION TO DISMISS STANDARDS

[HN1] A motion to dismiss under *Federal Rule of Civil Procedure 12(b)(6)* challenges the sufficiency of the complaint for failure to state a claim upon which relief may be granted. *GE Capital Corp. v. Lease Resolution Corp., 128 F.3d 1074, 1080 (7th Cir. 1997).* Dismissal is appropriate only if it appears beyond a doubt that the plaintiff can prove no set of facts in support of its claim that would entitle it to relief. *Conley v. Gibson, 355 U.S. 41, 45-46, 2 L. Ed. 2d 80, 78 S. Ct. 99 (1957);* [*4] *Kennedy v. Nat'l Juvenile Det. Ass'n, 187 F.3d 690, 695 (7th Cir. 1999).* In ruling on the motion, the court accepts as true all well pleaded facts alleged in the complaint, and it draws all reasonable inferences from those facts in favor of the plaintiff. *Jackson v. E.J. Brach Corp., 176 F.3d 971, 977 (7th Cir. 1999); Zemke v. City of Chicago, 100 F.3d 511, 513 (7th Cir. 1996).*

[HN2] In addition to the mandates of Rule 12(b)(6), *Federal Rule of Civil Procedure 9(b)* requires "all averments of fraud" to be "stated with particularity," although "malice, intent, knowledge, and other condition of mind of a person may be averred generally." "The rule requires the plaintiff to state the identity of the person who made the misrepresentation, the time, place, and content of the misrepresentation, and the method by which the misrepresentation was communicated to the plaintiff." *Vicom, Inc. v. Harbridge Merch. Servs., Inc., 20 F.3d 771, 777 (7th Cir. 1994); see also DiLeo v. Ernst & Young, 901 F.2d 624, 627 (7th Cir. 1990)* ("Although states of mind may be pleaded generally [under Rule 9(b)], [*5] the 'circumstances' must be pleaded in detail. This means the who, what, when, where, and how: the first paragraph of any newspaper story."). "'Because only a fraction of financial deteriorations reflects fraud,' . . . plaintiffs in securities cases must provide enough information about the underlying facts to distinguish their claims from those of disgruntled investors." *Arazie v. Mullane, 2 F.3d 1456, 1458 (7th Cir. 1993),* quoting in part *DiLeo, 901 F.2d at 628.*

Further, [HN3] in addition to Rule 9(b), the PSLRA imposes "heightened pleading requirements" to discourage claims of "so-called 'fraud by hindsight.'" *In re Brightpoint, Inc. Sec. Litig., 2001 U.S. Dist. LEXIS 5023, No. IP99-0870-C-H/G, 2001 WL 395752, at *3 (S.D. Ind. Mar. 29, 2001).* Section 78u-4(b) "requires a court to dismiss a complaint that fails to (1) identify each of the allegedly material, misleading statements, (2) state facts that provide a basis for allegations made on information and belief, or (3) state with particularity 'facts giving rise to a strong inference that the defendant acted with the required state of mind.'" *Brightpoint, 2001 U.S. Dist. LEXIS 5023, at *4.*

## MOTIONS TO STRIKE

Before examining the allegations [*6] of the complaint, the court will address plaintiff's motion to strike several exhibits that defendants filed with their motion to dismiss. Plaintiff moves to strike exhibits C, D, F, G, K, and N because these exhibits are not mentioned in plaintiff's Complaint, are not subject to judicial notice, and questions exist about the exhibits' authenticity and/or admissibility. n2 Exhibits F, G and N are transcripts of conference calls. The conference calls are mentioned in the Complaint, but the transcripts are not. Exhibits C and K are a press release and scientific study not mentioned in the Complaint. Exhibit D is a press release mentioned in the Complaint.

n2 In the alternative, plaintiff asks for a continuance to conduct discovery related to facts surrounding these exhibits. The court denies this motion.

### A. Exhibits F, G, and N

Plaintiff argues that exhibits F, G and N cannot be considered on this motion because the transcripts are not subject to judicial notice and are not cited anywhere in the Complaint. [*7] Moreover, plaintiff asserts that accuracy issues exist regarding the transcripts, as it is unknown who transcribed the conference calls, what medium they were transcribed from and the source of the conference call recording. Plaintiff admits that it references the conference calls themselves in the Complaint, but argues that the transcripts of the conferences calls are not cited or referenced. Defendants argue that reference to the conference calls in the Complaint is sufficient and the court may consider the transcripts on this motion to dismiss.

In *Cooper v. Pickett, 137 F.3d 616 (9th Cir. 1998),* the court considered whether conference call transcripts

could be considered on a motion to dismiss. The court concluded,

> In the complaint, plaintiffs make allegations about the conference calls, but do not expressly mention or refer to the transcripts, or even identify their existence. In fact, the transcripts themselves apparently did not exist at the time plaintiffs filed their complaint; they first appeared as exhibits to [defendants] motion to dismiss, and they are accompanied by a declaration describing their transcription from tapes. Further, plaintiffs [*8] disputed the authenticity and accuracy of the transcripts in the district court, and objected to their use; they repeat those objections here. The transcripts therefore cannot be considered in ruling on the motion to dismiss.

*Id.* at 623; *see also, In re Scholastic Sec. Litig.*, 1998 U.S. Dist. LEXIS 13910, No. 97 Civ. 2447 (JFK), 1998 WL 560052, at *2 (S.D.N.Y. Sept. 1, 1998) ("The problem, however, is that the Complaint makes no reference to a transcript of this phone call or even identifies its existence."). The court agrees with the reasoning in *Cooper*, in that the [HN4] transcripts are not within the allegations of the Complaint and thus must be disregarded on a motion to dismiss.

Moreover, the [HN5] transcripts are not subject to judicial notice, as they are not "historical documents, documents contained in public record, [or] reports, decisions, and regulations of administrative bodies . . . ." *Abrams v. Van Kampen Funds, Inc.*, 2002 U.S. Dist. LEXIS 9814, No. 01 C 7538, 2002 WL 1160171, *2 (N.D. Ill. May 30, 2002). For these reasons, the court will not consider the transcripts when examining the motion to dismiss.

**B. Exhibits C, D, and K**

Exhibits C and K are both [*9] not explicitly mentioned in the Complaint, thus, the court will not consider either on the motion to dismiss. As for exhibit D, plaintiff argues that this October 30, 2001 abstract of LEP data for six patients with solid tumors entails authenticity issues, as the exhibit neither states when this study was presented in connection with a conference nor establishes that it was actually published on October 30, 2001. Defendants respond that the abstract is explicitly referred to in the Complaint. Because the abstract does appear to be explicitly referred to, the court will deny the motion to strike exhibit D.

**ALLEGATIONS OF THE COMPLAINT**

Plaintiff's Complaint alleges the following facts, which are taken as true for purposes of this motion: NeoPharm is a biopharmaceutical company engaged in the research, development, and commercialization of drugs for the treatment of various forms of cancer. Kapoor is NeoPharm's Chairman of the Board of Directors and the largest single shareholder, owning directly or indirectly more than 37% of NeoPharm's outstanding common stock. Hussey is NeoPharm's President, Chief Executive Officer, and Director. Ahmad is NeoPharm's Vice President of Research [*10] and Development and Chief Scientific Officer.

Prior to the start of the class period, NeoPharm publicly represented that LEP was a potentially revolutionary method of administering the anti-cancer drug paclitaxel. Paclitaxel is marketed by Bristol-Myers Squibb Company under the trade name "Taxol(R)" and is used to treat a number of cancers, including breast, ovarian and lung cancer. Despite paclitaxel's wide use and its antitumor characteristics, its effectiveness has been limited both by side effects, such as nausea, vomiting, hair loss and nerve and muscle pain, and by a long infusion time. Because of the chemical characteristics of paclitaxel, it cannot be introduced into the body unless it is first formulated in a toxic mixture of castor oil and ethanol, which requires premedication of the patient. LEP delivery consists of encapsulating paclitaxel in a liposome. n3 NeoPharm represented that LEP does not require administration with castor oil and ethanol, thus reducing the need for premedication. NeoPharm also publicly stated that because LEP is purportedly stable, it is easy to store, prepare and administer.

n3 Liposomes are "microscopic spheres composed of lipid (or fat) membranes." (Def. Mot to Dismiss, Ex. A. at 5.).

[*11]

On February 19, 1999, NeoPharm entered into a world wide collaborative relationship with Pharmacia to develop and commercialize two products, one of which was LEP (the "Pharmacia Agreement"). Under the Pharmacia Agreement, Pharmacia obtained exclusive rights to develop and market LEP throughout the world, and assumed responsibility for, and the costs associated with, the clinical development and regulatory filings for LEP.

LEP was NeoPharm's lead product in development and was the only NeoPharm compound to have entered Phase II clinical trials. The continuing success of LEP clinical trials was critical for NeoPharm because prior attempts by others to utilize a liposome as a drug deliv-

ery vehicle had failed, and many of NeoPharm's products in development were designed around this liposome encapsulation system.

## A. Alleged False and/or Misleading Statements Prior to the Class Period.

On November 14, 2000, in a press release disseminated through Business Wire, NeoPharm announced its financial results for the quarter ended September 30, 2000. Commenting on the results, Hussey stated: "We also made significant progress in both our pre-clinical and clinical programs and have [*12] begun to expand our infrastructure to support our [LEP] development. We plan on placing a number of compounds in our liposomal system in the coming months."

Also on November 14, 2000, NeoPharm filed a Form 10-Q with the Securities and Exchange Commission ("SEC") for the quarter ended September 30, 2000. In the Form 10-Q, NeoPharm represented that the LEP technology could potentially overcome limitations of paclitaxel and that the Phase I/II clinical trial had been completed, with some degree of success. The Form 10-Q also noted that Pharmacia was initiating large scale multi-center, multinational Phase II/III clinical trials.

On March 29, 2001, in a press release disseminated through Business Wire, NeoPharm announced its results for the quarter and year ended December 31, 2000. Commenting on the results, Hussey stated: "The year 2000 was a breakthrough year for NeoPharm . . . our partner, Pharmacia, initiated Phase II/III clinical trials for Liposome Encapsulated Paclitaxel ("LEP"), for which we received a $ 3 million milestone payment." On May 9, 2001, in a press release disseminated through Business Wire, NeoPharm "confirmed . . . that the clinical development program [*13] for LEP is continuing in key oncology indications."

Plaintiff alleges that these statements, all before the class period, were still alive at the start of the Class Period. Plaintiff maintains that defendants did not correct these "positive" statements even though by October 31, 2001, defendants knew that the statements had become false and misleading. Plaintiff alleges that these statements were no longer true because NeoPharm was aware that: (1) Pharmacia was not studying the same LEP formulation, so that its study results would not be applicable to NeoPharm's LEP approval; (2) during the phase II testing of LEP, Pharmacia had failed to reproduce the required test article (i.e., the original NeoPharm phase I formulation), thereby undermining the validity of all clinical testing under the development date; (3) NeoPharm's reportedly successful prior phase I clinical trials of LEP were inapplicable to the current form of LEP as they related to a different formulation of LEP and not to

the same LEP formulation being currently developed; (4) LEP as currently developed was not efficacious in reducing the size of tumors or halting growth; (5) NeoPharm had to scrap the current LEP formulation, [*14] which was not efficacious in reducing the size of tumors or halting their growth, in order to reformulate LEP in an effort to make it work properly; and (6) any reformulated LEP would need to undergo renewed Phase I clinical trials, such that the development status of LEP was now returned to preclinical levels and the prior proof of concept that LEP could pass phase I trials was no longer valid as to the current LEP.

## B. Alleged False and/or Misleading Statements from October 31, 2001 to December 19, 2001.

On October 31, 2001, defendants caused NeoPharm to issue a press release through Business Wire containing false and misleading statements regarding the purported success of LEP test results:

> NeoPharm today announced that clinical data for liposome encapsulated paclitaxel (LEP) were presented at the AACR-NCI-EORTC meeting in Miami, Florida on Tuesday. In the study, LEP is administered weekly for six weeks using an intravenous infusion . . . . LEP is being developed by Pharmacia Corporation under a licensing agreement with NeoPharm.

> "In the Pharmacia study involving weekly dosing of LEP, an extended terminal half-life was observed," said Imran Ahmad, Chief Scientific [*15] Officer of NeoPharm. "This is a significant improvement because more paclitaxel appears to [be] available to attack tumors over the six week administration schedule."

On December 19, 2001, UBS Warburg issued a report on NeoPharm after its analyst, Andrew Gitkin ("Gitkin"), had discussions with defendants, which was based on and repeated information defendants provided to Gitkin. This report initiated coverage of NeoPharm with a "Buy Rating," noting:

> Our Buy ratings is based upon strong expected sales [of NeoPharm's] lead product, liposomal encapsulated paclitaxel (LEP), for the treatment of breast and non-small cell lung cancer (NSCLS). We expect the company's collaborative partner, Pharmacia, to commence Phase II/III trials for LEP in early 2002.

Also on December 19, 2001, FAC/Equities initiated coverage of NeoPharm with a "Buy Rating" based on the information defendants provided, including their pre-Class Period positive statements regarding now-inapplicable test results for LEP:

> Neo-Pharm's most advanced product is liposome-encapsulated paclitaxel (LEP), a liposomal version of Taxol, a $ 1.6-billion anticancer drug. Pharmacia, the licensee, is testing LEP in [*16] Phase II studies. In Phase I/II, LEP showed anti-tumor activity, a prolonged half-life, but no peripheral neuropathy or muscle pain, and low rates of alopecia and nausea. By contrast, Taxol is associated with high rates of these side effects: neuropathy (60%), muscle pain (60%), alopecia (87%), and nausea and vomiting (52%). A pivotal Phase II/III trial in metastatic breast cancer is expected to start during the first half of 2002.

Plaintiff alleges that these statements were false or misleading because at the time these representations were made to the public, defendants knowingly or recklessly failed to disclose adverse material information which made these false and misleading representations. Plaintiff alleges that defendants failed to disclose that (1) Pharmacia's Phase II trials of LEP had failed to show any beneficial results as both NeoPharm and Pharmacia subsequently admitted at the end of the Class Period; (2) NeoPharm was well aware of the lack of success Pharmacia was having with LEP Phase II clinical trials, because those clinical trials had commenced at least by October 2000 and defendants were kept updated as to the results of those trials as required by the Pharmacia [*17] agreement; (3) defendants had repeatedly received quarterly reports from Pharmacia indicating that the Phase II clinical trials of LEP had been unsuccessful; (4) contrary to defendants' October 31, 2001 public statements that Pharmacia's test results showed LEP had an extended half-life that was a significant improvement because it meant more of the drug paclitaxel was available to attack tumors in patients, the test results had actually shown an alarmingly broad range for terminal half-life, from exceedingly low to extremely high values, actually representing a gross lack of uniformity in the amount of paclitaxel available to attack tumors in patients and, moreover, the wide range of terminal half-life data indicated that the LEP used in the study was unstable and needed reformulation; (5) the LEP test results which NeoPharm publicly referred to on October 31, 2001 indicated that ongoing LEP testing was contrary to FDA guidelines which stated that if the drug is either unstable or not reproducible, then the validity of any clinical testing would be undermined because one would not know what was really being used in patients, and, moreover, the studies could pose significant risks [*18] to participants; (6) the Phase II test results which defendants referred to on October 31, 2001 actually contradicted early Phase I studies of LEP, because the latter studies showed toxicity in patients at 90 and 120 dosage levels, where previous Phase I dose escalation studies reportedly showed no similar toxicities in patients below the 175 dosage level, which was a further indication that LEP as currently formulated and developed did not have the benefits defendants were ascribing to it, that LEP was failing the Phase II clinical trials, and that LEP was a substantially different formulation than that which had undergone prior Phase II testing, necessitating not only another reformulation in an effort to fix it, but also renewed Phase I trials of any reformulated materials; (7) because the current formulation of LEP was not efficacious in reducing the size of tumors or halting their growth, NeoPharm would need to scrap the current formulation and attempt to reformulate LEP in an effort to have it perform properly; (8) as with any new formulation of a potential new drug of which clinical efficacy is highly uncertain, the reformulated LEP would be required to undergo new Phase I dose [*19] escalation studies; and (9) NeoPharm would need to reinitiate Phase I clinical trials for any reformulated LEP, such that the current development status of LEP had returned to the earliest stage of clinical development and the prior proof of concept that LEP could pass Phase I trials was no longer applicable.

Plaintiff also alleges that while in possession of the above publicly undisclosed inside information, defendant Hussey took advantage of his insider position and sold shares of NeoPharm at artificially inflated prices. Plaintiff alleges that Hussey improperly exercised options at $ 4.75 per share on November 13, 2001, and sold 71,000 shares at prices between $ 14.25 and $ 14.84 per share on November 13 and 14, 2001, for proceeds of approximately $ 1,033,000.

## C. Alleged False and/or Misleading Statements From January 11, 2002 to February 11, 2002.

On January 11, 2002, after discussions with Neo-Pharm's senior management, stock analyst Gitkin of UBS Warburg issued an analyst report downgrading Neo-Pharm's stock from a buy to hold, explaining:

> We are downgrading [NeoPharm] to a Hold from a Buy based on increasing concern regarding the timeline for Phase III development [*20] for the company's lead product LEP.

* * *

Recall that the Phase III program was expected to commence in 4Q01. We believe that the perceived delay in initiating a Phase III trial introduces some degree of uncertainty as to Pharmacia's ability to move forward with the product rapidly. Discussion with senior management did not serve to allay these concerns.

As a result, we believe that a Hold rating is most appropriate to reflect our increased concern. At present we prefer to take a wait and see approach until we gain further clarity into Pharmacia's development plans for the LEP. While we continue to believe that this product has a good likelihood of reaching the market, we are concerned that a delay in its time to market could adversely impact its market potential.

Two business days later, on January 15, 2002, defendants caused NeoPharm to issue through *Business Wire* a materially false and misleading press release that concealed both the serious nature of the problems they were having with LEP and their deteriorating relationship with Pharmacia, while downplaying the potential delays in LEP Phase III trials:

NeoPharm, Inc. announced today that it met with senior [*21] officials of Pharmacia on Monday, January 13, 2002 regarding the LEP (Liposomal Encapsulated Paclitaxel) development program. Following that meeting, Pharmacia officials expressed the following points to NeoPharm officials regarding the licensing agreement with NeoPharm:

1) Pharmacia remains fully committed to the development of LEP.
2) Pharmacia is interested in exploring the possibility of licensing other products in the NeoPharm portfolio.

Pharmacia, under a licensing agreement with NeoPharm, currently has all responsibility for development of LEP. As a result, NeoPharm is unable to confirm the clinical development timetable for LEP at this time.

On February 11, 2002, Hussey spoke at a conference in New York, where he again represented that LEP had shown successful results during clinical trials, including a lack of toxicity in test subjects. Hussey also allegedly downplayed and concealed the true nature of the still publicly undisclosed problems delaying the start of LEP Phase III clinical trials, noting only that it could take 60 days to fix a change that Pharmacia had made in LEP and that NeoPharm was working on this issue.

Plaintiff alleges that these statements [*22] were false and misleading because they failed to disclose the true conditions regarding both the status of LEP development and the on-going dispute with Pharmacia over who was responsible for the failure of the LEP development project, including (1) defendants were concealing that Phase II testing of LEP had been a failure and had shown no medical benefits, which testing indicated that the then-current formulation of LEP was not a successful or useful medical product that could or would be brought to the market; (2) modifications made to LEP were such that new Phase I trials were necessary, thereby not only delaying the start of Phase III clinical trials but setting the entire project back to square one with additional and substantial risk and uncertainty that LEP would never be reformulated in a way that would pass Phase I trial, much less be able to proceed to Phase III trials; (3) before LEP could even begin the necessary new Phase I trials it needed to be substantially reformed for it to have a chance of being a successful medical compound, such that the then-current LEP was at least two generations removed from the LEP that had shown success in the prior Phase I trials, and defendants [*23] were essentially back to the drawing board in an effort to create an LEP product that could successfully complete even a Phase I trial; (4) NeoPharm's relationship with Pharmacia had deteriorated so that NeoPharm was evaluating whether to take legal action against Pharmacia in connection with their licensing agreement for the development of LEP; and (5) NeoPharm was in the process of taking LEP back from Pharmacia in an effort to reformulate the compound in a way that might make it efficacious, and, therefore, contrary to their public statements, defendants did not control the timeline for LEP development.

## D. Alleged False and/or Misleading Statements From March 18, 2002 to April 11, 2002.

On March 18, 2002, NeoPharm issued another press release reiterating that LEP was currently in development at Pharmacia, and that good results from Phase I testing of LEP were recently presented at an oncology meeting in Florida. Also on March 18, 2002, NeoPharm held an analysts teleconference where NeoPharm representatives reported to investors that they were working with Pharmacia to expand the number and type of drugs that Pharmacia was licensed to develop for NeoPharm.

2003 U.S. Dist. LEXIS 1862, *

On March 21, 2002, UBS [*24] Warburg issued an analyst report, based on information provided by the defendants, reflecting that the market was cautiously optimistic about the status of the LEP clinical trials based upon both what NeoPharm was saying, as well as upon what it was not saying:

> Although there was no news in regards to the timing of Phase III trials for LEP, the company's lead product that is being developed by Pharmacia, we continue [to] expect to gain further clarity on this issue by mid-2002. Such clarity could be a potential catalyst for the stock as it would provide insight as to when the product could be commercialized.

Moreover, on April 11, 2002, NeoPharm filed its Form 10-K for the year ending December 31, 2001 with the SEC, which was signed by defendants Kapoor and Hussey on April 10, 2002, and which contained materially false and misleading statements regarding the purported success of clinical testing of LEP.

Plaintiff alleges that these statements were false and/or misleading because defendants failed to disclose (1) that Pharmacia had changed the formulation of LEP in a manner not acceptable to NeoPharm; (2) that Phase I trials were inapplicable to the current LEP formulation; [*25] (3) that NeoPharm was considering pursuing legal action against Pharmacia over who was responsible for the failed LEP clinical trials; (4) and that defendants knew the reported results of prior preclinical trials had no applicability to LEP because of Pharmacia reformulation.

**E. Alleged False and/or Misleading Statements At the End of the Class Period**

On April 19, 2002, NeoPharm issued a press release acknowledging the nature of the problems NeoPharm was having with clinical trials of LEP, with the development of LEP and with Pharmacia's conduct in connection with LEP, such that NeoPharm was pursuing legal action against Pharmacia over these issues. Moreover, defendants also admitted that they had been aware of these problems for months.

On April 22, 2002, defendants held an analysts teleconference where they responded to questions regarding their prior surprise announcement that NeoPharm was arbitrating its dispute with Pharmacia over LEP development. During this teleconference, defendants acknowledged that LEP was defective, that it needed to be reformulated and that at least three months earlier NeoPharm had taken LEP back into its own laboratory in an effort to reformulate [*26] it. Hussey also admitted at this tele-

conference that the months-long effort to reformulate and fix LEP would also necessitate renewed preclinical trials of any new LEP compound.

On April 23, 2002, NeoPharm issued another press release in which it confirmed that the Phase II clinical trials of LEP were not successful and that LEP's failure to properly perform was the topic of months-long discussions with Pharmacia. This press release also acknowledged that as currently formulated, the defective LEP was substantially different from the LEP that had been licensed to Pharmacia, such that it was in need for significant reformulation.

Plaintiff alleges that these statements illustrate that defendants' prior public statements were false and misleading because defendants failed to disclose (1) that LEP had been substantially reformulated as a result of Pharmacia's development work so that it was no longer the same compound that had been licensed to Pharmacia or the same compound that had passed earlier Phase I clinical trials; (2) that clinical testing of the current LEP formulation showed no medical benefits; (3) that LEP would need further development and reformulation if it was ever to [*27] work properly; and (4) that any newly formulated LEP would require additional Phase I testing, thereby essentially returning the entire LEP development project back to square one.

**DISCUSSION**

Section 10(b) of the Securities Exchange Act of 1934 provides,

> [HN6] It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce or of the mails, or of any facility of any national securities exchange . . . to use or employ, in connection with the purchase or sale of any security . . . [,] any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the [Securities and Exchange] Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors.

[HN7] Pursuant to this section, the SEC promulgated Rule 10b-5, which makes it unlawful for any person

> (a) To employ any device, scheme, or artifice to defraud, (b) to make any untrue statement of a material fact or to omit to

2003 U.S. Dist. LEXIS 1862, *

state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading, or (c) to engage [*28] in any act, practice or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security.

*17 C.F.R. § 240.10b-5.*

[HN8] To establish liability under section 10(b) and Rule 10b-5, a plaintiff must prove that "(1) the defendant made a false statement or omission (2) of material fact (3) with scienter (4) in connection with the purchase or sale of securities (5) upon which the plaintiff justifiably relied (6) and that the false statement proximately caused the plaintiff's damages." *Caremark, Inc. v. Coram HealthCare Corp., 113 F.3d 645, 648 (7th Cir. 1997); Searls v. Glasser, 64 F.3d 1061, 1066-67 (1995).* In their motion to dismiss, defendants argue that (a) there is no duty to update statements made before the Class Period; (b) plaintiff has failed to properly plead the existence of a materially false statement or omission with respect to the statements made during the Class Period; (c) plaintiff has not pled particularized facts giving rise to a strong inference of scienter; (d) plaintiff has failed to properly plead each individual [*29] defendants' liability; and (e) plaintiff has failed to plead control person liability under § 20(a).

**A. Statements Prior to the Class Period**

Defendants maintain that any statements made before the Class Period are not actionable, as NeoPharm has no duty to update statements that had previously been made. *See In re Silicon Graphics, Inc. Sec. Litig., 970 F. Supp. 746, 759 (N.D. Calif. 1997)* [HN9] ("Only statements made after the alleged fraud began--that is, during the class period--are actionable."). [HN10] The Seventh Circuit has defined two types of duties in situations of this nature: the duty to correct a statement and the duty to update a statement. "The former applies when a company makes a historical statement that, at the time made, the company believed to be true, but as revealed by subsequently discovered information actually was not." *Anderson v. Abbott Labs., 140 F. Supp. 2d 894, 904 (N.D. Ill. 2001),* citing *Stransky v. Cummins Engine Co., 51 F.3d 1329, 1331 (7th Cir. 1995).* A duty to update arises when "a company makes a forward looking statement--a projection--that because of subsequent events becomes untrue. [*30] " *Id.,* citing *Stransky, 51 F.3d at 1332.* The Seventh Circuit recognizes the duty to correct, but has rejected the duty to update. *Stransky, 51 F.3d at*

*1331-32; see also, In re HealthCare Compare Corp. Sec. Litig., 75 F.3d 276, 282 (7th Cir. 1996); Anderson, 140 F. Supp. 2d at 904; Fry v. UAL Corp., 895 F. Supp. 1018, 1046 n.26 (N.D. Ill. 1995).*

NeoPharm's pre-Class Period statements fall into the duty to update category and are not actionable. Nothing subsequent to the pre-Class period statements illustrates that the statements were false when they were made. Instead, these statements are more closely aligned with forward-looking projections that, because of subsequent events, latter became untrue. Moreover, plaintiff, in the Complaint, alleges these pre-class statements "were no longer true" because of a series of events that happened during the class period. No allegation is made that these subsequent events rendered these statements untrue when made. As such, NeoPharm had no duty to correct these statements and claims based on these statements are dismissed.

**B. False Statements or Omissions [*31] of Material Fact**

Defendants argue that plaintiff has failed to properly plead the existence of materially false statements necessary for a suit under Section 10(b) or Rule 10b-5. [HN11] A material misrepresentation is found where a defendant "either made a false statement of material fact or failed to make a statement of material fact thereby rendering the statements which were in fact made misleading." *Searls, 64 F.3d at 1065.* A statement is material if it would be viewed by "a reasonable investor as significantly altering the total mix of available information." *In re Newell Rubbermaid Inc. Sec. Litig., 2000 U.S. Dist. LEXIS 15190, No. 99 C 6853, 2000 WL 1705279, at *14 (N.D. Ill. Oct. 4, 2000),* citing *Basic Inc. v. Levinson, 485 U.S. 224, 231-32, 99 L. Ed. 2d 194, 108 S. Ct. 978 (1988)* and *Parnes v. Gateway 2000, Inc., 122 F.3d 539, 546 (8th Cir. 1998).* Furthermore, the heightened pleading standard imposed under the PSLRA requires that a plaintiff "specify" the reasons a defendant's statement is false. *15 U.S.C. § 78u-4(b)(1)(B).*

Defendants point to nine separate sets of statements as not adequately pled as false [*32] and misleading: (1) October 31 Press Release; (2) FAC Equities analyst report; (3) WBS Warburg Report; (4) January 11, 2002 analyst report (5) January 15, 2002 press release; (6) February 11, 2002 investor conference; (7) March 18 press release; (8) March 21 analyst report and (9) Forum 10-K (Fiscal Year 2001). The court will break these statements into two categories: those taking place before January 15, 2002 and those after that date.

*1. Pre-January 15, 2002 statements*

Prior to January 15, plaintiff attributes three separate statements to one or more defendants: (1) the October 31 press release; (2) the December 21, 2001 WBS Warburg report; (3) the December 19, 2001 FAC/Equities report. Defendants argue that plaintiff has not adequately pled why each of these statements is false as they are required under the PSLRA. Plaintiff responds that the allegations are not that these statements are untrue, but they are materially misleading. Specifically, plaintiff alleges that defendants had knowledge when all of the above statements were made that LEP had failed to show clinical benefits in recent testing and would need to be reformulated, that changes had been made to LEP which [*33] rendered any prior clinical test results inapplicable and necessitated renewed pre-clinical testing, and that defendants were embroiled in dispute with Pharmacia regarding the development of LEP.

While [HN12] "mere silence about even material information is not fraudulent absent a duty to speak," *Stransky, 51 F.3d at 1331,* plaintiff alleges that defendants' silence about the Phase II trials violated a duty to disclose because defendants made public statements relating to the Phase I trials. Putting aside the issue of scienter for the moment, if NeoPharm had knowledge that the Phase II trials were failing to such a great degree that the Phase I results would be affected, and that they were, for practical matters, back to the drawing board with respect to LEP development, then the pre-January 12 statements may very well have been misleading to investors. *E.g., In re Westell Techs., Inc., Sec. Litig., 2001 U.S. Dist. LEXIS 17867,* No. 00 C 6735, *2001 WL 1313785,* at *8 (N.D. Ill. Oct. 26, 2001) (concluding that [HN13] if defendants knew that sales to a top buyer were [*34] to drop precipitously, it was reasonable to infer that the optimism of the defendant with respect to statements made regarding that buyer were misleading).

[HN14] "The disclosure required by the securities law is measured not by literal truth, but by the ability of the material to accurately inform rather than mislead prospective buyers." *Lindelow v. Hill, 2001 U.S. Dist. LEXIS 10301,* No. 00 C 3727, *2001 WL 830956,* at *3 (N.D. Ill. July 20, 2001). While the statements defendants' made may technically have been correct, if the allegations plaintiff makes are true--that defendants were aware of the problems with LEP when these statements were made--a reasonable jury could find them misleading.

With respect to the October 31 statement, defendants argue that this statement is technically correct, insofar as it refers to Phase I studies which actually did have the results listed. As mentioned above, however, while this statement may have been technically correct, plaintiff argues that it is misleading because defendants had knowledge that the Phase II tests were a failure at this

point. If defendants knew that the Phase II tests had failed when they were touting the performance of the Phase I tests, a finder of fact could find the statements materially false.

Defendants, however, contend that plaintiff has not sufficiently pled [*35] that defendants had knowledge of the Phase II trials when the October 31 statement was made. The courts disagree, as plaintiff has sufficiently pled enough facts illustrating strong circumstantial evidence that defendants knew the results of the Phase II trials at the beginning of the Class Period. The Complaint alleges that the Phase II testing had been underway since at least November 2000. Moreover, throughout the year of Phase II testing that occurred before the Class Period, Pharmacia was required to keep NeoPharm updated with "sufficient information so as to allow NeoPharm to be adequately informed as to the strategic development" of LEP. Additionally, this information as to whether NeoPharm was aware of the Phase II test results at the beginning of the Class Period was likely only in the control of the defendants, and plaintiff has pled sufficient facts to illustrate an inference that defendants were aware. *In re Newell Rubbermaid, 2000 WL 1705279,* at *14 [HN15] ("It is well established in this Circuit that a party may be excused from Rule 9(b)'s requirement of pleading with particularity if the information that he is required to plead rests exclusively within the [*36] defendants' control or is otherwise unavailable to him."). As such, plaintiff has properly pled that the October 31 press release was misleading.

While the same general analysis would apply to the December 19 Warburg report and FAC/Equities report, the court sees other problems that defendants have appropriately raised with these reports. [HN16] Since these reports are analyst reports, plaintiff must plead specific facts demonstrating that defendants "adopted the statements or were entangled with them," *e.g., In re Cypress Semiconductor Sec. Litig., 891 F. Supp. 1369, 1377 (N.D. Cal. 1995), Westell, 2001 U.S. Dist. LEXIS 17867, 2001 WL 1313785,* at *2, *4 (reports both acknowledged discussion with "the Company's management" or discussions with "Westell's management"), or "have put their imprimatur, express or implied, on the projections." *In re Syntex Corp. Sec. Litig., 95 F.3d 922, 934 (9th Cir. 1996).* An examination of the statements provides no insight as to how the defendants were involved, entangled or otherwise placed their imprimatur on these statements. The only allegations in the Complaint are that these reports were based on information that defendant had provided [*37] to both Gitkin, who authored the UBS Warburg report, and FAC/Equities. These conclusional allegations that defendants provided the information, with no further facts, are insufficient under the heightened pleading standard. Instead, plaintiff needs

2003 U.S. Dist. LEXIS 1862, *

facts illustrating that defendants provided the basis for the information. *Cf. Westell, 2001 U.S. Dist. LEXIS 17867, 2001 WL 1313785*, at *2 (stock analyst expressly noted that after conversations with "the Company's Management," he had learned about a new supply order). As such, the court concludes that any claims based on these analyst reports prior to January 12 should be dismissed without prejudice.

### 2. Post-January 11, 2002 statements

Plaintiff attributes six statements to defendants on or after January 11, 2002: (1) a January 11, 2002 analyst report; (2) a January 15 NeoPharm press release; (3) statements made at a February 11, 2002 investor conference; (4) a March 18 press release; (5) a March 21 analyst report; and (6) a Forum 10-K filed with the SEC for the year ending December 21, 2001. Defendants attempt to persuade the court that these statements should be treated differently based on this court's opinion in *Westell, 2001 U.S. Dist. LEXIS 17867, 2001 WL 1313785*. [*38] Defendants argue that on January 11, investors were warned that a potential delay in Phase III clinical trials of LEP possibly could exist, as a report issued by UBS Warburg stated that NeoPharm was downgraded from a buy to a hold because of "increasing concern regarding the timeline for Phase III development for the company's lead product LEP."

Moreover, defendants point out that on February 11, 2002, Hussey spoke at a conference where he stated:

> We're meeting hopefully shortly with Pharmacia to talk about the new timing. We are assisting them. They had made a change in the product which they had felt was not a big deal. It ended up being for them a big deal. They have brought us in now to fix it. We're hopeful we'll be able to fix that in a rapid fashion and I think in the next 60 days we'll have a better idea of timing.

The basis for defendants' argument is that a reasonable investor who relied before January 12 on defendants' representations concerning LEP should have understood that the January 12 and February 11 disclosures were ominous news. *See Westell, 2001 U.S. Dist. LEXIS 17867, 2001 WL 1313785*, at *8; *see also, Zoghlin v. Renaissance WorldWide, Inc., 1999 U.S. Dist. LEXIS 20815*, No. 99 C 1965, [*39] *1999 WL 1004624*, at *8 (N.D. Ill. Nov. 4, 1999) [HN17] ("Sophisticated investors, such as [plaintiff], are expected to 'understand the limits of a projection.' In short, *'caveat emptor'* applies equally, if not more, in the securities market." [citation omitted.]). Plaintiff, however, alleges that despite any

disclosures, defendants fraudulently downplayed the significance of the LEP delay by not disclosing the serious extent and nature of the problems plaguing LEP. The court agrees with plaintiff, as the facts here are distinguishable from *Westell*. In *Westell*, the defendants disclosed the ominous news but attempted to downplay its significance in the form of comfort statements assuring investors. This court concluded that "comfort statements made in reaction to acknowledged problems are cold comfort which a reasonable investor would assess skeptically." *Westell, 2001 U.S. Dist. LEXIS 17867, 2001 WL 1313785*, at *8. Moreover, in *Westell*, the problems defendants were having were "public knowledge and, therefore, part of the total mix of information available to the investor who wished to assess the effect on Westell." *Id.* The same cannot be said here, as plaintiffs allege [*40] that the full extent of the problems with LEP was known by defendants but were not public knowledge and the failure to disclose the news regarding Phase II testing when discussing LEP was materially misleading. The court agrees, as a reasonable trier of fact could find that the news defendants allegedly withheld was misleading and that the extent of the public knowledge at the time was not sufficient to give a reasonable investor notice of the problems with any testing. For these reasons, the court rejects defendants' argument that claims based on these post-January 11 statements should be dismissed because of any publicly available information.

Having found generally that the allegations concerning the statements after January 11 are sufficient based on what information was publicly disclosed, the court next considers whether these statements are adequately pled as false or misleading. Using the same general analysis applied above, it concludes that the post-January 11 statements are adequately pled because plaintiff alleges in press releases and investor conferences NeoPharm did not fully inform investors as to the problems in its LEP formulation. Although NeoPharm did make statements [*41] saying that any timetable was delayed, plaintiff alleges that more was known and was not told. As with the pre-January 11 statements, if defendants were aware of the problems with LEP and failed to disclose them when discussing LEP, a reasonable trier of fact may find that the statements were misleading. n4 As such, the statements after January 11 are properly pled as misleading and will not be dismissed on this motion.

n4 The January 11 Warburg report is an analyst report, but contrary to the flaw the court found in the analyst reports prior to January 11, this analyst report specifically mentions discussions with senior management. Moreover, the court concludes that a reasonable trier of fact could find it sufficiently misleading as the report

2003 U.S. Dist. LEXIS 1862, *

states uncertainty as to the Phase III development, which concerns were not allayed by discussions with NeoPharm's senior management. If NeoPharm had knowledge of the problems with the development of LEP development but did not come forth with such information, the statement may be found to be false or misleading. With respect to the March 21 analyst report, it gives no basis for how defendants were entangled with the statements. It is, therefore, dismissed without prejudice.

[*42]

## C. Scienter

[HN18] "Scienter 'may be established either (a) by alleging facts to show that defendants had both motive and opportunity to commit fraud, or (b) by alleging facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness." *Westell, 2001 U.S. Dist. LEXIS 17867, 2001 WL 1313785,* at *10, quoting *Rehm v. Eagle Fin. Corp., 954 F. Supp. 1246, 1253 (N.D. Ill. 1997),* citing *Shields v. Citytrust Bancorp, Inc., 25 F.3d 1124, 1128 (2d Cir. 1994).* "Reckless conduct is, at the least, conduct which is highly unreasonable and which represents an extreme departure from the standards of ordinary care . . . to the extent that the danger was either known to the defendant or so obvious that the defendant must have been aware of it." *Rehm, 954 F. Supp. at 1255,* citing *Rolf v. Blyth, Eastman Dillon & Co., 570 F.2d 38, 47 (2d Cir. 1978).*

Plaintiff relies on part (b) of the above scienter test, arguing that the allegations "clearly demonstrate that defendants made their false statements while in possession of non-public information that directly contradicted their statements, thereby showing [*43] they knew, or were grossly reckless in not knowing, that their public statements were false and misleading at the time they were made." (Pl. Resp. at 3-4.) *See, e.g., Aldridge v. A.T. Cross Corp., 284 F.3d 72, 83 (1st Cir. 2002)* ("However, [HN19] the fact that the defendants published statements when they knew facts suggesting the statements were inaccurate or misleadingly incomplete is classic evidence of scienter."); *Florida State Bd. of Admin. v. Green Tree Fin. Corp., 270 F.3d 645, 665 (8th Cir. 2001); Novak v. Kasaks, 216 F.3d 300, 308 (2d Cir. 2000).*

Defendants, not disputing that knowingly publishing inaccurate or misleading statements may suffice for scienter, instead argue that the plaintiff has not pled particularized facts demonstrating that defendants knew and concealed the results of Pharmacia's Phase II trials. According to defendants, plaintiff does not allege when Pharmacia completed any Phase II studies or specify

when Pharmacia informed NeoPharm about the status, completion or analysis of any Phase II studies. As mentioned above, however, the court believes that plaintiff has sufficiently pled facts illustrating [*44] strong circumstantial evidence that defendants knew the results of the Phase II testing at the beginning of the Class Period. As such, the court concludes that plaintiff has pled enough to show scienter for purposes of this motion.

## D. Individual Defendants' Liability

Plaintiff contends that all the individual defendants' are liable for the false public statements alleged in the Complaint under the group pleading doctrine. [HN20] The group pleading doctrine allows plaintiffs "to rely on the presumption that certain statements of a company, such as financial reports, prospectuses, registration statements, and press releases, are the collective work of those high-level individuals with direct involvement in the everyday business of the company." *Sutton v. Bernard, 2001 U.S. Dist. LEXIS 11610, No. 00 C 6676, 2001 WL 897593,* at *5 n.5 (N.D. Ill. Aug. 9, 2001). Without question NeoPharm issued press releases and financial reports during the Class Period. The issue, however, is whether the group pleading doctrine has survived the PSLRA. The Seventh Circuit has yet to rule on this issue and the courts in this district have been split. *Compare Danis v. USN Communications, Inc., 73 F. Supp. 2d 923, 936-39 (N.D. Ill. 1999)* [*45] with *Chu v. Sabratek Corp., 100 F. Supp. 2d 827, 835-37 (N.D. Ill. 2000).*

In *Westell,* this court sided with Judge Shadur's opinion in *Dardick v. Zimmerman, 149 F. Supp. 2d 986, 987 (N.D. Ill. 2001),* where the court found [HN21] the "proper course" is to examine each individual's liability based on each "defendant's own conduct (or, where applicable, on respondeat superior principles)." *Id.* Plaintiff alleges that all of the defendants had knowledge of the failures of the LEP development and what was to be published in the press releases and public reports. Furthermore, plaintiff alleges that defendants participated in a continuous course of conduct to misrepresent the results of NeoPharm's operations. The court believes this sufficient pleading as to each defendants' liability. It alleges that each defendant was aware of the information, had the opportunity to prevent the issuance of such information but did not so, and that NeoPharm's operations contained materially false information. As such, each defendants individual liability is sufficiently pled. n5

n5 Defendants also argue that the only "group published" document was the Form 10-K filed in April 2002, which Ahmad did not sign. This ignores, however, the press releases from October 31 (which, while containing statements

from Huffey, was a press release by NeoPharm), January 15 and March 18. Moreover, defendants argue that because Kapoor was an outside director, plaintiff is required to allege that the director participated in the day-to-day corporate activities or had a special relationship with the corporation. *In re GlenFed, Inc. Sec. Litig., 60 F.3d 591, 593 (9th Cir. 1995); Polar Int'l Brokerage Corp. v. Reeve, 108 F. Supp. 2d 225, 237-38 (S.D.N.Y. 2000)* [HN22] ("the group pleading doctrine is extremely limited in scope. Courts in the Second Circuit and elsewhere have construed the doctrine as applying only to clearly cognizable corporate insiders with active daily roles in the relevant companies or transactions."); *In re The Baan Co. Sec. Litig., 103 F. Supp. 2d 1, 18 (D. D.C. 2000)* ("An outside director is not necessarily involved in the day-to-day business of running a company."). Plaintiff's Complaint does not allege facts showing that Kapoor participated in the day-to-day activities or otherwise involved himself with the publishing of the group documents. Thus, the court will dismiss the claims against Kapoor without prejudice.

[*46]

### E. Control Person Liability Under Section 20(a)

Section 20(a) of the Securities Exchange Act of 1934 states:

[HN23] Every person who, directly or indirectly, controls any person liable under any provision of this chapter or of any rule or regulation thereunder shall also be liable jointly and severally with and to the same extent as such controlled person is liable, unless the controlling person acted in good faith and did not directly or indirectly induce the act or acts constituting the violation or cause of action.

*15 U.S.C. § 78t(a).*

Section 20(a) [HN24] control person liability attaches if a defendant "exercised control over the operations of the person in general and . . . possessed the power or ability to control the specific transaction or activity upon which the primary violation was predicated, whether or not that power was exercised." *Harrison v. Dean Witter Reynolds, Inc., 974 F.2d 873, 881 (7th Cir. 1992); see also, Lindelow, 2001 U.S. Dist. LEXIS 10301, 2001 WL 830956,* at *9 (holding that individual defendants were subject to "control person" liability because "of their status as top-ranking officials whose high level positions [*47] necessarily involve general oversight and direction."). Defendants only argue that § 20(a) liability is inappropriate because plaintiff has failed to adequately plead the underlying § 10(b) claims. Since the court finds the underlying § 10(b) claims adequately pled, the court does not agree that the § 20(a) claims should also be dismissed.

### CONCLUSION

For the reasons stated above, defendants' motion to dismiss is granted in part and denied in part [# 35]. Claims based on the pre-class statements are dismissed with prejudice. Those based on the analyst reports published prior to January 12 and the March 21 analyst report are dismissed without prejudice. Kapoor is dismissed from the action without prejudice. All other claims remain. Plaintiff's motion to strike is granted and denied in part as stated above [# 39]. A status hearing is set for February 18, 2003. In the meantime, the parties are directed to meet in a sincere effort to resolve this case and, if that is not possible, present a proposed scheduling order.

ENTER:

JOAN HUMPHREY LEFKOW

United States District Judge

Dated: February 7, 2003